UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
RIDGE CORPORATION,                    )
                                      )
   PLAINTIFF,                         )      CASE NO. 2:23-cv-3012
                                      )
          vs.                         )
                                      )
KIRK NATIONAL LEASE CO., et al.,      )
                                      )
   DEFENDANTS.                        )
_____)
```

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME I OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 3, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
    Bailey Cavalieri LLC
    By:  Christopher W. Tackett, Esq.
         John P. Miller, Esq.
         Graycen M. Wood, Esq.
    10 West Broad Street, Suite 2100
    Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
    FGKS Law
    By:  Joshua A. Koltak, Esq.
    100 South Main Avenue, Suite 300
    Sidney, Ohio  45365

    Faruki PLL
    By:  Donald E. Burton, Esq.
    110 North Main Street, Suite 1600
    Dayton, Ohio  45402

    Faruki PLL
    By:  Melissa L. Watt, Esq.
    201 East Fifth Street, Suite 1420
    Cincinnati, Ohio  45202

APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215

                         - - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

VOL. I –    3

TUESDAY MORNING SESSION

OCTOBER 3, 2023

– – –

(The following proceeding was held in chambers with all counsel present.)

THE COURT:  Good morning.  I just wanted to have a brief conference to set the rules of engagement.  I know that this is a preliminary injunction hearing, but I run my preliminary injunction hearings like I run my trials.  And for those of you who have tried cases before me, it's very basic. I expect everybody to follow the rules.

I may be considered idiosyncratic these days because I insist on lawyers on direct examination asking nonleading questions.  I absolutely deplore them almost as much as I detest them because it clouds the record.

Now, you get a chance to testify as lawyers on cross-examination and I fully expect you to do that, but not on direct examination.  For some of you more seasoned veterans, I expect you to show the young lawyers in the group and my law clerks how a case should be tried by asking proper questions. That does not apply, however, to, let's say, 803(6) exhibits where you're going to lay a foundation and you can ask the witness, for example, was this document created and maintained in the regular and ordinary course of business which is contra from the question, this document was created in the regular and

VOL. I -    4

1   ordinary course of business, wasn't it?  I don't expect the

2   latter.  I expect the former.

3        Otherwise, you received my rulings on the motions in

4   limine, and I want to make sure that we stick to the four

5   prongs that you're trying to prove, Mr. Tackett, and the

6   defense is trying to disprove, or at least trying to point out

7   how you have failed to sustain your burden.  But I really just

8   wanted to make sure that you understood that this is to be

9   conducted like a trial.  I expect the lawyers to ask nonleading

10  questions on direct.  And that's about it.

11        I will occasionally ask questions of the witnesses.  And

12  I may -- well, I don't anticipate asking any questions of the

13  lawyers, but I do want to know whether you wish -- either side

14  wishes to do a brief opening and/or brief closing, or whether

15  you would rather do post-hearing briefs, although I think that

16  the case has been comprehensively briefed at this point anyway.

17  I leave it up to counsel.

18        MR. TACKETT:  Your Honor, we would like to do a brief

19  opening if the Court would permit.  As far as closing, I think

20  short, contemporaneous post-hearing briefs would be the best

21  way to do it in this case.  But I'll defer to the Court.

22        THE COURT:  You have requested this extraordinary

23  relief, extraordinary in the legal sense.

24        MR. TACKETT:  Understood.

25        THE COURT:  And, you know, post-hearing briefs will

VOL. I –     5

1   elongate the process.  But if that's what counsel wishes to

2   do –– because first Ms. Evans has to get your transcript, then

3   I would require simultaneous opening briefs, simultaneous

4   replies.  So we'll have a business week.

5        What is your preference?

6        MR. CLIFFORD:  We would agree with opening statement

7   and we would agree with an expedited briefing schedule for

8   closing.

9        THE COURT:  We'll set it as soon as we're done because

10  then once we're done taking all the evidence, Ms. Evans will

11  have a better sense of how long it will take her to prepare the

12  transcript.

13       I have –– and I apologize for this.  We have a hard stop

14  at two because I have a doctor's appointment at 2:30 that I

15  couldn't move.  It's been on the books for a while.  Since

16  nobody in this room is 69, you don't understand it.  Doctors'

17  appointments, they're almost as routine as a visit to the gym.

18       MR. DILLARD:  Looking forward to it.

19       THE COURT:  All right.  Are there any questions from

20  the plaintiff?

21       MR. TACKETT:  No, Your Honor.

22       THE COURT:  Any questions from the defense?

23       MR. CLIFFORD:  Your Honor, you said you're going to

24  deal with the motions in limine?

25       THE COURT:  These were the motions in limine for the

VOL. I - 6

1    expert witnesses?

2              MR. CLIFFORD:  Correct.

3              THE COURT:  I'm going to allow the expert witnesses to

4    testify because it goes to -- I think that those questions go

5    to weight and not to admissibility.  And at a -- now, the

6    rulings might be different if we were before a jury because

7    nobody is claiming that it's really junk science.  It's either

8    that we don't need anybody to testify as to this or they're

9    usurping the function of the jury.  As a trial judge, I don't

10   think that either side has that to worry about.

11             Now, should this case go to trial, you may be able to

12   renew those objections because this gives me a bird's-eye view

13   a preliminary glimpse, at what the expert testimony will be.  I

14   think both experts meet -- maybe barely, but they meet the

15   requirements of 702.  So we'll go with it.

16             MR. BURTON:  Don Burton counsel for KNL defendants.

17   We also wanted a brief opening, but I think we've worked out

18   with my codefendant Altum that rather going in caption order,

19   Altum will do an opening and we'll do an opening.  And,

20   generally, as the case proceeds, Altum will examine witnesses

21   and --

22             THE COURT:  Thank you for that.  That will be fine.

23        Anything else?

24             MR. CLIFFORD:  Not from us, Your Honor.

25             MR. TACKETT:  Nothing from plaintiff, Your Honor.

VOL. I -    7

1   Thank you.

2          THE COURT:  Thank you very much, everyone.  And we'll

3   be ready in a couple of minutes.  I'll just robe and come on

4   out.

5      (End of chambers discussion.)

6      (The following proceeding was held in open court.)

7          THE COURT:  Good morning.

8        Ms. Stash, would you please call the case.

9          THE DEPUTY CLERK:  Case No. 2:23-CV-3012, Ridge

10  Corporation versus Kirk National Lease Co, et al.

11         THE COURT:  Would counsel please identify themselves

12  for the record beginning with counsel for the government.  When

13  you identify yourself, if you have a client representative

14  seated with you at counsel table, please identify him or her.

15         MR. TACKETT:  Good morning.  Christopher Tackett, not

16  here on behalf of the government, here on behalf of Ridge

17  Corporation.  I wanted to make that clear on the record.

18      We have counsel representatives in the courtroom.  They

19  are not sitting at counsel table.

20         MS. WOOD:  Graycen Wood on behalf of Plaintiff Ridge

21  Corporation.

22         MR. MILLER:  Good morning.  John Miller on behalf of

23  plaintiff Ridge Corporation.

24         THE COURT:  Counsel for the defense.

25         MR. BURTON:  For what we call the Kirk National Lease

VOL. I -    8

1   and Truck and Trailer Part Solutions, Don Burton on behalf of

2   those defendants.  And this is client representative Jeff

3   Phlipot, P-H-L-I-P-O-T.

4          MS. WATT:  Melissa Watt also on behalf of the KNL

5   defendants.

6          MR. KOLTAK:  Your Honor, we ran out of room.  Josh

7   Koltak also for defendant Kirk National Lease and TTPS.

8          MR. CLIFFORD:  Damion Clifford and Mike Dillard on

9   behalf of Altum LLC.  I have with me Dominic Grandominico for

10  the corporate rep for Altum, LLC.

11         THE COURT:  Mr. Tackett, are you ready to proceed with

12  your opening statement?

13         MR. TACKETT:  Yes, Your Honor.  And I will be brief.

14  I know the Court is up to speed on this matter, but a few

15  remarks to -- I'm sorry, the lectern, of course.

16         THE COURT:  Okay.  And we've previously discussed, for

17  all counsel, for you -- I think, Mr. Clifford, you're giving

18  opening on behalf of Altum; is that correct?

19         MR. CLIFFORD:  That is correct, Your Honor.

20         THE COURT:  And Mr. Dillard.

21         MR. BURTON:  Mr. Burton on behalf of the defendants.

22         THE COURT:  Mr. Burton, in addition to reviewing

23  whatever facts you're going to review in your opening

24  statements, I ask counsel to still adhere to the Court's

25  earlier admonishment to fit everything within the four criteria

1  so that I'll know what to look for within each of the four

2  preliminary injunction criteria as you go forward.

3       MR. TACKETT:  Yes, Your Honor, understood.

4       So Plaintiff Ridge Corporation came to the Court with an

5  emergency complaint and a motion for a temporary restraining

6  order because there was a textbook case of unfair competition

7  occurring.  The unfair competition is pretty straightforward.

8  There is a patent here.  In the complaint we identify the

9  patent.  That's Plaintiff's Exhibit 1.  It's called the Cold

10  Chain patent throughout the case.  It's a patent for a single

11  panel roll-up door that goes on the back of a commercial truck

12  vehicle.

13       Plaintiff goes step-by-step in Exhibit P16 explaining

14  how the accused product infringes the Cold Chain patent.  That

15  claim chart was prepared by Richard A. Sharpe, a former patent

16  examiner and a longtime patent attorney.  Mr. Sharpe can walk

17  through claim by claim why the accused product infringes.  It's

18  very simple.

19       There's going to be a lot of other noise in the case.

20  There's prior relationships between Ridge Corporation and Kirk

21  National Lease, but we really don't need to look at all of that

22  for purposes of analyzing the main claim.  There is a patent.

23  It's being infringed.  We can establish that claim, and that in

24  itself is showing the irreparable harm that's here.

25       A competitor in the exact same space is going to market

VOL. I -   10

1   with an infringing product.  They're tainting the marketplace.

2   As we've shown at the temporary restraining order, they're not

3   doing so silently.  They are directly going out to prospective

4   customers.  On their website they said we have a patented

5   single panel roll-up door.  They filed an application in '22.

6   It's called the '144 application throughout the nomenclature of

7   the case.  They don't have a granted patent.  That in itself is

8   a statutory violation.  It's called false marketing.

9        What we've discovered in the expedited discovery in the

10  case is that advertisement was not an outlier.  There are

11  numerous emails that we've seen so far that show that the Kirk

12  National Lease and TTPS salesmen are going directly to major

13  prospective customers and they're saying we have a patented

14  single panel roll-up door, you should check it out, you should

15  buy this.

16       We'll see that in the case.  We'll see that as the

17  presentation goes forward.  This again shows irreparable harm.

18       We will also see that there was imminency when plaintiff

19  Ridge Corporation came to the Court.  There were

20  cease-and-desist letters that went out in June.  These went out

21  at the beginning of June.  Do you want to know what the record

22  will show for June?  It will show that Kirk National Lease sold

23  the most doors it had ever sold of the accused product.  It

24  will show that the codefendant Altum sold the most door panels

25  to go into the roll-up doors that it had ever sold to Kirk

VOL. I - 11

1    National Lease after it got a cease-and-desist letter.

2         The declaration that defendant Altum's principal put

3    into the record is Plaintiff's 40.  It's in the Court record as

4    docket item 30.  The declaration of Dominic Grandominico says

5    they were ramping up production to 25 panels per week with an

6    upward trajectory to 115 panels per week.  He makes this

7    assertion to say Altum is harmed, Your Honor, but what it shows

8    is they were ramping up, they were going full speed into the

9    market.

10        There is an exclusive supply agreement that Altum

11   offered to Kirk National Lease.  In the recitals, in the

12   requirements of that proposed agreement, it says Altum wants

13   Kirk National Lease to sell as many doors as possible.  So

14   Altum is providing a panel that goes into the infringing door,

15   Your Honor.  But they're not a silent player here.  They helped

16   design and they helped do the layout, and they also are urging

17   Kirk National Lease to sell as many doors as possible.  And

18   that, Your Honor, is exactly why there is irreparable harm

19   here.  They're going to the market and they're going full

20   speed.

21        Kirk National Lease and Altum have agreed that there is

22   a market for 275,000 of these units per year and they want to

23   get their first.  And they tried to.  And of great fortune,

24   this Court's TRO order stopped that.  And there's nothing

25   that's going to happen in these proceedings that will justify

VOL. I - 12

1    eliminating that injunction.

2         Nothing further, Your Honor.

3         THE COURT:  Thank you, Mr. Tackett.

4       Mr. Clifford.

5         MR. CLIFFORD:  Thank you, Your Honor.

6         You have that in front of you, Your Honor?

7         THE COURT:  Yes, I do.

8         MR. CLIFFORD:  So we're here because of the litigation

9    that's been filed by Ridge Corporation.  Plaintiff is Ridge.

10   Ridge has revenue of somewhere between 90 million and

11   110 million for this year.  They project to have revenue close

12   to 200 million next year.

13        MR. TACKETT:  Your Honor, I don't mean to interrupt.

14   We weren't tendered a copy of this.  That's in violation of the

15   Court's order.

16        I'll sit down.

17        At least 30 minutes before the presentation, we would be

18   required to receive a copy per the Court's order.

19        MR. CLIFFORD:  I did not provide a copy of my opening.

20   I gave them a copy of the items that we would use during the

21   production of documents.

22        THE COURT:  Typically in a trial, I would require

23   this.  But the prejudice in this hearing, if any, will be

24   slight.  So I'm going to allow you, Mr. Clifford, to continue.

25   I find no -- there will be no harm to them making this

VOL. I - 13

1  presentation because it's sort of a compilation of the defense

2  brief which I've already reviewed.  So you may continue.

3       Your objection is duly noted.

4       MR. TACKETT:  Thank you, Your Honor.

5       MR. CLIFFORD:  Critically, Your Honor, Ridge admits it

6  has never sold a roll-up door.

7       Let's look at the defendants.  Kirk National Lease,

8  Truck and Trailer Parts, and Altum.  Those are the defendants

9  that are sued in this matter.  Kirk National Lease, Truck and

10 Trailer Parts Solution, they have a relationship together.

11 Altum is simply a supplier.

12      In 2008, Kirk National Leasing, KNL, and TTPS is what

13 we'll call them, approaches Ridge and has a design for a

14 roll-up door.  They bring it to Ridge and say:  Can you provide

15 supplies to us to make this?  They have the idea.  Here is an

16 example.  I think we keep talking about what a roll-up door is,

17 Your Honor.  This is an example of what the door looks like in

18 the final phase.  It's the middle part.  It rolls up, single

19 panel.  Ridge is the supplier.  Ridge says that's great.  We

20 can provide you with panels to make your door.  They do.

21      Now, this is a picture of the panel that Altum makes.

22 But I have for you, Your Honor, just to show, this is the

23 example of kind of what a panel is.  I can bring this up to you

24 if you want to feel it, hold it.

25      THE COURT:  I get it.

VOL. I -   14

1          MR. CLIFFORD:  This is a panel.  This is what Altum

2     makes and this is what Ridge made.  It's stiff.  It doesn't

3     bend.  This is what it is.

4          THE COURT:  What is the material?

5          MR. CLIFFORD:  Say again, Your Honor.

6          THE COURT:  Let me feel it.

7          MR. CLIFFORD:  May I approach?

8          THE COURT:  Yes, please.  Thank you.

9          MR. CLIFFORD:  You're welcome, Your Honor.

10     We talk a lot about what the panels are.  This is a

11     little indication of what it is.  So the top layer is

12     polypropylene reinforced fiberglass.  The middle layer is PET

13     foam, structural foam, and the bottom layer again is PP

14     reinforced fiberglass.  What you see in this picture is looking

15     down on the top of the panel showing the top layer, the middle

16     layer of structural foam, and then the bottom layer again.

17          There is a problem.  They're very lightweight as you can

18     see, Your Honor, but they're very rigid and stiff.  They won't

19     bend.  This isn't going to go over a track of a door.  So this

20     is from Ridge.  What they do is they call -- they create relief

21     cuts so that the panel is able to traverse around the bend.

22          In 2022, KNL provides a patent application to the Patent

23     and Trademark Office for a single panel roll-up door.  Ridge at

24     that same time provides KNL with a draft exclusive supplier

25     agreement where Ridge will be the exclusive supplier of panels

VOL. I -   15

1   to KNL.  What happens, though, is there is a falling out.  KNL

2   says, no, you're not going to be our exclusive supplier of

3   panels.  And what really set this off which really is the cause

4   of this litigation, is KNL tells Ridge you're not an inventor

5   of this patent; we are.  We came to you with the idea.  We came

6   to you with the prototype, so to speak, of what the door will

7   look like.

8        Ridge says, you know what, if you're not going to list

9   us as an inventor, we're not going to give you any more

10  supplies.

11       You'll see this evidence precisely.  Here is an email

12  from Jeff Phlipot to Gary Grandominico in September 2022 where

13  Ridge says, let us buy your patent.

14       Mr. Phlipot says, no, not going to do it.  However, I

15  would still love for Ridge to be our supplier of panels for our

16  door.

17       Mr. Grandominico gets upset.

18       THE COURT:  Mr. Clifford, excuse me for interrupting.

19  But just so the record is clear, when Ridge asked in 2022 KNL

20  to buy the patent, you're talking about the '144 patent?

21       MR. CLIFFORD:  The patent application.  I apologize,

22  Your Honor.  I shouldn't have said patent.  I should have said

23  the patent application.  Yes, Ridge asked to buy KNL's patent

24  application that was submitted to the Patent and Trademark

25  Office.

VOL. I -   16

1          THE COURT:  And the way that would work is -- because

2     I just don't know.  The way that would work is that if KNL and

3     Ridge had agreed to what you say is Ridge's overture, then

4     Ridge would have moved into the place of KNL before the PTO.

5     Is that right?  They would have essentially taken the place of

6     KNL on the patent application.

7          MR. CLIFFORD:  Your Honor, I -- conceptually, I agree

8     with you but I am not a patent --

9          THE COURT:  That's not a statement.  I'm simply

10    asking.  Is that the way it would work?

11         MR. CLIFFORD:  I would defer to Mr. Burton on that

12    one.

13         THE COURT:  Mr. Burton can answer the question in his

14    opening.

15         MR. CLIFFORD:  I just don't know.  I think that would

16    be accurate, but I don't want to misrepresent.

17         THE COURT:  I don't know either.  I wanted the record

18    to be clear.  You are talking about Ridge requesting to

19    purchase KNL's patent application.

20         MR. CLIFFORD:  That's correct.

21         The record will show that KNL did not want to sell that

22    patent.  And Mr. Grandominico was upset about it.  He tells

23    Mr. Phlipot, you might want to have someone else build your

24    panels from now on.  And he says to them, I don't want to do

25    you any harm, but we will defend Ridge with vigor and by all

VOL. I -   17

1    means despite any costs.

2         It's a threat, Your Honor.

3         Mr. Phlipot says, look, I understand where you're coming

4    from but I brought to you this idea.  It was my idea that I

5    brought to Ridge.  You're a supplier.  You don't have any right

6    or ability to claim you're an inventor.  Setting all of that

7    aside, though, we should have a business relationship, and if

8    you will make our panels, we will still like to do business

9    with you.

10        Mr. Grandominico responds emphatically, no.

11        So KNL, TTPS has this idea for a door but it doesn't

12   have a supplier.  They go to various different individuals and

13   companies to try to find someone who can make them the panels

14   they need for their door.  Eventually, after I think three or

15   four or five different companies declined, they come to Altum.

16   And they come to Transglobal who provides the parts, so to

17   speak, the wheels for the door.  So Ridge goes and licenses the

18   Cold Chain patent.  And that license is in early 2023 and is

19   amended in May of 2023.

20        Why do they do that?  They're still upset about not

21   being an inventor.

22        So Mr. Grandominico sends an email to Mr. Phlipot in May

23   of '23 saying we have this license, we will allow you to have

24   access to this license from Cold Chain and we'll even give this

25   to you royalty free if you'll just come back with us and put us

VOL. I -   18

1   on the invention.  But if you don't, we're not going to pursue

2   legal remedies, we want a commercial solution.

3          It's still another threat.  They're upset about not

4   being listed as an inventor.

5          What Ridge does in the meantime, they approach Whiting

6   Door Company.  Whiting Door Company is the original

7   manufacturer of roll-up doors.  They have a 40 percent market

8   share of roll-up doors in the U.S.  That's not my words.  Those

9   are Ridge's words.  You'll see that in the evidence of Ridge

10  having a business plan that shows Whiting having a 40 percent

11  market share.  They are the leader in the door industry.

12         Let's talk about this in litigation.  We have claims for

13  direct infringement, patent inducement, contributory

14  infringement, tortious interference, and we have the false

15  marketing.  I'm going to take those elements and apply those to

16  the four claims we need for preliminary injunction.

17         The first is likelihood of success on the merits, second

18  is immediate irreparable harm, third is a balance of equities,

19  harm to third parties, and the last is public interest.  They

20  also must present clear and convincing evidence.  And a

21  preliminary injunction is supposed to maintain the status quo.

22  That's not what Ridge is asking for.  The status quo was panels

23  being made, doors being sold.  That's being stopped.  That's

24  not the status quo.  But that's what they're asking you for.

25         So let's look at Cold Chain.  Cold Chain comes up with

VOL. I -   19

1   an idea.  Well, typically in industry, roll-up doors are

2   hinged, horizontal, metal panels that are filled with

3   insulation.  They're heavy and they have a lot of different

4   parts in those hinges that break and require maintenance.  And

5   because you have all of these panels that are separated, they

6   leave heat to escape through the panel crevices when the door

7   goes up, when the door goes down.  Cold Chain was very

8   concerned about we need to keep the stuff that we have cold.

9   And because of these panels and because of these maintenance

10  costs and because of how heavy it is, they said we need to come

11  up with a new idea.

12         So they come up with an insulated overhead door.  That's

13  the patent application -- that is the patent that was granted.

14  That door has an high R value, meaning high insulation, keeps

15  stuff cold.  It's lighter and it reduces heat intrusion, and

16  it's a single panel so it looks good too.

17         There is a problem with Cold Chain's idea.  Rauenbusch.

18  Rauenbusch is a patent that was issued in 1999, and it is the

19  same thing.  What you have in front of you is a single panel

20  door that has an outer membrane, it has a filling and a lower

21  membrane.  And there are joints between -- as you see here

22  pointing at 17, Your Honor, and 14 on the display.

23         THE COURT:  Yes.

24         MR. CLIFFORD:  -- that allow the door to bend at that

25  joint.  These are the figures that were provided.  You can see

VOL. I - 20

1    that the inside, interior of the Rauenbusch patent goes down

2    and there's these what they call depression zones.  Again, this

3    is so the door can bend.  There's even ones that have -- in the

4    drawings -- where not all of it is removed but there's still

5    remaining substance of the middle, between the top layer and

6    bottom layer, remain in the Rauenbusch patent.

7           So the Patent and Trademark Office, upon receiving Cold

8    Chain's patent says, no, all of your claims are rejected.  Why?

9           Rauenbusch discloses an insulated single panel overhead

10   door between a core member and outer facing layers that have

11   depressions to allow the door to bend.  Cold Chain goes back,

12   says, okay, how about we try this language.  Patent and

13   Trademark Office rejects it again a second time December 20,

14   2013.  This is all in the record.  This is part of the patent

15   prosecution history you will see.

16          So Cold Chain amends their application yet again on 3-19

17   of '14 and they say, okay, how about -- and a way to try to get

18   around Rauenbusch, how about we exclude the single panel not

19   having multiple rigid sections with articulating sections.  And

20   they say the door presented is clearly different from the doors

21   of Rauenbusch and they are, therefore, excluded by the language

22   of a single panel not having multiple rigid sections.  This is

23   what Cold Chain is saying to the Patent and Trademark Office to

24   try and get the patent and try and show that its door is

25   different from the Rauenbusch door.

VOL. I –   21

1          The Patent and Trademark Office says, nice try, no.  All

2     rejected.  So what happens is Cold Chain submits yet another

3     amendment.  And in this amendment, they say, okay, fine,

4     because the doors of Rauenbusch are alternating rigid panels,

5     they're not the same as the claimed overhead door and they

6     change it, the panel being flexible along the entire length of

7     the panel as recited here.  So they're saying, look, we don't

8     have a panel that's stiff with cuts, we have a panel that's

9     flexible along the entire panel.

10          Can I approach, Your Honor, and give you this?

11              THE COURT:  Yes, you may.

12              MR. CLIFFORD:  This is what Cold Chain's talking

13     about.  This is a panel that bends everywhere in every spot.

14     This is the Cold Chain panel.  This is the Cold Chain door.

15     This is submitted July 28th, 2014.  The Patent and Trademark

16     Office says, no, still denied.

17          Eventually, after Cold Chain amends their patent

18     application yet again, in October of '15, Cold Chain gets a

19     patent.  And the patent has claims in it, and the claims deal

20     with an insulated overhead door that has a second outermost

21     surface opposite the first, and both the first and second outer

22     surface are greater than the rest of the door.  There is a

23     thermoplastic glass fiber membrane, and the thermoplastic

24     membrane forming the first outermost surface of the door.  You

25     will hear testimony from individuals skilled in the art to

VOL. I - 22

1   explain what this means.

2          THE COURT:  The door you just showed me, was that the

3   door that received the patent or that was the door that -- that

4   was the panel that was rejected, what you're holding in your

5   hand?

6          MR. CLIFFORD:  Your Honor, what you will hear and what

7   the defendant's position is is what I have in my hand, the

8   panel that is flexible, that is two layers is the Cold Chain

9   patent.  What I have in my left hand is the Altum panel that's

10  used by KNL.

11          THE COURT:  And that's the one whose patent is

12  pending?

13          MR. CLIFFORD:  Correct, Your Honor.

14          THE COURT:  The '144?

15          MR. CLIFFORD:  Correct, Your Honor.

16      The second layer of the Cold Chain patent is insulating

17  material extending continuously from the top to the bottom,

18  meaning the foam goes all the way to the top, all the way to

19  the bottom, and the foam being the second outermost layer where

20  the door comprises of only one panel, the panel being flexible

21  along the entire length.  That's the language used.  And that's

22  what Ridge has to show is being infringed.  Evidence will show

23  they can't do that.

24          So what does this mean in practical terms?  We just went

25  through this.  Let's look at what Ridge says it means.

VOL. I -  23

1   Flexible.  It says, because the foam and liner chosen for the

2   panel are designed to flex, the flexibility is a property of

3   the material chosen for the panel.

4        And this is very important, Your Honor.  It is the

5   material itself that flexes.  The material itself that flexes,

6   rather than bending, it hinges which is what we're here for

7   today.  This doesn't -- the material of this panel does not

8   flex.  Instead, it bends, it hinges.  This is what the Cold

9   Chain patent told the Patent and Trademark Office.  It says it

10  is the material itself that flexes, rather than bending, it

11  hinges as would be the case with the rigid panel and hinge

12  structure.

13       So let's get to what the standard is for the injunction.

14  A likelihood of success on the merits.  Now, there are three

15  claims -- four claims that are the basis of this injunction

16  request.  The evidence will show that the plaintiffs will not

17  carry their burden.  As you can see and what you will hear is

18  the claim for direct infringement simply fails on its face.

19  The Cold Chain patent is not the door being made by KNL.  And

20  if there is no direct infringement, the claims for indirect

21  infringement against Altum, the contributory infringement and

22  the inducement also fail.

23       Lastly, there is a claim for tortious interference

24  against Altum.  Altum has not caused any relationship to be

25  terminated between Ridge and a third party.  Altum is not aware

VOL. I -   24

1    of what the -- who the third party is and hasn't done anything

2    to cause a termination in relationship.

3         In fact, the evidence will show that the relationship

4    between Ridge and, I assume, Whiting is thriving.  They have a

5    business relationship.  There is an NDA in place.  They're

6    working on finalizing the door to be sold through Whiting to

7    other people.  So the evidence will show that there isn't any

8    evidence of tortious interference.

9         The last claim is the false marketing or advertising.

10   The issue as to using the term patent, is my understanding, was

11   removed from the website of KNL.  So that language isn't out

12   there.  But it is very rich, Your Honor, when Ridge, in

13   advertising its products, has used the word patented since at

14   least 2020 for something they admit is not patented.  And they

15   took that down off their website only after being presented it

16   by us after the depositions.  So I just want to make sure the

17   Court is aware of the double standard that Ridge is asking the

18   Court to enforce.

19        Without likelihood of success on the merits and all the

20   claims failing, that leaves you the next prong which is

21   immediate irreparable harm.  So in order to show the immediate

22   or irreparable harm, there has to be price erosion.  This is

23   what Ridge has argued.  They haven't sold a door at all, ever.

24   There can't be any price erosion because they don't have

25   anything to put in market.  There's not going to be evidence of

VOL. I - 25

1    someone saying, well, I was going to sell it for X, but because

2    they're underbidding me at Y, I've lost value of my door.  It

3    doesn't exist.  Instead, it would be pure speculation to show

4    what the door would sell for because it doesn't exist.

5         Secondly, a loss of goodwill.  That's just not going to

6    be shown, Your Honor.  Ridge has partnered with the largest

7    door manufacturer in the United States that has a 40 percent

8    market share.  If they had such a loss of goodwill, Whiting

9    would be saying to Ridge, I don't want to deal with you.

10   You're not a company that I want to go into business with.

11   Instead, it's the opposite.  There's no loss of goodwill, and

12   there's no evidence of loss of goodwill.

13        Damage to reputation.  It's similar.  That goes to loss

14   of goodwill.  Again, if Ridge had such a horrible reputation in

15   light of the KNL door, Ridge wouldn't be partnered with

16   Whiting.  Ridge wouldn't be jumping to the front of the line

17   and saying, let's get this done, let's sell a bunch of these

18   doors, let's increase our sales above a hundred million and

19   push to 200 million.

20        Lastly, on the immediate harm is the loss of business

21   opportunities, diminished market share.  Again, it doesn't

22   exist.  They don't sell the door and they're partnered with the

23   leader in the room.  There's no way they have a loss of market

24   share.  There's no way they have a loss of business

25   opportunities.  The only thing that's holding Ridge back is

1    getting the panel and door in place to Whiting's satisfaction

2    so they can sell the door.

3         And interestingly, when asked by Altum about what is

4    KNL's market share of the roll-up door panel, Mr. Grandominico

5    had a very interesting response, something along the lines

6    of -- and I won't be able to quote it exactly -- that he said

7    he talked to -- his professor had told him one time that

8    there's some number that equates to zero, and KNL's share is

9    somewhere close to that zero percent.  So KNL is not taking

10   anything away from Ridge by selling a door when Ridge has the

11   market leader in its back pocket.  That fails also for

12   immediate irreparable harm.

13        The next prong is harm to others.  Ridge has 300

14   employees, revenues approaching a hundred million dollars, and

15   projected revenue of $200 million.  Let's compare that to

16   Altum.  Altum is a startup.  They have revenue with the door of

17   less than $200,000.  And because of this litigation, they've

18   had to furlough or lay off employees already.  It makes up

19   55 percent of their revenue.  This is really a ploy to squash

20   the competition, which gets us to the last prong of public

21   interest.

22        The public interest is, of course, interested in making

23   sure patents aren't infringed.  Of course.  But the public

24   interest also is to foster competition and to prevent

25   monopolistic trade.  That's what Ridge wants.  Ridge wants to

VOL. I -   27

1    make sure there's no one else in the market besides them and

2    Whiting.  That's their goal.  That's what they're trying to do.

3    An entity that has close to zero or less than zero market

4    share, that's a fly on a whale, Your Honor.

5         Something that will come up for the Court, and the Court

6    has seen in the briefing is something called prosecution

7    history estoppel.  What that means basically is Cold Chain

8    can't make representations to the Patent and Trademark Office

9    about how its door is not rigid and how it doesn't bend, it

10   hinges, and then come back to this Court and say, no, no, no,

11   it is rigid and it bends and hinges.  Prosecution history

12   estoppel says they can't do that.

13        I want to also -- if there was any doubt as to what Cold

14   Chain's patent says and what Cold Chain told the Patent and

15   Trademark Office to get it, let's look at the December 14th --

16   December 10th, 2014, amendment where Cold Chain is making one

17   last attempt to try and get a patent.  And they say, again,

18   listen, the Rauenbusch patent is a sandwich panel, has rigid

19   sections with hinges that allow it to flex.

20        And right here, Your Honor, the top of the second

21   paragraph, the sandwich structures of Rauenbusch are not the

22   same as applicant's claim structure.  This is the last writing

23   given to the Patent and Trademark Office to get their patent.

24   And confirming also what everyone can see, the second layer of

25   the Cold Chain patent is foam.  The second layer -- I mean,

VOL. I -   28

1   sorry, the outside layer of the KNL panel is not.  And that's

2   part of the other reasons why the Patent and Trademark Office

3   was allowing this to be issued.

4            THE COURT:  Mr. Clifford, could you hold up the Cold

5   Chain panel again?

6            MR. CLIFFORD:  Yes, Your Honor.

7            THE COURT:  Now, on the side of the panel that does

8   not have the white Plexiglas quality, is that the panel as it

9   exists?  Or does the panel have a -- I mean, is that black foam

10  sandwiched between the two white panels?

11           MR. CLIFFORD:  Let me answer to the best I can on

12  that, Your Honor.

13           THE COURT:  It was a terribly phrased question.  Maybe

14  I can ask the question more simply.  Is that exactly what the

15  panel looks like?

16           MR. CLIFFORD:  Your Honor, I will say yes and let me

17  give you a little explanation on that.  We have went to Cold

18  Chain's website and pulled the specs off Cold Chain's website.

19  That's what this is.  So the answer would be, yes.  And you'll

20  hear testimony from Mr. Grandominico about how he got this

21  information.  There's different science that goes into this.

22  But the Cold Chain -- and you'll see this in the patent

23  prosecution history.  It says two layers.  Originally, Cold

24  Chain asked for a sandwich panel to be its patent and the PTO

25  said no.  One of the last amendments made was, okay, we're not

VOL. I — 29

1    asking for a sandwich panel, we're asking for two layers, one

2    being the reinforced fiberglass and the other being the foam.

3         Again, this panel goes to what Cold Chain wanted to do.

4    It wants to keep the cold stuff cold.  You can look at it, Your

5    Honor.  What's going to have better insulation?  What's

6    flexible along its entire base?  It's not the KNL door.  It's

7    not the KNL door with relief cuts.  This is just again showing

8    you this was the last amendment submitted to the Patent and

9    Trademark Office.

10        Unless you have any further questions, Your Honor, I

11   will sit down and defer to Mr. --

12        THE COURT:  Thank you, Mr. Clifford.  I have no

13   further questions.

14        MR. TACKETT:  Your Honor, on behalf of plaintiff, we

15   do want to register on objection to the second demonstrative.

16   I didn't want to interrupt his presentation.

17        The foam demonstrative that he's representing as being

18   the Cold Chain patent, Your Honor, we completely disagree

19   that's a representation of what the claims state in the Cold

20   Chain patent.  And we have a physical copy of what we believe

21   it looks like right over here, if I can hold it up and show

22   you.  I went for about five or six minutes.  He went for about

23   30.  I thought we were capped so I wanted to be brief.

24        But, Your Honor, this is what we understand to be

25   covered by the Cold Chain patent.

VOL. I -   30

1           THE COURT:  All right.

2           MR. TACKETT:  You have thermoplastic on the outside

3     and then you have foam.  Now, there are relief cuts in the foam

4     to allow for the panel to traverse the radius of the door

5     frame.

6           THE COURT:  I understand.

7           MR. TACKETT:  It is --

8           THE COURT:  That's sufficient.  I mean, now I have a

9     visual understanding.  And through the course of the testimony,

10    the Court will gain better appreciation for what the Cold Chain

11    patent, as used and sold by Ridge, will look like.  I just

12    didn't know whether that's what it looked like based on the

13    arguments -- the opening statement of Mr. Clifford.

14          MR. TACKETT:  Understood.  Your Honor, we want to make

15    a statement for the record because there could be a decent

16    potential for confusion based on some of the representations

17    made.  There's nothing in the Cold Chain patent that says there

18    is an inch and a quarter of foam here.  There's nothing like

19    that in the specs of the patent.  And the patent experts will

20    talk about that stuff.  Thank you, Your Honor.

21          THE COURT:  Thank you for that clarification,

22    Mr. Tackett.

23        Mr. Burton.

24          MR. BURTON:  Yes, Your Honor.

25          THE COURT:  Just one second.

VOL. I -   31

1          Thank you, Mr. Burton.  Please proceed.

2            MR. BURTON:  Thank you, Your Honor.

3          On behalf of defendants Kirk National Lease and Truck

4    and Trailer Parts Solutions, my opening remarks will focus on

5    Ridge's claim of -- preliminary injunction claim for patent

6    infringement, the first claim for relief in the complaint.

7    Just for clarity, I heard plaintiff's counsel say there's

8    unfair competition going on.  There's unfair competition

9    because of patent infringement.  And the first paragraph of the

10   temporary restraining order in this case prohibits the parties,

11   including the KNL defendants, from continuing to manufacture,

12   advertise for sale, sell, or further contract to sell the

13   alleged infringing door as defined in the complaint.

14         That's a matter for patent law, any relief they're

15   entitled to for making, using, selling or offering to sell

16   infringing devices under 35 U.S.C. Section 271.  Any other

17   relief under state law or any other basis is preemptive.  It's

18   strictly a matter of patent law.  That's why I want to focus on

19   the patent claim in particular, the three main points raised in

20   KNL's memorandum in opposition, section three of that

21   memorandum, lack of standing, noninfringement, inability to

22   show irreparable harm.

23         And when I talk about standing, I'm talking about does

24   Ridge have standing to assert the patent in the absence of the

25   patent owner, Cold Chain.  As Ridge pointed out, in the

VOL. I —   32

1    September 21 Rule 65.1 conference, Ridge is an exclusive

2    licensee from Cold Chain.  Ridge says that's enough for

3    standing.  It's not enough.

4          We're talking about who may assert rights under a

5    patent.  And this kind of relates to a question you raised,

6    Your Honor, in Mr. Clifford's opening statement about what

7    would happen if Ridge had taken over the patent application

8    that KNL had pending.  Under U.S. law, the inventors, the

9    patentees, are actually individuals and the rights have to be

10   assigned to a corporation.  Literally, Ridge Corporation would

11   not be the inventor on that patent.  It would have to be

12   individuals.

13         If you look at the exhibits attached to the complaint,

14   the Wachtell patent, the Cold Chain patent, you can see the

15   inventors are listed.  Mr. Wachtell and three other -- four

16   other individuals.  And it says, assignee, Cold Chain.  The

17   reason for that is the statutes I have cited here on this page.

18   Who can sue for infringement is the patentee and successors in

19   title under patent law.  You if you do not have the patent

20   owner in the case to assert exclusionary rights, it's necessary

21   you be at least an exclusive licensee.  That's necessary but

22   not sufficient.  The exclusive license must be tantamount to an

23   assignment and transfer all substantial rights in the patent.

24         This is discussed in our brief.  It's basically a

25   paraphrase of the cases on page five of our brief.  It's an

VOL. I - 33

1   all-or-nothing test.  It's not a balancing test, not a factory

2   test.  There has to be a transfer of all the substantial

3   rights.

4          So does Ridge have all substantial rights of the Cold

5   Chain patent?  No.  Cold Chain can still sue for infringement.

6   As in the case law we cite on page six of our memorandum in

7   opposition explains, that that's one of the important rights

8   that if retrained by the patent owner means that the licensee

9   does not have standing to sue.  Under that paragraph 14, I cite

10  a license agreement.  That's the May 1 amended and restated

11  license agreement attached to the complaint as Exhibit 3.

12  Ridge and Cold Chain can sue for infringement, and Ridge has

13  some duties under that paragraph.

14         They -- if Ridge wants to sue for patent infringement,

15  it says licensee, which is Ridge, shall give licensor the

16  option by written notice of initiating such action before doing

17  so itself or before issuing any demand or threat of such

18  action.  In the converse situation where Cold Chain sues, then

19  Ridge has a duty to cooperate with Cold Chain.

20         So one other thing we pointed out in our brief that the

21  courts looks to - page 7 of our brief, our memo in op - does

22  the owner retain the right to get any proceeds of any monetary

23  recovery in litigation?  That box is checked here too.  Cold

24  Chain gets up to half of the monetary recovered from

25  litigation.

VOL. I -   34

1    The next point the courts look to -- although any one of

2    these is sufficient to show that the patentee has not

3    relinquished all substantial rights, but the next point we

4    point out here is the question:  Does the licensee have the

5    right to transfer its license?  Paragraph three says, no, it's

6    nontransferable.  Ridge can't transfer its license.

7    The next point:  Are there restrictions on the

8    licensee's ability to sublicense?  And that's true here too.

9    Ridge can sublicense to a manufacturer only if the manufacturer

10   agrees to use Ridge as its exclusive supplier.  One side effect

11   of that is this is a case that can't be settled in a

12   conventional way.  What I mean by that, you can't have a

13   case -- a settlement where defendant's pay a sum of money and

14   the plaintiff agrees to dismiss the case and gives the full

15   release.  That's not allowed under this provision about

16   sublicense.  And you also -- Ridge lacks the ability to give a

17   full release as to Cold Chain.

18   So we cover all of that in our brief.  And we raised

19   this issue -- or I raised this issue in our Rule 65.1

20   conference.  I said, yes, Ridge is an exclusive licensee, but

21   that's not sufficient to give them standing to sue.  So why

22   does it matter now?

23   Well, we -- we not only raised this in the 65.1

24   conference, we raised it in the memo in op.  Obviously, we

25   talked about that.  In the reply memorandum that Ridge filed,

1    they repeat that they're a substantial licensee and basically

2    say we should kick this issue down the road.  There is, under

3    Rule 19, a defense of failure to join an indispensable party.

4    The classic example under Rule 19 is an exclusive licensee who

5    lacks all substantial rights, who fails to join the owner of

6    the patent.  That defense can be raised under Rule 12.  It can

7    be raised in answer.  Rule 12(a) says it can be raised up until

8    beginning of trial.  We understand that.  We'll definitely

9    raise that defense because of the absence of Cold Chain.

10        We're dealing with here and now, and we're in a very

11   accelerated proceeding.  Everything is accelerated.  We have

12   claims for patent infringement under the Southern District of

13   Ohio local rules.  We have a very detailed procedure and

14   timings on disclosure of infringement contentions, disclosure

15   of validity contention rules, and even patent cases before Your

16   Honor as well, rules with making your claim construction

17   contentions known, exchanging claim contentions, having the

18   claim construction hearing, having a claim construction ruling.

19   All that will happen in the future in this case, and we're not

20   following those right now because we're in an expedited

21   proceeding.

22        But in exchange for being -- asking for that

23   extraordinary relief, the plaintiff has to make the strong

24   showing on the merits right now.  And part of the strong

25   showing on the merits is that they can be in court.  Right now,

1    Ridge lacks all substantial rights under the Cold Chain patent.

2    They can't assert those rights unless and until Cold Chain is

3    joined.

4         And I have a couple cases cited here.  The *Lone Star*

5    case from the federal circuit:

6              "We agree with the district court that AMD did not

7              transfer all substantial rights in the asserted

8              patents.  Lone Star is therefore not the relevant

9              patentee and cannot assert these patents in its own

10             name under Section 281."

11        The *Alps* case from the federal circuit:

12             If, however, the transferee or licensee does not hold

13             all substantial rights – which is like Ridge – it may

14             sue third parties only as a co-plaintiff with the

15             patentee.

16        Where does that leave us?  The TRO should be dissolved.

17   We should not have a TRO.  Ridge should forfeit the $10,000

18   bond they put up, and Ridge, as a sole plaintiff, lacks ability

19   to seek a preliminary injunction at this point.  That's all my

20   first point.

21        Moving on to the second point I had was the infringement

22   issue.  I think I'm not going to dwell on this just because

23   Mr. Clifford, on behalf of Altum, made a good presentation on

24   showing you the visuals and explaining the patent, and

25   Mr. Tackett on behalf of plaintiff was commendably brief and

VOL. I –   37

1   said we're going to have Mr. Sharpe testify and go over the

2   patent claims.  And, in response, we are going to have

3   testimony and go over the second outermost surface issue that

4   we raise in our brief.  I think the groundwork has been laid

5   for all of that already so I'm going move ahead past the

6   infringement slides to the last slide.

7            This is the lack of irreparable harm point.  As

8   Mr. Clifford pointed out, there were a lot of representations

9   made in the Rule 65.1 conference and the TRO motion that Ridge

10  is in direct competition with defendants.  There's going to be

11  loss of market position, price erosion, it's happening in a

12  narrow and niche market.

13           This is plaintiff's counsel in the Rule 65.1 conference.

14  "This is a really narrow market space, this commercial

15  trucking-related industry.  It's niche and it's narrow."  Later

16  on he says:  I mean, they're whole -- here, their whole product

17  is infringing.  Once it gets in the market, and, again, I think

18  in particular because of this narrow niche industry that we're

19  talking about in particular, that is a problem.  Yet, we have

20  evidence, as mentioned even in plaintiff's opening, of 275,000

21  sales a year of possible market.

22           And that -- so that representation which is part of the

23  Court's finding in the motion, in the TRO order on page 6, will

24  not -- the proof will not bear that out in the preliminary

25  injunction hearing.  We also mention some of the points

VOL. I - 38

1    Mr. Clifford went in more detail, that Ridge does not have a

2    sellable product at this moment.  Also one of the irreparable

3    harm factors that's listed in our brief, at least, is

4    willingness to license the product.  If you want to license

5    your patent, that cuts against the idea that you have

6    irreparable harm as opposed to a damages recovery.

7         So the evidence will show, and I think what's been

8    introduced by Mr. Clifford's opening and the complaint itself,

9    is that Ridge was very eager at one point, May, June 2023, to

10   license to the KNL defendants the Cold Chain patent in exchange

11   for Ridge becoming the exclusive supplier of panels.  KNL can

12   go out and sell the door with Ridge selling the panels.  The

13   Whiting Motor Company, the company that Mr. Clifford mentioned

14   which the evidence will show has a big presence in the roll-up

15   market, one of the big three of the roll-up market, Ridge is

16   working with them and it looks like it would be in the same

17   capacity.  They're content to be a supplier of panels while

18   Whiting, it's big position in the market, goes out and sells

19   the doors.

20        The only other point I want to add to that, the

21   irreparable harm point for patent infringement is we have -- we

22   asked for discovery, of course, before this proceeding on

23   issues relating to irreparable harm.  We asked for discovery --

24   and these are attached as exhibits in our exhibits: Exhibits

25   142 and 143.  Exhibit 142, Defendant's Exhibit 142, is Ridge's

VOL. I -   39

1    response to interrogatories.  Interrogatory number 1:  Describe

2    Ridge's marketing and advertising activities and efforts

3    regarding the Ridge door.  Ridge objects.  It's irrelevant to

4    Ridge's patent infringement claims.

5         Interrogatory number 2:  State the number of Ridge doors

6    sold.  And they admit it's none.  But they also object as

7    irrelevant to Ridge's patent infringement claims.

8         Their response to documents, written response to

9    documents which is attached as Exhibit 143 -- is our Exhibit

10   143, our first document request said samples of marketing

11   materials for the Ridge door.  Ridge objects to this request

12   because it is irrelevant to Ridge's patent infringement claims.

13   The marketing materials, they're claiming loss of market share.

14   Document request number 7:  All writings relating to efforts by

15   Ridge to gain market share from its competitors on the Ridge

16   door.  Ridge refers us to a document and still objects that

17   it's irrelevant to Ridge's patent infringement claims.

18        It looks like -- as Altum said at page 16 of their

19   memorandum in op to the motion for preliminary injunction, it

20   looks like what Ridge is arguing is that just a presumption of

21   irreparable harm, that the market is being tainted, as

22   Mr. Tackett argued today, rather than putting forth actual

23   evidence which they say is irrelevant of loss of market share.

24   But you can't do that.  The *EBay* case from the Supreme Court

25   says in a patent infringement case, you have to consider the

VOL. I -   40

1    traditional, equitable factors for preliminary injunctive

2    relief.  For permanent injunctive relief, as well, you have to

3    consider the traditional injunctive factors such as irreparable

4    harm.  This is the argument of Ridge, but the evidence will not

5    bear it out.

6         And for all of those reasons, especially for KNL

7    defendants not having the right plaintiff in the court, we and

8    the Altum as a defendant ask that the motion for preliminary

9    injunction be denied.

10        THE COURT:  One final question before you are seated,

11   Mr. Burton.  You alluded to this but I'm not clear on the

12   answer.  It's the same answer that I put to Mr. Clifford, and

13   it's just a procedural matter.  If you know, fine.  If you

14   don't, I'll find it out.

15        But when Ridge and KNL were negotiating and Ridge

16   requested to purchase the pending patent, '144 patent, would

17   that -- if that transaction had come through, would Ridge have

18   then stood in the shoes of KNL before the PTO?  Is that how

19   that would work if you purchase a pending patent?

20        MR. BURTON:  Yes.  I will defer to what the evidence

21   shows in the actual agreement proposed.  But, yes, as a -- just

22   as a general matter --

23        THE COURT:  As a matter of law.

24        MR. BURTON:  As a matter of law you can purchase from

25   the assignee.  If KNL or the original inventors like Jeff

VOL. I -   41

1   Phlipot assigned the patent rights to KNL, then KNL as

2   successor in title, can, in turn, assign those rights to Ridge.

3   And Ridge, in plain English, is the patent owner and can

4   prosecute the patent at that point.

5            THE COURT:  Thank you.

6            MR. BURTON:  If there's nothing further, that's all,

7   Your Honor.

8            THE COURT:  Thank you.

9         Mr. Tackett, are you ready to begin with the

10  presentation of your case in chief?

11           MR. TACKETT:  Yes, Your Honor.

12           THE COURT:  Would you call your first witness, please.

13           MR. TACKETT:  Plaintiff Ridge Corporation calls

14  Mr. Raymond McDonald.

15           MR. CLIFFORD:  At this time we'd like to request a

16  separation of witnesses.

17           THE COURT:  Any objection to that, Mr. Tackett?

18           MR. TACKETT:  To the extent that it is not reciprocal

19  across the board --

20           THE COURT:  Once I grant a motion for separation of

21  witnesses, it applies throughout the trial to all parties with

22  the exception of the experts who are allowed to sit through

23  the -- the experts and your individual client representatives.

24  Now, everybody from the client is not a client representative.

25  But the experts are -- those witnesses whom you have designated

VOL. I -   42

1    as expert witnesses will be permitted to sit through the

2    presentation of all evidence.  And each side may have one --

3    Altum may have one client representative, KNL one client

4    representative, and the plaintiff Ridge may have one client

5    representative.

6            MR. TACKETT:  Your Honor, no objection.  Gary

7    Grandominico will be the representative of the Ridge

8    Corporation.  I think the practical result of the separation

9    would be two people leaving the court.  But that's fine.

10           THE COURT:  Whatever it is, I'm going to grant the

11   motion for separation of witnesses.

12           MR. CLIFFORD:  Thank you, Your Honor.

13           THE COURT:  So each side will determine who should be

14   in and who should not be.

15      (Witness sworn.)

16           THE COURT:  Mr. Tackett, are all of your witnesses who

17   should have been excluded now excluded?

18           MR. TACKETT:  Yes, Your Honor.

19           THE COURT:  Mr. Burton?

20           MR. BURTON:  Yes, Your Honor.

21           THE COURT:  And Mr. Clifford?

22           MR. CLIFFORD:  Yes, Your Honor.

23           THE COURT:  All right.  Good enough.

24           MR. TACKETT:  Your Honor, would the Court prefer

25   counsel to question from the lectern?

VOL. I -  43

1          THE COURT:  Absolutely.

2          MR. TACKETT:  We're ready to proceed after the witness

3   is sworn in.

4          THE DEPUTY CLERK:  I swore him in.

5          MR. TACKETT:  I'm sorry, ma'am.  I missed that.

6      Does the witness have a copy of the plaintiff's

7   exhibit binder?

8                         - - -

9                    RAYMOND MCDONALD

10   Called as a witness on behalf of the Plaintiff, being first

11   duly sworn, testified as follows:

12                   DIRECT EXAMINATION

13   BY MR. TACKETT:

14   Q.   Good morning, sir.  Can you please indicate your full

15   name for the record?

16   A.   Raymond Augustus McDonald, Jr.

17   Q.   And Mr. McDonald, what is your educational background?

18   A.   Undergrad degree, Mercer University, mechanical

19   engineering.  Graduate degree, master's, mechanical

20   engineering, Auburn University.  And professionally certified

21   in Georgia.

22   Q.   What is the professional certification that you're

23   referencing?

24   A.   Professional engineer, mechanical.

25   Q.   What is your role with the plaintiff Ridge Corporation?

1    A.   My job title is COO, one of the founders and owners of

2    the company, deal with just about every asset of the

3    business -- aspect of the business: sales, engineering,

4    production, operations, whatever is needed.

5    Q.   Sir, how long have you been involved with Ridge

6    Corporation?

7    A.   Since its inception in late 2004, early 2005.  Gary and

8    I started the business, it's been mentioned, in his basement.

9    Q.   When you say "Gary," just for the benefit of the record,

10   sir, who are you referring to?

11   A.   My partner Gary Grandominico.

12   Q.   How would you describe the focus of Ridge Corporation's

13   business?

14   A.   Ridge is an engineering, manufacturing and marketing

15   company.  We engage with customers and solve problems for them

16   using material science, engineering, and we also help them

17   market those products in their market spaces and design

18   advantages for them and ultimately manufacture those products.

19   Q.   And is there a particular -- or are there multiple

20   particular industries where Ridge focuses its engineering and

21   innovative efforts?

22   A.   We're concentrated in transportation elements but we do

23   touch other markets, primarily truck/trailer, class A down

24   through the lower classes, truck bodies, final mile.  We also

25   do work a far amount of work in recreational vehicles, RVs,

VOL. I - 45

1    boats.  We do some aerospace work.  We do a lot with

2    automotive, electric vehicles, many different markets that are

3    requiring light weighting, high strength and sophisticated

4    manufacture.

5    Q.    When did you mean when you said final mile as you were

6    going through that recitation?

7    A.    We provide components -- for example, the Amazon truck

8    that comes to your house.  The floor in that Amazon truck very

9    well may be a Ridge floor.  We manufacture those products for

10   OEMs that eventually supply those to the FedExes, the Amazons,

11   et cetera.  We're solving problems for those fleets.

12   Q.    What do you mean by OEM?

13   A.    Original equipment manufacturer.  Those would be

14   companies -- most of our partners or customers, I should say,

15   are very large billion dollar corporations:  Trans-Lee, Wabash,

16   Great Dane Trailers.  These companies manufacture

17   transportation goods.  Morgan Olson for instance.  Morgan Truck

18   Body.  They would manufacture the actual vehicle or assemble

19   the chassis in the box, and then supply that to a fleet who in

20   turn would use that equipment to service their customers which

21   may very well be yourself ordering something from Amazon.

22   Q.    What would be Ridge's role in working with those larger

23   companies?

24   A.    Twofold.  One, we've done a fair amount of work with

25   fleets directly.  So the fleet has a problem that needs to be

VOL. I - 46

1    solved.  A fleet, say Coke or Pepsi, may have a problem and

2    they want it addressed, and we will design a product.  And that

3    fleet will go to the OEM, the original equipment manufacturer,

4    and say we want this product on our vehicle.  We would like to

5    try it, test it.  That's one avenue.

6         The other avenue is going directly to the OEM, providing

7    them a solution, marketing the solution, and helping them help

8    their customers or gain a market advantage in their markets

9    against their competition.  There's two routes, two channels,

10   that we can work design-wise.

11   Q.   And how would you describe the competitiveness of

12   getting in the door with those OEMs with your solutions?

13   A.   It's a challenge.  They're very busy.  They have a lot

14   of people knocking on their doors with a lot of different

15   ideas.  We're fortunate.  We have very good credibility with

16   our customers.  They come to us.  The OEMs come to us asking

17   for solutions many times, and we will develop new products

18   specifically for their needs.  We have a very good reputation.

19   So we're successful.

20   Q.   When did Ridge first start looking into a potential

21   roll-up door for commercial vehicles?

22   A.   Ridge -- okay, well, several different aspects of that.

23   Gary Grandominico, my partner, has always been interested in

24   roll-up door solutions for decades.  He can talk about that.

25   We've been approached by the top two door manufacturers to

VOL. I -   47

1    supply products for testing.  They wanted to use our materials,

2    our thermoplastic glass reinforced materials, in different ways

3    to try to accomplish different roll-up door solutions.

4         We provided materials as samples.  They've done various

5    testing to try to integrate our materials into their incumbent

6    solutions, their existing solutions.  So we started, I'd say,

7    it was '17, '18, '19, we were having actual material sent to a

8    Whiting Door, a TODCO door, the two largest manufacturers in

9    the industry.  So --

10   Q.   When you say '17, '18, '19, you're referring to 2017,

11   2018, and 2019?

12   A.   I believe so.  I mean, there's records of these

13   transactions where we were involved, whether it's emails or

14   working with various customers on samples.

15   Q.   Can you tell me what it is that Ridge did in its roll-up

16   door work with the TODCO company that you mentioned?

17   A.   My understanding, we supplied them some materials that

18   they could use as an exterior skin for a product that they were

19   trying to develop called Arctic Flex which is a one-piece door,

20   an insulated one-piece door.  And they wanted to try and get

21   rid of the hinges, work with a living hinge-type concept.  We

22   engineered the material to get the proper flex, solve the

23   problem they were achieving, and we provided materials on that

24   front.

25   Q.   And the other one that you mentioned, was that around

VOL. I - 48

1    the same time as your work for TODCO?

2    A.    A little bit later.  They approached -- interestingly, I

3    believe the approach was from Pat Whiting, the owner of Whiting

4    Door.  I believe he saw some of our VCR roof materials, a

5    different product that we were offering to the transportation

6    market.  He was interested in integrating that into a

7    multi-piece panel door.  So those would have been sandwich

8    panels and flat panels that we provided them for testing.  I

9    want to say that was probably more towards 2019, later.

10   Q.    What is the -- what's the great -- what's the great

11   thing, what's the benefit, I guess to say it better, about

12   making a roll-up door that is one piece?

13   A.    Well, there's several advantages.  Obviously, weight is

14   always a concern for transportation.  They want lighter

15   weights, hyper strengths, better durabilities.  The

16   thermoplastic composites we produce are high energy absorbers,

17   very high deflection materials, can take a lot of abuse.

18   They're traditionally used for protective barriers inside of

19   trailers.  A lot of our customers come to us that are familiar

20   with our scuff band products which are used to protect the

21   inside of a trailer.  They also have experience with our skirt

22   products out in the environment and get engaged and hit, many

23   different products.  They know the durability of this

24   thermoplastic composite.  They're all looking to integrate that

25   benefit into other areas of the trailer that they have

VOL. I -   49

1   maintenance problems with or get damaged.

2        So the roll-up door, having a one piece roll-up door

3   made out of that material that saves weight, that would be

4   easier to install for an OEM or fleet, would have lower

5   maintenance because roll-up doors are a maintenance nightmare

6   in general for the traditional fleet.

7        You also have injuries associated with roll-up doors.

8   As there are driver shortages, you have more people coming into

9   the driver market.  Some of these are slighter-build women,

10  younger women.  They can't lift hundreds of pounds on these

11  doors.  There's rotator cuff injuries.  There is a lot of

12  reasons you want a lighter, more durable, easier to operate,

13  lower cost to operate, door.  The material – a composite

14  material – provides a route to achieve a lot of those benefits.

15  Q.   In your experience at Ridge being in this market, when

16  you're doing this work in 2017, 2018 and 2019, was there

17  something already in the market that met that need?

18  A.   No.  I mean, that was a one-piece door that was a

19  commercialized product, no.

20  Q.   What relationship did Ridge Corporation have with Kirk

21  National Lease prior to these most recent events that led to

22  the lawsuit in this case?

23  A.   Well, prior to the discussions regarding the door, Kirk

24  National Lease was a customer of our other products.  Okay.  So

25  I'll divide it into pre-October 2018 and post-October 2018.

VOL. I – 50

1  They would buy various products, whether it was linings --

2  different Ridge products that we produce for trailers.  So they

3  were a regular customer.

4    Q.   Okay.  In this pre-2018 demarcation of time, how long

5  had Kirk National Lease been a customer of Ridge Corporation?

6    A.   I don't know exactly.  We would have to check the

7  records, but several years.

8    Q.   Okay.  Was the other party in this case, the TTPS

9  entity, also a customer of Ridge?

10   A.   To be honest, I don't understand the TTPS, Kirk National

11  Lease, whether it's a sub-entity.  I don't understand what it

12  is.  My understanding is it's a sales arm, maybe just a parts

13  arm.  But I don't know if there's different ownership or same

14  ownership.  I don't know.  We'd have to look at the orders to

15  see if they were Kirk, KNL, TTPS.  It may be a mix.

16   Q.   Okay.

17   A.   We recognize them as the same entity, but I don't know

18  if that's legally true.  I don't know.

19   Q.   Okay.  And you made a time divider, if you will, between

20  pre-October 2018 and post-October 2018 with respect to Ridge

21  Corporation's relationship with Kirk National Lease.  What

22  happened in October 2018 between Ridge Corporation and Kirk

23  National Lease?

24   A.   Well, at that point, they -- the relationship changed

25  substantially.  They had come to us looking for help to solve a

VOL. I -    51

1   problem and design a new product: the one piece roll-up door.

2   So at that point, we were not only selling them existing

3   materials that we produced that they were very happy with and

4   recognized the benefit of, they wanted to push that into, hey,

5   how do we use these materials to make a roll-up door.

6   Q.   So what exactly did Kirk National Lease ask Ridge to do

7   when they came to Ridge to meet and discuss collaboration on a

8   single panel roll-up door?

9   A.   They were familiar with our skin, scuff, lining

10  materials.  And I believe Chris Fannin, who was a salesman for

11  us at the time, had shown them some sandwich panels.  They

12  wanted to evaluate how would we use these sandwich panels to

13  potentially make a roll-up door.

14       The initial conversations were brainstorming how do we

15  do this.  And we very quickly brought to the table that you

16  would curve cut or corrugate or do something in order to create

17  locations where you could facilitate the radius for the

18  roll-up.

19  Q.   In those discussions, what would you say it was that

20  Kirk National Lease was seeking from Ridge?  What was Ridge's

21  piece of this equation?

22  A.   We had to come up with a solution.  They didn't know how

23  to do it.  So we had -- that's why they were there.  Otherwise,

24  they would have just ordered the panel.

25       But they needed to figure out, hey, how do we make this

VOL. I -   52

1    thing go around the corner of the radius of the track to roll

2    up.  We had experience with that.  We provided that solution.

3    Q.   How would you characterize the solution?  What would

4    it -- what category of work would that fall into?

5    A.   That would be the design work.  And Bret's group, after

6    those initial meetings, went to work designing the curve cut,

7    putting together the drawings, discussing with the engineers on

8    the team how do -- what the geometry should look like, how much

9    spacing there should be, et cetera, in order to facilitate the

10   radius.

11          THE COURT:  Ms. Evans, I want you to read back

12   Mr. Tackett's question.

13     (Thereupon, the last question was read by the court

14   reporter.)

15          THE COURT:  And would you read back Mr. McDonald's

16   answer.

17     (Thereupon, the last answer was read by the court

18   reporter.)

19          THE COURT:  I asked Ms. Evans to read back that

20   question and answer because in the last two questions,

21   Mr. Tackett, you've asked two questions to the witness, the

22   second question explaining the first question.  So when he

23   answered that question, it's hard to disaggregate which

24   question to which he's responding.  So I'm not sure whether he

25   was responding to how do you characterize the solution.  That

VOL. I -   53

1    was one question.  Or whether he was responding to what

2    category of work would it fall into.

3         So you have to ask one question.  It wasn't a compound

4    question.  It didn't have the conjunctive "and."  But it was

5    two questions fused together almost.

6         So let's go back and let's ask Mr. McDonald first how

7    would you characterize the solution.

8              THE WITNESS:  Yes, Your Honor.

9         The solution would be a design solution.  That's how I

10   would characterize it.

11             THE COURT:  And now let's ask what category of work

12   would that fall into.

13             THE WITNESS:  Yes, Your Honor.  The category of work

14   that it would fall into would be product engineering.  It would

15   be engineering design where we would work out the geometry to

16   make the part do what it needed to do to be able to bend the

17   radius in transition.

18             THE COURT:  How did the group that you characterize as

19   Bret's group factor into that?

20             THE WITNESS:  Your Honor, he's the director of product

21   engineering for Ridge Corporation.  He works and reports to

22   Gary and I.  And his group -- that's his function in product

23   engineering.  He also works as our director of R&D as well.  So

24   his engineers are an assortment of mechanical engineers that

25   regularly engage in this phase of the work to come up with the

VOL. I -   54

1   solution for our customers.  That's why we have so many

2   engineers on staff.

3          THE COURT:  What's Bret's last name, again?

4          THE WITNESS:  Bret Moss.

5          THE COURT:  Please continue, Mr. Tackett.

6          MR. TACKETT:  Thank you, Your Honor.  I think you

7   asked my question which was to identify Mr. Moss.

8   BY MR. TACKETT:

9   Q.   What was the outcome of those design and engineering

10  efforts that Ridge put forth for Kirk National Lease on the

11  roll-up door?

12  A.   I believe Bret can be more detailed on this -- Bret Moss

13  can be more detailed on this.  There were a series of

14  discussions back and forth between KNL and Ridge about these

15  relief cuts, how they should be configured.  They had some

16  ideas they wanted to throw into the equation that we vetted out

17  and explained wouldn't work.  We were working back and forth at

18  that point to try and come up with an optimal scenario that

19  would work as a product for both.

20  Q.   And at the conclusion of that design and engineering

21  work, what did Ridge deliver for Kirk National Lease?

22  A.   Well, we produced -- I say "we."  Bret Moss's group

23  produced some drawings, definitely guidance.  We provided

24  panels at the time, just flat panels, because they were going

25  to try and make some quicker prototypes that they could test.

VOL. I — 55

1    I believe they were going to use a Dado saw, was the

2    discussion, to facilitate the relief cut.  They wanted to get a

3    door in so they could check weights and counterbalancing, the

4    other components of the door.  They wanted to get a functional

5    panel so they could start working on the bracketry and rollers

6    and springs and the other components of the door.  That was the

7    next step.

8         Parallel to that, we were also evaluating a corrugated

9    scenario which is where we would use a die and actually not do

10   a curve cut and actually corrugate the panel.  We were running

11   tests simultaneously on that as another option to try and solve

12   the corner issue, going around the radius.

13   Q.   What is the difference for Kirk National Lease regarding

14   their concept of a single panel roll-up door from when they

15   came in October of '18 to Ridge and when you all stopped work

16   together on that project?

17   A.   Ask the first part of that again.  What's the difference

18   between when they came and where it ended?

19   Q.   What was the difference in terms of they came to you

20   with an idea and what did they leave with?

21   A.   Okay.  They came with the idea of how do we use a

22   structural panel to make a roll-up door.  They left with a

23   functioning design that -- a panel that could work in a roll-up

24   door.  That's how it ended.

25   Q.   Okay.  And how did the business relationship on the

VOL. I - 56

1   business side end between Ridge Corporation and Kirk National

2   Lease on that project?

3       A.   How did it end?

4       Q.   Yes, sir.

5       A.   It ended because they decided they wanted to go a

6   different direction.  We couldn't come to a commercial

7   solution.  They went out and broke their word and pursued IP

8   independently when they one hundred percent made the overtures

9   that we were going to develop this together.  And we did the

10  work.

11      Q.   And after that relationship ended, what did Ridge

12  Corporation do next in terms of looking into their continued

13  efforts on a roll-up door?

14      A.   We continued -- we continued to evaluate the market.  We

15  had generated an entire business plan for KNL on how to market

16  this product.  We had the expertise to produce it.  So when

17  they decided to unilaterally go after IP and leave Ridge out,

18  we had to start from the beginning and do it right and actually

19  research the art that was in that space, start investigating

20  that which we started in the summer of '22.  And that's at that

21  point, August, somewhere in the fall, we found the Cold

22  Chain -- Cold Chain patent and that's when we started

23  discussions with Cold Chain to find out if there was the

24  opportunity to license it, what they were doing with it.

25           And it also turns out that was the patent that was

VOL. I -   57

1   licensed by TODCO when we actually supplied material to TODCO.

2   So it all came full circle, and we started researching that

3   patent, the claims, how it would apply to the product we

4   produced to date for KNL.  And then we got into discussions

5   with them on licensing that IP.

6   Q.   So I would like you to look to Plaintiff's Exhibit 1 in

7   your binder if you could.  You just made a reference to Cold

8   Chain patent.  I want you to look at Plaintiff's Exhibit 1.

9   Does this match the -- and align with the reference that you

10  were just making regarding a patent from Cold Chain?

11  A.   Yes.  It's from the cover sheet.  This is one of the

12  patents, yes.

13  Q.   Is this the one you were referring to?

14  A.   Yes.

15  Q.   You reference discussions with Cold Chain about

16  obtaining a license to this patent at Plaintiff's Exhibit 1.

17  What was the outcome of those discussions?

18  A.   They were favorable.  They wanted to learn more about

19  Ridge.  They had had some bad experiences in the past by

20  licensing this particular IP.  And Gary basically handled those

21  conversations.  We had a -- we had a -- we arranged a visit to

22  Ridge so that they could come and learn more about our company.

23  We spent a day with their principals.  They reviewed our

24  operation and were very excited to move forward.  Shortly

25  thereafter, we were able to enter into legal discussions to put

VOL. I −   58

1    together a deal.

2    Q.    When you say "put together a deal," can you look at

3    Plaintiff's Exhibit 2 and tell me is that part of the deal

4    you're referencing?

5    A.    Yes.  This is the license agreement, the license

6    agreement we put together to license the IP, the Cold Chain IP,

7    the initial license agreement.

8    Q.    Okay.  And why was there a second license agreement?

9    A.    The second license agreement was −− I assume you're

10   talking about the amended and restated license agreement.

11   Q.    Yes.  That's at Plaintiff's Exhibit's 3.  Do you

12   recognize that?

13   A.    Yes.  Yes.

14   Q.    Why was there this amended and restated license

15   agreement?

16   A.    Okay.  So for the first license agreement, that would

17   have facilitated the opportunity for Ridge to build a complete

18   door and market a complete door to the market.  The other

19   channel to market this door would be to partner with an

20   existing door manufacturer.  And in order to have them produce

21   the door, we would have to have the ability to sublicense.  And

22   main focus behind this amendment is to have the ability to

23   sublicense those rights to a partner to manufacture the door

24   and sell it.

25   Q.    What level of rights did Ridge Corporation obtain under

1    these two license agreements?

2       A.    These were exclusive.

3       Q.    And regarding the amended and restated license agreement

4    at Plaintiff's Exhibit 3, you referenced the ability to

5    sublicense with other door companies.  Why was that important

6    to Ridge Corporation?

7       A.    For a couple of reasons.  One, it would accelerate

8    bringing the product to market.  An existing door manufacturer

9    has an existing sales staff and marketing team.  They have

10   relationships and they sell in that channel.  So being able to

11   provide a panel that they could integrate with their existing

12   components, balancers, rollers, et cetera, they would be able

13   to bring a finished product to the market much more quickly

14   than us going vertically, integrate it, and trying to do the

15   entire panel together.

16         It gave us an option to bring product to the market

17   quicker and partner with their sales organization.

18      Q.    What would be the key for Ridge to be an attractive

19   suiter from one of those players in the door market for

20   commercial vehicles that you all were pursuing?

21      A.    The key is you have to have -- you have to have the

22   expertise, but also they wouldn't do anything unless you had

23   intellectual property rights.  They wouldn't want to be

24   exposed.  Is that what you were asking?

25      Q.    You're fine, sir.

VOL. I - 60

1          As we sit here today, does Ridge Corporation have any

2     inked agreements with any door manufacturer or anybody else for

3     the manufacturing of its exclusive licensed IP?

4     A.   As far as completed deals, no.  We have nondisclosure

5     agreements in place so we can investigate those deals.  They're

6     ongoing.  We're trading agreement redlines back and forth.

7     Q.   And who is Ridge -- what entities is Ridge trading

8     potential agreement redlines with?

9     A.   That would be Whiting Door Company.

10    Q.   And during the time that Ridge Corporation has continued

11    exploring efforts with its IP, what developments have you

12    learned from -- regarding Kirk National Lease?

13    A.   Are you asking about their patent application or what

14    they're doing in the market?  What are you asking?

15    Q.   I asked you a bad question.  And your response is

16    natural when being asked a bad question.  So please forgive me.

17         With respect to a single panel roll-up door, what market

18    activities of Kirk National Lease have you heard of during this

19    same time period where you're actively pursuing these efforts

20    with potential partners in this space to bring your patented

21    single panel roll-up door to market?

22    A.   Well, they're approaching fleets trying to sell the door

23    in the marketplace, heard from our salespeople that they're

24    attending trade shows and demonstrating the door and offering

25    the door for sale.  I assume they're providing samples to

VOL. I –   61

1   fleets.  They're trying to market and sell the door

2   aggressively.

3   Q.    And has Ridge analyzed whether the product, the accused

4   product that KNL is sending out to the market, infringes upon

5   the exclusive license that you all have?

6   A.    Well, Ridge --

7           MR. DILLARD:  Objection, Your Honor.

8           THE COURT:  Basis?

9           MR. DILLARD:  He's not an expert and can't testify as

10  an expert on the infringement.

11          MR. TACKETT:  And he doesn't intend to.

12          THE COURT:  I'm going to overrule the objection.  The

13  question simply asked what Ridge has done with respect to its

14  analysis.  The question is, "Has Ridge analyzed whether the

15  product, the accused product that KNL is sending out to the

16  market, infringes upon the exclusive license that you all

17  have."  He's asking what Ridge has done.  And as a CEO, he

18  would be in a position to know what Ridge has done.  The

19  objection is noted but overruled.

20        Can I see all counsel at side who are going to be

21  conducting examination of witnesses?

22                          - - -

23    (The following proceeding was held at sidebar.)

24          THE COURT:  I neglected to over this aspect with you

25  all back there.  Lawyers who are going to handle that

VOL. I -   62

1    particular witness can object.  You may very well be handling

2    that witness so it's not a problem.  I meant to alert everybody

3    to that.  You, of course -- because there are two defendants,

4    you may also object whenever you think something is being asked

5    that's improper.  But there was nothing improper about it.  But

6    I would also ask so that the witness won't even be confused or

7    clued, that just give the legal basis for your objection.  If

8    you need to elaborate, just ask for a sidebar.  I'll give it to

9    you and then you can elaborate on the record.

10              (The following proceeding was held in open court.)

11              THE COURT:  Mr. Clifford, please continue.

12              MR. TACKETT:  Thank you, Your Honor.

13    BY MR. TACKETT:

14    Q.   Mr. McDonald, do you remember the question?

15    A.   I believe so.  What did Ridge do regarding the

16    infringing KNL --

17    Q.   What did Ridge do to analyze whether the KNL product was

18    infringing on your exclusive license?

19              MR. DILLARD:  Objection, Your Honor.  Same grounds.

20              THE COURT:  Your objection is noted but overruled for

21    the same reason.  You may answer.

22              THE WITNESS:  Thank you, Your Honor.  What we did, on

23    those types of issues, we would lean on our counsel, our patent

24    attorneys, to review the issue at hand and give us their

25    opinion on infringement or whether there's grounds for next

VOL. I -   63

1   steps.

2    BY MR. TACKETT:

3    Q.    Okay.  And without getting into the discussions that you

4   all had with counsel, what did Ridge conclude as a result of

5   that analysis?

6    A.    Well, Richard Sharpe was the attorney that we used, with

7   Pearne and Gordon, to evaluate the infringement or whether

8   there is an issue.  The conclusion was there was definite

9   infringement.

10   Q.    What did Ridge do to address that infringement?

11   A.    Well, I believe at that point, more discussions ensued

12   with the legal teams, the Bailey Cavalieri, also Pearne and

13   Gordon.  We wanted to do quite a bit of research to verify.  I

14   believe they started doing more in-depth analysis in terms of

15   claim charts to make sure we understood what was going on.  And

16   I believe at that point we started discussions about notifying

17   Altum, KNL, Transglobal, TTPS, on what we believed was an

18   infringing product in the space.

19   Q.    Can I direct your attention to Plaintiff's Exhibit 9,

20   sir?  Are you there?

21   A.    Yes, I am.

22   Q.    I'm showing you a June 6th letter from Pearne Gordon,

23   Messrs. Richard A. Sharpe and J. Gregory Chrisman, to Kirk

24   National Lease and TTPS.  Now, do you recognize this letter?

25   A.    Yes.  I do recognize this letter.

1    Q.   Can you describe to me what this letter relays to Kirk

2    National Lease and TTPS?

3    A.   I believe it's -- we're letting them know that we

4    believe there's a problem and that there will be -- we're

5    trying to inform them that we're the exclusive licensee of the

6    Cold Chain patent and there's some infringement issues.

7    There's the remainder -- I have the first page in this exhibit.

8    Exhibit P9 is one page.  But I believe there's more details

9    later on.

10   Q.   You should have two pages in the letter, sir.

11   A.   We're letting them know that -- that there's IP issues

12   and we're trying to come to a commercial -- we're proposing a

13   commercial resolution.

14   Q.   Okay.

15   A.   Asking for a response.

16   Q.   And after this notice of infringement, what effect did

17   this have with KNL?

18        MR. DILLARD:  Objection, Your Honor.

19        THE COURT:  Sustained.

20        THE WITNESS:  Forgive me.  Am I supposed to answer

21   anything?

22        THE COURT:  No.  It's sustained, Mr. Tackett, on the

23   basis of the fact that this is beyond this witness's knowledge

24   on the basis of the record here.

25        If you can lay a foundation for how he would know, then

VOL. I - 65

1    you may get into that. But as the record -- as the evidentiary

2    record exists, there's no basis for Mr. McDonald to know what

3    effect something had on some other entity. He's not been -- he

4    doesn't work for KNL. There's no evidence presently of record

5    that he would otherwise know this. So it invites speculation

6    without any evidentiary record for how he would know what

7    KNL -- how KNL was affected by something.

8         MR. TACKETT: Yes, Your Honor. We understand and

9    appreciate your ruling. We did not know the basis of the

10   objection because Mr. Dillard did not state it. But I

11   understand your ruling.

12   BY MR. TACKETT:

13   Q.   Mr. McDonald, were you involved in -- did you have

14   knowledge that this cease-and-desist letter and notice of

15   infringement went out to Kirk National Lease and TTPS?

16   A.   Yes.

17   Q.   And what is your understanding about whether Kirk

18   National Lease and TTPS complied or relayed agreement to comply

19   in response?

20   A.   There was no immediate response, if I recall. And there

21   was an offer to respond at a later date. And then a period of

22   time later, I believe the response -- they did respond, okay,

23   we don't believe we're infringing. So that's the response we

24   heard back. So they were off to do what they wanted to do was

25   my impression.

VOL. I - 66

1    Q.   At that point in time, what did Ridge Corporation do

2    next?

3    A.   I believe we sent letters to -- cease-and-desist letters

4    to multiple -- all the entities to ask them to stop as well,

5    and we received various responses back from Altum and

6    Transglobal, I believe.

7    Q.   I'd like to turn your attention to the additional

8    cease-and-desist letter at Plaintiff's Exhibit 12.  Turn to

9    that.  Do you recognize and are you familiar with this letter?

10   A.   Yes.

11   Q.   Can you describe what it is?

12   A.   We're serving notice that we are licensed again --

13   similar to what we did with KNL.  We're making Altum aware of

14   the issue.  We're letting them know that Altum supplying

15   materials could be potential grounds, I guess, for contributory

16   infringement or inducing infringement, and we're asking them to

17   cease and desist and asking for a response.

18   Q.   And what is your understanding of whether Altum relayed

19   agreement to cease and desist or whether they disagreed with

20   this position?

21   A.   My understanding is their response was they disagreed

22   with the position and were going to continue to do what they

23   wanted to do.

24   Q.   I'd like you to turn to the next tab that's Plaintiff's

25   Exhibit 13.

VOL. I - 67

1    A.    Okay.

2    Q.    This is a letter from Altum's counsel.  Do you recognize

3    this letter?

4    A.    Yes.

5    Q.    When you were just testifying, is that part of what you

6    were referring to or is there something else?

7    A.    This is -- this is the response, I guess, the formal

8    response from Altum regarding our notice of the issue to Altum.

9    So in response to that.

10   Q.    And how much longer -- how much time had passed between

11   the June 9th cease-and-desist letter to Altum and that response

12   that you're looking at?

13   A.    Approximately a month.

14   Q.    I would like you to turn to the next tab in the binder.

15   It's Plaintiff's Exhibit 14.

16   A.    I'm there.

17   Q.    A letter dated September 6th, 2023, to Whiting Door

18   Corporation.  Have you seen this before?

19   A.    I have.

20   Q.    What is your understanding of this letter?

21   A.    This is a threat to a business partner, threating to sue

22   them if they work with us.

23   Q.    And who directed this letter to be sent to your

24   potential business partner?

25         MR. DILLARD:  Objection, Your Honor.  Lack of

VOL. I –   68

1   foundation.

2          THE COURT:  Sustained.

3     BY MR. TACKETT:

4     Q.   Mr. McDonald, this letter is from a gentleman named

5   Andrew Barnes.  Do you see that?

6     A.   Yes.

7     Q.   Do you have an understanding of who Andrew Barnes

8   represents?

9          MR. DILLARD:  Objection, Your Honor.  Foundation.

10          THE COURT:  Overruled.  You may answer.

11          THE WITNESS:  I believe KNL, TTPS.

12          THE COURT:  The question was do you have an

13   understanding.  Do you, Mr. McDonald?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  I think that the next question is, what is

16   the basis -- the factual basis of your understanding?  How did

17   you come to understand who Mr. Barnes is?

18          THE WITNESS:  Your Honor, he has been part of

19   correspondence prior to this letter in regards to KNL --

20          THE COURT:  Correspondence to you?

21          THE WITNESS:  Correspondence between our attorneys

22   that was shared with us.  That was our understanding, that he

23   was representing them.  I would add that our partner was unsure

24   who he was representing.  So it was -- there was some confusion

25   there.

VOL. I - 69

1          THE COURT:  All right.  You may continue.

2          MR. TACKETT:  Thank you, Your Honor.

3     BY MR. TACKETT:

4     Q.   Did you receive -- strike that.

5          What response did your potential partner Whiting Door

6     Corporation have when they received this letter threatening

7     royalty damages?

8          MR. DILLARD:  Objection.  Hearsay.

9          THE COURT:  I'm going to overrule it.  I think the

10    question doesn't ask for the truth of the matters asserted

11    therein as much as it does to show what effect it had on the

12    listener and what steps either Ridge or Mr. McDonald took.  On

13    that basis, I'm going to overrule the objection.  You may

14    answer.

15         THE WITNESS:  A very colorful reaction.  They were not

16    very happy at all and wanted to know what the hell was going

17    on.  And we had to bring them up to speed, and we started

18    discussions of different ways we could save the deal by

19    indemnifying them from any of these alleged damages.  And we

20    started discussions with our counsel on how to potentially fill

21    that void should it be necessary.

22    BY MR. TACKETT:

23    Q.   And after this September 6th letter and the fallout with

24    Whiting Door Corporation relating to the letter, what did Ridge

25    do next?

VOL. I — 70

1    A.   We explained to Whiting the situation -- Whiting Door

2    the situation.  We wanted to continue the testing.  We had

3    to -- it was a crisis at that point.  We had to file a suit.

4    We had to do something.  It was obvious that we were not making

5    grounds with the cease-and-desist letters.  We weren't able to

6    achieve a commercial resolution.  We literally had no more

7    options.  So here we are.

8    Q.   And you said file suit.  So you are familiar with the

9    complaint that Ridge Corporation filed in this case?

10   A.   Yes, I am.  I am familiar.

11   Q.   And the verification on the complaint, are you familiar

12   with that?

13   A.   Yes, I am.  I'm familiar with the verification on the

14   complaint.

15   Q.   How is that?

16   A.   Because I had to read it and I had to sign it.

17        MR. TACKETT:  Your Honor, I have nothing further at

18   this time.

19        THE COURT:  All right.  Thank you, Mr. Tackett.

20        Mr. Dillard, cross?

21        MR. DILLARD:  Do you mind if I grab a water, Your

22   Honor?

23        THE COURT:  Please do.

24        MR. DILLARD:  I didn't want to interrupt Mr. Tackett.

25

VOL. I —   71

1                                    - - -

2                          CROSS-EXAMINATION

3      BY MR. DILLARD:

4      Q.    Good morning, Mr. McDonald.

5      A.    Good morning.

6      Q.    I wanted to cover a couple of points that you addressed

7      on your direct examination first and foremost.

8            You testified that the Cold Chain door, there was

9      nothing like it in the market when you made the analysis 2017,

10     2018 and beyond.  Is that right?

11     A.    That I was specifically aware of.

12     Q.    And you made that analysis after you had been making the

13     door for KNL; is that correct?

14     A.    Can you be a little bit more specific of the time frame?

15     Q.    When you looked -- you said that there was nothing in

16     the market like the Cold Chain door I think you said 2017,

17     2018, 2019?

18     A.    I mean, there was the Arctic Flex-type product that was

19     out there that they had licensed the patent to try and get some

20     IP protection.  But like the door that we were producing, I

21     hadn't seen anything.

22     Q.    The Arctic Flex door was nothing like the thing that you

23     were producing currently for KNL at the time when you made the

24     analysis?

25     A.    Not completely, no.

VOL. I -   72

1    Q.   I want to turn to P9.  This is the letter that you and

2   Mr. Tackett were looking at.  In this letter, basically, Ridge

3   is telling KNL that it's infringing the Cold Chain patent

4   generally; is that correct?

5    A.   We were making them aware of the IP.  We're letting them

6   know -- we're trying to reach -- we're offering a commercial

7   option and asking for a response.

8    Q.   Are you advising them that they're infringing?

9    A.   We're letting them know that we are aware that they're

10   selling -- offering for sale and selling a door that infringes

11   one or more of the '084 patent claims.

12    Q.   If we go to D22.  It's going to be Bates number Altum

13   LLC 001602.

14        Now, Ridge just sent, in June, a letter telling KNL that

15   they're infringing the '084 patent with their door design.  And

16   then here on July 2nd, Ridge's lawyer is still asking KNL to

17   let Ridge be a coinventor on the patent application.  Isn't

18   that right?

19    A.   We're reminding them of our inventorship on their

20   application, that's true.

21    Q.   Ridge wants to be a coinventor on that application,

22   correct?

23    A.   Right.  We believe they were in the process of

24   committing fraud on the patent office.

25    Q.   You and Gary Grandominico are the two primary owners at

VOL. I -   73

1   Ridge, correct?

2   A.   Correct.

3   Q.   It's fair to say you both run the company?

4   A.   We do.

5   Q.   You worked with Bret Moss on the roll-up door for KNL;

6   is that right?

7   A.   Yes.

8   Q.   You worked on -- with -- on the roll-up door with Bret

9   Moss for the Whiting Door that you're making; is that right?

10  A.   Yes.

11  Q.   Kirk National came to Ridge in October 2018 wanting to

12  make a roll-up door; is that right?

13  A.   Correct.

14  Q.   A Ridge employee named Chris Fannin told you that KNL is

15  interested.  Exhibit D8.  Do you remember this email?

16  A.   Yes, I do.

17  Q.   And Chris Fannin here is saying -- is telling -- he's

18  telling Ridge, the folks on this email, including you, that KNL

19  wants to talk to Ridge about possibly making roll-up door

20  panels for a new door application they are looking at making

21  for one of their customers.  Did I read that correctly?

22  A.   Yes.

23  Q.   After this email, at some point, you had meetings with

24  KNL; is that right?

25  A.   Yes.

VOL. I -  74

1    Q.    During one of those meetings, you did some brainstorming

2    with other Ridge folks with KNL people there, and you believe

3    this a prototype or a concept, right?

4    A.    Yeah, we proposed the curve cut and corrugation in those

5    meetings.

6    Q.    And the curve cut was going to be applied to a Ridge

7    sandwich panel; is that right?

8    A.    Yes.

9    Q.    That's a structural foam panel?

10   A.    Yes.  We refer to that product line as Transcore, for

11   the most part.

12   Q.    So a three-layered product with polypropylene and

13   fiberglass skins on both sides of polypropylene foam?

14   A.    Yes.  They're polypropylene fiber reinforced skins on

15   both sides of a polypropylene core, foam core.

16   Q.    Exhibit 43.  So here is a picture of -- well, tell me,

17   what do you think that's a picture of there?

18   A.    It appears to be the picture of a prototype door.  It

19   appears to be a door panel that we produced, and it appears to

20   have rollers, and at least one side of it is in the track, the

21   roll-up door track.

22   Q.    The blue lines running across those panels, is that what

23   we're referring to as the relief cuts?

24   A.    In those areas, that would be referred to as the relief

25   cut where the back skin and the foam core is cut so that you

VOL. I – 75

1    can allow the hinge -- the exterior skin to hinge.

2    Q.   44.  I just want to go through a couple of pictures with

3    you to make sure that everybody has a conceptualization of what

4    we're talking about.  Is this another view of a Ridge door with

5    relief cuts?

6    A.   It appears to be, yes.

7    Q.   What are the brackets there for?

8    A.   I believe those brackets are there to attach rollers.

9    They -- roller -- roller components would be installed into

10   those so that it could be put into the track.

11   Q.   Now, Ridge wanted to use the sandwich panels for the

12   door at those initial meetings because it knew the technology

13   and it was comfortable with its experience, right?

14   A.   Yeah.  We had experience with using relief cuts for many

15   years on -- you know, to produce radii and bendable surfaces,

16   panels in the radii or composites in the radii.

17   Q.   But there is an inherent problem with the sandwich panel

18   for the roll-up door because of the stiffness and that sandwich

19   panel wants to remain flat; is that right?

20   A.   Yeah, depending on the stiffness of the nonrouted

21   section, it's ability to flex changes.  It reduces as it gets

22   stiffer.

23   Q.   In order to address that stiffness problem, you knew

24   that the relief cuts were going to be the way to get it to roll

25   up the track and into the back -- into the top of the truck?

VOL. I - 76

1    A.   In order to transition around tighter radii, you need

2   relief cuts to do it in this particular thickness of panel.

3    Q.   Without the relief cuts, the Ridge sandwich panel that

4   it intended to use was not rolling up that track into the back

5   of the truck?

6    A.   Not without a lot of force.  It wouldn't have been very

7   functional.

8    Q.   How much force are we talking about?

9    A.   I don't know.  We never tested it because this was

10  easier.

11        MR. DILLARD:  May I approach the witness, Your Honor?

12        THE COURT:  Yes, you may.

13  BY MR. DILLARD:

14   Q.   I'm going to tell you this is a demonstrative exhibit,

15  an example of a foam panel that ultimately --

16        THE COURT:  Can we give that demonstrative exhibit a

17  number so the record will reflect?

18        MR. DILLARD:  Sure.  Forty-seven.  Plaintiff's 47.

19        THE COURT:  It will be marked as --

20        MR. DILLARD:  Excuse me.  Defendant's 47.

21        THE COURT:  I'm sorry.  Defendant's 47.

22  BY MR. DILLARD:

23   Q.   So is that -- is that a reasonable -- reasonably like

24  the Ridge panel that it makes for KNL and Whiting Door?

25   A.   Well, the core -- based on what I heard its description,

VOL. I -   77

1   the core is a PET foam as opposed to a PP foam.  I'm not sure

2   what the density of this core is.  It's a foam core in between

3   what appears to be thermoplastic skins.

4    Q.   So maybe this one is not good.

5    A.   Okay.

6         MR. DILLARD:  Mr. Tackett, can I use the demonstrative

7   that you brought?

8         MR. TACKETT:  If the Court would permit me to get up

9   and hand it to you, I have no problem with doing so.

10        THE COURT:  Does that -- does that demonstrative,

11   Mr. Tackett, have a number?

12        MR. TACKETT:  It does not.  When we premarked, we

13   didn't mark this thing.

14        THE COURT:  What's your last premarked exhibit?

15        MR. TACKETT:  Pardon?

16        THE COURT:  What is your last premarked exhibit?

17        MR. TACKETT:  The last one is 69.  So this would be

18   70.

19    BY MR. DILLARD:

20    Q.   I believe Mr. Tackett, in his opening, represented this

21   to be an infringing product, meaning the Cold Chain door that

22   Ridge alleges that is what it makes.

23        So tell me again.  Without those relief grooves -- I

24   want you to put your hands right there and see how much force

25   that will take to bend that to get it go up a track and into

VOL. I -   78

1  the top of the truck.

2   A.   Yes.

3   Q.   Is that happening?

4   A.   Not without a lot of force.

5   Q.   Are we talking industrial-sized force, not manmade

6  force, correct?

7   A.   I wouldn't think you would be able to do it with manmade

8  force.

9   Q.   Okay.  Thank you.

10       I think in spring of 2023 Ridge approached Whiting Door

11  and other door manufacturers to collaborate on a roll-up door

12  concept, correct?

13   A.   I believe that's the appropriate time, yes.

14   Q.   Because it had worked with KNL on a door concept, they

15  didn't want to let that work go to waste, right?

16   A.   Well, I mean, we had a history of working with the door

17  guys.  I'd say Gary's past experience and desire to make a

18  door, this brought us closer to that point.  And it was time to

19  probably take the next steps seeing how things weren't going to

20  happen with KNL, or we weren't sure they were going to work.

21   Q.   And Ridge provided sandwich panels to Whiting?

22   A.   Yes.

23   Q.   With relief cuts?

24   A.   With relief cuts, yes.

25   Q.   Similar to Plaintiff's Exhibit 70 that we just looked

VOL. I - 79

1   at?

2   A.  Ours had thermoplastic skins, polypropylene core.  They

3   would have been similar to the products we supplied KNL during

4   the time they were supplying KNL.

5   Q.  And that's similar to what we just looked at, the

6   demonstrative exhibit, Plaintiff's Exhibit No. 70?

7   A.  Similar from a geometry standpoint but not a material

8   standpoint.

9   Q.  Stiffness standpoint?

10   A.  Can't really opine on that.

11   Q.  Who would know better?

12   A.  Who would know better?  We can test it.  I mean, it's a

13   matter of testing it.

14   Q.  You made it.  Who would know better than you?

15   A.  Let me back up.  Are you asking me about that sample

16   there?

17   Q.  I'm sorry.  I may have asked bad questions.  I'm talking

18   about the Whiting Door.

19   A.  Yes.

20   Q.  The panels with relief cuts that you provided to them,

21   similar to -- are they similar to Plaintiff's Exhibit 70 that

22   we just looked at?

23   A.  They're similar in geometry.

24   Q.  Stiffness?

25   A.  Stiffness?  We'd have to measure it.  I don't know what

1  the stiffness of that cross section is.

2    Q.   The door you provided to Whiting is very similar to the

3  one you provided -- that you provided to KNL?

4    A.   Correct.

5    Q.   And does Ridge hope to finish the project, the testing

6  with Whiting and move into the marketplace and start to sell

7  doors with Whiting?

8    A.   Yes.

9    Q.   So I understand, you also approached a company called

10  Diamond Door?

11   A.   I believe so, yes.

12   Q.   Those talks aren't as far along as the ones with

13  Whiting, though, correct?

14   A.   I don't have specific status.  I believe some of our

15  salespeople reached out to them.  There's some interest.  But I

16  don't know that we're doing any specific testing with them

17  right now.

18   Q.   Exhibit 14.  So can you tell me what this document is?

19   A.   From what's on the screen, it looks like a business

20  plan, cooperative agreement.  It appears to be a business plan

21  that we produced for KNL, TTPS.

22   Q.   And you're listed as one of the authors of this

23  document?

24   A.   Correct.

25   Q.   And it's dated January 11, 2022?

VOL. I –   81

1    A.   Yes, sir.

2    Q.   The purpose of this document is to go to KNL, explain to

3    them what the market for roll-up doors looks like from Ridge's

4    perspective and give them a little background about Ridge's

5    general business situation.  Is that accurate?

6    A.   They asked us to produce this.  My understanding is Jeff

7    Phlipot asked Gary Grandominico, let's put together a business

8    plan, can you make a draft of it and let's figure out how to

9    get these to market.

10   Q.   Let's move to page 7.  Page 7, it looks like Ridge has,

11   in this business plan, stated that Whiting Door is the largest

12   manufacturer of roll-up door?

13   A.   This is page 6.  I don't know if it's Altum eight or --

14   Q.   I'm sorry.  Apologies.  Page 7.  I apologize.  Page 7 of

15   the document.

16   A.   All right.

17   Q.   This is what happens when you don't have the document in

18   front of you.

19        So here we look at the direct competitors, as Ridge

20   views them, doing the KNL door and the first one is Whiting

21   Door.  Correct?

22   A.   Yes.  Correct.

23   Q.   They have been around the longest, since 1953.

24   A.   Yes.  Yes.

25   Q.   Okay.  And at this time, at least, it was believed they

1    had a 40 percent market share in the roll-up door market?

2        A.    Right.   That was the input.   I believe that was produced

3    by our sales team there, their surveyor experience.

4        Q.    And you believe it was accurate?

5        A.    I do.

6        Q.    Do you have any reason to believe that it's not accurate

7    today?

8        A.    No specific reason, no.

9        Q.    We go to the next page, page 8.  Here we see direct

10   competitor number 2, Diamond Roll Up Door.

11       A.    Yes.

12       Q.    And it says Diamond has a 5 percent market share?

13       A.    At the time this was produced, it sounded reasonable to

14   me.

15       Q.    And you don't have any reason today to believe that

16   that's not still accurate?

17       A.    Today, other than just don't know how much their

18   business has changed over the last couple years.

19       Q.    But the talks with Diamond are nowhere near as far along

20   as the talks with Whiting as it relates to Ridge providing a

21   relief cut panel?

22       A.    That's correct.

23       Q.    If we turn to page 13 of this document, can you tell me

24   what this is?

25       A.    It looks like a projection on roll-up door sales by year

VOL. I –   83

1   based on a sales price and market share penetration.

2     Q.   And we see that in this chart, Ridge projected in 2022

3   it would have zero dollars in revenue from the sale of roll-up

4   doors?

5     A.   In 2022, correct.

6     Q.   Is that about right?

7     A.   Yes, yes.

8     Q.   And Ridge's total revenue, if we go to page -- the next

9   page, this is a chart of Ridge, what it projects its total

10  revenue would be.  If we look at 2022 there, we see total

11  revenue of over 142 million.  Ridge didn't quite reach that

12  though?

13    A.   No, sir.

14    Q.   It was more like 60 to 80 million?

15    A.   In that range, yes.

16    Q.   Ridge has 298 employees?

17    A.   Currently in that range, give or take ten.  We add --

18  some people quit.  In that range.

19    Q.   Back to 13, please.  Here we see the roll-up door

20  estimated sales total revenue for Ridge in 2023 is about

21  $300,000?

22    A.   At this time, that's what we were projecting, yes.

23    Q.   That didn't happen, though, right?  Or it's not likely

24  to happen?

25    A.   No, I do not expect that to happen.

VOL. I -   84

1    Q.   It's going to be less?

2    A.   Yes.

3    Q.   Exhibit 14, please.  And here we see 2023 projected

4    total revenue for Ridge and we're over 267 million.  That's not

5    going to happen either, correct?

6    A.   No.  That -- we will not achieve that this year.

7    Q.   It's going to be more like 90 to 110 million?

8    A.   Yes, in that range, yeah.

9    Q.   So we go back to 13.  It's a little tedious.  I

10   apologize.

11        Here we look at 2024 and we see Ridge is anticipating

12   3.6 million in roll-up door sales.  And you think that number

13   is attainable provided you get on track with Whiting and

14   potentially Diamond Door; is that right?

15   A.   We're talking the 2024 numbers?

16   Q.   That's right.

17   A.   We could greatly exceed that.

18   Q.   If you get everything in line with Whiting and with

19   Diamond?

20   A.   And we can take infringing products out of the market

21   space, yes.

22   Q.   If we can eliminate our competition, you would agree

23   with me that we would be better off always, correct?

24        MR. TACKETT:  Objection.

25        THE WITNESS:  Infringing competition, yes.

VOL. I - 85

1    BY MR. DILLARD:

2    Q.   If you go back to 14.  Ridge predicts over $400 million

3    of sales in 2024.  Do you think that's attainable?

4    A.   It would be tough.  We could do it but it would be

5    tough.

6    Q.   I think during your deposition you told me it would

7    probably be more like 200 million?

8    A.   It depends on what happens in several markets.  That's

9    still close enough that I don't think we'll hit the 400.  It

10   would definitely be a challenge.

11   Q.   I think we'll just stay on this page.  For 2025, Ridge,

12   in early 2022, projected 467 million in total revenue.  I think

13   during your deposition you told me that you think Ridge could

14   achieve that and you definitely have the capacity to reach that

15   number; is that right?

16   A.   That's correct.

17   Q.   Go back to 13.  And here Ridge projected total roll-up

18   door sales in the neighborhood of 5.5 million for 2025, right?

19   A.   That's correct.

20   Q.   One of the claims Ridge is asserting in this lawsuit is

21   for false marketing.  Are you aware of that?

22   A.   Yes.

23   Q.   If we go to Exhibit 24, page 24.  Defendant's 24.  I

24   apologize.

25        Here we see at the bottom Ridge's claim.  If you go to

VOL. I -   86

1    the next page.  Ridge claims that KNL's marketed roll-up door

2    is patented.

3            THE COURT:  Where are you reading from?

4            MR. DILLARD:  I'm generally going through what his

5    claims are.  I'm putting the complaint up there for his

6    consultation if he needs it.

7            THE WITNESS:  Are you in 118?

8    BY MR. DILLARD:

9    Q.   Yeah, could be there.

10   A.   What's that?

11   Q.   Yes, sure.

12   A.   Yes, the marketed and infringing door.

13   Q.   And Ridge is claiming in doing so, KNL acted with an

14   intent to deceive the public; is that right?

15   A.   That's my belief, yes.

16   Q.   Ridge claims it's not able to compete against KNL and

17   TTPS because of this false marketing.  Is that accurate?

18   A.    It definitely creates headwinds, of course.

19   Q.   Ridge also falsely marketed products it's patented in

20   the past, hasn't it?

21   A.   We did find some erroneous language, but we understand,

22   I believe, why it happened.

23   Q.   Exhibit 32.  This is a webpage from Ridge's website, and

24   if you go towards the bottom under foam adhesion.

25           MR. TACKETT:  Your Honor, I want to register an

VOL. I -  87

1    objection.  This document has no relevance to whether or not

2    the defendants are infringing nor whether or not they're liable

3    for false marketing under the patent statute at issue.

4            THE COURT:  What's the relevance of this?

5            MR. DILLARD:  I think it's kind of a general fairness,

6    an unclean hands argument.

7            THE COURT:  In your answer did you allege unclean

8    hands?

9            MR. DILLARD:  We haven't filed an answer yet, Your

10   Honor.

11           THE COURT:  So unclean hands would apply if they had

12   done something in this case that related to this infringement.

13   This is what some would call an FE.  Do you know what an FE is,

14   Mr. Dillard?

15           MR. DILLARD:  What's good for the goose is good for

16   the gander?

17           THE COURT:  No, that's not an acronym for FE.  It's a

18   false equivalent.  And false equivalents are, at their core,

19   irrelevant.  Your objection is sustained.

20           MR. DILLARD:  I appreciate that.  I have no further

21   questions, Your Honor.  Thank you.

22           THE COURT:  Thank you, Mr. Dillard.

23        Mr. Koltak.

24           MR. KOLTAK:  I just have a couple of questions.

25

VOL. I -   88

1                          - - -

2                  CROSS-EXAMINATION

3    BY MR. KOLTAK:

4    Q.   Mr. McDonald, would you turn back to Plaintiff's

5    Exhibit 3 in the book you were provided?

6         THE COURT:  Mr. Koltak, my court reporter indicated

7    she needs a break.  If you only had two questions, we can go

8    with those two questions.  And I like to take lawyers at their

9    word.

10        MR. KOLTAK:  Two may have been an underestimate, but

11   one or two.  That's it.

12        THE COURT:  Let's finish with yours and then we'll

13   break.

14   BY MR. KOLTAK:

15   Q.   Exhibit 3.  That's the amended and restated license

16   agreement?

17   A.   Yes, sir.

18   Q.   Between Ridge Corporation and Cold Chain LLC?

19   A.   Correct.

20   Q.   Is this the final agreement reached with Cold Chain

21   prior to entering into -- filing this lawsuit?

22   A.   This appears to be the signed agreement in this -- this

23   would be the last license agreement that I'm aware of.

24   Q.   And when you say signed agreement, on page 12 by Gary

25   Grandominico CEO?

VOL. I — 89

1      A.    Correct.

2      Q.    And then Joe Forney, CEO for Cold Chain?

3      A.    Correct.

4      Q.    And that is the agreement on which Ridge Corporation

5   bases its rights with the Cold Chain patent?

6      A.    I would believe so, yes.

7             MR. KOLTAK:  No further questions, Your Honor.

8             THE COURT:  Thank you, Mr. Koltak.

9          Mr. Burton, do you have any questions?

10            MR. BURTON:  No.  Koltak is my co-counsel.  So no

11  thanks.

12            THE COURT:  We're going to take a break here.

13  Mr. Tackett, I'm assuming you have some redirect.

14            MR. TACKETT:  Yes, sir, some redirect on Exhibit 14.

15            THE COURT:  We'll stand in recess until 11:30.  It's

16  11:15, right now.

17      (Recess taken from 11:15 a.m. to 11:30 a.m.)

18            THE COURT:  Mr. Tackett, are you ready to proceed with

19  your redirect?

20            MR. TACKETT:  Yes, Your Honor, if I may.

21            THE COURT:  You may proceed.

22                         - - -

23                  REDIRECT EXAMINATION

24   BY MR. TACKETT:

25      Q.    Mr. McDonald, counsel for Altum was asking you some

1    questions about Exhibit D14 that they put in front of you, a

2    document entitled Business Plan/Cooperative Agreement.  Can you

3    turn back to that D14, please?

4    A.   I believe they were showing it on the screen.

5    Q.   We'll figure it out one way or another.  It looks like

6    we got belt and suspenders right now.

7         Mr. Dillard was asking you some questions about the

8    portions of the document containing revenue projections.  I'd

9    like you to look at those.  On pages 13 and 14 of this exhibit,

10   so --

11   A.   Okay.  I'm there.

12   Q.   Page 13 contains -- relates to the revenue projections

13   for the door, right?

14   A.   Yes.  This projection is for roll-up door total sales,

15   not to be confused with door panel sales.

16   Q.   Okay.  And under the column that says total and in

17   alignment with the row 2023, what are you projecting there?

18   A.   That would be $3.6 million in sales if -- I'm sorry.

19   2023?  That would be year two.  That would be $299,299 if we

20   sold approximately 299 complete doors at approximately a

21   thousand dollars.

22   Q.   And then in the next year, after ramping up, what are

23   you projecting there on that?

24   A.   Similar.  It's 3,500 complete doors at a thousand

25   thirty-one dollars per door system, and aggregating to

VOL. I —   91

1   $3.6 million.

2   Q.   Now, in terms of Ridge's efforts to go into the market

3   with its exclusive license to different companies and sell what

4   they're offering, what different type of figures would you be

5   looking at for those sales?

6          MR. DILLARD:  Objection, Your Honor.  Speculation.

7          THE COURT:  Overruled.  You may answer.

8          THE WITNESS:  Thank you, Your Honor.

9          Assuming we put together the deal with Whiting, we would

10  be selling a door panel.  They would, in turn, be selling a

11  complete door.  So that's scenario one.

12         Scenario two is we build the door ourselves, nothing

13  happens with Whiting.  And that's what these type of numbers

14  would reflect because this is a complete door.  These numbers,

15  based on this percentage market share penetration, would be low

16  because this was working with KNL which is not an established

17  door manufacturer.  They don't have any clout in that arena.

18  Working with Whiting would be substantially quicker.  The ramp

19  up would be substantially quicker, and the revenues I'd expect

20  to be larger year two, year three, year four than what we're

21  projecting here.

22         Now, this is a 2022 document.  Right?  We're in 2023.

23  So the delay that this whole thing has caused kind of makes the

24  years inaccurate here.  Right?  We got to start the clock

25  again.  So, basically, we would be projecting -- I would

VOL. I - 92

1  project larger numbers than these on year two, three, four, et

2  cetera, if we're able to bring and overcome the issues with

3  Whiting, making sure they're comfortable with the relationship.

4  BY MR. TACKETT:

5  Q.   And what type of revenue does Ridge expect it could

6  obtain from its efforts to sell to Whiting, Diamond, and others

7  its patented solution?

8  A.   I don't have a specific number, Mr. Tackett.  Looking at

9  these, the penetration values here of 300, 3,500, 5,200 seem

10  extremely low.  One partner could take five thousand.  And we

11  deal with fleets of that size all the time.  And there's

12  several fleets that are very interested in the door system.  So

13  we could dwarf these numbers very quickly.

14  Q.   What type of numbers would you be looking at in terms of

15  units?

16  A.   Two customers could comprise ten thousand units in a

17  year very easily.

18  Q.   What type of numbers in terms of revenue would you

19  expect in those unit sales?

20  A.   As far as a per panel unit sale, like what kind of

21  pricing would we project?  A panel alone -- and this is a range

22  of the type of panel that we've been producing, I would say

23  would be in the 380 to 450 -- 380 dollars to 450-dollar range

24  depending on the makeup, the amount of finish detail the

25  customer needed.

VOL. I -   93

1    Q.   Can you turn to the next page, page 14 of this Exhibit

2    D14?  It's Bates labeled Altum LLC 15.

3    A.   Yes.

4    Q.   Altum's counsel asked you to look at the revenue figure

5    for 2022 which was a projection of 142 million.  And I believe

6    you testified that actual revenue was somewhere in the

7    neighborhood of 60 to 80 million?

8    A.   Correct.

9    Q.   Would getting into the market with your patented

10   solution bridge part of that gap between your projection and

11   what you actually realized?

12   A.   In 2022?

13   Q.   Yes, sir.  Assuming the beginning of '22 things work out

14   and you get into the market with your solution.

15   A.   At that point, we would have been working with KNL and

16   we would have been doing sales with KNL.  This was a projection

17   for doing business together with KNL in the -- in that year.

18   Now, if we -- right now we're moving forward.  You have to

19   slide this probably at least 12 months on the projection.  But,

20   yes, obviously, we would be generating revenues at a much

21   higher ramp with a significant partner that would offset some

22   of these numbers, of course.

23   Q.   And then in terms of 2023, what you have here of the

24   projection of 267 million versus the lower revenue that you

25   have, would getting to the market with Diamond, Whiting, and

VOL. I –   94

1   others help you bridge that gap?

2   A.   Certainly.  Yes.

3   Q.   And how much so?

4   A.   Well, we'd have to have a door that was completed

5   through the testing, and in a matter of our capacity to produce

6   the doors is very high.  We could produce thousands of doors a

7   week, panels a week.  So it would be a matter of which partners

8   were selling the doors.  It could be substantial.

9   Q.   What would be the estimated revenue difference?

10   A.   It could be millions, millions of dollars annually.

11   Q.   And one more point of your testimony on cross that I

12   want to clarify, just one question.

13       There was testimony about Diamond Door, Whiting Door and

14   others as potential partners.  But as we sit here today, are

15   there any agreements that are signed between Ridge and any of

16   those potential partners to go to market?

17   A.   To go to market, no.  Just nondisclosure agreements at

18   this point.

19           MR. TACKETT:  Nothing further.  Thank you, Your Honor.

20           THE COURT:  Thank you.  Thank you, Mr. Tackett.

21       Mr. Dillard, any recross?

22           MR. DILLARD:  No recross, Your Honor.  Thank you.

23           THE COURT:  Mr. Koltak, any recross?

24           MR. KOLTAK:  No, Your Honor.

25           THE COURT:  Mr. McDonald, thank you very much, sir.

VOL. I –   95

1    You may be excused.

2           THE WITNESS:  Thank you, Your Honor.

3           MR. TACKETT:  Your Honor, we have a clarifying

4    question for the Court before calling our next witness.  With

5    regard to the order of the separation of witnesses, may

6    Mr. McDonald stay in the courtroom now or should he leave?

7           THE COURT:  Do any of you intend to call Mr. McDonald

8    as upon cross?

9           MR. DILLARD:  At this time we don't know, Your Honor.

10          THE COURT:  Mr. Koltak?

11          MR. KOLTAK:  Unclear.

12          THE COURT:  Do you have any objection to Mr. McDonald

13   remaining in the courtroom?

14          MR. DILLARD:  Yes, Your Honor.

15          THE COURT:  What's the basis of it?

16          MR. DILLARD:  If we need to recall him for some other

17   witness testifying conversely to what he testified, one of

18   Ridge's own witnesses, and get clarification from him.  That

19   would be our only basis.

20          THE COURT:  So in preparing for this, you didn't

21   contemplate calling him as a witness; is that right?

22          MR. DILLARD:  That is right, Your Honor.

23          THE COURT:  Is that the same for you, Mr. Koltak?

24          MR. KOLTAK:  Correct.  He is not listed as a witness

25   for our side.

VOL. I -   96

1          THE COURT:  But you don't know whether -- for this

2    preliminary injunction hearing, whether you're going to call

3    him back?

4          MR. DILLARD:  We do not at this point, Your Honor.

5          THE COURT:  And you have -- who is your client

6    representative who is here?

7          MR. TACKETT:  Mr. Gary Grandominico, the CEO.

8          THE COURT:  Mr. Grandominico is seated right there?

9          MR. TACKETT:  Yes, Your Honor.

10         THE COURT:  We will have him -- Mr. McDonald excluded,

11   although I would be disingenuous if I said I'm convinced that

12   you're going to recall him.  But there is a possibility that

13   you might because I know how well you all have prepared for

14   this.  And I would assume that you would know whether you're

15   going to call him back.  But given the nature of his testimony,

16   you may be correct.

17         MR. DILLARD:  With that being said, Your Honor, we do

18   not anticipate recalling him.  I just don't know that something

19   may come up.

20         THE COURT:  It's better to be safe than sorry.

21   Mr. McDonald, you are excused.

22         Ms. Wood, your next witness?

23         MS. WOOD:  We call Richard Sharpe to the stand.

24         THE COURT:  Mr. Sharpe, please come forward and be

25   sworn.

VOL. I -   97

1      (Witness sworn.)

2          THE COURT:  Ms. Wood, please proceed.

3                  - - -

4                  RICHARD SHARPE

5    Called as a witness on behalf of the Plaintiff, being first

6    duly sworn, testified as follows:

7                  DIRECT EXAMINATION

8    BY MS. WOOD:

9    Q.    Can you please state your name for the record?

10   A.    Richard Andrew Sharpe.

11   Q.    Mr. Sharpe, what is your profession?

12   A.    I'm a patent attorney.

13   Q.    Where do you work?

14   A.    I work at the firm of Pearne and Gordon in Cleveland,

15   Ohio.

16   Q.    How long have you worked there?

17   A.    At Pearne and Gordon, about 12 years, I believe.

18   Q.    What is your title at Pearne and Gordon?

19   A.    I'm a partner.

20   Q.    What is your educational background?

21   A.    I have an undergraduate degree in chemistry, a

22   Bachelor's of Science in chemistry from Otterbein College.  I

23   think it's Otterbein University now in Westerville, and I have

24   a law degree from the American University in D.C.

25   Q.    Do you hold any licenses?

VOL. I -  98

1    A.    Yes.  I'm licensed in the state of Ohio to practice law.

2    I am licensed to practice before the United States Patent and

3    Trademark Office.

4    Q.    Are you a member of any professional organizations?

5    A.    ABA, Cleveland Intellectual Property Law Association.

6    Q.    How many years have you worked as a patent attorney?

7    A.    About 32.

8    Q.    Before that, did you have any patent experience?

9    A.    Yes.  I was a patent examiner at the United States

10   Patent and Trademark Office.  And then after that, I was a

11   patent agent for a law firm in D.C. while I was finishing up

12   law school.

13   Q.    What does your experience as a patent examiner entail?

14   A.    Well, as an examiner, it's our job to examine patent

15   applications, pending applications for patentability.  As part

16   of that process, we are trained to assess the level of ordinary

17   skill in the art and then apply that to patentability

18   determinations for pending applications.

19   Q.    Have you examined the Cold Chain patent?

20   A.    I have.

21   Q.    And have you examined the accused door in this case?

22   A.    I have.

23   Q.    Have you reviewed any other sources of information in

24   this case?

25   A.    The prosecution history for the patent application, the

VOL. I — 99

1    Cold Chain patent.

2      Q.    And have you reached any conclusions as a result of your

3    examination of those items we discussed?

4      A.    Yes, I have.

5      Q.    What is your conclusion?

6      A.    I conclude that the --

7          MR. CLIFFORD:  Objection, Your Honor.

8          THE COURT:  Basis?

9          MR. CLIFFORD:  It's basically the basis of the motion

10   in limine.  They're asking for him to step in your shoes and

11   determine whether there's infringement or not.  And his

12   testimony is not appropriate in this area.

13         MS. WOOD:  We're not asking Mr. Sharpe to opine on any

14   legal conclusions.

15         THE COURT:  Could you bend the microphone toward you?

16         MS. WOOD:  We're not asking Mr. Sharpe to opine on

17   legal conclusions.  He will be relying on his technical

18   expertise in the area, and he will not be opining as to the

19   ultimate issue as to whether there is infringement or not

20   infringement in this case.

21         THE COURT:  Your objection is overruled.

22      You may answer, Mr. Sharpe.

23         THE WITNESS:  I have concluded that the accused doors

24   have every element that is recited in the asserted claims of

25   the Cold Chain patent in this case.

VOL. I -  100

1    BY MS. WOOD:

2    Q.   Mr. Sharpe, what is your relationship with Ridge?

3    A.   I am its intellectual property attorney.

4    Q.   How long have you worked for Ridge?

5    A.   I would say probably less than a year.

6    Q.   And through your work with Ridge, did you become what --

7    become involved with the Cold Chain patent?

8    A.   I did.

9    Q.   How?

10   A.   It was brought to my attention by I believe

11   Mr. Grandominico.  He said, you know, we have concerns that KNL

12   may be making a door under this patent and we'd like you to

13   look at it.

14   Q.   And I believe you just mentioned KNL, Kirk National

15   Lease.  I'm going to ask, are you familiar with the defendants

16   in this action, Kirk National Lease, Truck and Trailer Parts

17   Solutions, and Altum?

18   A.   Yes.

19   Q.   How are you familiar with them?

20   A.   Through the process of preparing the complaint and

21   preparing for this hearing.

22   Q.   And how did you first come to know that they might be

23   players in this action?

24   A.   I would say we got information about the door, the

25   panels and the accused door from Ridge, and we set about doing

VOL. I - 101

1  our analysis, comparison of the Cold Chain patent to those

2  accused doors.  We saw the samples of the accused doors in a

3  video at the TTPS website.  And Transglobal was raised

4  somewhere in the process of contributing to the door, as well

5  as Altum.

6     Q.   After you received information and you did an analysis,

7  what did you do next?

8     A.   I prepared a claim chart, and we advised Ridge as to our

9  conclusions regarding that.

10    Q.   Did you prepare any letters in this action?

11    A.   Yes.

12    Q.   Do you have plaintiff's exhibits in front of you,

13  Mr. Sharpe?

14    A.   I do.

15    Q.   Could you please turn to Tab P5?

16         What is this document?

17    A.   This is a letter that I sent -- myself and my partner,

18  Greg Chrisman, prepared to counsel -- our understanding to

19  counsel for KNL.  This letter is to notify them that we

20  believed that employees of Ridge were joint inventors of an

21  application that KNL had filed.  We referred to it as the '144

22  application, I believe.

23    Q.   Is this a true and accurate copy of the letter?

24    A.   Yes.

25    Q.   And who wrote this letter?

VOL. I – 102

1    A.    Myself.

2    Q.    I believe you may have mentioned this, but what was the

3    purpose of this letter?

4    A.    To inform KNL that we felt that the inventorship needed

5    to be corrected.

6    Q.    What was the basis for the facts in this letter?

7    A.    We discussed the contributions and the development of

8    the door with the people at Ridge.  And through those

9    discussions, we learned that KNL had approached Ridge with an

10   idea for a roll-up door.  And through the process of -- the

11   development process with the Ridge personnel and engineers that

12   they, in fact, developed a door to meet those needs.

13   Q.    Did you receive a response to this letter?

14   A.    I believe we did.

15   Q.    Could you turn to Tab P6, please?

16   A.    Okay.

17   Q.    Are you familiar with this document?

18   A.    Yes.

19   Q.    What is this document?

20   A.    I believe this is the response that they sent to us

21   regarding the question of their inventorship contribution.

22   Q.    What is the date on this document?

23   A.    This is dated June 30th, 2023.

24   Q.    And is this a true and accurate copy of the June 30th

25   email?

VOL. I - 103

1    A.    I believe that is it.

2    Q.    What does that email say?

3    A.    This email references a brief conversation that Attorney

4    Barnes had with my partner, Mr. Chrisman, to discuss the

5    inventorship issue.  And during that conversation, Mr. Chrisman

6    indicated that we would send them some corroborating

7    information for the position that we took in the initial

8    letter, which I believe we ultimately did.

9         And then it also says that Mr. Phlipot does not agree

10   with our assessment that Ridge personnel were joint inventors

11   of the application.

12   Q.    Did you have a reaction to this response?

13   A.    We disagreed.  And I do believe we did provide

14   corroborating evidence to Mr. Barnes as requested.

15   Q.    Could you please turn to Tab P4?  Or I'm sorry.  P7.

16   Excuse me.

17        Are you familiar with this document?

18   A.    Yes.

19   Q.    What is this document?

20   A.    This is our response to Mr. Barnes's request providing

21   him with documentary evidence and support for conclusions

22   regarding joint inventorship.

23   Q.    What type of information did you provide?

24   A.    We provided a series of engineering drawings.  There may

25   have -- notebooks entries.  I don't know if there was any

VOL. I -  104

1    correspondence included.  But it was certainly a fair amount of

2    detailed information on not just the configuration and the

3    geometry of the doors, but the materials and how to make the

4    doors actually function to curve around the tracks.

5    Q.   Could you turn to the page that is Bates labeled Ridge

6    59, please?

7    A.   I'm sorry.  Excuse me?

8    Q.   Ridge 59.

9    A.   An exhibit or page?

10    Q.   The page in that exhibit.

11    A.   Okay.  Gotcha.  Okay.

12    Q.   Are these the drawings that you were referring to?

13    A.   Yes, they are.

14    Q.   Could you please flip the page?

15    A.   Okay.

16    Q.   Are these also drawings that you were referring to?

17    A.   Yes.

18    Q.   And did you think this information satisfied Mr. Barnes'

19    request?

20    A.   I do not believe it did.  I believe that he maintained

21    his position that Ridge employees were not joint inventors of

22    the subject matter of the pending application.

23    Q.   Did you send any other letters in this action?

24    A.   We did.

25    Q.   Could you please turn to Tab P9?

VOL. I — 105

1  A.  All right.

2  Q.  Are you familiar with this document?

3  A.  Yes.

4  Q.  What is it?

5  A.  This is an excerpt from the TTPS website from which we

6  derived some of the information concerning our analysis of the

7  accused door.

8  Q.  Thank you.  I'm sorry if I misspoke.  I meant Tab P9.

9  A.  Yes.  This is a letter also from my law firm, myself,

10  directed to Kirk National Lease and TTPS regarding the Cold

11  Chain patent.

12  Q.  What is the date on this document?

13  A.  June 6th, 2023.

14  Q.  Is this a true and accurate copy of the letter?

15  A.  I believe it is, yes.

16  Q.  And who wrote this letter?

17  A.  I did.

18  Q.  Can you please explain the purpose of this letter?

19  A.  The purpose of this letter was to inform KNL and TTPS of

20  the Cold Chain patent and our analysis or belief that the doors

21  that KNL and TTPS were offering infringed that patent.

22  Q.  What was the basis for the facts in this letter?

23  A.  Again, the information about the accused doors that we

24  received from Ridge.

25  Q.  Did you receive a response to this letter?

VOL. I —  106

1    A.    I believe so.

2    Q.    Could you turn to Tab P10, please?  What is this

3   document?

4    A.    This was the initial response to the letter in Exhibit 9

5   basically saying that they'll get back to us.

6    Q.    And does this look to be a true and accurate copy of the

7   letter?

8    A.    Yes.

9    Q.    Did you have a reaction to this response?

10    A.    I personally thought this was a little flippant.

11    Q.    Did you ever receive another response?

12    A.    I believe we did.

13    Q.    Could you turn to Tab P11, please?  Are you familiar

14   with this document?

15    A.    Yes.

16    Q.    What is it?

17    A.    This is a response, a formal response, from KNL's

18   attorney advising us that they disagreed with our conclusion

19   regarding infringement of the patent.

20    Q.    What is the date on this letter?

21    A.    This is dated August 1st, 2023.

22    Q.    Is this a true and accurate copy of the letter?

23    A.    I believe so, yes.

24    Q.    And did you have a reaction to this letter?

25    A.    We disagreed with the conclusion, obviously, and we

VOL. I -  107

1    advised our client accordingly.

2    Q.    Could you turn to Tab P12, please?  What is this

3    document?

4    A.    Similar to our other notice letter, this is a letter to

5    Altum informing Altum of the Cold Chain patent and our belief

6    that they were contributing or inducing infringement of that

7    patent.

8    Q.    What is the date on this letter?

9    A.    This is dated June 9th, 2023.

10   Q.    Is this a true and accurate copy of the letter?

11   A.    Yes, ma'am.

12   Q.    And who wrote this letter?

13   A.    I did.

14   Q.    What was the basis for the facts in this letter?

15   A.    Our understanding of Altum's contribution to the

16   ultimate -- the KNL door.  There has to be a direct

17   infringement in order for there to be a contributory or induced

18   infringement.  This reflects our understanding that they were

19   materially involved with helping KNL design the door and how to

20   make the grooves and things to let it function to go around the

21   curves.

22   Q.    Did you receive a response to this letter?

23   A.    I believe so.

24   Q.    Can you turn to Tab P13, please?

25        Are you familiar with this document?

VOL. I — 108

1    A.   Yes.

2    Q.   What is it?

3    A.   This is a response to our notice of the Cold Chain

4  patent to Altum.

5    Q.   And does this look to be a true and accurate copy of the

6  response?

7    A.   Yes.

8    Q.   What does this document say?

9    A.   This document denies that Altum infringes the Cold Chain

10  patent.

11    Q.   Did you have a reaction to this letter?

12    A.   Again, we disagreed with that conclusion.

13    Q.   Are there any other relevant letters that you're aware

14  of?

15    A.   I believe we received a letter –– a letter that was sent

16  to Cold Chain or that was sent to Whiting Door.

17    Q.   Could you please turn to Tab P14?

18         What is this document?

19    A.   This is the letter I mentioned that was sent to Whiting

20  Door.

21    Q.   Are you familiar with this letter?

22    A.   I am.

23    Q.   And how did you learn about this letter?

24    A.   This letter was brought to our attention I believe by

25  Mr. Grandominico.

VOL. I –  109

1    Q.   What does this letter say?

2    A.   This letter basically was informing Whiting Door of a

3   pending patent application by KNL, the '144 application.  And

4   it alleges or implies, anyways, that Whiting could be liable

5   for royalty damages from the date of publication, and the

6   implication obviously being, in my opinion, a veiled threat.

7    Q.   And you mentioned royalty damages.  This letter brings

8   up royalty damages.

9    A.   Yes.

10   Q.   Do you have any -- did you have a reaction to the

11   royalty damages specifically?

12   A.   We did.  The provision about royalty damages back to the

13   date of publication is contingent on several things.  And one

14   of the things it's contingent on is that the claims are

15   essentially the same as they were when they were originally

16   filed.  We went and took a look at the prosecution and the

17   claims at that point in time and determined the claims were

18   materially changed from the original status as filed and,

19   therefore, that eliminates the possibility to recover those

20   royalty damages prior to -- back to publication.

21   Q.   When you say "the claims," are you -- can you tell me

22   what patent you're talking about?

23   A.   The pending claims in the '144 application.

24   Q.   Can you please turn to Tab P15?

25   A.   Okay.

VOL. I – 110

1   Q.   Are you familiar with this document?

2   A.   This looks to be an excerpt from the pending '144

3   application of KNL.

4   Q.   Are these the amendments that you were referring to?

5   A.   Yes.  As you will see, in addition to significant

6   changes to the text, the claims themselves were heavily

7   amended.

8   Q.   Are you familiar with the complaint filed in this

9   action?

10   A.   I am.

11   Q.   Are you familiar with the claim chart that is attached

12   as Exhibit 16 to the complaint?

13   A.   Yes, ma'am.

14   Q.   Can you please turn to Tab P16?

15        What is this document?

16   A.   This is the claim chart to which I referred earlier

17   which we prepared to illustrate where each element of the

18   asserted patent claims were found in the accused doors.

19   Q.   Does this look to be a true and accurate copy of the

20   claim chart?

21   A.   Yes, ma'am.

22   Q.   What was your role with this claim chart?

23   A.   I drafted most of it in conjunction with my partner Greg

24   Chrisman.

25   Q.   What is the purpose of the claim chart?

VOL. I - 111

1    A.    The purpose of the claim chart is to, in the left-hand

2    column, reproduce the language of the patent claim itself.  And

3    it's that language that -- on which determination of

4    infringement is based.  And in the right-hand column, we try to

5    illustrate as clearly as possible where each of those features

6    from the claim are found in the accused -- in the accused

7    doors.

8    Q.    And to clarify, what does a claim mean in patent law?

9    A.    So the patent claims are the numbered paragraphs at the

10   end of the patent that define the legal scope of your patent

11   claim.  Hence, the term claims.  So they basically say if you

12   have everything in that patent claim, all of the features, all

13   the elements that are recited, you infringe.  If you don't have

14   all the features or elements, then you don't infringe.

15   Q.    Can you explain the difference between an independent

16   and dependent claim?

17   A.    An independent claim is a claim that doesn't refer back

18   to any other claims.  So it stands independently on its own. A

19   dependent claim, by contrast, actually refers back to a prior

20   claim.  As a result of that, that dependent claim includes, in

21   addition to the features it recites itself, all of the features

22   of the claim it refers back to.

23   Q.    Can you please walk us through claim 1 of the claim

24   chart?

25   A.    So claim 1 on the claim chart, as I said, in the

VOL. I - 112

1    left-hand column is the claim language of claim 1 that's

2    reproduced.  It starts out referring to an insulated overhead

3    door that's designed to roll open and close in tracks to cover

4    a door opening having a top and bottom.  In the right-hand

5    column, we kind of tried to show the 10,000-foot view, as it

6    were, of the door to demonstrate it can roll up and down, open

7    and close to cover the opening of the door which is kind of

8    shown in blue.  And so it's kind of shown there.  The video

9    also, I believe Exhibit 8 to the complaint, also shows how the

10   door actually functions.

11        Then the claim goes on to recite that the insulating

12   overhead door has a first outermost surface and a second

13   outermost surface opposite the first outermost surface.  Again,

14   in the right-hand column, we generally point to the exterior

15   surface of the door that's shown there with the green arrows to

16   show that that's the first outermost surface of the claim.  And

17   we know that because subsequent language in the claim actually

18   defines what that surface is.

19        Then a second outermost surface we show in the lower

20   picture in figure 2 as the foam surfaces that are seen on the

21   inside of the door there.  You see that with the orange arrows

22   pointing to those little slots.

23        Now, if you turn the page to Ridge 127, the claim

24   language continues.  And so these are -- the description on the

25   right-hand side tries to elaborate what those individual

VOL. I - 113

1    surfaces are.  So I prefer to look at figure 4, but figure 4 is

2    really just -- it's an illustration of the panel that we see in

3    figure 3 in an effort to try and make this a little more

4    understandable.

5         So what you see here is basically a panel, as we've all

6    discussed so far.  And at the bottom of the panel you have a --

7    you see a green line.  Okay?  And the claim language pointing

8    to that green line is quoted in figure 4 itself.  That's a

9    thermoplastic membrane comprising glass fibers, and the

10   thermoplastic membrane forming the first outermost surface.

11   The first outermost surface disclaimed there is the outer

12   surface of that green basically fiberglass thermoplastic resin

13   membrane.

14        Then we have a layer of insulating foam, orange.  That's

15   shown in orange in figure 4.  It's also shown up in figure 3 as

16   the photograph of the accused door.  And that insulating foam

17   extends continuously along the green thermoplastic membrane.

18   And then you have above that you see segments of white which is

19   also -- that's the inner skin.

20        Basically, Your Honor, it's a foam sandwich.

21        And then you also see in this figure this groove that's

22   been routed out or cut out of the back of the door to eliminate

23   that first -- the thermoplastic membrane on the inside of the

24   door and some of the foam.  That's how we get the flexibility

25   of the panel.  So then the claim on Ridge 128 -- the claim goes

VOL. I -  114

1   on to further define the surfaces.

2          MR. CLIFFORD:  Your Honor, the pending question was

3   probably asked about ten minutes ago of what is this.  And

4   Mr. Sharpe is just now reading from the document without

5   actually answering questions.

6          THE COURT:  Your objection is to a narrative?

7          MR. CLIFFORD:  Yes, Your Honor.  This document, Your

8   Honor, is probably --

9          THE COURT:  The question was -- I'm going to tell you

10  what the question was.  "Can you please walk us through claim 1

11  of the claim chart?"  That's what he's doing.

12      I agree that questions that call for narrative or

13  narrative answers are generally prohibited.  But in the nature

14  of an opinion witness under *Johnson*, I will allow Mr. Sharpe to

15  walk us through this claim as the question asked -- was posed,

16  rather.  So it is responsive to the question.  So your

17  objection is noted but overruled.

18         Please continue, Mr. Sharpe.

19         THE WITNESS:  Thank you, Your Honor.

20         So on Ridge 128, the claim language continues in the

21  left-hand column, and it says both the first outermost surface

22  and the second outermost surface being larger than any of the

23  top surface, the bottom surface, a first side surface and a

24  second side surface.  Patent lawyers tend to use a lot of

25  words.  That's basically saying that the outer thermoplastic

VOL. I -  115

1    membrane surface of the door and the second outermost surface
2    of the door, which is the exposed foam surfaces on the inside
3    of the door, the area of those is larger than any of the edge
4    surfaces around the outside of the door is basically what
5    that's saying.
6           So then the claim chart goes on on Ridge 129 to actually
7    show you the calculations based on estimated size of the outer
8    membrane surface and the second innermost surface.  And that
9    basically illustrates, Your Honor, that those meet that size
10   requirement for the surfaces to be the first outermost surface
11   and the second outermost surface as the claim requires.
12          Then on Ridge 130, again, the claim continues.  It
13   further explains that the door comprises a thermoplastic
14   membrane comprising glass fibers, has a top and bottom and a --
15   basically, it's the skin.  It's the outer surface skin.  It's
16   defining that thermoplastic membrane as having glass reinforced
17   fibers, basically fiberglass, Your Honor.  And it says that
18   that thermoplastic membrane forming the first outermost
19   surface.
20          So if you'll bear with me.  If you go back to figure 4
21   on Ridge 127, Your Honor.
22          THE COURT:  Let me get there.  Go ahead.
23          THE WITNESS:  That's basically saying that green line
24   you see in the bottom --
25          THE COURT:  Yes.

VOL. I - 116

1          THE WITNESS:  -- that's the outer membrane, the

2    thermoplastic membrane described on Ridge 130 as being a

3    thermoplastic membrane comprising glass fibers and forming the

4    first outermost surface.  So it's basically the outside of the

5    door.

6          THE COURT:  All right.

7          THE WITNESS:  Then it goes on back at Ridge 130 to

8    describe that the door also includes a sheet of insulated foam

9    material directly attached to the thermoplastic membrane.  And

10   as seen as figure 3 on the right-hand column, you can see that

11   there is a layer of foam insulating material attached to the

12   thermoplastic membrane which is, again, the outside of the

13   door.  That's the foam and the foam -- in the foam sandwich.

14         THE COURT:  Give me just one moment before you resume.

15   Please continue.

16         THE WITNESS:  Then if we go to Ridge 131, you'll see

17   in the orange text in the left-hand side the claim goes on to

18   further describe and define what that -- the sheet of foam

19   insulating material.  And the foam insulating material is

20   essentially -- it's attached to the thermoplastic membrane, the

21   green membrane.  And that foam insulating material forms the

22   second outermost surface.

23         So, again, if we go back to Ridge 127 and figure 4

24   there, that's basically saying -- if you see figure 4, there is

25   a lot of outermost surfaces.  There's the outermost edge

VOL. I - 117

1   surfaces that you see in orange on the side.  I'm sorry.  It's

2   127, Your Honor.  Ridge 127.

3        So if you see that figure, there is a lot of outer

4   surfaces.  I'm sorry, Your Honor.

5        THE COURT:  I got it.

6        THE WITNESS:  There's the outer edge surfaces around

7   the edge of the door.  There's the outer surface on the outside

8   of the door.  There's the surface formed by this thermoplastic

9   material shown in white.  There's the surfaces -- the outer

10  surfaces that are shown forming the groove.  So as you can see,

11  a panel has a lot of -- a door has a lot of different outermost

12  surfaces, but the claim itself specifically defines exactly

13  what the second outermost surface is for purposes of what is or

14  is not a patented door.  And that is the foam insulating

15  material forms the second outermost surface.

16       So then going back to figure 4 of all the outermost

17  surfaces that you see here --

18       THE COURT:  You mean figure 4, illustration of figure

19  3?

20       THE WITNESS:  Yes.  So all of the outermost surfaces

21  that you see there, the claim itself specifically defines the

22  second outermost surface as being formed by the insulating

23  foam.

24       That surface, Your Honor, is the surface that's opposite

25  the green line inside those grooves as defined by the claim

VOL. I –  118

1    language itself, expressly --

2           THE COURT:  And it has the parallel lines in it,

3    right?

4           THE WITNESS:  Right.

5        So then moving on to the rest of the claim at Ridge 131,

6    the claim goes on to define that the door has wheels that are

7    attached to the door.  Those are shown in purple on figure 5.

8        We move on to Ridge 132, the overhead door comprises

9    only one panel.  That's the claim to fame here.  That's what

10   everybody is fighting about.  We have a single panel door.

11   It's kind of a big deal I understand in the industry.  The

12   panel is flexible along its entire length so as to be capable

13   of approximating the curvature of the curved tracks.  The

14   curved tracks shown in figure 6 are shown in purple.

15       As you can see both in the video and in juxtaposing

16   figure 6 --

17          THE COURT:  I don't have figure 6.  I have figure 5

18   that has the tracks in purple.

19          THE WITNESS:  Yes.

20          THE COURT:  And then to the right of that -- is that

21   figure 6 to the right of that?

22          THE WITNESS:  Figure 6 is on the next page.  I'm

23   sorry.

24          THE COURT:  I don't have a figure on the next page.

25          THE WITNESS:  Ridge 132.

VOL. I -  119

1          THE COURT:  Okay.  I got it now.

2          THE WITNESS:  So basically the rest of this language

3    goes on to say that this door, it has tracks, it has wheels,

4    and it can -- it's flexible along its entire length so it can

5    go up and down and approximate the curve of that track.  If it

6    didn't, the door couldn't go up and down.  It wouldn't bend.

7          In short, Your Honor, that explains how each of the

8    claimed features of claim 1, which is the first independent

9    claim of the Cold Chain patent, is found in the accused door.

10         Now, the claim chart goes on to identify the remaining

11   claims that we consider are -- the accused doors to have, to

12   infringe.  Much of it is repetitive, what I just went over with

13   claim 1.  And I am glad to walk the Court through all of those,

14   but I do think that they're fairly self-explanatory.  But I'm

15   here to answer any questions that you or counsel has.

16   BY MS. WOOD:

17   Q.   Thank you, Mr. Sharpe.  Overall, what does the claim

18   chart show?

19   A.   The claim chart shows that the accused door has every

20   feature that is recited in each of the asserted claims of the

21   Cold Chain patent.

22   Q.   Are you familiar with the report of Jason Foster in this

23   action?

24   A.   Yes, ma'am.

25   Q.   Can you please turn to Tab P18?

VOL. I - 120

1     A.     Okay.

2     Q.     What is this document?

3     A.     This is an expert report of Jason H. Foster.  It was

4     provided to me during the last week or so.

5     Q.     Did you review this document?

6     A.     Yes, I did.

7     Q.     From a technical perspective, do you have any criticisms

8     of the Foster report?

9     A.     I have a number of criticisms of the Foster report.

10    However, I tried to distill them down into the salient points.

11    And I believe I have articulated those in my response report.

12    But, fundamentally, the Foster report alleges that the foam in

13    the accused door is not continuous.

14           You may recall on the claim chart, Your Honor, the

15    claims required that the foam, the orange, be continuous foam

16    attached directly to the green thermoplastic membrane shown in

17    figure 4 in the chart.  The expert report alleges that foam is

18    not continuous, and in fact it is both as shown and as

19    Mr. Foster himself testified.

20    Q.     Is there -- are there any other criticisms you would

21    like to explain?

22    A.     I believe that Mr. Foster also takes the position that

23    the accused door is not flexible along its entire length so as

24    to be able to approximate the curve of the curved tracks.

25    Again, I think that's -- it's shown and evident from the claim

1 chart that that is in fact the case, otherwise, the door

2 couldn't go up and down.

3 Q. Are there any other criticisms you would like to

4 explain?

5 A. Off the top of my head, no. But...

6 Q. Are you familiar with the report of Sam Han in this

7 action?

8 A. Yes, ma'am.

9 Q. Can you please flip to Tab P19?

10 A. Okay.

11 Q. What is this document?

12 A. This is the report of Mr. Han.

13 Q. Have you reviewed this report?

14 A. I did.

15 Q. From a technical perspective, do you have any criticisms

16 of the Han report?

17 A. Yes. The Han report opines that the accused doors don't

18 infringe because they don't have the claimed second outermost

19 surface that we just discussed. And, of course, as you can see

20 in the illustrations and the photographs in the claim chart,

21 the doors do have that second outermost surface as defined by

22 the claim language itself, which is the second outermost

23 surface has to be formed by the foam insulating material.

24 That's the orange foam that's exposed in those grooves.

25 Q. Are there any other criticisms that you would like to

VOL. I - 122

1  explain?

2  A.   Well, I was a little perplexed that Mr. Han held himself

3  out as one of ordinary skill in the art.  That's kind of a

4  legal term and it generally requires experience in the field,

5  experience in the industry.  And from his CV, I didn't see any

6  evidence that Mr. Han had any experience with single panel

7  roll-up doors.

8  Q.   And did you prepare a rebuttal report in this action?

9  A.   Yes, ma'am.

10  Q.   If you could go to the small binder and turn to Tab P51.

11  A.   Okay.

12  Q.   What is this document?

13  A.   This is my response to the expert reports submitted by

14  the defendants.

15  Q.   Is this a true and accurate copy of your response?

16  A.   Yes.

17  Q.   Can you please walk us through the key points of your

18  response?

19  A.   So as I alluded to, collectively, the defendants'

20  experts dispute the question of infringement on three primary

21  reasons.  First, that the foam is not continuous.  And then the

22  second is that the accused doors don't have the second

23  outermost surface as recited in the claim.  And then the third

24  is that the panel is inflexible along its entire length so as

25  to be capable of approximating the curvature of the curved

1  tracks.  Those are the three bases outlined in the defendants'

2  reports as to why the accused doors purportedly don't infringe.

3  For both legal and technical reasons, those conclusions, in my

4  opinion, are erroneous.

5      In the case of the foam not being continuous, if the

6  Court wishes to go back to the claim chart, you can look at

7  both the photograph and figure 4.  It shows that the foam is,

8  in fact, continuous along the length of the thermoplastic

9  membrane, the green.  The expert report of Mr. Foster itself

10  has a photograph in it.  I believe it was even shown earlier

11  this morning at some point.  That shows the foam being

12  continuous along the thermoplastic membrane.

13      And then Attorney Foster in his expert report disclosed

14  that the foam is continuous.  In fact, it's as much as

15  7 percent even in the grooves even after the grooves had been

16  formed in the panel.  And I believe his testimony during his

17  deposition that it was continuous and that he had no knowledge

18  to dispute that it was continuous even in the grooves.  So I

19  cannot reconcile those admissions of the continuousness of the

20  foam with the opinion that it's not continuous because they

21  form the router grooves in the panel.

22      I would point out also that when you're looking at claim

23  terms and what they mean or what they cover, it is rarely the

24  case that a claim fails to include embodiments that are

25  specifically disclosed in the patent itself.  In this case,

VOL. I - 124

1    while Mr. Foster's report identifies a number of various -- a

2    single configuration of the door that he disputes establishes

3    that it is not continuous.  In fact, the patent itself

4    discloses additional embodiments, in this case, in column 4 in

5    lines 44 through 46 of the patent, that expressly discloses

6    forming these grooves in the foam material through the first

7    layer of thermoplastic material exactly as seen in the accused

8    doors.

9        Regarding the second outermost surface, I think we

10   fairly well covered that by the definition of what that surface

11   is in the claim itself.  We've -- there is a lot of outermost

12   surfaces on these panels.  The claim says only one of those

13   outermost surfaces is the second outermost surface.  It has to

14   be formed of the insulating foam material and it has to meet

15   certain size requirements, i.e., the amount of those foam

16   surfaces has to be larger than any of the edge surfaces.

17       So unless the Court has any questions, I don't think we

18   need to beat that one to death.

19       I would point out that when construing patent terms and

20   patent claims, the courts generally frown upon introducing what

21   we call extrinsic evidence, Your Honor.  When we figure out

22   what a patent claim means, we first start with the plain

23   language of the claim itself.  That's always where you start

24   and end.  Usually, if the claim is clear just by reading the

25   claim, you can stop there.  It's always good to look at the

VOL. I -  125

1    specification and the prosecution history.  But they can never

2    be used to alter the plain meaning of the claim.

3         The specification, the written description in the

4    patent, and the arguments they made to the patent office,

5    that's all called the intrinsic record.  That's where we really

6    look to to see what does the patent mean, what does the patent

7    not mean.  Extrinsic evidence such as expert testimony,

8    dictionary definitions and things like that are generally

9    considered not helpful because it's not part of the patent and

10   it's not part of the process of getting the patent.  So it's

11   generally frowned upon.  Again, I think the law is pretty clear

12   that it can never change the ordinary meaning gleaned from the

13   patent and the claim language itself.

14        So finally, then, the third basis on which the experts

15   suggest that the claim is not met by the accused device, the

16   accused doors, is that they say that the patent applicant Cold

17   Chain, when they were arguing to the patent office,

18   distinguished doors like the accused door from what they were

19   trying to claim.  And you saw reference earlier to arguments

20   about the patent not being directed to a series of rigid panels

21   that articulate.  And to be sure, those arguments were made

22   early on in the prosecution of the patent application.

23        What counsel in his opening remarks did not tell you is

24   that that language on which they're basing these arguments that

25   the door -- that the patent does not include these articulating

VOL. I - 126

1   rigid panels was removed from the patent before it was granted.

2   They went in a completely different direction.  In fact, the

3   patent was allowed on the basis of the second outermost surface

4   which we just discussed.  So the fact that they made those

5   arguments earlier on with respect to claim language that was

6   expressly taken out of the claim doesn't change the fact that

7   when we're determining infringement, when we look at the claims

8   that were actually granted, and that claim language clearly

9   shows that the accused doors are flexible along their entire

10  length to be able to approximate that curve around the track.

11      There is a couple what we call canons of claim

12  construction that kind of establish the veracity of that.  One

13  is that claim terms in a claim -- different terms mean

14  different things.  And at the time that these arguments were

15  being made and the amendment -- there is an amendment that's

16  dated July 28th that is referenced in the expert reports.  At

17  the time that that was pending, there was actually language in

18  the claim that said -- that excluded alternating rigid panels

19  that can flex; they're tied together.  Okay?

20      And the claim also had the language of the actual

21  granted patent that we're discussing now, and that's that it's

22  flexible along its entire length so as to approximate the curve

23  around the tracks.  Those terms are presumed to mean different

24  things.  So being flexible along its entire length to

25  approximate the curve of the tracks is presumed not to exclude

VOL. I -  127

1   or not to mean the same thing as the exclusion that was in the

2   claim at the time that excluded a series of articulating rigid

3   panels.

4         THE COURT:  At this point, I think that you have

5   answered the question posed by Ms. Wood with respect to Exhibit

6   16.  And there have been some other questions in between

7   dealing with distinguishing the defendants' experts.

8         Do you have anything else, Ms. Wood?

9         MS. WOOD:  Yes.  One.

10  BY MS. WOOD:

11  Q.   Mr. Sharpe, overall, would you explain your ultimate

12  opinion as to the Cold Chain patent and the accused door?

13  A.   My opinion is as set forth in the claim chart, that the

14  accused doors have every feature that's recited in the claims,

15  the asserted claims, of the Cold Chain patent.

16        MS. WOOD:  No further questions.

17        THE COURT:  Mr. Clifford, cross?

18        MR. CLIFFORD:  Yes, Your Honor.

19        Before I start, do you want to take our lunch break now?

20        THE COURT:  It could be a good time.  We'll stand in

21  recess until one, and then we'll come back and work for at

22  least an hour.

23        (Recess taken from 12:32 p.m. to 1:00 p.m.)

24                            - - -

25

VOL. I - 128

MONDAY AFTERNOON SESSION

OCTOBER 3, 2023

- - -

THE COURT:  Mr. Clifford, I hope you had time to do
more than simply inhale your lunch.  Are you ready to proceed
with your cross?

MR. CLIFFORD:  Thank you, Your Honor.  I appreciate
that.

THE COURT:  Please proceed.

- - -

CROSS-EXAMINATION

BY MR. CLIFFORD:

Q.   Mr. Sharpe, I believe one of the last set of questions
you were asked were about the compression gaps as referenced in
the embodiment of the Cold Chain patent.  Do you recall that
line of questioning?

A.   I think I know what you mean when you say compression
gaps but I don't recall being asked about them.

Q.   Maybe I misheard.  Can you turn to D6?  I'll put it up
on the screen for you, figure 1.  Do you see figure 1 in front
of you, Mr. Sharpe?

A.   I see a -- I must have touched something.  Yes, I see
it.

Q.   And figure 1 is depicted in the Cold Chain patent,
correct?

VOL. I —  129

1    A.    Yes.

2    Q.    And the compression gaps in figure 1 are depicted as

3  number 8 in figure 1, right?

4    A.    I would have to see the rest of the patent to confirm.

5    Q.    Sure.  Why don't you turn to column 4, the second to

6  last paragraph on the right at the bottom.  It's Altum 639.

7          MR. CLIFFORD:  Can you blow that up for him?

8  BY MR. CLIFFORD:

9    Q.    I'm trying to make it easy for you to see.  You see that

10  in front of you, Mr. Sharpe?

11    A.    Yes.

12    Q.    In the Cold Chain patent, it identifies the compression

13  gaps as number 8 in figure 1, correct?

14    A.    Yes.

15    Q.    Can we go back to figure 1, please?

16          In looking at figure 1, the compression gaps are in the

17  second layer of foam, correct?

18    A.    In that figure, yes.

19    Q.    Okay.  Thank you.

20          In this matter, you're Ridge's counsel, correct?

21    A.    Yes.

22    Q.    You signed the complaint?  You're signature block is on

23  the complaint, correct?

24    A.    I don't know that.

25          MS. WOOD:  Objection.

VOL. I — 130

1          THE COURT:  Basis, Ms. Wood?

2          MS. WOOD:  We filed a notice to clarify Mr. Sharpe's

3    appearance.

4          THE COURT:  Your legal basis.

5          MS. WOOD:  Mischaracterizes.

6          THE COURT:  Overruled.  You may answer, Mr. Sharpe.

7          THE WITNESS:  Yes. I don't know.  I don't think I am

8    on the complaint.  If I am, I am.

9     BY MR. CLIFFORD:

10    Q.    D24, please.  Have you seen D24 before, Mr. Sharpe?

11    A.    Yes.  If that is the complaint in this case, then, yes,

12    I have seen it.

13    Q.    Go to page 27, please.  Do you see page 27, Mr. Sharpe?

14    A.    I do.

15    Q.    Is that your signature block on page 27 of the

16    complaint?

17    A.    It is.

18    Q.    Does that refresh your memory as to you're counsel in

19    this matter?

20    A.    It does.

21    Q.    The ordinary and customary meaning of a claim term is a

22    term as it would mean to someone in the art.  Isn't that

23    correct?

24    A.    Yes.

25    Q.    And the presence of a dependent claim adds a limitation

VOL. I -  131

1    and gives the presumption that the independent claim is

2    different from that dependent claim, right?

3    A.    The presumption is that the independent claim is broader

4    than that claim.

5    Q.    Okay.  And the patent prosecution history provides

6    evidence of how the Patent and Trademark Office and the

7    inventor understood what the patent covered.  Would you agree

8    with that?

9    A.    Can you ask that again?

10   Q.    Sure.  The patent prosecution history provides evidence

11   of how the Patent and Trademark Office and the inventor

12   understood what the patent covers?

13   A.    It can, yes.

14   Q.    And one purpose of consulting the patent prosecution

15   history is to determine whether an interpretation of a claim

16   was disclaimed during that patent prosecution history with the

17   Patent and Trademark Office, right?

18   A.    It can be, yes.

19   Q.    And if a patent is rejected, if a patent claim is

20   rejected, an inventor could appeal that decision, correct?

21   A.    After final rejection, yes, it can be appealed.

22   Q.    I'll clarify it and ask that question that you answered.

23   If a final rejection is made by the Patent and Trademark

24   Office, one of the options of an inventor is to appeal that

25   decision, correct?

VOL. I –  132

1    A.    That is one of the options, yes.

2    Q.    And if a final -- I'm sorry.  If a patent claim is

3  finally rejected by the Patent and Trademark Office, another

4  option would be for the inventor to amend the claim for

5  reconsideration, in essence, correct?

6    A.    Actually, you probably can't amend it after a final

7  rejection.  I think you would have to either file a

8  continuation application.  There's procedural requirements to

9  be able to amend the claim after final.

10   Q.    And I believe that Cold Chain in its patent prosecution

11  asked for continuation to allow amendments to occur, correct?

12   A.    I do not recall.

13   Q.    Patent prosecution estoppel is a defense to a patent

14  infringement claim, right?

15   A.    It can be.

16   Q.    And patent prosecution estoppel is also a limitation on

17  the doctrine of equivalence, right?

18   A.    Prosecution history estoppel is a limitation of the

19  doctrine of equivalence.  It can be; depends on the claim

20  language.

21   Q.    You reviewed the Cold Chain patent prosecution history

22  in completing Plaintiff's 16, right?

23   A.    Yes.

24   Q.    And you also reviewed the Cold Chain patent in

25  completing Plaintiff's 16, correct?

VOL. I -  133

1    A.   That's correct.

2    Q.   You did not review KNL's -- back up.  When I refer to

3    KNL, do you understand that to be Kirk National Leasing?

4    A.   I do.

5    Q.   So if I refer to KNL, you understand what I'm saying?

6    A.   Yes.

7    Q.   I want to make sure we're on the same page so there's no

8    confusion.

9         You did not review KNL's patent application in

10   completing Plaintiff's 16, correct?

11   A.   No.

12   Q.   And you didn't rely upon KNL's patent application in

13   completing Plaintiff's 16, right?

14   A.   No.

15   Q.   No, you did not?

16   A.   No, I did not.

17   Q.   I want to make sure.  We had a double negative.

18   Sometimes it messes up the record.

19        You looked at what was represented to you as a

20   representative sample of the KNL door in completing Plaintiff's

21   16, correct?

22   A.   Among other things, yes.

23        MR. CLIFFORD:  Chris, can I borrow that just so I have

24   a frame of reference?

25        Your Honor, I want to show him P70.

VOL. I –  134

1              THE COURT:  You may.

2              MR. CLIFFORD:  Plaintiff's 70.  I apologize, Your

3    Honor.

4              MR. TACKETT:  Try not to hit anybody with this.

5              MR. CLIFFORD:  I will do my best.

6         May I approach, Your Honor?

7              THE COURT:  Yes, you may.

8    BY MR. CLIFFORD:

9    Q.   Mr. Sharpe, Plaintiff's 70 is the sample that you

10   reviewed in completing Plaintiff's 16, correct?

11   A.   Yes.

12   Q.   When I say I'm talking about the sample, can we refer to

13   it as Plaintiff's 70 and you understand what I'm talking about?

14   A.   We can.

15   Q.   You also, in completing Plaintiff's 16, looked at photos

16   provided to you by Ridge, right?

17   A.   That's correct.

18   Q.   You also looked at a video from KNL's website in

19   completing Plaintiff's 16, correct?

20   A.   No.

21   Q.   You didn't look at a video of the door from KNL's

22   website?

23   A.   No.  I think it was TTPS's website.

24   Q.   Do you have any understanding as the difference between

25   KNL and TTPS?

VOL. I – 135

1    A.    I know they're related, but that's as far as I know.

2    Q.    You reviewed a video of the KNL door on TTPS's website,

3    correct?

4    A.    I reviewed a video of a door on TTPS's website.

5    Q.    And looking at the photos, the sample and the video, you

6    reached conclusions as to what you believe those items

7    collectively depicted, correct?

8    A.    Yes.

9    Q.    And you don't know who created Plaintiff's 70, correct?

10   A.    I do not.

11   Q.    In Plaintiff's 70, when I refer to segments --

12            MR. CLIFFORD:  May I approach again, Your Honor?

13            THE COURT:  Yes, you may.

14   BY MR. CLIFFORD:

15   Q.    In Plaintiff's 70, you agree with me that these segments

16   here -- you see what I'm saying, the segments?  We have a

17   segment.  We have the groove, segment, groove.  We on the same

18   page?

19   A.    Yes.

20   Q.    You agree with me that the segments on Plaintiff's 70

21   are stiff, right?

22   A.    Agreed.

23   Q.    And on Plaintiff's 70, when we look at the grooves, you

24   did not measure the amount of foam remaining in the grooves

25   between the segments on the sample, right?

VOL. I - 136

1    A.    That's correct.

2    Q.    And you have not performed a calculation to determine

3    how much foam was actually left in the groove between the rigid

4    panels, right?

5    A.    I have not.

6    Q.    And you have not measured the thickness of the segments

7    of the sample, right?

8    A.    No.

9    Q.    We turn to Plaintiff's 16, please.

10         Jeff will put it up on the screen for you.  If you have

11   your glasses, it will help you out so you don't have to flip

12   through those binders.  It's kind of a problem.

13         If you turn to page 3 of Plaintiff's 16, Ridge 128, do

14   you see that measurement to the left of figure 1, Mr. Sharpe?

15   A.    Yes.

16   Q.    And that measurement, as we covered in your deposition,

17   is not actually half an inch, correct?

18   A.    That's correct.

19   Q.    You then used that measurement -- turn to the next page,

20   please.  You used that measurement at the top of P16 to make

21   calculations, correct?

22   A.    Yes.

23   Q.    And you did not revise those calculations as you sit

24   here today, right?

25   A.    No.

VOL. I -  137

1    Q.   No, you did not?

2    A.   That's correct.

3    Q.   Okay.  Thank you.

4         And you were asked a couple of questions on direct

5    examination.  Claims 1, 12 and 17 are independent claims in the

6    Cold Chain patent, correct?

7    A.   I believe that's correct.

8    Q.   And all the remaining claims in the Cold Chain patent

9    are dependent claims, right?

10   A.   I believe that's correct.

11   Q.   And I think you said this, but I'm not positive.  You

12   can't have indirect infringement if you don't have a successful

13   direct infringement claim, right?

14   A.   That is correct.

15   Q.   Can we turn to D7, please?

16        Have you seen D7 before, Mr. Sharpe?  I know it's a lot

17   of pages.

18        MR. CLIFFORD:  Jeff, if you want to tab through so he

19   can look at them.

20   BY MR. CLIFFORD:

21   Q.   He is not going to go through all of them, Mr. Sharpe.

22   A.   This appears to be the prosecution history of the Cold

23   Chain patent.

24   Q.   And do you know if it is true and accurate as you sit

25   here today?  I don't know if you want to go through the binder,

VOL. I - 138

1    but I don't want to waste the Court's time on going through --

2    A.   I don't.

3    Q.   That's fine.  And Defendant's 7 is one of the sets of

4    documents that you reviewed in form -- in creating Plaintiff's

5    16, correct?

6    A.   I reviewed the prosecution history of the Cold Chain

7    patent.

8    Q.   If I represent to you that Defendant's 7 is the

9    prosecution history for the Cold Chain patent, that would be

10   something you relied upon in creating Plaintiff's 16?

11   A.   Correct.

12   Q.   Turn to Altum 234, please.

13       If we can just tab through this so he can look at this

14   real quick.

15       Mr. Sharpe, this 234 through 248 is the initial patent

16   application of Cold Chain, correct?

17   A.   I don't know that.  But if you're representing that that

18   is the case --

19   Q.   Well, I'm just trying to speed it up.  Take the binder

20   out --

21   A.   I'm not trying to be obstinate.  I don't know it from

22   sight.

23   Q.   Look at pages 234 through 248 in the binder in front of

24   you and confirm that it is the Cold Chain patent application.

25   A.   Defendant's binder?

VOL. I -  139

1    Q.   Yes.  This is still Defendant's Exhibit 7.

2    A.   This is Exhibit 7?

3    Q.   There is a Bates number at the bottom, 234 to 248.

4    A.   Yes, this appears to be the original patent application.

5    Q.   Can you turn to page 201 at the bottom, Altum 201 in D7?

6    A.   All right.

7    Q.   And Exhibit -- page 201 of D7 is an office action

8    summary from the Patent and Trademark Office that rejects

9    entirely Cold Chain's patent application, correct?

10   A.   That's correct.

11   Q.   Go to page 200 and pull up the notification date,

12   please.

13        The initial patent application of Cold Chain was

14   rejected on August 16th, 2013, right?

15   A.   That's correct.

16   Q.   Turn to page 202, please.  Pull up that middle of the

17   paragraph, the Rauenbusch.  Right there.

18        Mr. Sharpe, the reason that the initial Cold Chain

19   patent application was rejected was because of the Rauenbusch

20   patent that preexisted the Cold Chain patent application,

21   correct, one of the reasons?

22   A.   Correct.

23   Q.   And it says in the patent prosecution history, the

24   patent examiner says specifically, "Rauenbusch discloses an

25   insulated single panel overhead door comprising a core member

VOL. I - 140

1  between a pair of outer face layers and cover sheets having

2  depressions to facilitate the bending of the door as it is

3  guided on the tracks."

4       Did I read that correctly?

5  A.  Yes.

6  Q.  So the Patent and Trademark Office is telling Cold

7  Chain, your design, your proposal, is already disclosed by the

8  prior art, correct?

9  A.  That's correct.

10  Q.  And Rauenbusch is a sandwich panel, correct?

11  A.  I don't know what you mean by sandwich panel, but it is,

12  as stated here, discloses an insulating single panel overhead

13  door, et cetera, as you've highlighted.

14  Q.  A sandwich panel is -- has a core member with two

15  exterior sides.  Would you agree with me on that?

16  A.  Okay.

17  Q.  Yes?

18  A.  Yes.

19  Q.  And Rauenbusch describes a panel that has two outer

20  sides and an interior core, right?

21  A.  Yes.

22  Q.  So Rauenbusch would be a sandwich panel, correct?

23  A.  Okay.  Yes.

24  Q.  Turn to page 185, Altum 185, in D7.

25       185 on D7 is an amendment by Cold Chain of its patent

VOL. I – 141

1   application, correct?

2   A.   That's correct.

3   Q.   And if you look at the underlying portion for claim 1,

4   Cold Chain adds the language the single panel being

5   sufficiently flexible to traverse curved tracks, right?

6   A.   Yes.

7   Q.   Turn to page 176 of this document, Mr. Sharpe.  You can

8   either look on the screen, Mr. Sharpe, or in front of you,

9   whichever you prefer.

10  A.   Okay.

11  Q.   Okay.  And this is another office action summary where

12  the Cold Chain patent is rejected, correct?

13  A.   That's correct.

14  Q.   Go to 175, please.  And the notification date of this

15  rejection is December 20th, 2013, right?

16  A.   That's correct.

17  Q.   And if we look at 177, please.  The panel is rejected

18  not only because of Rauenbusch but also because of Wendt.  Do

19  you agree with me on that?  It's the second full paragraph.

20  A.   Yes.

21  Q.   So that's correct, it's not only Rauenbusch but also

22  Wendt too?

23  A.   And Martin.

24  Q.   What was the last part you said?

25  A.   And Martin.

VOL. I - 142

1    Q.    Thank you.

2          Turn to page 178 at the very top, continuing that

3    paragraph, the first four lines.

4          It says, "Wendt discloses an insulated overhead door

5    which is a single panel made of inner and outer walls filled

6    with a suitable insulating material each being attached to one

7    another and of which are sufficiently flexible to traverse

8    curved tracks," correct?

9    A.    Yes.

10   Q.    So Wendt is a sandwich panel too, correct?

11   A.    Using the definition of sandwich panel that you gave,

12   yes.

13   Q.    And under -- according to Wendt and according to the

14   Patent and Trademark Office, Wendt teaches the material being

15   sufficiently flexible to traverse curved tracks, right?

16   A.    I'm sorry.  Can you repeat that?

17   Q.    When I ask questions on the fly, Mr. Sharpe, they don't

18   have them right at my --

19          THE COURT:  I'll have Ms. Evans read it back.

20          MR. CLIFFORD:  That would be great.  Thank you, Your

21   Honor.

22      (Thereupon, the last question was read by the court

23   reporter.)

24          THE WITNESS:  I would say according to the patent

25   office's interpretation of Wendt.

VOL. I — 143

1    BY MR. CLIFFORD:

2    Q.    Okay.  Yes.  Turn to page 158 of D7 and the first number

3    there.

4          In response to the rejection by the Patent and Trademark

5    Office, Cold Chain then amends its patent application again,

6    adding language the single panel not having multiple rigid,

7    articulating sections, correct?

8    A.    Correct.

9    Q.    Turn to page 164, please.

10         The last paragraph, please.  It states -- and it is from

11   Cold Chain, "The claimed overhead door of the present

12   disclosure is clearly different from the doors taught by

13   Rauenbusch, which include alternating rigid panels and flexible

14   strips, the flexible strips allowing the articulating rigid

15   panels to traverse a curved track," correct?

16   A.    Correct.

17   Q.    So Cold Chain is telling the Patent and Trademark

18   Office, hey, our door doesn't have rigid panels and doesn't

19   have flexible strips which allow the entire door to traverse a

20   curved track, correct?

21   A.    Based on the claim language that was pending at that

22   time, correct.

23   Q.    Turn to page 124, please.

24         And despite the amendment by Cold Chain, the Patent and

25   Trademark Office, in an office action summary, rejects all of

VOL. I -  144

1   the claims again, correct?

2   A.   Yes.

3   Q.   142, please.

4        And that rejection occurs on May 2nd, 2014, correct?

5   A.   That's correct.

6   Q.   Turn to page 122.  And in 122, Cold Chain amends its

7   patent application again, correct?

8   A.   Yes.

9   Q.   And in the patent application, Cold Chain removes

10  sufficiently flexible, right?

11  A.   Yes.

12  Q.   Okay.  And adds flexible along the entire length of the

13  panel so as to be capable of approximating the curvature of

14  curved tracks, correct?

15  A.   That's correct.

16  Q.   Turning to page 129, please, the first paragraph there.

17       In describing for the Patent and Trademark Office what

18  Cold Chain means by its new language added to the application,

19  it tells the Patent and Trademark Office the following:  "It is

20  clear from the specification that it is the flexibility of both

21  the thermoplastic membrane and the foam composite from which

22  the panel is made that allow the panel to flex to traverse the

23  tracks rather than relying on multiple rigid hinged sections,"

24  correct?

25  A.   That's what that says, yes.

VOL. I - 145

1    Q.   And that's what Cold Chain was telling the Patent and

2    Trademark Office:  We don't have multiple rigid hinged

3    sections.  Right?

4    A.   The claim specifically says that.

5    Q.   Okay.  And it continues.  "Because the foam and liner

6    chosen for the panel are designed to flex, the flexibility is a

7    property of the material chosen for the panel."  Did I read

8    that correctly?

9    A.   Yes.

10   Q.   "It is the material itself that flexes, rather than

11   bending at hinges, as would be the case with a rigid panel and

12   hinge structure."  Did I read that correctly?

13   A.   Yes.

14   Q.   Turn to page 133, please.

15        At the very top, it continues in describing the

16   flexibility of the panel itself.  "Because the doors of

17   Rauenbusch include alternating rigid panels, they are not the

18   same as the claimed overhead doors comprising only one panel,

19   the panel being flexible along the entire length of the panel

20   as recited in the claims."  Did I read that correctly?

21   A.   Yes.

22   Q.   Again, Cold Chain's telling the Patent and Trademark

23   Office the entire panel flexes, it doesn't have rigid panels

24   and it doesn't flex at hinge points, correct?

25   A.   Based on the claim language pending at that time, yes.

VOL. I -  146

1    Q.   Turn to page 87, please.  Despite these descriptions and

2    despite the claim language, the patent application is rejected

3    again, correct?

4    A.   That's correct.

5    Q.   Turn to page 86.  And this rejection occurs on

6    October 10th, 2014, right?

7    A.   Yes.

8    Q.   Turn to page 84.  On page 84, this is an interview

9    between the Patent and Trademark Office and Cold Chain, right?

10   A.   Yes.

11   Q.   And during the interview, Cold Chain told the Patent and

12   Trademark Office the applicant discussed the feature of the

13   overhead door as having only two layers as opposed to the

14   previously claimed three layers, correct?

15   A.   Yes.

16   Q.   So the application at this time -- go to the first page

17   of 83, please.

18        So on December 9th, 2014, Cold Chain is telling the

19   Patent and Trademark Office there's two layers, not three,

20   correct?

21   A.   Well, I can tell you what the patent office said about

22   it.

23   Q.   Let's go back to the -- Cold Chain tells the Patent and

24   Trademark Office we have two layers, not three, correct?

25   A.   Well, I can tell you what the interview summary said.

VOL. I -  147

1   The interview summary said the applicant discussed the feature

2   of the overhead door as having only two layers as opposed to

3   previously claimed three layers.

4   Q.   Cold Chain is telling the Patent and Trademark Office we

5   only have two layers, not three, right?

6   A.   I don't believe they're saying what I think you're

7   implying they're saying.

8   Q.   Let's go back to 84, correct?  Let's look at this again.

9        "The applicant discussed the feature of the overhead

10  door as having only two layers."  Did I read that correctly?

11  A.   Yes.

12  Q.   The applicant is Cold Chain, right?

13  A.   Correct.

14  Q.   And the feature of the overhead door as having only two

15  layers, correct?

16  A.   That's what that says, yes.

17  Q.   As opposed to the previously claimed three layers,

18  correct?

19  A.   That's correct.  That's what that says.

20  Q.   Do you have any reason to doubt that the patent examiner

21  lied or misstated what was told to them by Cold Chain in

22  December of '14?

23  A.   No.

24  Q.   Any reason to doubt?

25  A.   No.

VOL. I -  148

1    Q.   You haven't gone and talked to Cold Chain and said, hey,

2    the patent examiner said you only have two layers versus three.

3    You don't have any of that testimony, correct?

4    A.   No.

5    Q.   So as represented by Cold Chain to the Patent and

6    Trademark Office, there's two layers in its door, correct?

7    A.   At least two layers.

8    Q.   It doesn't say at least two layers, does it, Mr. Sharpe?

9    A.   I can look at what the claims say.  You're talking about

10   an interview summary.  I'm sorry.  You're asking me to

11   extrapolate an interview summary to what the claims mean.

12          THE COURT:  Mr. Sharpe, maybe I can help here.

13          The interview summary is saying that there are two

14   layers in the Cold Chain door; is that right?

15          THE WITNESS:  I would say that that is partially

16   right, Your Honor.

17          THE COURT:  Okay.  It says as having only two layers,

18   right?

19          THE WITNESS:  Well, if -- that's what it says, yes.

20          THE COURT:  Because you have expertise in this.

21   You're testifying as an opinion witness.  But as a Court, I

22   understand what the language says.  And the language says as

23   having only two layers, right?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  And that's referring to the door that Cold

VOL. I - 149

1    Chain had tendered under this particular patent, right?

2              THE WITNESS:  That is referring to this patent.

3              THE COURT:  And this particular patent -- well, this

4    particular application was not granted.  That's right, isn't

5    it?

6              THE WITNESS:  That's correct.  So at this juncture,

7    that's what they're talking about.

8              THE COURT:  The application that the PTO rejected was

9    the application that said that the Cold Chain patent had only

10   two layers?

11             THE WITNESS:  Well, at that juncture, the application

12   itself didn't because this is a discussion that the examiner --

13   the attorney had that ultimately would lead to an amendment.

14             THE COURT:  The discussion reflects what the examiner

15   believed.

16             THE WITNESS:  Yes, and that's what they discussed.

17             THE COURT:  As having worked at the PTO, you

18   understand that the examiner is expressing her or his opinion.

19             THE WITNESS:  That's correct.

20             THE COURT:  Actually, what the examiner is discussing

21   is her or his *ratio decidendi*, right?

22             THE WITNESS:  I'll take your word for it.

23             THE COURT:  You remember from law school that's the

24   rationale for decision, right?

25             THE WITNESS:  Yes.

VOL. I –  150

1          THE COURT:  That's what it is.  That's the *ratio*

2  *decidendi* for rejecting that particular application, right, in

3  part?

4          THE WITNESS:  I guess what I would say, Your Honor, is

5  this is a reflection of a telephone discussion that they had

6  talking about ways that they might be able to make the claims

7  patentable.  They discussed this, according to the examiner.

8          THE COURT:  All right.

9          MR. CLIFFORD:  Your Honor, if I may continue if you're

10  done.

11          THE COURT:  I have one other question.

12      So the difference between the patent application that

13  was rejected and the '84 application that was accepted was

14  what, Mr. Sharpe?

15          THE WITNESS:  They changed the claims to add the

16  claimed second outermost surface that we discussed, and that

17  second outermost surface is the foam surface.  And of those

18  segments, which make the thing bend, it is only two layers.

19          THE COURT:  All right.  Can I see counsel at sidebar

20  for a second?

21                           –  –  –

22      (The following proceeding was held at sidebar.)

23          THE COURT:  Okay.  This is why I'm calling a sidebar.

24  I understand that you're establishing context, right?

25          MR. CLIFFORD:  I think it goes to the credibility of

VOL. I -  151

1    the witness in creating this --

2              THE COURT:  Absolutely.

3              MR. CLIFFORD:  Yes, Your Honor.

4              THE COURT:  And once you establish context, what is

5    your argument to me going to be?

6              MR. CLIFFORD:  Well, the argument is going to be, Your

7    Honor, on its face, the Cold Chain patent is not the Altum

8    panel and the KNL door.  That's one reason.  And part of that

9    reason is that the Cold Chain, in asking for the patent under

10   patent prosecution estoppel, disclaimed any notion of having

11   rigid sections that bend at flex points.  You've seen

12   Plaintiff's Exhibit 70 which they believe is the KNL door, and

13   it has rigid sections with flex points.

14        And the remainder of my examination was going to show is

15   the amendment that's later granted further confirms that it's

16   not the KNL door that is being patented.

17        Your Honor, you're referencing this is the application

18   that was rejected.  In fact, it's not.  That was already

19   rejected in October.  In December when they're having this

20   discussion, you had the office conference and they submit

21   language based upon an office conference on December 10th that

22   is then granted.

23             THE COURT:  Okay.  Because there's some things that

24   still stick in my craw, Mr. Dillard.  And one of them is this.

25   And it's like an uncontrovertible fact that the '144

VOL. I -  152

1   application still says single panel door.  And I don't want you

2   to spend an inordinate amount of time telling me about the '84

3   patent, or whatever that number was that was rejected.

4        But the '84 patent was the one that was granted, right?

5        MR. CLIFFORD:  Yes, Your Honor.

6        THE COURT:  Because that's what we're dealing with.

7   They have a patent.  You don't, right?

8        MR. CLIFFORD:  That's correct.

9        THE COURT:  So if you're going to show me about the

10  likelihood of success on the merits, you're going to have to

11  show me how you didn't infringe on their patent because you

12  don't have a patent.

13       MR. CLIFFORD:  I understand, Your Honor.

14       THE COURT:  I sometimes get the feeling that -- and no

15  offense to you, Mr. Dillard, because I thought that you did a

16  wonderful job of cross-examination, but it was like when you

17  asked that last question that was a false equivalent, it's

18  almost Trumpian.  You're showing me a bright, shiny object to

19  obscure the truth.  I don't want to see a bright, shiny object

20  because I know it's specious.  It's like specious beauty.  It's

21  not real.

22       So what I want you to do is to get to how -- and I

23  believe that you're getting there.  I really do believe that

24  you're getting there.  Your point on how the '144 -- the door

25  that you've shown me, how that doesn't infringe on the door

VOL. I - 153

1    that they have.

2         Now -- and I got to tell you, I was -- I found

3    compelling your -- the statements in your opening when you

4    showed me the door that wasn't the door because it looks

5    totally different.  But the one that is the door, it looks like

6    the one that you're selling.  I'm just telling you.  No need to

7    respond to what I'm telling you I've seen because you can't

8    tell me what I saw.  Only I can tell me what I saw.

9         But I'm giving you the opportunity to persuade me that

10   those are my lying eyes deceiving me again.  But you're going

11   to have to do it with facts.  I don't want you to dwell on

12   things that don't really amount to a persuasive argument.  So

13   I'm giving you a road map.

14        MR. CLIFFORD:  I appreciate that, Your Honor.

15        THE COURT:  And I want you to follow it.

16        MR. CLIFFORD:  I'm almost done with Mr. Sharpe's

17   cross.  I have a few more questions.

18        THE COURT:  You can cross-examine him as long as is

19   reasonable.  I'm not telling you to stop.  I just don't want

20   you to go the wrong way.

21        MR. CLIFFORD:  I appreciate that, Your Honor.  The

22   point I would say is what's been shown to you as the example is

23   what is represented as the KNL door.  What I'm trying to

24   persuade the Court to show is the KNL door is not the Cold

25   Chain patent.  There's many reasons it's not the Cold Chain

VOL. I — 154

1    patent.

2            THE COURT:  That could be persuasive.

3            MR. CLIFFORD:  The first point I raised that I'm going

4    through with Mr. Sharpe is the fact that the Cold Chain patent

5    has two layers.  The KNL door has three.  And part of the

6    way -- the reason it was granted was because it only had two

7    layers.

8            THE COURT:  Seventy looks like it has three layers.

9    It looks like it has two sides and foam in the middle.  That's

10   what it looks like.

11           MR. CLIFFORD:  I can appreciate that, Your Honor, but

12   that's not the Cold Chain door is my point.

13           THE COURT:  Mr. Tackett has shown me a door that's not

14   the Cold Chain door?

15           MR. TACKETT:  That's their argument.

16           THE COURT:  That's your argument.

17           MR. CLIFFORD:  Correct.

18           THE COURT:  And he is the exclusive licensee of the

19   Cold Chain patent; is that right?

20           MR. CLIFFORD:  That's what I understand.

21           THE COURT:  Now, Mr. Burton, let's assume this

22   hypothetical.  Let's assume that Mr. Tackett's client Ridge is

23   exclusive licensee of the Cold Chain door.  Cold Chain still

24   retains the patent even though he is the exclusive licensee; is

25   that right?

VOL. I — 155

1          MR. BURTON:  Right.

2          THE COURT:  If he produced a door that was

3    inconsistent with or incongruous to the patent, wouldn't Cold

4    Chain have the right to sue him for representing this as the

5    Cold Chain patented door but not consistent with the patent

6    itself?  Is that true?

7          MR. BURTON:  I don't know if Ridge is doing that.

8    They're not saying --

9          THE COURT:  I asked you a hypothetical.  So could you

10   answer my hypothetical?  If you don't know, you don't have to

11   answer it.

12         MR. BURTON:  We're not disputing that Ridge -- first

13   of all, we're not disputing that Ridge --

14         THE COURT:  Stop.  You're not listening to my

15   question.  What you're being is an advocate.  I'm asking you to

16   be an intellectual.  I'm asking you a hypothetical, and the

17   hypothetical is going to help me in deciding this case.

18         So do you need Ms. Evans to read the hypothetical back?

19   Because I don't want you to tell me what you think.  I'm asking

20   because I can ask what I know I want to know.

21         MR. BURTON:  Please.

22       (Thereupon, the requested colloquy was read by the court

23   reporter.)

24         MR. BURTON:  So I have to assume that Ridge does not

25   produce something that is covered by the Cold Chain patent.

VOL. I —  156

1          THE COURT:  That's kind of what I'm saying.  If they

2     produced a door that they held out as the Cold Chain patented

3     door but it was inconsistent with the patent, Cold Chain could

4     have a cause of action against Ridge.  Am I right?

5          MR. BURTON:  Yes, I would think so.  That's correct.

6          THE COURT:  That's all I wanted to know.

7        Go ahead.

8          MR. CLIFFORD:  But we don't have from Cold Chain the

9     specs or drawings or plans of that Cold Chain door.  We

10    subpoenaed Cold Chain for records.

11         THE COURT:  Don't you have the patent, the patent that

12    was granted?

13         MR. CLIFFORD:  The patent, yes, we have the patent,

14    Your Honor.  But theoretically, Cold Chain tried to market that

15    door and there would be specs and measurements and things here

16    as how they interpret that patent to make that door.  Your

17    hypothetical to Mr. Burton doesn't answer the question of

18    whether -- even if that's true, that doesn't get around for

19    Mr. Tackett bringing an action against us saying it is the same

20    thing.  That just says that Cold Chain can sue Ridge, but it

21    doesn't answer your question is there infringement or not

22    because we don't have the Cold Chain evidence from Cold Chain

23    as to how they built the door and what they meant by the patent

24    application minus the patent prosecution history and minus what

25    they say on their website.

VOL. I -  157

1          THE COURT:  But your question is based on a

2    presumption of my hypothetical.

3          MR. CLIFFORD:  I was trying to help you.

4          THE COURT:  Let me tell you a story -- and this is

5    true.  There was a trial -- and I know this because I know some

6    of the lawyers who were involved.  There was a trial.  And as

7    happens a lot, Mr. Dillard, at the conclusion of the trial, the

8    jury was deliberating but the parties were trying to settle the

9    case, Mr. Burton.  They were still negotiating.

10         The jury sent out a question and the question was, can

11   we provide -- give the plaintiff more than the plaintiff asked

12   for?

13         The plaintiff's counsel stopped negotiating.  It came

14   back as a defense verdict.  And then the judge went and asked

15   the jury why they sent out the note, and the jury said we were

16   just curious.

17         That's a true story.  I didn't make that up.

18         So the question posed to Mr. Burton was simply for the

19   Court's edification to give me a broader context for this

20   because Mr. Burton, this is his area of expertise.  It's not

21   this Court's.  I'm not like the federal circuit.  So we get

22   these periodically, and I'm filling in the gaps as with oral

23   arguments and these kinds of proceedings.

24         I don't want you to presume anything.  I want you to

25   prove to me what it is and I want to tell you what is

VOL. I -  158

1    persuasive and what is not.  So it will save you time, effort

2    and energy.  That's all I'm saying.  Thank you.

3        (The following proceeding was held in open court.)

4            THE COURT:  Please continue.

5            MR. CLIFFORD:  Thank you, Your Honor.

6    BY MR. CLIFFORD:

7    Q.    Turning to page 62 of D7, Cold Chain files another

8    amendment after the October rejection and after the office

9    conference with the Patent and Trademark Office, correct?

10   A.    Correct.

11   Q.    And that filing occurs, if you go to page 76, on

12   December 10th, 2014?

13   A.    That's correct.

14   Q.    And in that amendment, Mr. Sharpe, at the very top --

15   let's go back to page 69.  You see that at the very bottom,

16   "during the interview."  Do you see where I'm at?  The bottom

17   of 69.

18   A.    Okay.

19   Q.    Yes?

20   A.    Yes.

21   Q.    And I'm going to read this for you and make sure I read

22   it correctly:  During the interview, applicants undersigned

23   attorney, Matthew Whipple, presented arguments with respect to

24   a proposed amendment to the claims adding language of the

25   thermoplastic membrane comprising glass fibers and, quote, the

VOL. I - 159

1    panel comprising only two major layers wherein the

2    thermoplastic membrane is the first major layer and the

3    insulating material is the second major layer.

4         Did I read that correctly?

5    A.   Yes.

6    Q.   In the amendment that the Patent and Trademark Office

7    relies upon: two layers.  Correct?

8    A.   Yes.

9    Q.   And on page 72, first full paragraph, do you see that

10   when you're there?

11   A.   Yes.

12   Q.   It says, "As described previously on the record,

13   Rauenbusch teaches laminate structures have rigid panels

14   separated by film hinges that allow the door to flex to

15   traverse curved tracks," right?

16   A.   Yes.

17   Q.   And then at the next paragraph, starts, "The sandwich

18   structures of Rauenbusch are not the same as applicant's

19   claimed structure."  Did I read that correctly?

20   A.   Yes.

21   Q.   In the patent application that the Patent and Trademark

22   Office grants, Cold Chain is telling the Patent and Trademark

23   Office our door is different from Rauenbusch, correct?

24   A.   Because it goes on to explain that it is different

25   because Rauenbusch does not have the claimed second outermost

VOL. I —  160

1    surface which was added by amendment in this claim at the same

2    time that the amendment removed the claim language concerning

3    rigid panels.

4        Q.   The sandwich structures of Rauenbusch are not the same

5    as applicant's claimed structure, correct?  That's what it

6    says?

7        A.   That's what that says, yes.

8        Q.   That's what Cold Chain told the Patent and Trademark

9    Office?

10       A.   That's what that says, yes.

11       Q.   "For example, the Rauenbusch sandwich structures do not

12   include a foam insulating material forming the second outermost

13   surface of the door, as recited in claims 1, 16 and 24 and the

14   claims dependent thereon."  I read that correctly?

15       A.   Yes.

16       Q.   So again, Rauenbusch is a sandwich panel, correct?

17       A.   Yes.

18       Q.   Rauenbusch is three layers, correct?

19       A.   I would have to look at it, but I believe it is three

20   layers throughout.

21       Q.   Cold Chain has two layers, correct?

22       A.   Cold Chain has at least two layers.

23       Q.   So when it uses the word only two, that to you means at

24   least, correct?

25       A.   It goes on to -- well --

VOL. I — 161

1    Q.    Answer my question.  You can have redirect.

2    A.    The patent specification describes optional additional

3    surfaces.  And in the claim amendment where they add the second

4    outermost surface, it is, in fact, only two layers.

5    Q.    Only two layers.  Thermoplastic membrane and foam,

6    right?

7    A.    Yes, in the second outermost surface region of the

8    panel.

9    Q.    And based upon the representations from Cold Chain to

10   the Patent and Trademark Office, this December 10th, 2014,

11   amendment, the Patent and Trademark Office grants the patent

12   application, correct?

13   A.    Correct.

14   Q.    Turn to Defendant's 6, please.  I think we covered this

15   before at the very beginning.  I want to make sure.  This is

16   the Cold Chain patent, correct?

17   A.    Yes.

18   Q.    And what's the title of the patent?

19   A.    Insulated Overhead Door.

20        MR. CLIFFORD:  I have no further questions at this

21   time.

22        THE COURT:  Your timing was perfect, Mr. Clifford.

23   We're going to adjourn here for today.  We'll pick up with

24   Mr. Burton's cross-examination at 8:30 tomorrow morning.  Thank

25   you, everyone, for your patience.

```
                                              VOL. I -   162
 1      (Proceedings concluded at 1:55 p.m.)

 2                         - - -

 3

 4

 5                         - - -

 6                    WITNESS INDEX

 7                         - - -

 8   WITNESSES          DIRECT   CROSS   REDIRECT   RECROSS

 9   PLAINTIFF'S:

10   Raymond McDonald     43      71        89
     (By Mr. Koltak)              88
11   Richard Sharpe       97     128

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

VOL. I –  163

1                        C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
12                              Official Federal Court Reporter

13

14                              October 12, 2023

15

16

17

18

19

20

21

22

23

24

25