UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                    )
                                      )
  PLAINTIFF,                          )       CASE NO. 2:23-cv-3012
                                      )
        vs.                           )
                                      )
KIRK NATIONAL LEASE CO., *et al*.,)
                                      )
  DEFENDANTS.                         )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME II OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 4, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
      Bailey Cavalieri LLC
      By:  Christopher W. Tackett, Esq.
           John P. Miller, Esq.
           Graycen M. Wood, Esq.
      10 West Broad Street, Suite 2100
      Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
      FGKS Law
      By:  Joshua A. Koltak, Esq.
      100 South Main Avenue, Suite 300
      Sidney, Ohio  45365

      Faruki PLL
      By:  Donald E. Burton, Esq.
      110 North Main Street, Suite 1600
      Dayton, Ohio  45402

      Faruki PLL
      By:  Melissa L. Watt, Esq.
      201 East Fifth Street, Suite 1420
      Cincinnati, Ohio  45202

SHAWNA J. EVANS,  FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD, COLUMBUS, OHIO  43215
614-719-3316

```
    APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215
```

                              - - -

```
        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

VOL. II - 166

1      TUESDAY MORNING SESSION

2      OCTOBER 4, 2023

3              - - -

4          THE COURT:  Good morning, Mr. Sharpe.  Would you

5      please come forward and resume the stand.

6          Mr. Burton, I believe you were poised to begin your

7      cross-examination.

8          Good morning, everyone.  I hope you had a pleasant

9      evening.

10             - - -

11                RICHARD SHARPE

12     Called as a witness on behalf of the Plaintiff, being first

13     duly sworn, testified as follows:

14               CROSS-EXAMINATION

15     BY MR. BURTON :

16     Q.   Good morning, Mr. Sharpe.  I wanted you to look first at

17     one of the exhibits you looked at in your direct examination,

18     Plaintiff's Exhibit 9.  And this is the letter -- one of the

19     letters you sent out regarding infringement pre-suit, right?

20     A.   That's correct.

21     Q.   This is the one that was sent to Kirk National Lease and

22     Truck and Trailer Parts Solutions, right?

23     A.   Yes.

24     Q.   If we go to the second page, there is a reference to --

25     if you look in the second paragraph, in the middle, it says

1   Ridge is willing to offer a sublicense for the Cold Chain

2   patents along with supplying TTPS and KNL with Ridge's high

3   quality TransCore panels.  Do you see that part of your letter?

4   A.   Yes.

5   Q.   And the TransCore panels were what, in your

6   understanding?

7   A.   Those are panels that are manufactured and sold by

8   Ridge.

9   Q.   So is the arrangement you are proposing here one in

10  which Ridge would be a supplier of panels to TTPS or KNL?

11  A.   That's my understanding, yes.

12  Q.   And then TTPS would, or KNL would manufacture the

13  finished door product.  Is that true?

14  A.   That's my understanding of what was being offered, yes.

15  Q.   I will just call it KNL.  KNL would then sell the door

16  in the market, right?

17  A.   I believe so.

18  Q.   At that time, were you aware that Ridge had supplied

19  panels to TTPS previously?

20  A.   No.

21  Q.   And --

22  A.   Actually, I take that back.  I believe they were doing

23  business together.  I don't know that they were selling panels.

24  Q.   So you knew there had been some sort of business

25  relationship?

VOL. II - 168

1    A.    That's correct.

2    Q.    You don't know if they specifically supplied panels; is

3    that right?

4    A.    What was the last part of your question?  I'm sorry.

5    Q.    You didn't know -- in answer to my question, you didn't

6    know specifically at that time whether Ridge had supplied

7    panels to TTPS?

8    A.    That's right.  I didn't know the details of the

9    relationship.

10   Q.    And this letter -- if you look down, if you can scroll

11   down a little bit on the page, this letter was carbon copied to

12   Ridge Corporation and Cold Chain LLC; is that right?

13   A.    That's correct.

14   Q.    We had some testimony yesterday about Plaintiff's

15   Exhibit 16 which is your claim chart.  Had that been prepared

16   at the time of this correspondence, Exhibit 9?

17   A.    I don't -- I don't know.

18   Q.    Now, in Exhibit 16, does that show any claim

19   construction you did?

20   A.    No.

21   Q.    What it has is -- it's a chart with two columns, right?

22   A.    Yes.

23   Q.    The leftmost column, it just cites the claim elements,

24   right?

25   A.    That's correct.

VOL. II - 169

1    Q.    And the rightmost column applies those elements to the

2  accused device, right?

3    A.    Yes.

4    Q.    Would you agree with me that, generally speaking, an

5  infringement claim requires a two-part analysis?  The first

6  part being construing the claims, and the second part applying

7  the properly construed claims to the accused device?

8    A.    Any formal claim construction setting such as a Markman

9  hearing or something of that nature, yes.

10   Q.    So you didn't do that first step for purposes of this

11 chart, right?

12   A.    That's not correct.

13   Q.    Okay.  Does your chart show any claim construction --

14   A.    No.

15   Q.    -- that you did?

16         Okay.  You don't, on the chart, show any definitions of

17 terms; is that correct?

18   A.    No.  Or that's correct.

19   Q.    And I believe you said you -- in your view, you did not

20 look at extrinsic evidence in preparing this chart?

21   A.    It was unnecessary, that's correct.

22   Q.    You did not look at dictionaries, right?

23   A.    I can't say I did not look at dictionaries.  I know I

24 looked at dictionaries.  I don't know at what point I looked at

25 the dictionaries.

VOL. II - 170

1    Q.    Do you remember what terms you look at at this point?

2    A.    No, I don't.

3    Q.    But at any rate, you would agree that the finished

4    product, the claim chart, does not reference any dictionary

5    definitions of terms; is that correct?

6    A.    That's correct.

7    Q.    Now, I'd like to look at your rebuttal report which is

8    Plaintiff's 51.  I want to turn to page 5 of that exhibit.

9          Now, in your --

10          THE COURT:  What exhibit number is this, Mr. Burton?

11    I'm sorry.

12          MR. BURTON:  Plaintiff's 51.

13    BY MR. BURTON:

14    Q.    On page 5, there is a part where you talk about the

15    second outermost surface in the middle of the page, the first

16    paragraph.  Do you see that?

17    A.    Yes.

18    Q.    You say only one of those outermost surfaces meets the

19    definition of second outermost surface as defined by the claim

20    language itself, right?

21    A.    Yes.

22    Q.    And you say it's -- it's basically the foam layer, or

23    the second outermost surface comprises foam layer, right?

24    A.    The second outermost surface is, yes, the foam

25    insulating material.

VOL. II -  171

1          THE COURT:  Mr. Sharpe, bend the microphone.

2     BY MR. BURTON:

3     Q.   So, when you're saying the definition of second

4     outermost surface as defined by the claim language itself, are

5     you saying the definition of second outermost surface is second

6     outermost surface?

7     A.   I'm saying that the claim defines what the second

8     outermost surface is.  And in the claim, it defines that

9     surface as the foam insulating material.

10    Q.   So if we look back at page 4 of your rebuttal report,

11    beginning paragraph states, The plain language of the asserted

12    independent claims of the '084 patent expressly defines the

13    second outermost surface, right?

14    A.   Yes.

15    Q.   And you go on to say as being the surface and go through

16    some of the claim language.  And you end that paragraph by

17    saying the foam insulating material forming the second

18    outermost surface, right?

19    A.   That's correct.

20    Q.   And the complete quote actually is the second outermost

21    surface of the door, right?

22    A.   Yes.

23    Q.   And you have that there in your diagram.  Just below

24    that it says the foam insulating material forming the second

25    outermost surface of the door, right?

VOL. II - 172

1    A.    Yes.

2    Q.    So is the entirety of the -- under the claim 1 of the

3  patent, is the entirety of the foam layer the second outermost

4  surface?

5    A.    Excuse me?

6    Q.    Let me ask you about your diagram.  You have a line

7  pointing to the valley of the groove, the orange stippled area

8  there, right?

9    A.    Yes.

10   Q.    And beside that there are also solid orange pieces that

11 represent the foam layer, right?

12   A.    Yes.

13   Q.    And those parts of the layer outside that groove, do you

14 consider those in the accused device a second outermost

15 surface?

16   A.    Not within the meaning of the claims, no.

17   Q.    Why is that?

18   A.    Because the claim defines the second outermost surface

19 as the foam insulating material.

20   Q.    But that is foam insulating material, the parts --

21   A.    It is not an outermost surface.

22   Q.    Would you say that the white layer above the orange

23 layer is an outermost surface?

24   A.    Yes.

25   Q.    I wrote down -- and you can correct me if I'm misstating

VOL. II - 173

1  it.  In your testimony you said something along the lines

2  there's lots of outermost surfaces, right?

3    A.    There are lots of outermost surfaces, yes.

4    Q.    So, actually, I need you to go back to page 6.  This is

5  where you're talking about Attorney Han's opinion there at the

6  bottom of page 6.  One of your criticisms starts out by saying

7  because, quote, outermost, unquote, and, quote, farthest out,

8  unquote, are synonymous.  You go on to make a criticism of Mr.

9  Han's report.  Is that fair?

10   A.    That's one criticism.

11   Q.    So you are saying outermost and farthest out are

12  synonymous, right?

13   A.    Yes.  One -- outermost he defined as farthest out.  So,

14  to me, that means they're synonymous.

15   Q.    In your report you are saying outermost and farthest out

16  are synonymous, right?

17   A.    Yes.

18        MR. BURTON:  That's all the questions I have, Your

19  Honor.

20        THE COURT:  Thank you.

21      Ms. Wood, do you have any redirect?

22        MS. WOOD:  Yes, Your Honor.

23

24

25

1                              - - -

2                        REDIRECT EXAMINATION

3      BY MS. WOOD:

4      Q.    Good morning, Mr. Sharpe.

5      A.    Good morning.

6      Q.    Yesterday I believe you were talking with Mr. Clifford

7      about measurements.  Do you recall that?

8      A.    Vaguely.

9      Q.    Let me clarify.  Measurements of the foam.  Do you

10     recall that?

11     A.    Yes.

12     Q.    Does the Cold Chain patent specify how thick the foam

13     needs to be?

14     A.    It does not.

15     Q.    If you could look at P16, please, the page that is

16     marked Ridge 129.

17     A.    Okay.

18     Q.    Does that page have dimension calculations?

19     A.    It does.

20     Q.    Are the dimension calculations on that page required to

21     be exact in order for the accused door to meet claim 1?

22     A.    No.  These are approximations.  We didn't have an actual

23     door to measure or anything of that nature.

24     Q.    Do you recall talking yesterday with Mr. Clifford about

25     the prosecution history and various amendments?

VOL. II -  175

1    A.   Yes.

2    Q.   Did the USPTO issue the Cold Chain patent?

3    A.   Yes.

4    Q.   If we look at the claims granted just by the USPTO, how

5    do those compare to the accused door?

6    A.   The accused door has every feature recited in those

7    claims.

8    Q.   Do you recall talking with Mr. Clifford and Mr. Burton

9    about various surfaces?

10   A.   I do.

11   Q.   Could you please look at Exhibit P1?  If we look at

12   claim 1, does it say there can't be another layer of material

13   over the foam?

14   A.   No, to the contrary.  There are dependent claims that

15   specifically provide for additional layers.

16        MS. WOOD:  Your Honor, may I approach the witness?

17        THE COURT:  Yes, you may.

18        MS. WOOD:  I'm picking up what's been marked as P70

19   and approaching Mr. Sharpe with that.

20   BY MS. WOOD:

21   Q.   Does the accused door correspond to the optional layers

22   that are included in the Cold Chain patent?

23   A.   Yes.

24   Q.   Can you point out those optional layers?

25   A.   Your Honor, this is the first outermost surface.  That's

VOL. II - 176

1   the green thing in the chart.  This is the second outermost

2   surface, this foam surface, and these are optional surfaces

3   that are provided for both in the specification of the patent

4   as well as some of the subsequent claims.

5   Q.   Mr. Sharpe, claim 1 reads - and I'm going to

6   paraphrase - an insulated overhead door, et cetera, et cetera,

7   the door comprising.  What does comprising mean?

8   A.   Comprising is a term that we use in patent law.  It's

9   what we call an open-ended term.  So it means that the

10  invention as claimed includes all of the recited features, but

11  it comprises those features.  So that means it does not exclude

12  additional features.

13         THE COURT:  Mr. Sharpe, does comprising in your

14  language also mean consisting of?

15         THE WITNESS:  No.  Quite the opposite, Your Honor.

16         THE COURT:  The opposite?

17         THE WITNESS:  Yes.

18         THE COURT:  Could you explain what you mean by that?

19         THE WITNESS:  So consisting of in patent law says I'm

20  claiming this invention and it consists of these features and

21  only these features.  Comprising says I'm claiming an invention

22  that comprises these features, but it can include other things.

23         THE COURT:  All right.  Okay.

24      Please continue.

25      MS. WOOD:  No further questions, if you don't have

VOL. II - 177

1   any, Your Honor.

2          THE COURT:  I don't have anything.  Thank you.

3   Mr. Clifford, any recross?

4          MR. CLIFFORD:  Just very briefly on the last items

5   that were covered.

6          May I approach, Your Honor?

7          THE COURT:  Yes, you may.

8                          - - -

9                    RECROSS-EXAMINATION

10  BY MR. CLIFFORD:

11  Q.    So, Mr. Sharpe, I want to make sure we're on the same

12  page.  We're looking at P70, correct?

13  A.    I believe so.

14  Q.    And so your testimony you just provided to the Court is

15  the second outermost surface of P70 is only these grooves,

16  correct?

17  A.    The second outermost surface layer, yes, that's correct.

18  Q.    Only those grooves?

19  A.    Yes.

20  Q.    And not the foam that's covered by the hard -- by the

21  hard exterior above the grooves?

22  A.    According to the language of the claims, that's correct.

23  Q.    So only these grooves, not the covered foam?

24  A.    That's correct.

25  Q.    Okay.  Can you turn to Defendant's 6, 640 at the bottom?

VOL. II - 178

1    I think Jeff will get it for you.

2        I'm going to bring up the first paragraph of what a

3    claim is.  Do you see that?

4        This is claim 1 of the Cold Chain patent, right,

5    Mr. Sharpe?

6    A.    That is correct.

7    Q.    And I'm going to read this with you.  "An insulated

8    overhead door that is designed to roll open and closed in

9    tracks to cover a door opening having a top and a bottom, the

10   insulating overhead door having a first outermost surface, a

11   second outermost surface opposite the first outermost surface,

12   a top surface, a bottom surface, a first side surface and a

13   second side surface."  You following along here?

14   A.    Yes.

15   Q.    I've read it correctly so far?

16   A.    I believe so, yes.

17   Q.    "Both the first outermost surface and the second

18   outermost surface being larger than any of the top surface,

19   bottom surface, first side surface, and second side surface the

20   door comprising."  Did I read that correctly?

21   A.    Yes.

22   Q.    It's your testimony that the grooves in the foam are

23   larger than any other part of the door, correct?

24   A.    No.

25   Q.    Okay.

VOL. II -  179

1      A.   My testimony is that foam surfaces in those grooves are

2      larger than any of the top surface, bottom surface, first side

3      surface and second side surface, as the claim says.

4      Q.   Okay.  So your testimony is, then, those little grooves

5      are bigger than the different parts of the door that are

6      described in the claim chart, in the claim?

7      A.   That's not my testimony.  My testimony is those grooves

8      meet this claim limitation.

9           MR. CLIFFORD:  Okay.  No further questions.

10          THE COURT:  Mr. Burton.

11                              - - -

12                        CROSS-EXAMINATION

13     BY MR. BURTON:

14     Q.   I'm going to go back to Plaintiff's Exhibit 51 which is

15     your rebuttal report, Mr. Sharpe, specifically page 4, that

16     report.

17          We're getting it up here on the screen.

18     A.   I know.  I like to read the paper.  I'm old.

19     Q.   I can't object to that.

20          So I think it's easier to look at the diagram here, but

21     something you said in the -- in counsel's redirect about

22     optional -- additional optional surfaces, I think you said in

23     your testimony just a few minutes ago -- earlier that in this

24     diagram, the white layers constitute a second -- an outermost

25     surface, right?

VOL. II - 180

1    A.    The white surface is an outermost surface.

2    Q.    Sir, are you saying if we put a hypothetical additional

3    layer on top of that white layer, say a purple layer, that the

4    white layer retains its status as an outermost surface?

5    A.    Yeah.  There is a lot of outermost surfaces here.  Only

6    one of those outermost surfaces is defined by the claim as the

7    second outermost surface.

8    Q.    So a surface can be sandwiched between two layers and

9    still constitute a second outermost surface in your definition

10   of second outermost surface?

11   A.    No.  Perhaps I misunderstood your hypothetical.

12   Q.    Let's say in that diagram, on top of the white layer,

13   you have a hypothetical additional layer called the purple

14   layer.  Is that point, the purple layer, an outermost surface?

15   A.    Does the purple layer cover up all of the white layer?

16   Q.    Yeah.  I should have said that.

17   A.    Then, yes, that would be an outermost surface.

18   Q.    Would the white surface cease to be, in your definition,

19   an outermost surface at that point?

20   A.    Yes.

21        MR. BURTON:  All right.  That's all the questions I

22   had.

23        THE COURT:  Ms. Wood, do you have any re-redirect?

24        MS. WOOD:  Yes.  One question, Your Honor.

25

VOL. II - 181

1                          - - -

2                    REDIRECT EXAMINATION

3    BY MS. WOOD:

4    Q.   Mr. Sharpe, is the foam still defined as the second

5    outermost surface even if there are additional surfaces added

6    to the door?

7    A.   Yes.

8              MS. WOOD:  That's all, Your Honor.

9              MR. CLIFFORD:  No follow-up questions, Your Honor.

10             MR. BURTON:  No follow-up, Your Honor.

11             THE COURT:  Mr. Sharpe, thank you very much, sir.  You

12   may be excused.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  As an expert, Mr. Sharpe, you may remain

15   in court.

16             THE WITNESS:  Thank you.

17             THE COURT:  Mr. Tackett, your next witness.

18             MR. TACKETT:  Yes, Your Honor.  If I may, we'll call

19   Jeff Phlipot to the stand, the CEO of Kirk National Lease.

20        (Witness sworn.)

21

22

23

24

25

VOL. II - 182

1                          - - -

2                    JEFFREY PHLIPOT

3   Called as a witness on behalf of the Plaintiff, as upon

4   cross-examination, being first duly sworn, testified as

5   follows:

6                    CROSS-EXAMINATION

7   BY MR. TACKETT:

8   Q.    Good morning, sir.

9   A.    Good morning.

10  Q.    Can you please state your full name for the record?

11  A.    Jeffrey Albert Phlipot.

12        THE COURT:  Would you spell your last name for the

13  record, please.

14        THE WITNESS:  P-h-l-i-p-o-t.

15  BY MR. TACKETT:

16  Q.    And Mr. Phlipot, you are a co-owner of Kirk National

17  Lease, correct?

18  A.    Yes.

19  Q.    What's your ownership interest in Kirk National Lease?

20  A.    Roughly 98 percent.

21  Q.    You also serve as an officer of Kirk National Lease as

22  the CEO, correct?

23  A.    Correct.

24  Q.    Now, there is a codefendant with Kirk National Lease in

25  this lawsuit called TTPS, short for Truck and Trailer Parts

1  Solutions.  You're also an owner of that entity, aren't you?

2  A.   Correct.

3  Q.   What's your ownership interest in that entity?

4  A.   50 percent.

5  Q.   Do you provide services to that entity as well?

6  A.   Yes.

7  Q.   And what's your title over there at TTPS?

8  A.   I believe it's president.

9  Q.   And are you familiar with the complaint that Ridge

10  Corporation filed against Kirk National Lease, TTPS, Altum and

11  the now dismissed defendant Transglobal?

12  A.   Yes.

13  Q.   Are you generally familiar with the allegations in that

14  complaint that accuse the KNL overhead single panel roll-up

15  door of infringing on a patent owned by Ridge Corporation?

16  A.   Yes.

17  Q.   Can we agree to call that the KNL door the accused door

18  as we talk here today?

19  A.   Yes.

20  Q.   What is the role of TTPS with respect to manufacturing

21  and selling the accused door?

22  A.   TTPS routs the door, assembles it, and then we ship it

23  from there.

24  Q.   And which entity buys the panels from Altum that are

25  used to create the accused door?

VOL. II  -  184

1    A.    TTPS.

2    Q.    And what's the relationship between TTPS and KNL for

3    TTPS to convey the doors over to KNL?

4    A.    TTPS was created for -- we do quite a bit of fabrication

5    for other companies.  During that time to do the fabrication,

6    we set up as a distributor for several companies and would not

7    set up Kirk National Lease.  It's hard to set up Kirk National

8    Lease or KNL, however you want to put it, as a distributor for

9    some of those because of the people we would compete against.

10   So TTPS is where all the stuff is purchased through, built, and

11   then either sold to KNL or outright to the customer.

12   Q.    Before KNL sells one of the doors, it buys it from TTPS?

13   A.    Yes.

14   Q.    Does TTPS secure a profit on that sale over to KNL?

15   A.    Yes.

16   Q.    How much?

17   A.    Roughly 15 percent, somewhere around there.

18   Q.    Okay.  And then when KNL sells one of the accused doors,

19   it retains the revenue that it receives?

20   A.    Yes.

21   Q.    Okay.  I want to ask you about your history with Ridge

22   Corporation.  You have worked with Ridge Corporation in the

23   past, correct?

24   A.    Correct.

25   Q.    And would you agree that Ridge Corporation has

VOL. II — 185

1  engineering skill and expertise with the composites involved

2  with the KNL door?

3     A.   Yes.

4     Q.   What was KNL's business relationship with Ridge

5  Corporation prior to October of 2018?

6     A.   It actually wasn't with Ridge.  In a roundabout way it

7  was.

8          We were putting a ceiling liner in trailers for Honda.

9  Lakeshore Trailer was actually the distributor for Ridge, and

10  we bought the material through Lakeshore for Ridge -- for

11  Honda, I should say.

12     Q.   Okay.  So as part of a past project that Kirk National

13  Lease was working on, it bought supplies from Ridge.  Is that

14  fair?

15     A.   Yes.

16     Q.   Okay.  Now, I reference October 2018.  Isn't it true at

17  that point in time that Kirk National Lease approached Ridge

18  Corporation about helping it with work together on a single

19  panel roll-up door?

20     A.   We went to Ridge, we mocked up a door, took it to Ridge,

21  showed them what we wanted to do to see if they could make

22  their panel work for that, yes.

23     Q.   Now, there's one email in the defendant's binder that I

24  think sets up this time period.

25          MR. TACKETT:  If it's all right, I can approach the

VOL. II - 186

1   witness or you can get the separate binder.

2           THE COURT:  Or you can put it on the ELMO.  That's yet

3   another option.  That may be easier.  That way everyone can see

4   it simultaneously.

5           MR. TACKETT:  He was kind enough to put it on the

6   screen for me, Your Honor.

7   BY MR. TACKETT:

8   Q.   Mr. Phlipot, I'm showing you an email from -- this is an

9   internal email at Ridge from October 26, 2018, indicating that

10  a sales manager at Ridge had had a meeting with you and that

11  you wanted to come in for a meeting with Ridge to talk about

12  them to help -- helping you with work on a single panel roll-up

13  door.  Is that fair?

14  A.   That's fair.

15  Q.   This email would you say is consistent with the time

16  period where you started exploring that with Ridge?

17  A.   Yeah.  It was fall of '18.

18  Q.   And would you agree that shortly after the time period

19  of this email, there was a meeting between you and several

20  individuals at Ridge?

21  A.   Yes.

22  Q.   At that meeting, you discussed a single panel roll-up

23  door, correct?

24  A.   Correct.

25  Q.   And who was at that meeting?

1    A.   At the start of the meeting it was Chris Fannin, Zach

2   somebody from Ridge.  I'm not for sure what Zach's role was.

3   Bret Moss might have been in the meeting at the start.  And

4   then after we were in the meeting, then Gary came in.

5    Q.   When you say "Gary," you're referring to Ridge

6   Corporation's CEO Gary Grandominico, right?

7    A.   Right.

8    Q.   And Bret Moss would be the director of engineering at

9   Ridge, right?

10    A.   Right.

11    Q.   And when you went to Ridge, what exactly did you ask

12   them for help with?

13    A.   Well, we mocked up a panel, took it into them.  And we

14   had it in the track, rollers in it, brackets on it, ran it up

15   and down.  And I wanted to see if they can get their material

16   to work for what we wanted to do.

17    Q.   Okay.  And when you went to Ridge, would you agree that

18   you did not have a functioning single panel roll-up door?

19    A.   I only had a piece to make just a small section of a

20   door.

21    Q.   Isn't it true when you went to Ridge, you were

22   suggesting putting a roll-up door onto a unit that had a swing

23   door, as a roll-up door replacing a swing door?

24    A.   Yes.

25    Q.   Are you aware now that would not possibly work?

1    A.    Oh, we got one.

2    Q.    Pardon?

3    A.    We got a trailer with a swing door that's been replaced

4    with a roll-up door.

5    Q.    So you believe that that would functionally work long

6    term in the field?

7    A.    It's in the field, yes.

8    Q.    I have a feeling we'll hear some other testimony about

9    that later.

10    A.    Okay.

11    Q.    As you just said, you didn't have a functioning door

12    when you went to Ridge.  You were hoping that their engineering

13    expertise could help take what you already had started and make

14    it something that would function and work long term, correct?

15    A.    Out of their material, yes.

16    Q.    And you would agree that Ridge had expertise with the

17    composites out of which you were hoping to build a functioning

18    door that you could take to market?

19    A.    Yes.

20    Q.    And would you agree that KNL did not have expertise with

21    the composites that you were using?

22    A.    That's why I went to Ridge, yes.

23    Q.    And Ridge also had an engineering team that could work

24    on the product and assist you, correct?

25    A.    To make their product work, yes.

VOL. II - 189

1    Q.    And did KNL have an engineering team that it could use

2    to work on the product?

3    A.    Myself and Larry.

4    Q.    Are you an engineer?

5    A.    No.

6    Q.    Is Larry Phlipot an engineer?

7    A.    No.

8    Q.    Isn't it true in the process of working with Ridge that

9    Ridge engineers did calculations and modified designs in order

10   to optimize a single panel roll-up door and make it operative

11   so it would work long term?

12        MR. BURTON:  I object to the relevance to this line of

13   questioning, Your Honor.

14                          - - -

15      (The following proceeding was held at sidebar.)

16        THE COURT:  Go ahead.  What's the basis?  It's -- you

17   said it sounds irrelevant.  So tell me why this is not

18   relevant.

19        MR. BURTON:  It sounds like he's going down a path to

20   try to show that Ridge contributed enough work to the KNL

21   application to be deemed a coinventor, which some of the

22   pre-suit correspondence addressed, or I have seen some of that.

23   I'm fine with general background explanations that there was

24   relationship between Ridge and KNL, but the inventorship

25   dispute question is not part of this case.

1      THE COURT:  I'm going to give Mr. Tackett an

2   opportunity to respond.  But if my memory serves me correctly,

3   there's been quite a bit made in both opening statements and in

4   some of the questioning about the preexisting Ridge/KNL

5   relationship, how Ridge essentially took some of the steps that

6   it took because it was displeased with the fact that KNL would

7   not agree to include Ridge on the '144 patent.

8      So what is irrelevant about exploring the relationship

9   that led to this matter that you -- that the defendants have

10  opened the door to?

11     MR. BURTON:  Well, the relevance would be if we

12  crossed the line from just exploring the relationship to trying

13  to prove who the inventors were or weren't in this case.

14     THE COURT:  Mr. Tackett?

15     MR. TACKETT:  Your Honor, there's certainly relevance

16  because it goes to the relationship.  It goes to also the

17  overall fact that KNL could never create its own IP in this

18  area.  It needed Ridge's expertise and Ridge's engineering.  On

19  the '144 application, effectively, they stole an invention by

20  not listing Ridge.  What happened when we have the patent

21  infringement going on today?  They're stealing the invention

22  again.  It's the same course of conduct.  They don't have

23  engineers there.  They need our help.

24     Now, I'm not here to spend the whole day proving

25  ownership, inventorship on the '144 application because I agree

VOL. II -  191

1   we have a straightforward point-blank case of patent

2   infringement.  We don't need the '144 application

3   coinventorship issue, but it is absolutely relevant to this

4   narrative.

5           THE COURT:  I'm going to overrule the objection

6   because I believe that the defense opened the door with respect

7   to the relationship between KNL and Ridge.  I think that this

8   is germane to that.  I don't know that it has gotten to the

9   point where you say that we're trying the case of who --

10  whether Ridge was a coinventor, but I will maintain an ear for

11  that.  And if it gets beyond just a mere background

12  relationship, you may renew your objection.

13          MR. BURTON:  Thank you, Your Honor.

14       (The following proceeding was held in open court.)

15          THE COURT:  Please continue, Mr. Tackett.

16          MR. TACKETT:  Thank you, Your Honor.

17       Your Honor, may I ask to have the court reporter read

18  the open question.

19          THE COURT:  Ms. Evans, would you please read back the

20  underlying question.

21       (Thereupon, the last question was read by the court

22  reporter.)

23          THE WITNESS:  If they did, I haven't seen any drawings

24  from them to show that.

25

VOL. II -  192

1    BY MR. TACKETT:

2    Q.   I'm not sure the answer is responsive.

3         I'm asking you -- you said that Ridge had a team of

4    engineers.  You said that KNL did not have engineers on the

5    project?

6    A.   Correct.

7    Q.   You said that the Ridge engineers worked on the project

8    and they made suggestions and did design work that helped you

9    to create a working single panel roll-up door.  Isn't that

10   true?

11   A.   If they did design work, I haven't seen any of the

12   designs.

13   Q.   You understand you're under oath, correct?

14   A.   Correct.

15   Q.   Okay.  Do you remember in your deposition a few days ago

16   when I showed you pictures of design drawings that were dated

17   back to 2019 prepared by Bret Moss and his engineering team?

18   A.   What he had in his notebook.

19   Q.   Do you recall that?

20   A.   Yes.

21   Q.   Do you remember seeing those?

22   A.   Yes.

23   Q.   And do you remember testifying that you did not have any

24   design drawings that were contemporaneous with that time

25   period?

VOL. II -  193

1   A.   Everything we would have had, I said, was on the

2   whiteboard in my office.

3   Q.   Again, you remember testifying you did not have any

4   design drawings from that time period?

5   A.   Correct.

6   Q.   So I won't mark that document so long as you're saying

7   you agree that you remember seeing those design drawings from

8   Bret Moss.  Is that true?

9   A.   Yes.

10   Q.   And those were relating to the single panel roll-up door

11   that KNL is attempting to patent under the '144 application,

12   correct?

13   A.   I suppose so, yes.

14   Q.   I'm going to ask you to turn to Tab 4 in your binder,

15   please.

16   A.   Which one?

17   Q.   Plaintiff's exhibit binder, P4.

18   A.   Okay.

19   Q.   Do you recognize this document to be the '144

20   application that we are talking about, that Kirk National Lease

21   filed for a, quote, single panel roll-up door?

22   A.   Yes.

23   Q.   You're familiar with this document?

24   A.   Yes.

25   Q.   And Kirk National Lease filed this patent application

VOL. II - 194

1  February 19th, 2022, correct?

2  A.   If that's what the date says.  I can't -- yeah, you're

3  right, it is.

4  Q.   On that application, you list as inventors yourself,

5  Jeff Phlipot, a Mr. Mark Schneider, and your brother Larry

6  Phlipot, correct?

7  A.   Correct.

8  Q.   You did not list Ridge as a coinventor under the '144

9  application, did you?

10  A.   Correct.

11  Q.   Ridge has alerted you that it believes you have

12  committed an error by not listing it as a coinventor, correct?

13  A.   Yes.

14  Q.   And when Ridge has alerted you of this fact through

15  correspondence to your counsel, it has provided copies of

16  emails and design drawings from the time period that you guys

17  were working together, correct?

18  A.   Yes.

19  Q.   I want to turn your attention to Tab 7 in your binder,

20  please.  Are you there?

21  A.   Yes.  I'm sorry.  I was reading it.

22  Q.   Now, this is the email that Ridge's patent counsel sent

23  to patent counsel for KNL regarding KNL's failure to list Ridge

24  as a coinventor on the '144 application.  And included in this

25  exhibit are the attachments to that email which Ridge believes

VOL. II - 195

1   shows its role as a joint inventor.

2         As you flip through, are you familiar with and do you

3   recall receiving these materials?

4   A.    Yes.

5   Q.    Has Kirk National Lease retained these materials as part

6   of its business records regarding the '144 application?

7   A.    Yes.

8   Q.    I'd like you to turn to the last page of this exhibit.

9   It has two emails that are grouped together in this compilation

10  exhibit.  At the top is a July 23, 2021, email from you, Jeff

11  Phlipot, to Gary Grandominico, subject line Roll-up Door.  Do

12  you see that and do you recognize that email?

13  A.    Yes.

14  Q.    Is that an email you received?

15  A.    Yes.

16  Q.    You say in this email:  Gary, good afternoon.  After

17  many attempts, we have the roll-up door working.  Actually, it

18  works great.  Would like to sit down with you to start the

19  paperwork to lock this down.  Patent, comma, IP, dot, dot.  Let

20  me know what day and time works for you.

21        Do you see this?  Do you remember sending that?

22  A.    Yes.

23  Q.    But you never sat down with Gary Grandominico and did

24  paperwork to lock down the IP, i.e., the '144 application, did

25  you?

VOL. II - 196

1    A.    No.

2    Q.    You can move that exhibit to the side.

3          Now, would you agree that at some point KNL's refusal to

4    acknowledge Ridge as a coinventor on the door that it was

5    attempting to patent under the '144 application led Ridge and

6    Kirk National Lease to have disputes with each other, strife?

7    A.    Just over the door, yes.

8    Q.    And how would you characterize the relationship between

9    Ridge and Kirk National Lease as ending?

10   A.    Well, the only reason it ended, we were -- Gary

11   continued to agree to sell me product that they produced.  We

12   do a lot for different customers, ceiling liners, scuff liners.

13   We were actually using their scuff liner into another patented

14   product we had.  Instead of using rollers, their ogre material

15   was very good for plastic skids to slide on.  We ordered stuff

16   and it took forever.  It would just keep getting pushed off

17   every time that -- the parts department would call.  It was

18   always being delayed and being delayed and being delayed.  It

19   was tied up at the rail yard, it was tied up at customs, it was

20   tied up somewhere.

21         From my understanding, the ogre material was scrap

22   pieces left over that they ground back up and put in.  So I

23   don't know why that would be tied up at the port.

24         I went and turned in -- when we couldn't get it, US

25   Liner made the product for me and we did that and we canceled

VOL. II -  197

1  it.  Once we canceled it, then they turned around just -- I

2  don't know if it was a day or just a couple hours, that we can

3  make this for you tomorrow.  I already reordered it from

4  another vendor.  So since they started supplying it, that's the

5  only reason we haven't been back.

6  Q.  Would you agree that you asked Ridge for a business plan

7  regarding the roll-up door work that you had done together,

8  regarding engineering on the single panel roll-up door that

9  ended up being the subject of your '144 patent application?

10  A.  Yes.  We wanted a business plan how we could move

11  forward.

12  Q.  Do you recognize this to be the business plan that --

13  slash, cooperative agreement that Ridge Corporation offered to

14  you in early '22?

15  A.  Yes, it's one of them.

16  Q.  And is this a document that you reviewed and recall

17  reviewing?

18  A.  Yes.

19  Q.  And you retained this document in your business records?

20  A.  Yes.

21  Q.  Would you agree that the proposal from Ridge Corporation

22  contemplated that Ridge Corporation and KNL had jointly

23  developed the single panel roll-up door that was the subject of

24  the '144 application?

25  A.  Yes.  My idea, their material.

VOL. II - 198

1    Q.   My question is would you agree that their business

2  proposal reflected Ridge's understanding that they were a joint

3  developer?

4    A.   Unless you got something to document, I don't know.

5    Q.   Ridge's business plan proposed that you all would work

6  together and that KNL would have a royalty-free license to make

7  the door.  Is that fair?

8    A.   In this plan?

9    Q.   Yes.

10   A.   Yes, I guess.

11   Q.   Kirk National Lease did not agree to any sort of

12  business arrangement with Ridge regarding shared credit for the

13  single panel roll-up door that you worked on together, correct?

14   A.   Correct.

15   Q.   And at some point in time, Kirk National Lease, in 2022,

16  started looking for other suppliers of the key feature of the

17  roll-up door, the panels that go into the door, correct?

18   A.   Correct.

19   Q.   And at that same point in time, this is September of

20  2022, the responses that Kirk National Lease provided to Ridge

21  got much slower.  Would you agree?

22   A.   Ask that again, please.

23   Q.   There was email correspondence dating back to September,

24  the beginning of September '22, where Ridge Corporation is

25  continuing to request that you all work together and agree to

VOL. II – 199

1   some sort of joint development and, suddenly, in September,

2   Kirk National Lease goes quiet and starts working with Altum.

3   Isn't that true?

4   A.   Yes.

5   Q.   I want to direct your attention to Plaintiff's 24, sir.

6   This is a document Bates labeled Altum LLC 402.  This is an

7   email from Dominic Grandominico at Altum LLC, to you being Jeff

8   Phlipot, and your brother Larry Phlipot dated September 9,

9   2022, talking about a meeting that you all had to explore Altum

10  potentially working with you to assist you with -- continue to

11  produce a single panel roll-up door, correct?

12  A.   Correct.

13  Q.   Now, before we get into the detail of this, isn't it

14  true that you knew that Altum LLC was made up of employees who

15  came from Ridge?

16  A.   When it got to this email, yes.

17  Q.   And you knew that Dominic Grandominico was a former

18  employee of Ridge Corporation, correct?

19  A.   When the first time Dominic come into the building, I

20  asked him, I says, I hear you're Gary's son.  He said, yes.  I

21  won't tell you -- just yes.

22  Q.   You knew that the Altum team had knowledge and expertise

23  of working on these type of composites from having been at

24  Ridge, didn't you?

25  A.   Yes.

VOL. II -  200

1    Q.   And because of that fact, that made Altum a perfect

2  replacement for Ridge once you had a dispute, didn't it?

3    A.   I also got panels from Impact Guard, US Liner, Tuck

4  Modal.  And the only one that didn't come in was Avient,

5  something like that.

6         MR. TACKETT:  Move to strike.

7  BY MR. TACKETT:

8    Q.   I'm asking you because you knew that these individuals

9  had the knowledge and expertise with composites from Ridge, it

10  made them the perfect replacement with Ridge once you had a

11  dispute?

12        THE COURT:  Just a minute.  You had a motion.  I

13  haven't had a chance to rule on the motion.

14      I'm going to grant the motion, but the answer was

15  unresponsive.  Do you understand the question, Mr. Phlipot?

16        THE WITNESS:  Yes.  I understand the question.

17        THE COURT:  All right.  You may answer.

18        THE WITNESS:  Yes, they are a supplier that could do

19  this, yes.

20  BY MR. TACKETT:

21    Q.   An ideal replacement for Ridge because of their

22  knowledge and expertise gained at Ridge, correct?

23    A.   Yes.

24    Q.   I want to look down through this email.  Dominic

25  Grandominico lists out a number of items here to memorialize

VOL. II - 201

1    the meeting that you all had the day prior on September 8,

2    2022.  Would you agree that the items that Dominic Grandominico

3    lists here – ten items – accurately reflect the discussions

4    that you all had at that point?

5      A.   Yes.

6      Q.   And would it be fair to say, then, that you asked Altum

7    LLC to prepare two prototypes for you.  And in items 4 through

8    9, you were essentially giving them performance requirements of

9    the panels that Altum would provide, correct?

10     A.   Correct.

11     Q.   And there's a reference to the type of foam that would

12   be used.  Paragraph 3.  Would you agree that Altum LLC chose

13   what type of foam would be used for the panel that they were

14   going to provide to you?

15     A.   Yes.

16     Q.   You can set that one aside.  I'd like you to look at the

17   next tab that's P25.  Plaintiff's 25.

18     A.   Which one do you want?

19     Q.   Plaintiff's 25, sir.

20     A.   Okay.

21     Q.   Now, do you recognize Plaintiff's 25?

22     A.   Yes.

23     Q.   And this is a CAD -- that means computer-assisted design

24   drawing -- that Altum LLC prepared for you, correct?

25     A.   Correct.

1    Q.    Now, this design drawing that -- it indicates Altum LLC

2    in the bottom right-hand corner.  Do you see that?

3    A.    Yes.

4    Q.    And it says Seamed Altumate Structural Board for TTPS.

5    Do you see that?

6    A.    Yes.

7    Q.    And now, do you see where the green areas are that are

8    going horizontally across this design drawing?

9    A.    Yes.

10   Q.    And those green areas would be proposals for where the

11   grooves would get made into the panels that Altum is providing,

12   correct?

13   A.    Correct.

14   Q.    And also Altum is explaining in this drawing, this

15   design drawing, that as part of their process, they'll have

16   seams at certain points in the panel and that the grooves will

17   be need to be moved around to avoid those seams, correct?

18   A.    Correct.

19   Q.    So Altum wasn't just providing you a panel off the

20   shelf.  It was also providing you a proposed layout.  Correct?

21   A.    This was after they already made us test panels.

22         MR. TACKETT:  Move to strike.

23         THE COURT:  Sustained.

24         MR. TACKETT:  Please answer my question, sir.

25         THE WITNESS:  Yes, this would be a drawing for that.

VOL. II – 203

1    BY MR. TACKETT:

2    Q.   They were providing you a proposed layout design,

3    correct?

4    A.   A proposed layout, yes.

5    Q.   I want to turn your attention to Tab 31, sir.  Let me

6    know when you're there.

7    A.   I'm there.

8    Q.   I'm showing you Plaintiff's 31.  This is Bates labeled

9    Altum LLC 1538 through 1540.  Take a moment to look at this.

10        The beginning of the email string is at the bottom of

11   the page.  It's an email from Dominic Grandominico to you,

12   Larry Phlipot, Mark Schneider, Jeff Phlipot and

13   Mr. Grandominico's partners Kyle Gaines and Greg Karst.  And

14   the subject line is Altum print for TTPS roll-up door.  Do you

15   see that?

16   A.   Yes.

17   Q.   Sir, if you flip to the next page you'll see the end of

18   this email.  Do you see that?

19   A.   Uh-huh.  Yes.

20   Q.   And then after that is a picture of the design drawing

21   that we just looked at at P25.  Would you agree?

22   A.   Yes.

23   Q.   You agree that you recognize this email, you received

24   it, and it is the email through which Altum transmitted to you

25   the design drawing that we just saw at P25?

VOL. II -  204

1    A.    Yes.

2    Q.    I want you to look at the second to last paragraph of

3    this email, sir.  Do you see there where Altum is saying

4    they've used one type of foam, a certain density level, and

5    they're considering experimenting with a different density

6    level.  Do you see that?

7    A.    Yes.

8    Q.    And again, you're not dictating the foam density level

9    that Altum would need to use in the panel that you would use to

10   manufacture your door, are you?

11   A.    Evidently, the panel that we tried, there must have been

12   some issue with the foam is why he discussed with Larry for

13   another type of foam to use.

14   Q.    Rather than move to strike, I'll just ask you again.

15         Kirk National Lease is not dictating to Altum precisely

16   what density of foam Altum has to use on this door, are they?

17   A.    No.

18   Q.    Now, after this email exchange that we just looked at

19   which was November of '22, Altum began supplying more and more

20   panels to Kirk National Lease and TTPS that Kirk National Lease

21   and TTPS then used to create the accused door which it then

22   sold to customers, correct?

23   A.    Yes.

24   Q.    Are you familiar with the allegations in the complaint

25   that Kirk National Lease inaccurately advertised to the

VOL. II – 205

1    consumers in the market for truck and trailer component parts

2    that the door Kirk National Lease was selling was patented by

3    Kirk National Lease?

4    A.    Yes.

5    Q.    I want to turn your attention to Plaintiff's 8, sir.  Do

6    you recognize Plaintiff's 8 to include a demonstration video

7    that was on the front page of the TTPS website?

8    A.    Yes.

9    Q.    If you flip to the next page, you will see the video

10   start to play snap through snap.  So you're saying we have

11   dozens of doors in the pilot phase with numerous fleets.  Do

12   you see that?

13   A.    Yes.

14   Q.    Did you review and approve these marketing materials?

15   A.    No.

16   Q.    But you would agree that as CEO that you have the final

17   say over what goes in and what goes out the door for your

18   company?

19   A.    Yes.

20   Q.    And who is responsible -- to whom do you delegate the

21   duty of marketing the products?

22   A.    Mitch Rank.

23         THE COURT:  Would you repeat that name.

24         THE WITNESS:  Mitch Rank.

25         THE COURT:  How is his last name spelled?

VOL. II - 206

1          THE WITNESS:  R-a-n-k.

2          THE COURT:  Mr. Tackett, give me one second.  I need

3   to get something from my office.

4      (Recess taken from 9:35 a.m. to 9:37 a.m.)

5          MR. TACKETT:  Your Honor, may I continue?

6          THE COURT:  Yes, you may continue.

7    BY MR. TACKETT:

8    Q.    Now, Mr. Phlipot, you said that you delegated marketing

9   to Mitch Rank.  What was his job title?

10   A.    He was head of the sales at that time, sales and

11  marketing.

12   Q.    Who employs Mr. Rank?

13   A.    Kirk National Lease.

14   Q.    And this is on the website for TTPS, though, correct?

15   A.    Correct.

16   Q.    So does Mr. Rank provide services to both entities?

17   A.    Yes.

18   Q.    We're just looking at the second page.  I'd like you to

19  flip to the third page here.  You see at the top of that page

20  where TTPS had advertised patented single panel design?

21   A.    Yes.

22   Q.    And you agree that at all times when TTPS had this

23  advertisement up, that TTPS and KNL did not have a patent on a

24  single panel roll-up door, correct?

25   A.    Correct.

VOL. II - 207

1    Q.    Do you have any way of knowing how many customers saw

2    this advertisement?

3    A.    We have telematics that tracks the number of customers

4    that looked at it.

5    Q.    And have you looked into those telematics and

6    investigated how many potential customers saw this false

7    advertisement?

8    A.    Yes.

9    Q.    Have you reached out to those customers and explained to

10   them that you had incorrectly stated that you had a patent when

11   you did not?

12   A.    I might have misspoke when you asked if we knew how many

13   customers.  I can't tell by their IP address.  So I'm sorry.

14   No, we did not reach out to any of them.

15   Q.    Understood.  Would you agree that separate and apart

16   from -- well, one moment.  How long was this advertisement

17   falsely stating that KNL had a patent, how long was that up?

18   A.    I'm not for sure.  I think from our conversation on the

19   deposition, it's probably been about a year.  I don't know the

20   exact date.

21   Q.    And would you agree that individuals in your sales team

22   also were sending direct marketing emails to large prospective

23   customers in which they marketed and claimed that Kirk National

24   Lease had a patent on a single panel roll-up door?

25   A.    Through the deposition, yes, I found out.

VOL. II - 208

1    Q.    I'd like you to take a look at some of those emails,

2    sir.  The first one is at Plaintiff's 47.  This is KNL 1476.

3    A.    I got it.

4    Q.    This is an email from DJ Marks to a prospective

5    customer.  The contact is name Jack Webster.  It's on

6    December 16th, 2022.  Do you recognize the name DJ Marks?

7    A.    Yes.

8    Q.    And he is an employee of Kirk National Lease, correct?

9    A.    Correct.

10   Q.    On the sales team for Kirk National Lease?

11   A.    Correct.

12   Q.    Would you agree that this is an email that Mr. Marks is

13   sending in the ordinary course of business to a prospective

14   customer?

15   A.    Yes.

16   Q.    And do you see there where he says we're working with

17   Merlin Solar, Dhollandia liftgates, and a one piece rolled door

18   that we have patented in case there might be any interested

19   generated there as well.  Do you see that?

20   A.    Yes.

21   Q.    Would you agree that Mr. Marks is marketing the fact

22   that you have a patent as a positive?

23   A.    I can't deny it, yes.

24   Q.    Now, did Kirk National Lease reach out to this customer,

25   prospective customer, I should say, and alert them that Kirk

VOL. II - 209

1  National Lease had falsely marketed that it had a patent when

2  it did not?

3   A.   When the TRO came in, we didn't talk to anybody about

4  the door.  So, no, we have not.

5   Q.   And does Kirk National Lease have any way of knowing

6  whether this recipient of the message, Jack Webster, may have

7  told others that Kirk National Lease had a patent on a single

8  panel roll-up door?

9         MR. CLIFFORD:  Objection.  Calls for speculation, Your

10  Honor.

11         THE COURT:  Well, Mr. Phlipot --

12         THE WITNESS:  Phlipot.

13         THE COURT:  Mr. Phlipot, did not -- is the CEO of the

14  company.  And Mr. Tackett is inquiring as to what, based on his

15  position as CEO, he knew whether Kirk National Lease did.  He's

16  already indicated that he was aware of representations to

17  others made by Kirk National because marketing ultimately

18  reported to him.  So I don't understand --

19         MR. CLIFFORD:  Let me be clear.  I believe the

20  question was, is he aware of whether the third party talked to

21  other third parties about the contents of the email.

22         THE COURT:  Here is the question.  "And does Kirk

23  National Lease have any way of knowing whether this recipient

24  of the message, Jack Webster, may have told others that Kirk

25  National Lease had a patent on a single panel roll-up door?"

VOL. II -  210

1          He asked if Kirk National Lease had any way of knowing.

2     That's appropriate.  He didn't ask what the third party

3     actually did or knew.

4               MR. CLIFFORD:  That's fair, Your Honor.  Thank you.

5               THE COURT:  You may answer the question as asked.  But

6     I don't want you to speculate.

7               THE WITNESS:  No.

8     BY MR. TACKETT:

9     Q.   Now, there is a number of other emails just like this,

10    so I'm going to try to go through them as fast as we can.  But

11    I want to make sure we identify them.  So can you turn to P57,

12    sir?

13    A.   Okay.

14    Q.   This is another sales email from DJ Marks, the same

15    sales manager.  This one is to a prospective customer at the

16    company Nussbaum.  And he has copied the director of sales

17    Mitchell Rank there.  This is August 8, 2023, just a month

18    before the complaint.

19          Would you agree this is a marketing email in the

20    ordinary course of Kirk National Lease's business to a

21    prospective customer?

22    A.   Yes.

23    Q.   So at the bottom of the page there is a pitch regarding

24    a single panel roll-up door.  He says:  Lastly, Mitch is in

25    charge of our sister company at TTPS where I briefly talked to

VOL. II - 211

1  you about the services that we provide.  We have Dhollandia

2  liftgate, parens, which are the global leader in liftgates,

3  Merlin Solar Solutions that range in many various capabilities,

4  Idlefree systems, so on and so forth.

5      And then he says a couple lines down:  And our patented

6  single panel rolled door.  Do you see that?

7  A.    Yes.

8  Q.    Would you agree that, again, DJ Marks is marketing to

9  this customer that having a patent is a positive in his sales

10  pitch to sell this prospective customer the single panel

11  roll-up door?

12  A.    He's posting it that way.  I don't know if it's a

13  positive or not, but he's posting it that way, yes.

14  Q.    And as you sit here today, are you aware of KNL letting

15  this client know that the sales email it sent a month ago

16  falsely stated that KNL had a patent when it did not?

17  A.    Yes.

18  Q.    Yes, you told this customer that it was incorrect?

19  A.    Oh, no.  I thought if I understood that we had a patent.

20  No, I did not know.

21  Q.    Does KNL have any way of knowing whether this

22  prospective customer may have told others about this false

23  representation?

24  A.    No.

25  Q.    Okay.  Can you turn to 58, sir?  Plaintiff's 58.

VOL. II - 212

1      Here's another marketing email from DJ Marks to GFS,

2   another prospective customer, correct?

3   A.   Correct.

4   Q.   Would you agree that this email was sent by Mr. Marks in

5   the course and scope of his employment for KNL?

6   A.   Yes.

7   Q.   Now, once again, if you go to the bottom of his email,

8   almost as if this is a script, he makes the pitch in that

9   second to last paragraph about the patented single panel door.

10  Do you see that there?

11  A.   Yes.

12  Q.   And you would agree again that Mr. Marks makes this

13  pitch even though KNL does not have a patent on a single panel

14  roll-up door, correct?

15  A.   Yes.

16  Q.   And this occurred in December of '22.  Has KNL ever

17  alerted this prospective customer, GFS, that it did not in fact

18  have a patent when it marketed that it did?

19  A.   No, not that I know of.

20  Q.   Does KNL have any way of knowing whether this customer

21  told others about the false representations that KNL made?

22  A.   No.

23  Q.   Next tab, please.

24       THE COURT:  For the record, what is the next tab?

25       MR. TACKETT:  I'm sorry, Your Honor.  Plaintiff's 59,

VOL. II -  213

1    sir.

2      BY MR. TACKETT:

3      Q.    Mr. Phlipot, this Plaintiff's 59 is an April 17th, 2023,

4    email from DJ Marks to a prospective customer.  And would you

5    agree that Mr. Marks is sending this email in the course and

6    scope of his employment for KNL?

7      A.    Yes.

8      Q.    And if you go to the second page, second paragraph from

9    the bottom, Mr. Marks says to the prospective customer,

10   "Although we've done very minimal business with the Kirk

11   National Lease maintenance side for Kroger, I just want to let

12   you know that we align with you on a lot of different

13   territories and have experience in all of your equipment bumper

14   to bumper, including work on liftgates versus just selling them

15   on the TTPS side."  Do you see that?

16     A.    Yes.

17     Q.    You agree that this is a marketing email in which he's

18   marketing roll-up doors.  Page 5 of this email string has the

19   representation that we're looking for.  Sorry about that.  It's

20   a longer string.

21     A.    Yes, I agree.

22     Q.    Did you find page 5?

23     A.    It seems to be a common thing that he puts down at the

24   end of every paragraph, all the options we list.

25     Q.    And so on page 5, there is an email from Mr. Marks to

VOL. II -  214

1   Kroger where he says, "We have patented a new roll door that is

2   one piece and weighs only 95 pounds which significantly reduces

3   the fatigue to your drivers using the door many times a day."

4   Do you see that?

5    A.    Yes.

6    Q.    You would agree that Mr. Marks is advertising the single

7   panel roll-up door and marketing the patent that you don't have

8   as a positive?

9    A.    Yes.

10    Q.    Now, did KNL alert the Kroger company that those

11   representations were false and it didn't actually have a

12   patent?

13    A.    No.

14    Q.    And does KNL have any way of knowing whether the Kroger

15   company may have shared those false representations with others

16   in the marketplace?

17    A.    No.

18    Q.    I'd like you to turn to the next tab, Plaintiff's 60,

19   sir.  Here is an email from the directer of marketing, or

20   whatever his title is -- the individual in charge of marketing,

21   Mitchell Rank at KNL, to someone that is a prospective

22   customer, it looks like by the email domain a carrier of some

23   type.  Do you see this?

24    A.    Yes.

25    Q.    And would you agree that this is also a marketing email

VOL. II - 215

1  sent in the course and scope of Mr. Rank's employment in which

2  he is advertising the single panel roll-up door?

3  A.   He reached out to R and L Carrier to see if they would

4  demo doors so we could get some history on it.

5  Q.   So, again, throughout this process -- and look at the

6  subject line of the email.  Can you tell me what it says?

7  A.   Patented roll-up door.

8  Q.   So would you agree that, again, Mr. Rank is marketing

9  that KNL has a patent on a single panel roll-up door when it

10 does not?

11 A.   Yes.

12 Q.   And did KNL let this prospective customer know that it

13 was false when it marketed the door that way?

14 A.   No.

15 Q.   And does KNL have any way of knowing whether that

16 prospective customer shared this false representation with

17 others in the marketplace?

18 A.   No.

19 Q.   Can you turn to the next tab, Plaintiff's 61, sir?

20 Would you agree this is another marketing email that Mitchell

21 Rank at Kirk National Lease sent to a prospective customer?

22 And, again, the subject line says patented roll door?

23 A.   Yes.

24 Q.   And so, again, Kirk National Lease is marketing to a

25 prospective customer that they have a patent on a roll-up door

VOL. II – 216

1    when they do not, correct?

2       A.    Correct.

3       Q.    And has Kirk National Lease let this prospective

4    customer know that they do not have a patent for a single panel

5    roll-up door?

6       A.    Yes.

7       Q.    You have?

8       A.    Yes.

9       Q.    You've alerted this customer of it?

10      A.    Coca-Cola, yes.

11      Q.    And was Coca-Cola unhappy when they learned of this?

12      A.    No.

13      Q.    I'm going to ask you to turn to Plaintiff's 62, sir.

14   This is another marketing email.  This is from Mitchell Rank to

15   someone at XPO Logistics.  Again, subject line patented single

16   panel rolled door.  Would you agree this is an email that

17   Mr. Rank sent in the course and scope of his employment for

18   KNL?

19      A.    Yes.

20      Q.    And again, here, the subject line is that the door is

21   patented when it is not, correct?

22      A.    Correct.

23      Q.    And did KNL alert XPO that it did not, in fact, have a

24   patent on a single panel roll-up door?

25      A.    No.

VOL. II -  217

1    Q.   And does KNL have any way of knowing whether XPO shared

2   the false marketing that it received from KNL with others in

3   the marketplace?

4   A.   No.

5    Q.   Please turn to Plaintiff's 63, sir.  Now, this is a

6   longer email but, again, from Mitchell Rank to a potential

7   customer at the company JB Hunt.  Subject line, proprietary

8   roll door.  Would you agree this is an email that Mr. Rank sent

9   within the course and scope of his employment for KNL?

10   A.   Yes.

11    Q.   And all of these emails are maintained by KNL in their

12   records, correct?

13   A.   As long as the salesman didn't delete it, yes.

14    Q.   This is KNL 1525 and was produced by KNL in this case,

15   right?

16   A.   Yes.

17    Q.   Okay.  And would you agree that in this email, Mr. Rank

18   markets to JB Hunt that KNL has a patent when it does not?

19   A.   Yes.

20    Q.   And has KNL contacted JB Hunt and alerted them that this

21   marketing was false?

22   A.   I believe we have, yes.

23    Q.   You believe or you know?

24   A.   I don't know for sure.  But I'm -- the communication we

25   have with JB Hunt, I would think they know.  But I don't know

VOL. II -  218

1    for sure so I'd have to say no.

2      Q.    That's what we have to focus on here in court, sir.

3            I'd like you to turn to Plaintiff's 64, sir.  Now, this

4    is another marketing email that Mr. Rank is sending to a

5    prospective customer in the course and scope of his employment

6    for KNL, correct?

7      A.    Correct.

8      Q.    And would you agree that in this email, again, Mr. Rank

9    is marketing that KNL has, quote, developed a patented single

10   panel roll door.  Do you see that?

11     A.    Yes.

12     Q.    And do you agree that Mr. Rank is marketing that KNL has

13   a patent when it does not?

14     A.    Yes.

15     Q.    And has KNL alerted this customer that it was false when

16   it was saying that it had a patent when it did not?

17     A.    No.

18     Q.    And does KNL have any way of knowing whether this

19   customer alerted others in the market of this false

20   representation?

21     A.    No.

22     Q.    Now, I'm going to show you Plaintiff's 65.  This appears

23   to be the email by which Mitchell Rank is communicating to

24   KNL's web developer what he wants the bullets in the video on

25   the TTPS website to say.  Would you agree?

VOL. II -  219

1    A.    Yes.

2    Q.    And right at the top, patented single panel design.  Do

3  you see that?

4    A.    Yes.

5    Q.    And you would agree that when that was given to the web

6  developer and at all times when it was on the website, KNL did

7  not have a patent?

8    A.    Correct.

9    Q.    And, sir, are you familiar -- I'm sorry, there's one

10  more.  Turn to Plaintiff's 66.

11    A.    Yes.

12    Q.    And go to the second page of this email.  Do you

13  recognize the name Eddie Beavers?  It looks like he has a KNL

14  web domain.

15    A.    Yes.

16    Q.    And who is he?

17    A.    He is a salesman.

18    Q.    And would you agree that in this email, Mr. Beavers, on

19  January 27th, 2023, is sending this email within the course and

20  scope of his work for KNL?

21    A.    Yes.

22    Q.    And he is saying in this email:  Here is more

23  information on the door and our TTPS division.  Open the

24  attached link to our TTPS website and scroll down to the bottom

25  until you see the window for the patented single panel roll

VOL. II -  220

1   door.  Do you see that?

2   A.   Yes.

3   Q.   And you would agree that Mr. Beavers is marketing to the

4   prospective customer that KNL has a patent when it does not?

5   A.   Yes.

6   Q.   And has KNL alerted this customer that the marketing

7   representations it made were false?

8   A.   No.

9   Q.   And does KNL have any way of knowing whether this

10  customer shared these false representations with others in the

11  market?

12  A.   No.

13  Q.   Okay.  Mr. Phlipot, are you familiar with the Court's

14  temporary restraining order in this case that ordered KNL and

15  TTPS and Altum to stop manufacturing the single panel roll-up

16  door that's been accused of infringement and also to stop all

17  marketing of the infringed door?

18  A.   Yes.

19  Q.   And do you believe that KNL has removed all false

20  marketing from the Internet?

21  A.   They better have, yes.

22  Q.   Would you have any way to disagree if I told you this

23  morning on a Facebook webpage I found a continued online

24  representation that KNL has a patented single panel roll-up

25  door?

VOL. II -  221

1    A.   I wouldn't know.  I wouldn't be -- I don't know.

2   They're not supposed to have anything marketed.

3         MR. TACKETT:  Can I ask for a sidebar, Your Honor?

4         THE COURT:  Yes.

5                        - - -

6       (The following proceeding was held at sidebar.)

7         THE COURT:  Go ahead, Mr. Tackett.

8         MR. TACKETT:  We found this on Facebook.

9         THE COURT:  What is the next exhibit?  70 was your

10  last exhibit that you added, right?

11        MR. TACKETT:  I think so.

12        THE COURT:  So this would be exhibit?

13        MR. TACKETT:  This would be 71.

14        THE COURT:  Just so we have some reference point in

15  the record.

16        MR. TACKETT:  This was not disclosed with our

17  exhibits.  We did not yet have it.  As part of our due

18  diligence to ask KNL about whether it's eliminated all false

19  marketing, we did web searches and we found this on the company

20  Facebook page.  And it's an old post but it's still up.

21        THE COURT:  It's a post -- it appears to be a post

22  from August 12th, 2022.  Is that correct?

23        MR. TACKETT:  Yes, Your Honor.

24        THE COURT:  Any comment, Mr. Burton?

25        MR. BURTON:  I'm not objecting to the relevance.

VOL. II - 222

1   Apparently this was overlooked in the scrubbing of all of the

2   marketing information.  I apologize to the Court for that and

3   the Court can take whatever course needs to be done on that.

4   We will obviously direct the client to -- however you take a

5   Facebook page off, to do that.

6          THE COURT:  All right.  Anything, Mr. Clifford?

7          MR. CLIFFORD:  No objection, Your Honor.

8          MR. TACKETT:  For us, Your Honor, the point is simply

9   once you let the cat out of the bag and you put false

10  information in the market, you have no way of knowing how far

11  down the trail that false information flows.

12         THE COURT:  Okay.  I'm going to allow you to examine

13  the witness about this.  He hasn't seen it, apparently.  You

14  haven't give it to him yet.  You may provide to him as Exhibit

15  71 for identification.

16         MR. TACKETT:  Thank you, Your Honor.

17       (The following proceeding was held in open court.)

18         THE COURT:  You may continue, Mr. Tackett.

19         MR. TACKETT:  Thank you, Your Honor.

20       May I approach the witness?

21         THE COURT:  Yes, you may.

22       Mr. Tackett, would you hand that exhibit to Ms. Stash so

23  she can put an exhibit sticker 71 on it.

24         MR. TACKETT:  Yes, Your Honor.

25         THE COURT:  Plaintiff's 71, Ms. Stash.

VOL. II - 223

1    BY MR. TACKETT:

2    Q.   Sir, I'm showing you a copy of what has been marked as

3    Plaintiff's 71.

4         Now, after the disclosure of exhibits in this case, we

5    found this on Facebook.  It appears from the company Facebook

6    page that appears to be operated by your director of sales,

7    Mitch Rank.  Would you say this is consistent with the

8    company's Facebook page in terms of, if you look at it, does it

9    appear to be a post that Mr. Rank has put up?

10        MR. BURTON:  I object the prologue.  He's saying

11   without foundation that this is from a company webpage.  I

12   don't know if we've established that yet.

13        THE COURT:  When you dropped your voice, I couldn't

14   hear you.

15        MR. BURTON:  I was objecting to the lack of foundation

16   for Mr. Tackett's prologue that this was from a Facebook

17   website -- or from a company website on Facebook.  Sorry.

18        THE COURT:  Overruled.  You may answer, Mr. Phlipot.

19        THE WITNESS:  I don't know if it's out in the market.

20   But, yes, it looks like it was done on August 12th.

21   BY MR. TACKETT:

22   Q.   And Mr. Rank -- would you agree that Mr. Rank does

23   marketing for the company through Facebook?

24   A.   Yes.

25   Q.   And before you saw this, were you aware that this was

VOL. II -  224

1   still up on the Internet?

2   A.   No.

3   Q.   Okay.  Would you agree that in the post, Mr. Rank says,

4   "Our owner has patented this door, there is nothing like it

5   available on the market"?

6        And then he puts a link to the video that was on the

7   TTPS website that we looked at at Plaintiff's 8, correct?

8   A.   Correct.

9   Q.   As you sit here today, do you have any way of knowing

10  that these online false marketing representations are

11  completely removed from the Internet besides this one that we

12  found?

13  A.   I don't know.

14  Q.   That's all I have on that exhibit.

15       I'd like you to look at Plaintiff's 53, sir.  This is

16  very hard to read.  This is a document produced by KNL in this

17  case.  It's KNL 230.  That is a log of sales of the accused

18  door.  Would you agree?

19  A.   Yes.

20  Q.   Now, if you look at the log, would you agree that sales

21  of the accused door are on an upward trend for KNL?

22  A.   Yes.

23  Q.   And June of '23, I want to draw your attention to.  Do

24  you see that row?

25  A.   Yes.

VOL. II -  225

1    Q.   Do you recall in June of '23 receiving a

2    cease-and-desist letter from Ridge Corporation telling you that

3    it believed the door that you were selling infringed its Cold

4    Chain patent?

5    A.   Yes.

6    Q.   You didn't cease and desist, did you?

7    A.   No.

8    Q.   In fact, in June of '23, KNL and TTPS sold more units of

9    the single panel roll-up door than it had ever sold before,

10   correct?

11   A.   Yes.

12   Q.   Before KNL was subject to the TRO order in this case

13   that we talked about a little bit ago, was KNL at all

14   considering stopping sales of the accused door?

15   A.   No.

16   Q.   Put that exhibit to the side, sir.

17        Actually, before you put it to the side, I have two

18   questions just to make sure we lay the foundation for

19   admission.  Would you agree that this is a true and accurate

20   business record for KNL on its sale of the roll-up doors?

21   A.   Yes.

22   Q.   And that these records are maintained and kept in the

23   ordinary course of business?

24   A.   Yes.

25   Q.   I'd like you to look at Plaintiff's 55 if you could,

VOL. II - 226

1    sir.

2    A.    Okay.

3    Q.    This is an email from Dominic Grandominico at Altum LLC

4    to Mark Schneider, you Jeff Phlipot, and your brother Larry

5    Phlipot with copy to Kyle Gaines and Greg Karst at Altum,

6    correct?

7    A.    Yes.

8    Q.    And the subject line of this email is GM door?

9    A.    Correct.

10   Q.    Do you recognize this email and remember receiving it?

11   A.    Yes.  I would say yes.  I don't remember it

12   specifically, but, yes.

13   Q.    And this is Altum LLC 1049 through 1051.  And in this

14   email, the bottom of the chain, Dominic Grandominico is telling

15   KNL that he's attaching a CAD drawing, computer-assisted design

16   drawing, with proposed layouts for an additional prototype, a

17   prototype that will go on doors for GM, correct?

18   A.    Correct.

19   Q.    And because the GM door would have different dimensions,

20   Altum is proposing a new layout for where the grooves will fall

21   in terms of KNL routing the grooves into the door, correct?

22   A.    Correct.

23   Q.    Altum is not selling KNL just a door off the shelf that

24   it already has in a warehouse, is it?

25   A.    They're selling us a blank.

VOL. II - 227

1    Q.   My question is a little different, sir.  I'm asking you,

2    Dominic Grandominico is sending you a proposed layout.  It's on

3    the next page.  You see the CAD drawing?

4    A.   Yes.

5    Q.   Dominic Grandominico is sending you a proposed layout

6    for a prototype for a door that has different dimensions than

7    what you had been working on at that point, correct?

8    A.   Correct.

9    Q.   What my question was: Altum LLC isn't sending you a

10   panel they just have in a warehouse.  They're sending you a

11   drawing with a proposed layout for a different door, correct?

12   A.   Correct.

13   Q.   And then in this email, at the top of the page, there's

14   discussion about further potential modification to accommodate

15   a latching mechanism that will need to be on the door, correct?

16   A.   Correct.

17   Q.   And again, that's a deviation from just a stock panel

18   that Altum would have had in a warehouse, correct?

19   A.   Correct.

20   Q.   I want you to look at Plaintiff's 45, please, sir.  Let

21   me know when you make it there.

22   A.   I'm there.

23   Q.   This is a document Bates labeled KNL 263.  Would you

24   agree this an invoice Kirk National Lease sent out to a

25   customer, and an invoice that -- sorry.  This is a compilation

VOL. II - 228

1    of invoices that Kirk National Lease has sent to customers

2    relating to installation work that KNL did installing the

3    accused doors for customers?

4        A.   Yes.

5        Q.   So Kirk National Lease charges money and receives

6    revenue for installing the accused doors, correct?

7        A.   Correct.

8        Q.   Are these true and accurate copies of invoices that Kirk

9    National Lease retains in the ordinary course of business?

10       A.   Yes.

11       Q.   Look at Plaintiff's 26 for me, please, sir.

12            This is an email from Dominic Grandominico at Altum to

13   you Jeff Phlipot, your brother Larry Phlipot, with copy to

14   Dominic's partners, Kyle Gaines, Greg Karst, and John Lowe with

15   subject line next order and agreements.  And it's dated June of

16   2023.  June 8th to be exact.  Do you recognize and remember

17   receiving this email, sir?

18       A.   Yes.

19       Q.   This is Bates labeled Altum LLC 1265.  Would you agree

20   in this email and its attachment that Altum is proposing an

21   ongoing exclusive supply relationship between Altum and KNL for

22   Altum to continue working with KNL to manufacture and sell the

23   accused doors?

24       A.   Yes.

25       Q.   I want to turn your attention to the attachment to that

VOL. II -  229

1    email.  It is a draft contract that is titled Exclusive Supply

2    Agreement for Patent Application blank.

3            Do you see that?

4     A.   Yes.

5     Q.   Do you remember receiving this agreement from Altum?

6     A.   Yes.

7     Q.   Who drafted this agreement?

8     A.   Altum sent it to us.  It's just -- I think something --

9    they worked with one of their people to put something together.

10    Q.   I'd like you to look at the fifth whereas clause in the

11   recitals.

12    A.   Okay.

13    Q.   Where it says:  TTPS believes Altum's patent, unique

14   panel design and potential manufacturing capability make Altum

15   an ideal supplier for the primary component of the single panel

16   roll -- I'm sorry, the single panel door.

17           Do you see that?

18    A.   Yes.

19    Q.   And again, you agree that it is Altum who said that

20   their panel design was unique and that they had manufacturing

21   capability that made them an ideal supplier for KNL?

22    A.   Yes.

23    Q.   I'd like you to turn to the next page, please.

24           THE COURT:  Would that be 1266?

25           MR. TACKETT:  1267, Your Honor.

VOL. II - 230

1          THE COURT:  Okay.  Thank you.

2          MR. TACKETT:  I misspoke.  I'm sorry.  The next page,

3     1268, page 3 of the agreement.

4     BY MR. TACKETT:

5     Q.   Do you see where it says:  KNL, TTPS, and Altum agree

6     that TTPS shall at all times use its diligent and good faith

7     efforts to market, promote, and expand the sale of the single

8     panel door?

9     A.   Could you tell me what paragraph you're on?

10    Q.   Yes, sir.  It's a little confusing because there's 2A

11    and then B, and then beneath B is another one that says A.  It

12    really should say C.  But the second A is where that clause is

13    contained.  Do you see that?

14    A.   Yes.

15    Q.   Would you agree that in this proposal, Altum includes a

16    provision that would require KNL to expand its sales and market

17    for the accused door?

18    A.   Yes.

19    Q.   I'd like you to look at two paragraphs beneath that

20    where it is labeled C.  Do you see that?

21    A.   Yep.  Yes.

22    Q.   And it says, "At least once per year, at the request of

23    either party, or more frequently as agreed by the parties, TTPS

24    shall meet with a company representative of Altum to discuss,

25    review and outline sale and distribution goals and to establish

VOL. II - 231

1   distribution targets."  Do you see that?

2   A.   Yes.

3   Q.   So, again, would you agree that in this proposal, Altum

4   isn't just saying I want to sell as many panels as you might

5   need.  Altum is telling you to expand and sell more of the

6   accused door.  Correct?

7   A.   Yes.

8   Q.   You can put that aside.  Just a couple more questions,

9   sir.

10  A.   Okay.

11  Q.   I'd like to turn your attention to Plaintiff's 16.  Do

12  you see the images on Plaintiff's 16, sir?

13  A.   Yes.

14  Q.   And this -- Plaintiff's 16 is a claim chart that was

15  prepared by patent counsel for Ridge and attached to the

16  complaint.  Have you seen it before?

17  A.   Yes.

18  Q.   Would you agree that these images that are contained in

19  the claim chart are the KNL door that we've been talking about?

20  A.   Yes.

21  Q.   Okay.  You can put that to the side.

22       Sir, I want to ask you about Plaintiff's Exhibit 14.

23  Can you turn to Plaintiff's Exhibit 14?  Are you there?

24  A.   I'm there.

25  Q.   This is a letter on the letterhead of a Mr. Andrew

VOL. II - 232

1   Barnes listing an email of andrewbarnesip@gmail.com.  Do you

2   see that?

3   A.   Yes.

4   Q.   Now, you agree that Mr. Barnes is a patent lawyer hired

5   by KNL and TTPS?

6   A.   Yes.

7   Q.   Do you recognize this letter?

8   A.   Yes.

9   Q.   And this is a letter that your patent lawyer sent to

10   Whiting Door Manufacturing Corporation.

11   A.   Wait a minute.  Which one are you on?

12   Q.   Plaintiff's 14, sir.

13   A.   Yeah, I recognize 15 also.

14   Q.   I'm sorry about that.

15   A.   Yes.  Now I'm there.

16   Q.   Okay.  And would you agree that this is a letter that

17   your patent lawyer sent to Whiting Door Manufacturing

18   Corporation on September 6th of 2023?

19   A.   Yes.

20   Q.   Just two weeks before the lawsuit in this case, right?

21   A.   Yes.

22   Q.   Okay.  Did you direct your attorney to send a letter to

23   Whiting Door?

24   A.   I can't say yes or no, to tell you the truth.  We had

25   the information, and I sent the information to the attorneys.

VOL. II -  233

1  They drafted the letter.

2   Q.   To be clear, I don't want to get into any privileged

3  discussions that you had with counsel.  But I want to make sure

4  that you were aware that this letter went out and you approved

5  of it going out?

6   A.   Yes.

7   Q.   And why -- how did you learn -- strike that.  Bad

8  question.

9        Why did you direct a letter to go to Whiting Door?

10   A.   Because we seen a video that went out from Ridge just to

11  let them know that there is something potentially -- a patent

12  pending or an application for a patent.

13   Q.   Let's try to work through this real quickly.  You

14  learned that Ridge might be working with Whiting Door on a

15  potential roll-up door, correct?

16   A.   Correct.

17   Q.   And because you learned that Ridge might be working with

18  Whiting Door, you thought you should send a letter to Whiting

19  and warn them, right?

20   A.   Right.

21   Q.   And this letter threats potential royalties against

22  Whiting Door if they work with Ridge to make a roll-up door,

23  correct?

24   A.   Yes.

25   Q.   But prior to sending this letter, Ridge Corporation had

VOL. II - 234

1  advised you that it was the exclusive licensee of the Cold

2  Chain patent, correct?

3    A.   Correct.

4    Q.   And Ridge had also advised you that the accused door

5  that you were making infringed upon the Cold Chain patent,

6  correct?

7    A.   Correct.

8    Q.   And at the time that this letter was sent on

9  September 6th, your patent lawyer was already working on an

10  amendment to the patent application.  Isn't that true?

11   A.   True.

12   Q.   And you would agree that the amendment on the next tab,

13  Plaintiff's Exhibit 15, that that was a significant amendment

14  of the prior application, correct?

15   A.   Correct.  We talked about that at deposition.

16   Q.   Correct.  We went through it.  I asked if you agreed if

17  it was a substantial revision.  And then you said I don't know

18  what is substantial.  And then we agreed upon at least

19  30 percent of the language had been changed.  Do you recall

20  that?

21   A.   Yes.

22        MR. TACKETT:  I have nothing further at this time.

23  Thank you, Your Honor.

24        THE COURT:  We're going to take a morning break now.

25  It's 10:30.  We'll stand in recess until 10:45, at which time

VOL. II - 235

1  we will have your next witness.

2        Mr. Clifford, Mr. Burton and all counsel, you, of

3  course, are familiar with our local practice whereas when

4  the -- when a party is being called as upon cross, the

5  representative of that party doesn't get to do the direct in

6  the opposing party's case in chief.

7        So you may call Mr. Phlipot in your case in chief.

8        Mr. Phlipot, you may be excused.

9          THE WITNESS:  All right.  Thank you, sir.

10         MR. TACKETT:  Thank you, Your Honor.

11    (Recess taken from 10:25 a.m. to 10:46 a.m.)

12         THE COURT:  Mr. Tackett your next witness.

13         MR. TACKETT:  Yes, Your Honor.  Plaintiff Ridge

14  Corporation calls Larry Phlipot.

15         THE COURT:  Mr. Phlipot, please come forward and be

16  sworn.

17    (Witness sworn.)

18         THE COURT:  Mr. Phlipot, please bend the microphone

19  toward you and speak clearly into it.  Thank you.

20         Please proceed, Mr. Tackett.

21

22

23

24

25

VOL. II — 236

– – –

LARRY PHLIPOT

Called as a witness on behalf of the Plaintiff, as upon

cross-examination, being first duly sworn, testified as

follows:

CROSS-EXAMINATION

BY MR. TACKETT:

Q.   Good morning, sir.  Can you please state your name for

the record?

A.   Larry J. Phlipot.

Q.   And Mr. Phlipot, where do you work?

A.   I work at TTPS.

Q.   What is your job title with TTPS?

A.   I do a variety of things.  I build the door.  I help the

guys on different jobs they do in the shop.

Q.   And how long have you worked for TTPS?

A.   TTPS would be probably two years.

Q.   And where did you work at before that?

A.   Kirk National Lease.

Q.   How long have you worked at Kirk National Lease before

you got moved over to TTPS?

A.   I started at Kirk National Lease in 2004 until I got

moved to TTPS.

Q.   And I think you just referenced it, but I want to make

sure that we're clear on terms.  Are you familiar with the

VOL. II -  237

1   complaint that Ridge Corporation filed against KNL and TTPS and

2   the other defendants in this case?

3     A.   Yes.

4     Q.   Are you familiar with the allegations in the complaint

5   that KNL and TTPS are manufacturing and selling a single panel

6   roll-up door that Ridge believes infringes upon a patent that

7   Ridge owns exclusive rights to?

8     A.   We are building a single panel patent.

9     Q.   Sir, I'm sorry.  I think you may have misspoke.  I'm

10  saying are you familiar with the allegations in the complaint

11  that the single panel roll-up door that KNL and TTPS are

12  building allegedly infringes upon a patent that Ridge owns

13  exclusive rights to?

14    A.   I know the allegations, but I don't believe that

15  infringes on the patent of Ridge's.

16    Q.   I understand.  I'm just making sure --

17         THE COURT:  Before we continue, that were a couple of

18  things that were asked that I'm not sure that the record

19  reflects are clear.  You told us what you did at TTPS.  One of

20  the questions was what is your job title at TTPS.

21         THE WITNESS:  I really don't have a job title.

22         THE COURT:  And you worked at KNL from 2004 to 2021;

23  is that correct?

24         THE WITNESS:  It would be about correct.

25         THE COURT:  All right.  Please continue, Mr. Tackett.

VOL. II - 238

1          MR. TACKETT:  Thank you.

2     BY MR. TACKETT:

3     Q.   For purposes of our discussion, if I'm talking about the

4     KNL door or the accused door, can you understand that I'm

5     talking about the door that you all are making that has been

6     accused by Ridge of infringing its patent?

7     A.   Repeat that question if you would.

8     Q.   Yes, sir.  I'm simply trying to make sure we're on the

9     same page with terminology.  And so I'm saying if I reference

10    the KNL door or the accused door, can we agree upon an

11    understanding that that is the door that Ridge Corporation has

12    said in the complaint infringes upon Ridge's patent?

13    A.   No, because I read the patent that Ridge has the license

14    to.

15    Q.   What do you want to call it, then?  I'm sorry.

16    A.   It's a panel door.

17         THE COURT:  I think you just -- you are both

18    misunderstanding one another.  He's saying for the purpose of

19    his questions, the door that he's referencing is the door that

20    you're building.

21         THE WITNESS:  Yes.

22         THE COURT:  And it's also the door that is the subject

23    matter of this complaint that they say you are infringing.

24    That's not to say that you are infringing or are not.  Those

25    are just the allegations.  Do you understand that?

VOL. II - 239

1        THE WITNESS: Yes.

2        THE COURT: Please continue.

3        MR. TACKETT: Thank you, Your Honor.

4   BY MR. TACKETT:

5   Q.   Sir, in terms of the accused door, the KNL door, would

6   you agree that you assist with manufacturing that door for

7   TTPS?

8   A.   Yes.

9   Q.   And you were unsure of your job title, but would you

10  agree that you help oversee the shop at TTPS?

11  A.   Yes, on occasions, yes.

12  Q.   What do you do in that role?

13  A.   Well, if the guys have questions with the kind of kits

14  they're installing or any other projects, they ask me for my

15  advise on it, on how I would handle it.

16  Q.   Do you have any ownership interest in either KNL or

17  TTPS?

18  A.   No, I do not.

19  Q.   And would you agree that during your time at KNL dating

20  back to 2004, that KNL had purchased products from Ridge

21  Corporation?

22  A.   We have purchased products from Ridge Corporation.  Most

23  of the product came from another vendor that we got, but it was

24  Ridge material.

25  Q.   What type of products had KNL purchased from Ridge?

VOL. II - 240

1    A.    It was a roof liner that we use on a trailer.

2    Q.    Would you agree that Ridge Corporation has expertise in

3    engineering and expertise with unique composites?

4    A.    Yeah, if they were in business, I would think they

5    would.

6    Q.    No, sir.  I'm not asking you to make an assumption.  I'm

7    asking you from buying things from Ridge, you agree that they

8    have engineering expertise and they have expertise with unique

9    composites?

10   A.    Yes.

11   Q.    Are you familiar with some point in time when Kirk

12   National Lease around October of 2018 started working with

13   Ridge Corporation together regarding the potential roll-up door

14   that KNL ended up making?

15   A.    Yes.

16   Q.    Okay.  And in terms of exploring that, would you agree

17   that your brother Jeff Phlipot went and had a meeting with

18   Ridge to talk about working on that project together?

19   A.    Yes.

20   Q.    And would you agree that your brother Jeff Phlipot

21   sought out Ridge Corporation's expertise with the unique

22   composites involved and their engineering expertise?

23   A.    Yes.

24   Q.    And would you agree that when your brother Jeff Phlipot

25   went to Ridge Corporation at that point in time, KNL did not

VOL. II  -  241

1   have a door that was operational and would traverse the track

2   over and over of a truck frame?

3    A.   He took a sample with him when he went to that meeting

4   that I made that he took with him to show him what we wanted to

5   do.

6          MR. TACKETT:  Move to strike.

7          MR. KOLTAK:  Your Honor, if I may, I think he answered

8   the question.

9          THE COURT:  Just a moment.

10       It is answered in part.  I'm going to ask Ms. Evans to

11   reread the question to Mr. Phlipot because it's only a partial

12   answer.  Part of the question requires a yes or no answer, and

13   then an explanation.

14       So Ms. Evans, would you read back the question.

15     (Thereupon, the last question was read by the court

16   reporter.)

17         THE WITNESS:  Yes, we did not have a door.

18    BY MR. TACKETT:

19    Q.   And would you agree it is true that Ridge Corporation

20   assisted with helping to engineer a door that would become

21   fully operational?

22    A.   They helped us in engineering it, I would say.

23    Q.   And you would agree that on the Kirk National Lease side

24   of this team, there were no engineers, correct?

25    A.   Yes, we're not engineers.

VOL. II - 242

1    Q.    And when we did your deposition in this case, we looked

2    through some engineering drawings that Bret Moss, director of

3    engineering at Ridge Corporation, had done regarding this

4    roll-up door.  Do you remember looking at those drawings?

5    A.    I never seen them drawings.

6    Q.    Do you remember looking at those drawings during your

7    deposition?

8    A.    Oh, during the deposition when you showed me, yes.

9    Q.    Okay.  And you would agree that during the deposition,

10   we looked at engineering drawings that showed calculations and

11   drawings for designs for how a door would traverse the track of

12   a truck?

13   A.    Yes.  You showed me that, but he never went over that

14   with us.  That's the first time I seen those drawings when you

15   showed them during my deposition.

16   Q.    So you would agree that that's what those drawings

17   depicted, correct?

18   A.    Well, yeah, that's what the drawings show.

19   Q.    And the drawings showed mathematical calculations

20   relating to the radii for the door frame, correct?

21   A.    Yes.

22   Q.    And do you have the ability to do those mathematical

23   calculations that we were looking at?

24   A.    No.

25   Q.    Does your brother Jeff Phlipot, to your knowledge, have

VOL. II - 243

1 the ability to do those mathematical calculations that we were

2 looking at?

3    A.    He might.  I don't know.  I don't sit down and do

4 mathematical work with him.  He might or might not.  I don't

5 know.

6    Q.    In your 20 years working with your brother at KNL and

7 now TTPS, have you ever laid your eyes upon a mathematical

8 calculation by which he did a calculation of how any structure

9 or object would traverse a radius?

10    A.    No.

11    Q.    Okay.  I would like you to look at Plaintiff's Exhibit 4

12 if you could, please.

13            THE DEPUTY CLERK:  Did you say 4, Mr. Tacket?

14            MR. TACKETT:  Yes, ma'am.

15            THE COURT:  I thought he said 40.

16            MR. TACKETT:  I was probably mumbling a little bit.

17 So that's my fault.

18    Q.    Mr. Phlipot, have you found Plaintiff's Exhibit 4?

19    A.    Exhibit on page 4?

20    Q.    On the bottom left-hand corner it should say Ridge 31 if

21 you made it.

22    A.    Yes.

23    Q.    This is a document titled United States Patent

24 Application.  Beneath that it says Phlipot, et al.  The title

25 of the application is Single Panel Roll-up Door.  Do you

VOL. II -  244

1   recognize this document?

2   A.   Yes.

3   Q.   If you go a few lines down beneath the inventors, it

4   says application number.  It says A-P-P-L, period, N-O, period,

5   and then there is a number.  Do you see that?

6   A.   Where at?

7   Q.   Just below where it says inventors the next section of

8   the document.  Do you see that?

9   A.   Application number.  Yes.

10  Q.   Okay.  And that application number ends in 144, correct?

11  A.   Yes.

12  Q.   Do you recall during your deposition we referred to this

13  as a '144 application?

14  A.   Yes.

15  Q.   Now, this application lists the inventors for this

16  application as Jeff Phlipot, Mark Schneider and you, Larry

17  Phlipot.  Agreed?

18  A.   Yes.

19  Q.   And as we were just discussing, part of what needed to

20  happen to create a door that would be fully operative was

21  engineering work and equations along with that engineering work

22  to modify the initial mockup and create an operational door,

23  correct?

24  A.   Yes.  I would say yes, but, you know.

25  Q.   Okay.  The folks who did that engineering work, none of

1    them are listed as inventors here, are they?

2    A.   No, because I didn't have to do the mathematical work to

3    make it work around the radius.  They made me blanks.  I routed

4    the blanks and I put them in the tracks to see if it would go

5    around.  When it didn't go around, I asked them to take layers

6    out to make it more flexible.

7    Q.   Have you ever commercialized a product with an original

8    equipment manufacturer?

9    A.   I put products on from original manufacturers, yes.

10   Q.   What products?

11   A.   Brake chambers, brakes valves.

12   Q.   A product that you designed, invented, and created?

13   A.   No, I didn't invent them and create them.

14   Q.   That's my question.  Have you ever designed, invented,

15   and created a product that you were able to then commercialize

16   with an original equipment manufacturer?

17   A.   No.

18   Q.   Are you aware in order to do that, to commercialize a

19   product with an original equipment manufacturer, that you need

20   to have quality assurance testing and you need to ensure that

21   your product is going to succeed in the market?

22   A.   We have never sold our doors to an OEM.

23   Q.   Are you aware or not aware that the product quality

24   testing must be done?

25   A.   No.

VOL. II - 246

1    Q.   So you would lack that knowledge and expertise, correct?

2    A.   I don't know if I'd say I don't have the expertise at

3  it.  But I would have to have a group of people to help do it

4  if you want to go that route.

5    Q.   But you agree that you've never done it, correct?

6    A.   No, I've never done it.  This is the first thing I ever

7  came up with.

8    Q.   You're aware that Ridge Corporation has successfully

9  created products and commercialized them with original

10  equipment manufacturers?

11    A.   Yes.

12    Q.   Okay.  I want to talk to you about the doors that you're

13  currently selling, the accused doors.  Would you agree that you

14  are working with Altum, a codefendant in this case, regarding

15  the creation of those doors?

16    A.   Yes.

17    Q.   Okay.  And from time to time, you would agree that Altum

18  is providing proposals for layouts that you're looking at in

19  terms of your manufacture of the doors?

20    A.   Yes.  When I talk to Dominic, I tell him what I want.

21  And for him to make sure what I want, he would draw it down and

22  send it back to me and say is this what you're wanting.

23    Q.   Would you agree that the Altum process engineering for

24  their panels requires the use of seams to connect their

25  paneling?

VOL. II - 247

1    A.    Yes.

2    Q.    Because of their use of those seams, Altum makes

3    proposals to KNL about where the grooves should potentially

4    land so as to avoid those seams, correct?

5    A.    He makes the proposal after I tell him what I'm making.

6    I will draw it out on a blank before I talk to him and tell him

7    what I need.  That way they can lay the seams out where I want

8    them.

9    Q.    And Altum prepares computer-assisted design drawings

10   related to its proposals for you to review, correct?

11   A.    Yes.  He would send them back to me so we could sign off

12   on them or tell him that's what we want, yes.

13   Q.    And would you agree that leading up to this lawsuit,

14   that Kirk National Lease was actively trying to increase its

15   sales of roll-up doors?

16   A.    Yes.  We had customers do repeat orders and the

17   invoices -- or the orders would come in more and more every day

18   or by the week.

19   Q.    And the number of orders -- the number of units ordered

20   was increasing, correct?

21   A.    Yes.

22   Q.    And the sales team at KNL and TTPS were actively

23   prospecting new customers to whom they could potentially sell

24   the single panel roll-up door, correct?

25   A.    They were dealing with customers of theirs, yes.

VOL. II - 248

1    Q.   And they were prospecting new customers too, weren't

2   they?

3    A.   I don't know who they talk to out in the field.  I don't

4   deal with the sales department.  So, you know, if they talk to

5   the customer before this all come about, I don't know.  I don't

6   work with sales.

7    Q.   And the '144 application that we just looked at, you

8   understand that that application has never been granted by the

9   USPTO, don't you?

10   A.   It's still in review by the inspectors.

11   Q.   And it has not been granted, correct?

12   A.   Not yet.

13   Q.   And despite not being a granted patent, KNL has said

14  over and over that it has a patent for a single panel roll-up

15  door, hasn't it?

16   A.   Only on the website it said that.

17   Q.   Are you aware that there are also numerous marketing

18  emails that we have seen in discovery in which KNL is telling

19  customers that it has a patent when it does not?

20   A.   There is one email you showed me that I never seen till

21  you showed me.

22   Q.   You would agree if there were more emails, you just

23  wouldn't know one way or another, right?

24   A.   No, not unless you came up with me and showed me, no.

25   Q.   You're not involved in the sales side of your business?

VOL. II - 249

1    A.   No.

2         MR. TACKETT:  Nothing further from Mr. Phlipot, Your

3    Honor.

4         THE COURT:  Mr. Phlipot, thank you very much, sir.

5    You may be excused.

6         THE WITNESS:  All right.  Thank you.

7         MR. TACKETT:  Your Honor, plaintiff Ridge Corporation

8    will call Bret Moss next.

9         THE COURT:  All right.

10       Mr. Moss, please come forward and be sworn.

11     (Witness sworn.)

12       THE COURT:  Mr. Moss, please bend the microphone

13   toward you and speak clearly into it.

14       Mr. Tackett, you made proceed.

15       MR. TACKETT:  Thank you, Your Honor.

16                           - - -

17                         BRET MOSS

18    Called as a witness on behalf of the Plaintiff, being first

19   duly sworn, testified as follows:

20                     DIRECT EXAMINATION

21   BY MR. TACKETT:

22   Q.   Mr. Moss, can you please state your full name for the

23   record?

24   A.   Yes.  Good morning.  My name is Bret Jameson Moss.

25   Q.   Mr. Moss, where do you work?

1    A.    I work at Ridge Corporation.

2    Q.    And how long have you worked for Ridge Corporation?

3    A.    I've worked for Ridge Corporation since approximately

4    2010.

5    Q.    And what is your job title currently with Ridge

6    Corporation?

7    A.    I am the director of product engineering and quality.

8    Q.    And Mr. Moss, what is your educational background?

9    A.    I went to college at Purdue University and got a degree

10   in mechanical engineering.

11   Q.    Okay.  When did you graduate?

12   A.    I graduated in 2006.

13   Q.    What did you do after graduation?

14   A.    After graduation went to work full time for Nibco

15   Incorporated.

16   Q.    Can you spell that?

17   A.    N-I-B-C-O.

18   Q.    What did you do for Nibco, sir?

19   A.    For Nibco, I was a product engineer.  So I was involved

20   in testing and design of plumbing fittings and valves.

21   Q.    How long did you work for Nibco?

22   A.    I worked -- while I was at college, I did a co-op with

23   the same company.  But as a full-time employee, I worked from

24   2006 to early 2007.

25   Q.    Did you work anywhere else before you went to Ridge

VOL. II - 251

1    Corporation?

2    A.    Before I went to Ridge Corporation, I worked for

3    Grandominico, McDonald and Associates.

4    Q.    What did you do for that company?

5    A.    I was a sales engineer for them.

6    Q.    What did you do in that role?

7    A.    I called on customers and OEMs to help sell the products

8    that they were offering.

9    Q.    And what -- how did you use your engineering background

10   in that role?

11   A.    Yes.  So the parts that we were selling were composite

12   wood flooring for trailers, structural steel components,

13   roll-formed steel components for trailers and composite linings

14   for trailers.  So all very technical products.  So having the

15   engineering background helped me to educate and sell to the

16   transportation market.

17   Q.    And when you went over to Ridge Corporation or it was

18   formed, when did you get into products engineering for Ridge?

19   A.    I got into product engineering with Ridge probably

20   before -- maybe slightly before I was full-time employee there.

21   So I would say prior to 2010 I was working on drawings and

22   development.

23   Q.    Okay.  And what industry did those products -- in what

24   industry were those products concentrated?

25   A.    The transportation industry.  Truck/trailer.

VOL. II - 252

1    Q.   And has that continued to be the case over your time at

2    Ridge Corporation from 2010 all the way now to 2023?

3    A.   Yes.  I've been -- you know, developed products and

4    commercialized them through that time.  One of the first ones I

5    was heavily involved in was our GreenWing aerodynamic skirt

6    early in my career.  That success led to me staying in that

7    role and becoming the director of that area and in charge of

8    hiring and managing engineers to continue developing and

9    commercializing products that used our materials and

10   engineering expertise to solve problems for our customers.

11   Q.   And how does a new project typically come to your people

12   for project engineering?

13   A.   They can come many different avenues.  You know, they

14   can come right from the field.  So customers having problems or

15   needing a solution will communicate with us and we will start

16   projects or at least do some testing and figure out what --

17   which one of our products would work for them.

18        Of course, if we have ideas internally, we will create a

19   project to output a product.  And then, of course, our OEM

20   customers can request -- have the same problem as the field use

21   ones, request for a product using our materials.

22   Q.   Okay.  And have you ever developed or designed a product

23   that used a living hinge technology?

24   A.   Yes.  So our products are all -- one of the reasons they

25   work so well is they're resilient, meaning they can bend and

VOL. II - 253

1   flex back into shape.  So that's a key feature, you know, to

2   the success of a lot of Ridge's products.

3        So, initially, it would be GreenWing, that aerodynamic

4   skirt, is very flexible.  It needs to be able to run over

5   different obstacles because it's on the bottom of the trailer,

6   flex and move out of the way.  And then even -- so there's

7   that.  And then we got into -- because of the aerodynamics, got

8   into tails and that's where we really looked at what a living

9   hinge is and deploying it in our designs.  So on the tail.

10  Q.   What year was the product that you were just describing

11  was the skirt wing?

12  A.   The GreenWing?

13  Q.   The GreenWing.

14  A.   Development on that started I would say 2008,

15  approximately.

16  Q.   When did that go to market?

17  A.   Very soon after.  I would approximate about 2009.

18  Q.   And then the aerodynamic tail product that you were

19  talking about, what about that one?

20  A.   That was a few years later.  2013 is approximately when

21  we started work on that.

22  Q.   And do you recall over your years at Ridge ever working

23  on roll-up doors?

24  A.   We -- doors have always been a subject of conversation

25  at Ridge.  And a lot of that comes from our work in the field

VOL. II - 254

1    with the customers. With them knowing how durable our products

2    are, it was not uncommon for a customer to ask when are you

3    going to make a door. You know, it went all the way from swing

4    doors and roll-up door parts and then into, you know,

5    developing roll-up doors.

6        Q.   Okay. And do you know the owners and partners of Altum

7    LLC?

8        A.   Yes.

9        Q.   How so?

10       A.   I worked with all three of them at Ridge Corporation.

11       Q.   And could you go through each one of the three partners

12   and tell us how you are familiar with them from Ridge?

13       A.   Yes. So Dominic Grandominico I met in college at

14   Purdue. So I've had a long, good relationship with Nick. And

15   then I worked at Ridge Corporation with him through 2018,

16   approximately. Yeah.

17            And then Kyle Gaines I also worked alongside of. He was

18   a director of purchasing, director of materials at Ridge, one

19   of the other. So I worked alongside of him.

20            And Greg Karst I also worked alongside of him for a

21   while and eventually was his manager towards the end of his

22   tenure.

23       Q.   How long did each one of those individuals work at Ridge

24   by your recollection?

25       A.   Nick would have been -- or Dominic would have been from

VOL. II - 255

1   the beginning of Ridge Corporation's history to approximately

2   2018.  Kyle, the same thing.  I believe he started very early

3   on when the company was created through the same time period,

4   although maybe a little -- worked a little longer for Ridge.

5   And Greg Karst, I'd have to guess at his exact start date.  But

6   I would say approximately 2015.  And then he also did not work

7   for Ridge by -- till about 2018.

8   Q.    Okay.  And I believe you said Mr. Gaines -- what his

9   title was at Ridge.  What were the other two individuals'

10  titles at Ridge?

11  A.    Nick would have been vice president of operations and

12  quality.  And then Greg was business development manager and

13  then would have been product engineer under me.

14  Q.    So Mr. Karst worked on the project engineering team with

15  you?

16  A.    Yes, he did.

17  Q.    And while you were at Ridge, did you ever work on a

18  single panel -- I'm sorry.  You're still at Ridge.  I don't

19  want any confusion.

20        In your time working for Ridge, have you ever worked on

21  a single panel roll-up door?

22  A.    Yes.

23  Q.    And when did you first work on one of those?

24  A.    The first project would have been involved with TODCO.

25  Q.    Can you spell that for the record?

VOL. II - 256

1    A.    Yes.   T-O-D-C-O.

2    Q.    About when was that, sir?

3    A.    That started in -- my work with it started in 2018.   It

4    might have started prior to that through conversations.

5    Q.    And would that be -- at what point in 2018 in terms of

6    the beginning, the middle, the end?

7    A.    The middle of 2018.

8    Q.    Okay.   And what did you do for TODCO?

9    A.    TODCO had a product on the market.   It was called the

10   Arctic Flex door.   And they approached us to create a skin, you

11   know, the exterior skin of the door, create a better performing

12   skin for that product.

13   Q.    And why did TODCO reach out to Ridge Corporation to do

14   that work?

15   A.    Because we had a connection through their salesmen, and

16   we provided -- we're well known in the market to have good

17   performing products.

18   Q.    And what was the skin that you provided for TODCO for

19   their potential roll-up door?

20   A.    The skin was a layered polypropylene and glass

21   thermoplastic composite laminate.

22   Q.    Would that be similar to the skin that was on the door

23   that we're talking about in the case, the accused door?

24   A.    Yes.   From my recollection, it looks like a

25   thermoplastic glass reinforced composite skin.

VOL. II - 257

1    Q.    After working on the roll-up door project with TODCO,

2    did you work on any other roll-up door projects?

3    A.    Yes, worked on one with KNL, Kirk National Lease.

4    Q.    Okay.  And tell me what you remember about how that

5    project started and what Ridge's work was on that project.

6    A.    Sure.  That project started at -- the first connection

7    with Kirk National Lease that I was involved with was at the

8    end of 2018.  And just like other applications, it was

9    brought -- they brought them in -- sales team brought them in,

10    Chris Fannin, to talk to us about our materials and expertise

11    for the items that they were interested in.

12    Q.    And as far as you recall, what was Ridge being asked to

13    do on its side of the project?

14    A.    Early on, conversations surrounded linings for their

15    trailers and also a roll-up door.

16    Q.    What work did you do on the roll-up door project for

17    KNL?

18    A.    I did -- I personally did a lot of work over many years

19    on the roll-up door, you know, from designing the skin that is

20    going to be used as a living hinge, to developing and working

21    with Kirk National Lease to have the cutting to actually work

22    as a living hinge for a roll-up door.

23    Q.    And when it comes to the engineering to make the door,

24    the potential door at that point, functional and sustainably

25    operative, who did the engineering?

VOL. II – 258

1    A.    The –– my team did the engineering to come up with the

2    geometry to transition over, you know, over a curve.

3    Q.    And you say your team.  So who else worked on it with

4    you at Ridge?

5    A.    I had various engineers working on the project.  Early

6    on, Matt Pyles – Matthew Pyles – and Krutarth Patel worked on

7    it.  He got on board a little later on in the project.

8    Q.    Can you spell Krutarth's name for the record?

9    A.    Yes.  K–r–u–t–a–r–t–h.  Patel is P–a–t–e–l.

10   Q.    And so would it be just those three engineers are the

11   ones at Ridge who worked on it, or did anybody else?

12   A.    Besides myself, they are the primary engineers.  There

13   were others involved that help to manage the work.  Some of

14   that was just order processing work.  So there were others

15   involved lightly.

16   Q.    And at the conclusion of your work, what did you

17   ultimately deliver to KNL?

18   A.    A door panel that worked for their roll–up door project.

19   Q.    And who came up with the exact parameters of what the

20   grooves needed to be on the door to allow it to traverse a

21   track and not put too much stress upon the paneling?

22   A.    The original idea was discussed early on in the project,

23   and it took a –– it took an effort between companies to refine

24   what was needed to work for the specific roll–up door

25   application.

VOL. II - 259

1    Q.   And why is that?

2    A.   Because -- because Ridge didn't have the full design

3    envelope and Kirk National Lease did.  They had the hardware,

4    the rollers, the balancer, all of that.  So you need to know

5    all of those things in order to completely design the panel.

6    Q.   And when it comes to figuring out exactly how the groove

7    cuts needed to be made into the door, who came up with that?

8    A.   So, originally, the design for we call it curve bending,

9    was talked in detail in June of 2019.  And so that's when I had

10   my engineers – at that point in time it was Matt Pyles – create

11   a calculation for curve bending to come up with how many relief

12   cuts are needed for the skin that is being bent to be able to

13   have, you know, the radiuses needed.  That was the beginning.

14   Q.   And I'd like you to look at Plaintiff's Exhibit 7 if you

15   can.  Now, there is an email here at Plaintiff's Exhibit 7 that

16   is from Ridge's patent lawyer to a patent lawyer for Kirk

17   National Lease saying that they're attaching evidence of Ridge

18   Corporation's role and inventorship of the roll-up door that's

19   the subject of Kirk National Lease's '144 application.

20        There is a number of attachments to this.  I'd like you

21   to flip to the attachments where you see a photograph of lab

22   notebook design drawings on gridded paper.

23   A.   Yes.

24   Q.   Okay.  And so there is a notebook page here that's dated

25   6-4-2019 and says roll-up door with living hinge.  And above

VOL. II – 260

1    that is a heading that says Bret Moss notebook page that's

2    entitled roll-up door with living hinge.  Do you see that?

3    A.   I do see it.

4    Q.   Do you recognize this notebook page?

5    A.   Yes.  That is a page from my design notebook.

6    Q.   Is this date here accurate?  Does it reflect when you

7    drew the drawing?

8    A.   Yes, that date is accurate.

9    Q.   I'd like you to flip to the next two pages of these

10   attachments and ask you if you can recognize these as design

11   drawings that your team did relating to the roll-up door?

12   A.   Yes, these are design drawings that my team -- and

13   calculations that my team did for the roll-up door.

14   Q.   And these calculations, were any of these done by KNL?

15   A.   No, they were not.

16   Q.   And what role did the calculations have in terms of

17   developing an operative final design?

18   A.   They play -- they play a big portion.  And they also

19   link with the skin design.  So, first, the skin design has

20   different layers of composite that all marry together to create

21   a skin, and they have certain flexural properties.  Over the

22   time period, I've been very sensitive to designs that require

23   bending and what the flexural properties of these materials are

24   such as flexural modulus and flexural stresses.

25        We've actually -- even on our internal testing, we've

VOL. II - 261

1    developed a line that says what the breaking radius is.  So

2    being very sensitive to what the breaking radiuses are for our

3    laminates is very important when it comes to a bending or

4    living hinge design.  So what we want to do is design the curve

5    for the cutting to make sure that we don't exceed the, you

6    know, flexural stresses.  And we try to space those out as good

7    as possible to have a good performing design.  So that's what

8    this is about, is how to shape and space those and protect with

9    a factor of safety the radius that it may break to.

10    Q.   I can certainly assume, but so the record is clear and

11   we all know, can you explain why that is so important?

12    A.   It's important so the product works, you know, to

13   expectation in the field and doesn't cause issues.

14    Q.   And these pages that I just had you look at which are

15   Bates labeled Ridge 59, Ridge 60 and Ridge 61, are those design

16   drawings that you continue to maintain in the course of

17   business?

18            THE COURT:  Mr. Tackett, do you want to rephrase that?

19            MR. TACKETT:  Yes, Your Honor.

20    BY MR. TACKETT:

21    Q.   The documents I just identified, Ridge 59, Ridge 60 and

22   Ridge 61, do you continue to maintain copies of those

23   documents?

24    A.   Yes, these documents are in our design notebooks.

25    Q.   As a matter of course, does Ridge maintain all of its

VOL. II –  262

1    design notebooks?

2    A.   Ridge maintains our design notebooks.  But more

3    importantly, as designs progress, we do, you know, change those

4    design records into drawings and things that are kept in our

5    document control system.

6    Q.   Are you familiar, sir, with the Cold Chain patent that

7    Ridge Corporation acquired an exclusive license to?

8    A.   I am familiar.

9    Q.   And are you presently working on bringing a design --

10   strike that -- bringing a -- commercializing a product based on

11   that patent?

12   A.   Yes.

13        MR. TACKETT:  Your Honor, may I please go pick up

14   Plaintiff's 70 and approach the witness with it?

15        THE COURT:  Yes, you may.

16   BY MR. TACKETT:

17   Q.   Mr. Moss, I'm going to show you what's marked as

18   Plaintiff's Exhibit 70.  This is the KNL accused door in the

19   case.

20        MR. DILLARD:  Objection, Your Honor.

21        THE COURT:  Basis?

22        MR. DILLARD:  No foundation.

23        THE COURT:  Well, are you saying he has no foundation

24   for showing him this?

25        MR. DILLARD:  I'm saying there's been no evidence that

VOL. II -  263

1  suggests that's the KNL door.

2        THE COURT:  All right.  That is what plaintiff's

3  counsel has represented to the Court as the KNL door.  Is that

4  right?

5        MR. DILLARD:  Yes.

6        THE COURT:  So for the purpose of laying the

7  foundation, if this witness doesn't recognize it as such, then

8  he can say so.  But for ease of convenience and because we

9  don't have a jury, I'm going to allow him to refer to that as

10 the door, and then it is up for refutation.

11       MR. DILLARD:  Thank you, Your Honor.

12       MR. TACKETT:  While we're at it, I'll just lay the

13 foundation, Your Honor.

14       THE COURT:  All right.

15  BY MR. TACKETT:

16  Q.   Mr. Moss, are you familiar with how this tangible item

17 I'm holding came into the possession of Ridge?

18  A.   Yes.

19  Q.   Can you explain that to us?

20  A.   That sample was given to Gary Grandominico.

21  Q.   And where did it come from?

22  A.   That sample was given to Gary by Chris Fannin.

23  Q.   Where was Chris Fannin employed when he obtained the

24 sales sample?

25  A.   I believe he was employed for TTPS.

VOL. II - 264

1    Q.   Was he working with Kirk National Lease?

2    A.   Yes.

3    Q.   Okay.  Now, as I was about to ask you, this door sample,

4    would this be consistent more or less with a door that you're

5    potentially commercializing under your exclusive license to the

6    Cold Chain patent?

7    A.   This sample here would be consistent with the door panel

8    we are commercializing.  That is correct.

9    Q.   Thank you.

10        THE COURT:  Mr. Moss, when you said that -- when you

11   testified that that door panel, Exhibit 70, would be consistent

12   with the door panel you're commercializing, what did you mean

13   when you said would be consistent with?

14        THE WITNESS:  Yes, Your Honor.

15        It's consistent meaning it's similar to what we're

16   providing in particular to the patent claims as I understand

17   them on the Cold Chain patent.

18        THE COURT:  All right.

19   BY MR. TACKETT:

20   Q.   Mr. Moss, as we sit here today, does Ridge Corporation

21   have a completed agreement to supply a door to any particular

22   supplier?

23   A.   I'm not aware of any such agreements.

24   Q.   Okay.  But Ridge is working on commercializing, you

25   said?

VOL. II - 265

1  A.   That's correct.

2  Q.   Just one more question.  When you talked about the

3  single panel roll-up door that you worked on for TODCO, were

4  any of the former Ridge employees who are at Altum -- were any

5  of them involved in that?

6  A.   Yes.  Mr. Greg Karst was.

7  Q.   And what was Mr. Karst's role on that project for TODCO?

8  A.   Mr. Karst, he -- he was on my team at that time.  And

9  when the customer visited, he helped me provide testing and

10 benchmarking of the incumbent material versus Ridge material.

11 Q.   And TODCO asked you -- what did they have you looking at

12 again, specifically?

13 A.   Providing a skin that would perform better than the skin

14 that they current -- that they were using at the time.

15 Q.   What would that be made out of?

16 A.   Polypropylene and glass composite, thermoplastic

17 composite.

18 Q.   What is the exterior surface of P70 made out of?

19 A.   It appears that it's a thermoplastic fiber reinforced

20 composite.

21 Q.   Working at Ridge, is this something that you learn a lot

22 about?

23 A.   Yes.

24 Q.   How so?

25 A.   The majority of our laminates and materials are

VOL. II - 266

1   polypropylene and glass fiber reinforced thermoplastic

2   composite.

3          MR. TACKETT:  I have nothing further.  Thank you, Your

4   Honor.

5          THE COURT:  I have one, maybe two questions for you,

6   Mr. Moss.

7        Mr. Moss, has Ridge produced a door pursuant to the '84

8   Cold Chain patent?

9          THE WITNESS:  Yes.

10          THE COURT:  You've actually made such a door?

11          THE WITNESS:  We have made such a door, door panel.

12          THE COURT:  You made such a door panel?

13          THE WITNESS:  Correct.

14          THE COURT:  But you haven't sold any; is that right?

15          THE WITNESS:  We provided samples for testing to

16   customers and they were sold as zero dollars.

17          THE COURT:  All right.  That's all I had.

18          MR. TACKETT:  I have one more question.  You jogged a

19   question for me, Your Honor.  May I ask it?

20          THE COURT:  Sure.

21   BY MR. TACKETT:

22   Q.   To your knowledge, did Ridge get paid any money by KNL

23   for the design work that it did when they were working together

24   with you on a single panel roll-up door?

25   A.   To my knowledge, there was no payment for the design.

VOL. II - 267

1      MR. TACKETT:  Thank you.

2          Mr. Dillard, we could begin.  Yours would be a somewhat

3   short exam or we could break for lunch at this time.  The Court

4   has an administrative matter in my duties as chief beginning at

5   noon that will last about 30 minutes, and then we can resume

6   at 12:45 with Mr. Moss.

7          MR. DILLARD:  That's fine with me.  I don't want to

8   overpromise and under-deliver as far as length in my cross.  I

9   think that makes sense.

10         THE COURT:  Good enough.  We'll stand in recess

11  until 12:50.

12      (Recess taken from 11:41 a.m. to 1:06 p.m.)

13                           - - -

14                          WEDNESDAY AFTERNOON SESSION

15                          OCTOBER 4, 2023

16                           - - -

17      THE COURT:  Thank you, everyone, for your patience.

18  Mr. Dillard, are you ready to proceed?

19         MR. DILLARD:  I am, Your Honor.  Thank you.

20                           - - -

21                    CROSS-EXAMINATION

22   BY MR. DILLARD:

23   Q.   Good afternoon, Mr. Moss.

24   A.   Good afternoon.

25   Q.   I just want to start with some simple questions.  You

VOL. II - 268

1   told me I think during your deposition that you reviewed the

2   Cold Chain patent?

3    A.    That is correct.

4    Q.    And the item on your screen marked as D6, that is the

5   Cold Chain patent, correct?

6    A.    Yes, that is the Cold Chain patent.

7    Q.    You'd agree with me that the title of the Cold Chain

8   patent on the top left is Insulated Overhead Door; is that

9   right?

10    A.    It reads Insulated Overhead Door, correct.

11    Q.    On direct examination, you talked with Mr. Tackett about

12   P4.  And I believe you testified that you had seen this

13   document before, correct?

14    A.    That is correct.

15    Q.    And this is the '144 application or the application for

16   KNL's roll-up door; is that right?

17    A.    That looks to be correct.

18    Q.    Tell me, you agree with me that the title of that patent

19   application, or the product that's the subject of this patent

20   application, is Single Panel Roll-up Door.  Isn't that right?

21    A.    The title is Single Panel Roll-up Door.

22    Q.    Thank you.

23         I also want to address another plaintiff's exhibit that

24   you talked about with Mr. Tackett, and that's going to be P7.

25   I think move on pages past -- are there more pages?

VOL. II - 269

1           Actually, what I'm referring to are the three

2    photographs of the entries in your lab notebook that you talked

3    about.

4    A.   Correct.

5    Q.   So your testimony today to this Court was that you

6    worked on this project for years working to design the KNL

7    roll-up door, right?

8    A.   I had -- this project began with KNL in 2018.  And all

9    the way through, you know, many years from that point on.

10   Q.   Many years meaning -- I just want to get it right.  2018

11   to let's say 2022 when the relationship terminated?

12   A.   That is correct.

13   Q.   And in those -- in that amount of time, you did designs

14   and you worked to help KNL come up with this commercialized

15   roll-up door, right?

16   A.   Yeah, we contributed to the design of the KNL roll-up

17   door.

18   Q.   And in doing that over that course of those years, you

19   had three pictures in your lab notebook, right?  That's what

20   you looked at today?

21   A.   That's correct.

22   Q.   I think you told me that Ridge had a final panel for the

23   KNL door likely in about 2021?

24   A.   That is what I remember.

25   Q.   I want to go layer by layer through that product, the

VOL. II -  270

1    product that Ridge prepared for KNL, okay?

2    A.    I understand.

3    Q.    Okay.  So I want to start with the outer layer.  It's my

4    understanding from our discussion in your deposition that the

5    outer layer, the first outermost layer, is a PET film layer,

6    correct?

7    A.    The first outermost layer is a PET film in the composite

8    skin construction.

9    Q.    And that PET film is attached to the next thing in line

10   which is I think you described it as a plurality of four

11   fiberglass reinforced polypropylene skins?

12   A.    The skin, the skin is comprised of four polypropylene

13   and glass tapes, to further clarify.

14   Q.    So we start with a PET layer, and we move to a plurality

15   of four layers of polypropylene fiberglass reinforced

16   composite?

17   A.    Four layers of polypropylene and glass reinforced tapes.

18   That's how you construct the skin.

19   Q.    And then the next layer, the next layer in line is now

20   the polypropylene foam.  Is that accurate?

21   A.    That is correct.

22   Q.    And then after the polypropylene foam, we kind of work

23   our way out in the sandwich panel so it kind of mimics the

24   front end.  So we start with a plurality of four layers of

25   fiberglass reinforced polypropylene tapes?

VOL. II - 271

1    A.   Yes.  So the -- as you work towards the other side of

2    the panel, depending on where you're at in the cross section of

3    it, there could be the four -- the layering schedule that I

4    just told you about.

5    Q.   We're going to get to the relief cuts in a minute.  For

6    now I'm talking about the panel, just the panel, okay?

7    A.   So you're talking about just the material as it's -- as

8    laminated as we would say, a blank.

9    Q.   The panel before you make relief cuts?

10   A.   Prior to cutting.  Okay.  I understand.

11   Q.   So we go from the polypropylene foam layer to a

12   plurality of fiberglass reinforced polypropylene tapes, four of

13   those, and then we get to the last layer which is another PET

14   film?

15   A.   That's correct.

16   Q.   The PET film that's used in that is not manufactured by

17   Ridge, correct?

18   A.   Correct.

19   Q.   So it's fair to say what we've described, then, in

20   Ridge's product that it made for KNL, is 11 layers and in those

21   layers we have two PET films, eight -- a plurality of eight

22   polypropylene fiberglass reinforced tapes and a layer of

23   polypropylene foam?

24   A.   That's correct.

25   Q.   It's very difficult for me to say all of that in one

VOL. II - 272

1    question.  I just want to let you know that.  Okay.

2         All right.  So now we have at this point the Ridge

3    sandwich panel?

4    A.    That is the -- yes.

5    Q.    The Ridge sandwich panel used in the KNL door that Ridge

6    made for KNL?

7    A.    That's a summary of it.

8    Q.    But there's a problem now with that sandwich panel on

9    its own being a roll-up door, right?  You have a stiffness

10   problem that in order to address, Ridge makes relief cuts in

11   the sandwich panel, correct?

12   A.    Yes.  There's -- you mention a problem.  The first

13   problem is the -- all of those layers I told you about need to

14   be laminated together to provide, you know, two skins and the

15   foam to make the sandwich panel.  And then, yes, the next

16   element needed is -- that we provided to KNL is machine relief

17   cuts.

18   Q.    Right.  If you go to Exhibit 44, does this reasonably

19   approximate in your estimation of the type of panel with

20   brackets on it that Ridge provided to KNL?

21   A.    The panel looks to be -- based on the color, the color

22   is there.  That would be the Ridge panel.

23   Q.    And 45.  Is this -- is this a Ridge panel that would

24   have been provided to KNL?

25   A.    From what I can tell from the photos and the colors of

VOL. II - 273

1    the panel and the foam, it appears to be a Ridge panel.

2    Q.    Now, to make the Ridge -- I want to back up just a

3    second.

4          To make that Ridge sandwich panel transverse the track

5    and roll up into the truck, you need to do several things we

6    talked about in your deposition.  Do you recall that?

7    A.    I recall.

8    Q.    You have to put wheels on it?

9    A.    Yes.

10   Q.    You have to add brackets to hold the wheels?

11   A.    Yes.

12   Q.    You have to have a track?

13   A.    Yes.

14   Q.    It's got to be the right size?

15   A.    It's got to fit the trailer, correct.

16   Q.    And it needs the relief cuts?

17   A.    It does need the relief cuts.

18   Q.    Without any one of those things, it's not rolling up

19   that track?

20   A.    Certainly doubtful.

21   Q.    Now, Whiting Door is a large door manufacturer that

22   Ridge is currently working with on roll-up doors, correct?

23   A.    That's correct.

24   Q.    And the panel that Ridge provides to Whiting Door is

25   very similar to the panel that it provided to KNL in 2018,

VOL. II –  274

1   2019, 2020; is that right?

2     A.   It is similar, yes.

3     Q.   Very similar?  I think that's what you told me in your

4   deposition.

5     A.   Similar, other than maybe the thickness and foam

6   density.

7     Q.   And the thickness and foam density depends on the actual

8   end-use customer, correct?

9     A.   No.  It can have -- it could have other advantages as --

10   from a product line as a whole.

11     Q.   I guess I'll make it simple for you.  I think in your

12   deposition you told me that it's a Ridge sandwich panel with

13   all the 11 layers that we just talked about with relief cuts.

14   That's the same -- the same type in that way, the KNL/Ridge

15   panel as the Whiting/Ridge panel?

16     A.   That's correct.  Both are thermoplastic skin sandwich

17   panels with relief cuts.

18          MR. DILLARD:  Your Honor, I'd like to approach the

19   witness.

20          THE COURT:  You may.

21          MR. DILLARD:  I'd like to show him what's been marked

22   Plaintiff's Exhibit 70.

23          THE COURT:  You may.

24     BY MR. DILLARD:

25     Q.   Now, Mr. Tackett asked you about this panel here.  And I

VOL. II - 275

1   just want to be detailed.  When we talk about the multiple

2   layers that we were just talking about, do you think this panel

3   is the same when it comes to what we were just talking about as

4   far as the Ridge/Whiting and Ridge/KNL panel?

5   A.   Can I examine it closer?

6   Q.   Sure.  It's my understanding that you've actually looked

7   at this before.

8   A.   That's correct.  What I see is a thermoplastic skin here

9   that likely has layers in multiple directions, a foam core and

10  a thermoplastic skin on the back with relief cuts through here.

11  Q.   So I think you told me -- are you finished with that?

12  A.   I'm finished, yes.

13  Q.   I think during your deposition you also told me that

14  from your review and look at this particular P70, you made the

15  determination that KNL's door that it's making with Altum is

16  very similar -- very similar to the Ridge/Whiting Door?

17  A.   Yes.  It's similar as in it has the thermoplastic skins,

18  foam, and relief cuts.

19  Q.   And I think also it's fair to say that Exhibit 70 was

20  not made by Ridge, correct?

21  A.   That exhibit was not made by Ridge.

22  Q.   And it was not made by Cold Chain?

23  A.   That exhibit was -- I can't be for certain who it was

24  made by, but likely not made by Cold Chain.

25  Q.   And you don't know, really, who made that Exhibit 70?

VOL. II - 276

1    A.    I can speculate that --

2    Q.    I'm not asking you to speculate.  I'm just saying you

3    don't know, right?

4    A.    I can't know for sure who made that.

5    Q.    You can speculate.  Actually, I change my mind.  Go

6    ahead and speculate.

7    A.    I speculate that Altum made it through the chain that I

8    understood that we came across that -- which was from Gary

9    through Chris Fannin which he said he got it from Altum.

10   Q.    So whose idea was it to add the relief cut grooves?

11   A.    The idea -- so the idea was, as shown in my design

12   notebook on the 4th, was when we put the design out there, to

13   put relief cuts in the panel to act as a living hinge for the

14   roll-up door project.

15   Q.    And go to Exhibit 11.  Defendant 11.  Excuse me.

16         Now, Defendant's Exhibit 11, it appears that you were

17   copied on this email from Chris Fannin, correct?

18   A.    Yes.

19   Q.    And as part of -- I think you explained it during your

20   deposition somewhat.  As part of Chris Fannin's duties, he

21   would often communicate -- be an intermediary communicator

22   between a customer like KNL and Ridge engineering; is that

23   right?

24   A.    That's correct.

25   Q.    And that looks like what's going on here.  Chris Fannin

VOL. II - 277

1    is forwarding an email chain to you and other members of Ridge

2    engineering, right?

3    A.    Chris Fannin forwarded it to me and members of my team,

4    my engineering team.

5    Q.    And that's a regular -- that's a -- something that

6    happens at Ridge on occasion.  I think that's the way you

7    explained that.

8    A.    Yes.

9    Q.    Okay.  And this email was sent to you on August 17th,

10   2020, as reflected there in the information?

11   A.    Yes.

12   Q.    I want you to go to the second page of the email.  Here

13   at the bottom we see an email from Chris Fannin to Jeff

14   Phlipot.  And it looks like Chris is asking a series of

15   questions.  And that first question, says, I'm assuming that

16   the relief cuts were to the inside of the trailer.  And then if

17   we go back up to the next email in the chain, just at the top,

18   it looks like Jeff has sent an email responding to those

19   questions with inserts.

20        So if you go back down, you see that Jeff Phlipot

21   answers the question:  I'm assuming the relief cuts were to the

22   inside of the trailer.  He says yes.  Do you see that?

23   A.    I see that.

24   Q.    And then Chris Fannin thought it -- well, Chris Fannin

25   forwarded this email and this information to you, correct?

VOL. II - 278

```
 1     A.    He forwarded it to my team and myself.

 2     Q.    Ridge makes sandwich panels for other customers,

 3   correct?

 4     A.    Yes, that is correct.

 5     Q.    One of those customers is Airstream?

 6     A.    That is correct.

 7     Q.    And Ridge makes the Airstream panel for the floor of

 8   their trailers; is that right?

 9     A.    The sandwich panel we provide them is for the floor of

10   their RV travel trailers.

11     Q.    Is that made up of PET film sandwiching polypropylene

12   layers with a polypropylene core generally?

13     A.    Generally, that is a summary of the layer construction.

14     Q.    You don't make relief cuts on that, though, correct?

15     A.    No, I do not.

16     Q.    Because the Airstream panel acts as a floor that you

17   walk on or put things on, you don't need to bend it to make it

18   go up into a truck?

19     A.    The Airstream panel is a floor supported by cross

20   members to prevent the bending of the panel.

21     Q.    But you don't use relief cuts because you don't want it

22   to bend, right?

23     A.    No, no relief cuts are needed for bending of that

24   particular panel.

25     Q.    Now, Ridge came up with the design or worked on the
```

VOL. II - 279

1  design with KNL leading up -- you said to 2020 you had a

2  workable panel, correct?

3  A.   Yeah.  End of 2021.

4  Q.   And you started -- once those relations with KNL broke

5  down, you started working with Whiting on that panel, right?

6  A.   Yeah, after that.

7  Q.   And Ridge acquired the Cold Chain patent in February of

8  2023.  Or I'm sorry.  They licensed the Cold Chain patent in

9  February of 2023, correct?

10  A.   That is my -- yes.

11  Q.   They amended that license in May of 2023?

12  A.   That's correct.

13  Q.   When they did that, did you talk to any Cold Chain

14  engineers about changing the design of the Ridge/Whiting door?

15  A.   I worked with Cold Chain for test reasons but not on

16  designs of the door.

17  Q.   Because you already had the design, right?

18  A.   Yeah, we had a good working design.

19  Q.   And that design that you had, that working design,

20  started with KNL, continued with Whiting.  That's the design

21  you're talking about, correct?

22  A.   The design overall, the design in our understanding of

23  coming to that point, started before then, I guess, with

24  knowing the materials and what would bend in our work on

25  previous projects.

VOL. II - 280

1      MR. DILLARD:  Move to strike, Your Honor.

2      THE COURT:  Sustained.  Read the question back to

3  Mr. Moss, please, Ms. Evans.

4      (Thereupon, the last question was read by the court

5  reporter.)

6      THE WITNESS:  Yes.

7  BY MR. DILLARD:

8  Q.   Back in 2017, 2018, you worked with a company called

9  TODCO, correct?

10 A.   That is correct.

11 Q.   And TODCO worked -- they provided a door, and that door

12 was called the Arctic Flex?

13 A.   That's correct.

14 Q.   And TODCO, it's my understanding, had licensed the Cold

15 Chain patent at that point?

16 A.   It is my understanding at this time that that's true.

17 Q.   And the Arctic Flex was TODCO's version of the Cold

18 Chain door, correct?

19 A.   It -- at the time I did not have that understanding, but

20 it appears that they had licensed the Cold Chain IP.

21 Q.   But you know that that door that they were making, the

22 one you worked on, you know that now, that that was their

23 version of the Cold Chain door, right?

24 A.   I do know now that they had the license, but I can't be

25 for certain what their door design was exactly.

VOL. II - 281

1    Q.   So your testimony today is that you don't know if what

2    they were working on with you was the Cold Chain door?

3    A.   They were working on a door that was apparently

4    licensed, you know.  They licensed the Cold Chain patent at

5    that time.  I am not familiar with the exact design of the

6    TODCO door.

7    Q.   Do you know what it looked like?

8    A.   I had seen a test door.

9    Q.   And that door, did it look like a polypropylene skin and

10   one thick layer of black insulating foam?

11   A.   The door that I saw had -- it had -- it was in motion

12   because it was testing.  That door had a polypropylene and

13   glass skin.  I know that.  And it had foam behind it and it

14   also had a cover over the foam.  And it had rollers and plates

15   installed.

16   Q.   The cover over the foam was a nylon fabric material.

17   That's what you're saying?

18   A.   I don't know what the material was it was testing.

19   Q.   Would there be anything to help refresh your

20   recollection about what the Arctic Flex door looked like and

21   was comprised of?  Could I show you a picture and you might

22   remember?

23   A.   You can show me a picture.

24        MR. DILLARD:  Approach the witness, Your Honor?

25        THE COURT:  Yes, you may.

VOL. II - 282

1    Could you tell me, Mr. Dillard, what that exhibit number

2    is?

3    MR. DILLARD:  This actually is not.  We brought it for

4    impeachment or refreshing purposes only.  It was provided in

5    the document production.

6    THE COURT:  Even if it's not going to be admitted, it

7    still needs to have an identifying number so that the record

8    will reflect what was the number of what was handed to the

9    witness.

10   MR. DILLARD:  I apologize.  Defendant 49.

11   MR. TACKETT:  Your Honor, plaintiff Ridge objects to

12   this exhibit.  It was entirely foreseeable.  If they were going

13   to use this document, there's no reason it couldn't have been

14   identified timely in compliance with the Court's schedule, Your

15   Honor.

16   THE COURT:  Mr. Dillard maintains that it was used as

17   an impeaching exhibit.  Therefore --

18   MR. TACKETT:  I heard him.

19   THE COURT:  -- it would not come under the normal

20   strictures of identification.  So your objection is noted but

21   overruled.

22   MR. TACKETT:  Thank you, Your Honor.

23   MR. DILLARD:  Judge, if I may add to the record.  We

24   did receive this document and picture from Ridge, but it was

25   black and white and we didn't know what it was.  It took us a

VOL. II - 283

1  little time to figure it out.

2          THE COURT:  I understand.

3    BY MR. DILLARD:

4    Q.   Did that help refresh your recollection of what the

5    Arctic Flex door looked like?

6    A.   Again, I saw the door in a test application where it was

7    moving.  I can be certain that a white skin was on the door and

8    there was foam behind it.

9    Q.   Thick, black insulating foam?

10   A.   With a layer that was over the foam.

11   Q.   And you couldn't tell whether that layer was another

12   thermoplastic or a fabric?

13   A.   Yeah, I couldn't tell that.

14   Q.   But in order to be the Cold Chain door, the -- it needed

15   to be a two-layer door, right?

16          MR. TACKETT:  Objection.

17          THE COURT:  Basis?

18          MR. TACKETT:  There's no foundation for the fact that

19   it has to be a two-layer door.  If he wants him to look at the

20   patent, he could.  But there's no foundation for that.

21          THE COURT:  Could I see counsel at sidebar?

22                            - - -

23     (The following proceeding was held at sidebar.)

24          THE COURT:  I know that this is day two and sometimes

25   with all the other information that everyone had to absorb, we

VOL. II -  284

1   can tend to forget things.  One thing that I don't want any of

2   the other lawyers to forget for the remainder of this hearing

3   is that there are no such things that are permitted in this

4   court known as narrative objections.  If you want to elaborate

5   on your objection, you may do so, Mr. Tackett, but at sidebar.

6          Now, you've unwittingly, I'm certain, just kind of

7   instructed this witness as to kind of the parameters of what a

8   good answer to his cross-examination -- Mr. Dillard's

9   cross-examination question.  I know you didn't intend to do

10  that.

11         MR. TACKETT:  Certainly not.

12         THE COURT:  Certainly not, but that's how it came out.

13  I don't want to see that happen from anyone again because you

14  remember the dog-bite rule from torts, Mr. Tackett?

15         MR. TACKETT:  I think so, Your Honor.

16         THE COURT:  Tell me what it is.

17         MR. TACKETT:  I think it's -- after you've bit once,

18  there is a presumption that the second bite is intentional.

19         THE COURT:  You impute that to the dog.  There is such

20  a rule, but it's the owner who gets -- the owner's dog gets the

21  free bite because the theory is that the owner doesn't know of

22  the dog's violent propensities with the first bite, but

23  subsequent bites the owner would be liable for because he knows

24  that now the dog has a propensity --

25         MR. TACKETT:  Am I the dog in this metaphor?

VOL. II -  285

1            THE COURT:  You got your free bite, but no more.

2            MR. TACKETT:  Understood, Your Honor.  My apologies.

3            THE COURT:  You may rephrase your question however you

4    wish, Mr. Dillard.

5            MR. DILLARD:  Thank you.

6        (The following proceeding was held in open court.)

7            THE COURT:  Mr. Dillard, you -- do you wish to

8    rephrase your question or have the question read back?

9            MR. DILLARD:  One second, Your Honor.  I just want to

10   make sure --

11           THE COURT:  Take your time.

12           MR. DILLARD:  May I confer with Mr. Clifford real

13   quick?

14           THE COURT:  Yes.

15           MR. DILLARD:  Thank you, Your Honor.  We have no

16   further questions at this time.

17           THE COURT:  All right.  Thank you.

18        Mr. Koltak, cross?

19           MR. KOLTAK:  Yes, Your Honor.

20                              - - -

21                       CROSS-EXAMINATION

22   BY MR. KOLTAK:

23   Q.   Good afternoon, Mr. Moss.

24   A.   Hello.

25   Q.   Josh Koltak.  I think we've seen each other on Zoom but

VOL. II - 286

1  I don't think we've had the chance to talk.  I'm one of the

2  attorneys for Kirk National Lease and TTPS.

3      Both in your direct examination and in the

4  cross-examination by Mr. Dillard, they had you look at the

5  documents at the end of the Exhibit P7, the drawings from your

6  design book.  Do you remember that?

7  A.  I do.

8  Q.  Prior to the email that attached those exhibits in it

9  looks like June of 2023, May of 2023, had you ever presented

10 those drawings to Kirk National Lease?

11 A.  They were in my design notebook.

12 Q.  Did you ever present them to TTPS?

13 A.  No.

14 Q.  Did you present those drawings to them before they filed

15 their '144 patent application?

16 A.  No.

17 Q.  We've had a lot of talk about Exhibit P70.  I'm not

18 going to make you hold it again and look at it.  I do have a

19 couple questions of your understanding of the -- what P70 is.

20 P70 is essentially a cutout of a door, correct?

21 A.  It appears to be a section of a door.

22 Q.  And no single feature of that door constitutes the door

23 itself, right?

24 A.  That would be correct.

25 Q.  The thermoplastic is not the door?

VOL. II - 287

1    A.    The thermoplastic is not the door.

2    Q.    The foam is not the door?

3    A.    The foam is not the door.

4    Q.    The metal fixtures are not the door?

5    A.    The metal fixtures are not the door.

6    Q.    It's when you put all of those things together, that's

7    when you get the door, right?

8    A.    The door is the combination of those things.

9    Q.    The PET layer that Ridge used to provide to Kirk

10   National Lease, to TTPS, who manufacturers the PET layers that

11   was used for that door?

12   A.    We've had two suppliers in our time so I can't be

13   certain which one was used.

14   Q.    During what time?

15   A.    Over time period since 2015 we've had two suppliers.

16   Q.    So one of them?

17   A.    Yes, it would be one of them.

18   Q.    And what about the manufacturer of the polypropylene

19   thermoplastic layer with the glass fibers?

20   A.    So Ridge -- the skins Ridge makes, but I assume you're

21   talking about the tape layers.

22   Q.    Correct.

23   A.    And you're asking me --

24   Q.    Who manufactures those?

25   A.    Who manufactures those?  Not Ridge Corporation.

VOL. II - 288

1  Q.  Can you tell me who?

2  A.  We had various suppliers, one being I guess -- they've

3  had multiple names, but I'll call them Jushi.  The other is

4  Polystrand.

5  Q.  When the layers -- the film, the foam, and then the film

6  again are laminated, does it all come from the same roller?

7  A.  No.

8  Q.  And does the PET membrane comprise glass fibers?

9  A.  The membrane consists of glass fibers and polypropylene.

10  Q.  Okay.

11       MR. KOLTAK:  No further questions, Your Honor.

12       THE COURT:  Thank you, Mr. Koltak.

13     Mr. Tackett, any redirect?

14       MR. TACKETT:  Yes, if I may.

15       THE COURT:  Please.

16                      - - -

17                REDIRECT EXAMINATION

18  BY MR. TACKETT:

19  Q.  Mr. Moss, do you recall being shown this question on

20  cross-examination -- this document on cross-examination?

21  A.  I do recall it.

22  Q.  And do you see in this email of August 17, 2020, where

23  Jeff Phlipot of Kirk National Lease is suggesting that a V cut

24  be made into the panel?

25  A.  I see that suggestion.

VOL. II - 289

1    Q.    Okay.  Would a V cut work at all to engineer the KNL

2    door to operate and traverse the radius of a truck door frame?

3    A.    I'll answer this question.  The -- from this time

4    period, it was after one of the first Ridge cut parts, and, you

5    know, it didn't work exactly as decided.  So this is where we

6    were working together.  And a V cut was suggested which we

7    internally discussed that it would not -- it would not help the

8    situation because it would pinpoint stress in one spot and thus

9    create too much stress on the skin leading to potential cracks

10   as it bent.

11   Q.    And when you say "we," you're referring to Ridge

12   providing that --

13            THE COURT:  You want to rephrase that, Mr. Tackett?

14            MR. TACKETT:  Yes, Your Honor, of course.

15   BY MR. TACKETT:

16   Q.    When you -- when you say "we" in your response to that

17   question, who are you referring to?

18   A.    "We" as in Ridge manufacturing, and cutting the V cut if

19   Ridge was to provide that V cut.

20   Q.    Okay.  And what team at Ridge was giving this advice to

21   Mr. Phlipot about the V cut?

22   A.    My team evaluated it internally and we never, to my

23   knowledge, produced a panel with a V cut as is we did not

24   believe it was a good idea.

25   Q.    And can you explain perhaps in just a little more detail

VOL. II - 290

1  why a V cut wouldn't work?

2  A.   So the relief cuts were smaller like this and they

3  created space for the living hinge to act and bend in that

4  area.  With a V cut, you do this and you pinpoint -- you

5  pinpoint some of the stress there.  So we did not think that

6  was a good way to help the situation as we understood it.

7  Q.   And what would be the result of a V cut pinpointing that

8  stress in isolated areas of the panel?

9  A.   So there would actually be more stress than there would

10 have been in the area that was wider.  So you could have

11 creases and cracks.

12 Q.   And this email exchange you were shown, how long after

13 your June and July 2019 drawings was that email?

14 A.   Over a year.

15 Q.   Okay.

16      MR. TACKETT:  Nothing further.

17      THE COURT:  Thank you.

18      MR. TACKETT:  Thank you.

19      THE COURT:  Mr. Dillard, any recross?

20      MR. DILLARD:  No, Your Honor.

21      THE COURT:  Mr. Koltak, any recross?

22      MR. KOLTAK:  No, Your Honor.

23      THE COURT:  Thank you very much.  Mr. Moss, thank you,

24 sir.  You may be excused.

25      THE WITNESS:  Thank you, Your Honor.

VOL. II - 291

1        THE COURT:  Mr. Clifford, do you anticipate calling

2    Mr. Moss as upon cross?

3        MR. DILLARD:  We don't anticipate.

4        THE COURT:  Just a second, Mr. Moss.

5      Mr. Burton, do you or Mr. Koltak anticipate calling

6    Mr. Moss as upon cross?

7        MR. KOLTAK:  No, Your Honor.

8        THE COURT:  Mr. Moss, you're free to stay in the

9    courtroom for the remainder of the hearing if you choose.

10      Mr. Tackett?

11        MR. BURTON:  Your Honor, I wanted to interpose a

12    request or an inquiry as to the schedule today due to a witness

13    availability issue.

14        THE COURT:  All right.  I intend for us to go to at

15    least 4:50, 4:55.  I have a trial ed class that begins at five

16    o'clock.  We can go up until that time.  What we don't finish

17    we'll begin tomorrow at 8:30.  I have a fairness hearing that

18    was previously scheduled.  We're going to start at ten.  It

19    will take about half an hour.  So we'll take a break from 10

20    to 10:30, and then we'll continue until we're done.

21        MR. BURTON:  The issue we're running into is we were

22    planning for a two-day hearing based on the order, and Mr. Han,

23    our expert, is not available tomorrow and it looks like --

24        THE COURT:  You want to call him out of turn?

25        MR. BURTON:  Yes.

VOL. II -  292

1          THE COURT:  Is there any objection, Mr. Tackett?

2          MR. TACKETT:  No, Your Honor.  We'll consent to that.

3          THE COURT:  Do you wish to call him now, then?  Would

4    this be a good time, Mr. Tackett?

5          MR. TACKETT:  That probably makes sense.  Our next

6    witness is a CEO of Ridge and that's probably going to be a

7    long direct and lengthy cross.

8          THE COURT:  Who was the expert?

9          MR. BURTON:  Mr. Han is one of our experts.

10         THE COURT:  All right.  We'll call Mr. Han at this

11   time.

12      (Witness sworn.)

13         THE COURT:  Mr. Han, please bend the microphone toward

14   you and speak clearly into it.

15         THE WITNESS:  Yes, Your Honor.

16         THE COURT:  Whenever you're ready, Mr. Burton, you may

17   proceed.

18         MR. BURTON:  Thank you, Your Honor.

19                            - - -

20                          SAM HAN

21    Called as a witness on behalf of the Defendants, being first

22   duly sworn, testified as follows:

23                      DIRECT EXAMINATION

24    BY MR. BURTON:

25    Q.   Mr. Han, can you tell me a little bit about your

VOL. II - 293

1  background as you believe it pertains to this case?

2    A.    Sure.  I graduated from the University of Michigan with

3  an engineering degree in 1992.  And then I went to Worchester

4  Polytechnic Institute which I'll refer to as WPI for graduate

5  school, and I got a master's degree and a Ph.D. from WPI.

6  After that I worked for about a year and went right to law

7  school and graduated from Georgia State University School of

8  Law in 2001.

9           THE COURT:  Before we go any further, Mr. Han, would

10  you state your name and spell your last name for the record,

11  please.

12           THE WITNESS:  I certainly can, Your Honor.  My name is

13  Sam Han.  S-a-m, first name.  H-a-n, second name.

14    BY MR. BURTON:

15    Q.    Could you look at Defendant's Exhibit 105, please?  I

16  think we're bringing it up on the screen, Mr. Han, as well.

17    A.    Certainly.

18    Q.    Do you recognize what we've marked as Exhibit 105?

19    A.    Yes, I do.  It's the first page of my CV.

20    Q.    I represent to you that if we page through it, it's your

21  entire curriculum vitae.  And it's -- is that up to date?

22    A.    It may be a couple of years old.  But it's -- for the

23  most part, it's complete.

24    Q.    And do you understand this curriculum vitae has been

25  provided to opposing counsel?

VOL. II -  294

1    A.   Yes, I do.

2    Q.   And aside from your educational background that you just

3    went through, your degrees, professionally, what is your

4    profession?

5    A.   I'm a patent attorney and I'm working with the law

6    office of Thomas E. Lees in Dayton, Ohio, as a patent lawyer.

7    I also do litigation work as counsel for an Atlanta law firm

8    called the Dewoskin Law Firm.  The law firm is D-e-w-o-s-k-i-n,

9    the Dewoskin Law Firm.  And I handle mostly nonintellectual

10   property-related matters for the Dewoskin Law Firm.

11   Q.   Are you still a patent attorney registered with the

12   United States Patent and Trademark Office?

13   A.   I am still a registered patent attorney with the United

14   States Patent and Trademark Office.

15   Q.   Is there anything in your background that -- well, first

16   of all, let me back up a step.  You understand there is a

17   concept in patent law of one of ordinary skill in the art?

18   A.   I do understand that concept.

19   Q.   Other than what you've mentioned perhaps already, is

20   there anything about your background that you consider yourself

21   from -- under which you consider yourself to be one of ordinary

22   skill in the art for the question we have before the Court in

23   this preliminary injunction hearing?

24   A.   Yes.  My understanding of the technology is that it is a

25   roll-up door.  And if we look at the file history of the Cold

VOL. II - 295

1    Chain patent, I'm used to calling it the Wachtell Patent.  So

2    you'll pardon me if I fall into that.  But the Cold Chain

3    patent, if we look at the prosecution history, it was examined

4    at the USPTO by an examiner that was in Art Unit 3634.  By way

5    of background, the art unit at the United States Patent and

6    Trademark Office is the core of examiners that are assigned to

7    a particular art.  If it's a chemical art, you would have

8    chemical background folks that are examiners that are assigned

9    to that art unit.  If it was a mechanical art, it would be

10   mechanical.

11        And this particular patent, the Cold Chain patent, was

12   examined by Art Unit 3634 which is an art unit that is

13   dedicated to moveable closures.  An example of a moveable

14   closure would be a garage door that slides up and down.  So

15   while it's not professional training, I've had decades of

16   experience using my garage door and I know exactly how it

17   works.

18   Q.   Let me just ask you this.  We can page through your CV,

19   but have you had any teaching experience?

20   A.   Yes.  I've taught mechanical engineering classes as well

21   as physics classes.  I was a physics instructor at the

22   University of Michigan, and I believe my background in

23   mechanical engineering and physics, as well as the classes that

24   I took as material science courses at the University of

25   Michigan provides sufficient background, in addition to my

VOL. II - 296

1    experience with my own garage door for decades to make me one

2    of ordinary skill in the art.

3         It's a very straightforward patent.  It's a mechanical

4    device, and I believe that folks that are familiar with garage

5    doors can understand how this particular Cold Chain door

6    operates.

7    Q.    Have you had an opportunity to -- opportunity to review

8    the prosecution history of the Cold Chain patent?

9    A.    Yes, I have.

10   Q.    And have you reviewed the Cold Chain patent itself?

11   A.    Yes, I have.

12   Q.    Have you examined the accused door or the KNL door?

13   A.    I have not examined the actual accused KNL door.

14   Q.    And you performed an analysis -- did you perform an

15   analysis in your report in this case of the accused device?

16   A.    I don't know how to answer that question.

17   Q.    Let me ask a better question.  Did you perform an

18   infringement analysis in a report that was provided in this

19   case?

20   A.    I did perform an infringement analysis in my report.

21   Q.    Can you explain how you did that without analyzing the

22   accused device, without looking at the physical accused device?

23   A.    My infringement analysis was based on one of the

24   exhibits that was in the complaint.  And it was an

25   illustration -- if I remember the testimony of Mr. Sharpe, it

VOL. II -  297

1   was an illustration that Mr. Sharpe had created.  I believe

2   it's figure 4.  It's a drawing that shows a green, orange, and

3   a white layer.

4           And when I did my analysis, one of the assumptions that

5   I made was that that illustration that was made by Mr. Sharpe

6   properly illustrated the accused door.  So I did not have an

7   opportunity to actually confirm whether or not it properly and

8   accurately represented the accused door.  I just took

9   Mr. Sharpe's illustration at its word that those were the

10  components that were in the accused door.  And I did my

11  analysis based on what was represented by plaintiffs in their

12  exhibit as being the accused door.

13  Q.    Did your analysis include conducting a claim

14  interpretation?

15  A.    Yes, it did.

16  Q.    Is that -- when I say claim interpretation, is that

17  something that patent lawyers also refer to as a claim

18  construction?

19  A.    Yes, it is.

20  Q.    Why did you do a claim construction?

21  A.    In order to do a proper infringement analysis, it's a

22  two-step process and the law requires both steps independently.

23  First of all, the claims must be construed.  And there is a

24  step by which you can go through the claim construction.  And

25  only after the construction of the claims -- they consider this

VOL. II - 298

1    the Markman phase.  Only after the construction of the claims

2    can you then read the construed claims upon the accused device

3    or the alleged infringing device.

4         Without a proper claim construction, there is no way to

5    read the claims as construed on an infringing device.  Because

6    of that, the claim construction step is a necessary step in

7    performing any type of infringement or noninfringement

8    analysis.

9    Q.   As to the Cold Chain patent and -- and I'll say I'm

10   looking at claim 1.  We'll look at claim 1.  Actually, can we

11   pull up I think it's Defendant's Exhibit 6?  If we can get

12   column 6.  I'll have you look at column 6 where the claims

13   begin so we have that in front of us.

14        MR. BURTON:  Can we page through the document, please?

15   Can you -- can we get this claim 1 a little larger?

16   BY MR. BURTON:

17   Q.   I have claim 1 of the '084 or the Cold Chain patent in

18   front of you now, Mr. Han.  Do you see that?

19   A.   Yes, I do.

20   Q.   Did you focus on any particular terms or phrases in

21   claim 1 of the Cold Chain patent?

22   A.   Yes, I did.

23   Q.   Can you point those out to us?

24   A.   The first term that I focused on was the term or the

25   phrase first outermost surface.  And you can find in

VOL. II -  299

1   approximately line 3 bleeding onto line 4 of the claim itself;

2   or if you're referring at the lines designated in the patent,

3   at approximately line 20, it says the first outermost surface.

4   That's the first phrase I focused on.

5        The second phrase I focused on was a second outermost

6   surface opposite the first outermost surface.  And that's the

7   phrase that immediately follows the first outermost surface.

8        And then the third and last phrase that I focused on is

9   if you drop down to approximately line 40 -- I'm sorry.  Hold

10  on.  Yeah.  Approximately lines 39 to 41, the claim recites the

11  foam insulating material forming the second outermost surface

12  of the door.

13  Q.   What process did you go through to construe those

14  claims?

15  A.   Initially, I read the claim --

16  Q.   Phrases.  Sorry.  Let me reask.  What process did you

17  use to construe those phrases?

18  A.   Initially, I took just the phrases at face value.  I

19  presumed the words meant what they said and they said what they

20  meant.  After I construed the words according to their plain

21  and ordinary meaning, I consulted a dictionary to make sure

22  that my understanding was not contrary to what the dictionary

23  defined those words according to their plain and ordinary

24  meaning.  And specifically, the dictionary was used to construe

25  the term outermost.  And what I found from the dictionary was

VOL. II – 300

1  that the term outermost means farthest out.

2          And I'm actually relieved to know that Mr. Sharpe agrees

3  that farthest out and outermost are synonymous.

4  Q.    I'm going to have you turn to Defendant's Exhibit 107.

5  Turn to -- we're bringing it up on the screen now.  Can you

6  tell me what Defendant's Exhibit 107 is?

7  A.    I believe that Defendant's 107 is the illustration that

8  I used in the report that I provided for my infringement,

9  noninfringement analysis.  And specifically, the drawing itself

10  with the green, the orange and the white layers and the

11  stippling that's inside that gap, that drawing with all of the

12  arrows was in the original claim chart that Mr. Sharpe created.

13  Q.    The one that was attached to the complaint; is that

14  correct?

15  A.    That is correct.  The difference between this particular

16  drawing and the one that was in the claim chart in the

17  complaint is that the labeling of where the arrows point is

18  different in this drawing because I labeled this drawing as I

19  understood what each component meant.

20  Q.    So the phrases that you construed, that you talked

21  about, are the elements corresponding to those construed

22  phrases present in the accused device as depicted in figure 4?

23  A.    When you say figure 4, are you referring to the drawing

24  on the screen right now as Defendant's D107 or are you

25  referring to figure 4 as in the figure 4 of the exhibits to the

VOL. II -  301

1    complaint?

2     Q.   My understanding is the illustration that we're looking

3    at in Defendant's Exhibit 7, aside from the commentary and the

4    arrows, is that illustration from the claim chart?

5     A.   That is correct.  That is the same.

6     Q.   So --

7          THE COURT:  Mr. Burton, is this Defendant's Exhibit 7?

8    On mine it has Defendant's 107.

9          MR. BURTON:  I believe I said 107.  We've --

10          THE COURT:  Well, Ms. Evans doesn't make mistakes.

11    And I heard, and as reflected, we're looking at in Defendant's

12    Exhibit 7.

13          MR. BURTON:  Sorry.  I meant to say 107.

14          THE COURT:  I just wanted to make sure we were looking

15    at the same one.

16    BY MR. BURTON:

17     Q.   The illustration from Exhibit 107, what you added was

18    the arrows and the phraseology; is that correct?

19     A.   That's not completely correct.  The arrows were already

20    there.  I just added labels that corresponded with where the

21    arrows were pointing.  Originally, they were labeled something

22    else, and I did not agree with how they were labeled.  The

23    arrows were in the original figure 4.  So there's nothing

24    different about this drawing from what Mr. Sharpe created other

25    than the words that designate what the arrows point to.

VOL. II - 302

1    Q.   Is this -- when you said you accepted the

2    characteristics of the accused device by plaintiff, is this

3    what you're referring to as the -- as the interpretation or the

4    characterization of the accused device by the plaintiff?

5    A.   What I meant by that is that I took this illustration

6    with the white layer, the orange layer and the green layer with

7    the cutout in the stippled area exactly as it was drawn.  My

8    presumption was that drawing with the green, the orange and the

9    white accurately depicted the accused device.

10        And I did not have an opportunity to see the accused

11   device or touch it or examine it at all.  And because of that,

12   the only thing that I could go on at the time that I made my

13   opinion was this illustration as well as several of the photos.

14   And this illustration was what I mainly relied on in doing my

15   infringement analysis.

16   Q.   Based on that presumption and your construction of the

17   phrases in claim 1, what was your infringement analysis?

18   A.   My infringement analysis was that all of the elements

19   that were in the claim did not read on the accused device.

20   Specifically, the second outermost layer did not read on the

21   accused device.

22   Q.   Can you explain how you reached that conclusion?

23   A.   Sure.  Initially, when I looked at this device -- well,

24   first of all, initially, when I construe the claims, I construe

25   the claim first outermost surface which is the thermoplastic

VOL. II - 303

1   layer to be the -- a thermoplastic layer that was farthest out.

2   And it had to be a surface that was farthest out.  So first

3   outermost surface.  The phrase itself has three components.

4   Number one, it has to be a surface.  Number two, it has to be

5   an outer surface.  Number three, it has to be an outer surface

6   that's farthest out.  And this would be the first of the outer

7   surfaces that is farthest out.

8        And when I construed the second outermost surface --

9   Q.   Can I stop you there for a second?

10  A.   Sure.

11  Q.   In terms of white, orange, green or something else, what

12  were you talking about there?

13  A.   I actually wasn't looking at this drawing when I

14  construed the claims.  When I construed the claims, I looked at

15  the language of the claims and I tried to interpret what that

16  language meant just from the patent itself and the prosecution

17  history.

18       I did not rely on any drawings such as the one that's in

19  D107.  I looked just at the language of the claims.  And

20  according to the language of the claims, the first outermost

21  was a surface that was on the outside but it was the farthest

22  out surface, and it was one of them because it was the first

23  outermost surface.

24  Q.   And on the illustration, how is that illustrated on the

25  accused device?

VOL. II - 304

1    A.    After I construed the claim, when I looked at the

2    illustration -- are we just referring to the illustration as

3    the accused device or --

4    Q.    You can correct me if I'm not doing it correctly.

5    A.    If this illustration correctly reflects the accused

6    device, then that first outermost surface would be the surface

7    of the green layer that we see.  The way the picture is drawn

8    or the illustration is made, it's looking at a perspective view

9    of a panel that I think is lying on the ground somewhere.  So

10   the green layer is at the bottom of the picture.  The first

11   outermost surface would be underneath.  It would be the surface

12   that we cannot see from this particular illustration.

13   Q.    Can you continue, then, with what was the next step, if

14   any, in your infringement analysis?

15   A.    Sure thing.  I do want to make a point before I continue

16   on.  I believe that is also the same interpretation that

17   Mr. Sharpe provides as the first outermost surface.  And so it

18   is that same bottom surface underneath that we cannot see which

19   is the same outermost surface.  I don't think there's any

20   dispute about that.  Okay.

21         Now --

22   Q.    So what was the next step in your infringement analysis?

23   A.    The next step in the infringement analysis -- it would

24   be the first step.  It was the construction of the phrase

25   second outermost surface.  If I can put the patent claim back

1  up or refer to the patent itself.  Is that okay?

2  Q.   Yes.  Can we put up D6?

3  A.   I'm going to apologize.  I might flip back and forth

4  from both of these because I'm looking at both the claim and

5  the illustration.

6       So right after the first outermost surface, there is a

7  phrase a second outermost surface opposite the first outermost

8  surface.  So when I construed that language, the way that I

9  construed it was that there was a second surface, and it had to

10  be a surface that was farthest out.  And in addition to that,

11  the way it's characterized is it has to be a surface that is

12  farthest out and also opposite of the first outermost surface.

13       And the way that I got to the farthest out for outermost

14  is plain and ordinary meaning confirmed by the dictionary.  So

15  if we --

16  Q.   Go ahead.

17  A.   I'm sorry.

18       Not only that -- I'm sorry.  If we take a look at

19  Exhibit D107.  I'm trying to get these numbers.  D107.  If

20  we're applying that language as to where the second outermost

21  surface is, first of all, it has to be a surface.  Second, it

22  has to be an outer surface.  Third, it has to be the farthest

23  out outermost surface.  And lastly, at least for the second

24  outermost surface, it has to be opposite where the first

25  outermost surface is.

VOL. II - 306

1        And so because of that when we look at this drawing, if

2    the first outermost surface is at the bottom where we can't see

3    it, the second outermost surface that is opposite that surface

4    would be on top of the white layer that we see.  And that's how

5    I labeled that drawing.

6    Q.   What's the consequence of that interpretation for your

7    infringement analysis?

8    A.   If that white layer is not a foam insulating layer, then

9    that white layer -- well, one step back.

10        The claims also require that that second outermost

11   surface has to be a foam insulating layer, I believe.  I don't

12   remember the language exactly but I believe it has to be a foam

13   insulation.  We can go back to the language if you wish.

14        If that white layer at the top is not a foam insulation

15   material, then that second outermost surface which is opposite

16   the first outermost surface, the claim limitation of second

17   outermost surface does not read on this particular

18   illustration.

19   Q.   And you said "if" there.  You said "if" in your answer.

20   Did you make a conclusion as to whether any elements of claim 1

21   were missing on the accused device?

22        MR. MILLER:  Objection.

23        THE COURT:  Basis?

24        MR. MILLER:  To the extent it goes to an issue of law.

25   That is a determination for the Court on whether there is

VOL. II - 307

1    actually infringement.

2          THE COURT:  Overruled.  I think that this goes to his

3    infringement analysis and his findings.  So I'm going to

4    overrule it.

5          You may answer the question, Mr. Han.

6          THE WITNESS:  Thank you, Your Honor.  Could you repeat

7    the question one more time, please?

8    BY MR. BURTON:

9    Q.    Did you reach a conclusion on the issue of whether an

10   element of claim 1 was missing from what you believe was a

11   depiction of the accused device?

12   A.    Yes, I did make a conclusion.

13   Q.    What was that?

14   A.    That conclusion was that if that white layer at the top

15   which is the second outermost layer was not foam material, then

16   an entire element of claim 1 was not present in this accused

17   illustration device.

18         And according to plaintiff's claim chart, they actually

19   note that white layer as not being foam insulating material but

20   being a thermoplastic material.  And considering that they,

21   plaintiff, designated that as not being a foam material, my

22   conclusion was that it could not be the second -- or that it

23   was -- the second outermost layer comprising a foam material

24   was not present in the accused illustration.

25   Q.    Did you have an opportunity -- have you had an

VOL. II - 308

1   opportunity to review Mr. Sharpe's rebuttal report in this

2   case?

3       A.   Yes, I have.

4       Q.   Did you agree with Mr. Sharpe on any points?

5       A.   I agreed with him on two points.  The first point that I

6   agreed with him on was that when construing the claims

7   according to its plain and ordinary meaning, that typically we

8   should not refer to extrinsic evidence, meaning that if the

9   plain language of the claims are understandable, then extrinsic

10  evidence is not necessary.

11       The second point I agreed with him on was that bottom

12  surface of that green layer that's in the drawings, that bottom

13  surface in its entirety is the first outermost surface.  So I

14  agreed with him on those two points.

15      Q.   What did you -- what, if anything, did you disagree with

16  in the positions taken by Mr. Sharpe in his report?

17      A.   I disagreed with the process that Mr. Sharpe went

18  through to do his claim construction.  First, that's the first

19  thing that I disagreed with him on.  And the reason that I

20  disagreed with Mr. Sharpe on the process that he used was he

21  comes straight out and indicates that we should not be using

22  extrinsic evidence at all to construe the claims, and then he

23  turned right around and used the exhibit that he manufactured

24  for the purposes of this lawsuit to construe the claims.

25       That exhibit, the one that we just saw, D109, that

VOL. II - 309

1    exhibit is extrinsic evidence.  It did not exist prior to the

2    filing of this lawsuit.  I don't believe it existed prior to

3    the filing of this lawsuit.  It did not exist when the patent

4    application was filed, and it is nowhere to be found in the

5    filing history.  So that drawing itself -- that drawing itself

6    is extrinsic evidence.  And I believe that the process by which

7    he construes the claims, if he construes them at all by

8    referring to that extrinsic evidence, violates his own rule of

9    not referring to extrinsic evidence when doing a claim

10   construction.  So that was the first point with which I

11   disagreed.

12   Q.   Any other points with which you -- you said the first

13   point.  Any other points you disagree with him on?

14   A.   I believe there were a total of four or five.  The

15   second point with which I disagreed with him on was that he

16   reads the second outermost surface onto the surface that is

17   inside of the compression gap or the groove.  I don't know how

18   you want to call it.  In his claim chart -- can we put 107 back

19   up on the screen for just a second so I can refer to it?

20   Q.   Certainly.  In that area, would you accept the

21   terminology of calling it a groove?

22   A.   I can call it a groove but I do believe it's labeled as

23   the compression gap because that's in claim 4 of the patent.

24   But we can call it a groove if you'd like.

25        The arrow where it says compression gap right there, he

VOL. II - 310

1    labeled that hash mark or stippled surface as being the second

2    outermost layer.  So what he does is he labels that horizontal

3    surface that is inside of the compression gap as the second

4    outermost surface.  And the reason that I disagreed with that

5    is because, number one, it is inside of the compression gap.

6    It's not even an outer surface.

7        If you remember, outermost surface requires a surface

8    which is on the outside, and it has to be the farthest out.

9    Here, I would concede that it is a surface.  But it is not an

10   outside surface because it is inside of the compression gap.

11   As a matter of fact, Mr. Sharpe's opinion actually says that

12   surface is inside of that gap or inside of the groove, however

13   he phrases it.  I can't remember his exact terminology, but he

14   does say it's inside.  So it is not even an outermost [sic]

15   surface, let alone an outermost surface.

16   Q.   Let me stop you there for a second.  Do you put any

17   significance in the fact that the claim says it's an outermost

18   surface of the door?

19   A.   I do.  If we were to look at this, the claim does not

20   say that it is any outer surface of a compression gap.  It does

21   not say it is an outer surface of a component.  The claim

22   specifically says it is the outermost surface of the door.  And

23   that door, I believe, is the aggregate of all of the components

24   combined.  It's not just the foam.  It's not just the

25   thermoplastic.  It's not just the hinges.  It's all of that

VOL. II - 311

1  stuff combined together to create the door.

2       If the door itself is what we're looking at, then the

3  outermost surface has to be the outermost surfaces of the door.

4  And by way of example, we all agree that the bottom of the

5  green is the first outermost surface.  That entire bottom of

6  the green is the first outermost surface.  There's no dispute

7  between me and Mr. Sharpe on that one.

8       If that's the case, and we're looking at the door in its

9  entirety, then the second outermost surface, the most

10  reasonable read on that would be that it is the top of the

11  white surface which is opposite the green surface at the

12  bottom.

13  Q.   And I believe I interrupted you when you were reaching

14  your third point of disagreement with Mr. Sharpe.  Can you tell

15  me what that was?

16  A.   Actually, I wasn't quite done with my second one either.

17  My apologies for being unclear.

18       I disagree it's an outer surface to begin with, let

19  alone an outermost surface.  Thirdly, it couldn't be the

20  outermost surface because compared to where the outside green

21  layer is, the farthest surface away from that, the farthest out

22  is not that orange surface of the compression gap.  It is the

23  white surface of the door.

24       And clearly, from the picture itself, we can see that

25  that inside surface of the compression gap is closer to the

VOL. II - 312

1    green than the outside surface of the white from the green.  So

2    under the plain and ordinary meaning, the outer surface that is

3    farthest out is the top of the white surface because it is the

4    farthest out from the bottom of the green surface.  That's my

5    second disagreement.

6    Q.   Okay.  And I did hear you say you had a third

7    disagreement.  What would that be?

8    A.   I did.  The third disagreement is that when Mr. Sharpe

9    actually looks at this drawing to construe where that second

10   outermost surface is, he necessarily has to have that

11   compression gap there in order for him to be able to say that

12   the surface inside the compression gap is the second outermost

13   surface.  The problem is that compression gap is not recited

14   anywhere in claim 1.  It is a feature that has to be included

15   in claim 1 in order for the surface of the compression gap to

16   be the second outermost surface.

17        And it cannot be that because the compression gap is

18   recited in dependent claim 4.  Compression gap does not even

19   appear in the independent claims.  And so to say that the

20   compression gap surface is the second outermost surface when

21   that compression gap isn't even recited in claim 1 I believe is

22   error.

23   Q.   Do you have any further disagreements you want to point

24   out with Mr. Sharpe?

25   A.   No.  But I'd also like to clarify that.  According to

VOL. II - 313

1    claim 1, because there is no compression gap that's recited in

2    claim 1, at least my understanding of the door that is recited

3    in claim 1, according to its plain language is literally a

4    two-layer door.  There is a thermoplastic layer and a foam

5    layer that is directly attached to the thermoplastic layer.

6    There are no compression gaps in the claim 1 device.

7          There's also not a third layer in the claim 1 device

8    because that third layer is nowhere recited in claim 1.  In

9    order for Mr. Sharpe to be able to distinguish the surface of

10   the compression gap and the surface of the white thermoplastic

11   layer, he necessarily has to presume that the compression gap

12   is there, and he necessarily needs to presume that the white

13   thermoplastic layer has to be in claim 1, but neither of them

14   are recited in claim 1.  So according to its plain and ordinary

15   meaning, unless we can impute these features into claim 1,

16   which I don't believe we're permitted to do, the claim

17   construction of that stippled lower surface being the farthest

18   out surface, I disagree with Mr. Sharpe about.

19   Q.   So have you concluded summarizing your points you wanted

20   to make as to disagreements with Mr. Sharpe?

21   A.   Yes.  And so, ultimately, from that as leading up to

22   this is I do not believe that the second outermost surface can

23   be the surface of the compression gap because, first of all, it

24   has to be the surface of the door.  Secondly, it has to be the

25   outermost surface of the door in opposition to the first

VOL. II -  314

1   outermost surface.  And in this drawing, if we extend this

2   drawing out, the only surface that we see that is farthest away

3   from the green surface at the bottom is the white surface at

4   the top.  And according to plaintiffs themselves, that white

5   material is not a foam insulating material.

6   Q.   All right.  One additional point I wanted to come back

7   to was you said you hadn't seen the actual -- well, am I

8   correct that you hadn't seen the actual accused product at the

9   time of your report, right?

10  A.   At the time of my report, I did not see the actual

11  accused device.

12  Q.   Were you provided any depiction or examples at the time

13  of your deposition?

14  A.   I was not provided with any examples.  The only thing

15  that happened prior to my deposition but after I had submitted

16  the opinion was a brief conversation that I had with you on

17  whether or not you had actually seen the device itself and

18  whether or not my assumption about that white layer being on

19  the door was correct, that that white layer as shown in this

20  illustration was not a foam insulating material.

21  Q.   In order to know if Mr. Sharpe's illustration accurately

22  depicts the accused product, what would you need to examine or

23  look at?

24  A.   It would be nice if I could take a look at the actual

25  accused product just to see if that illustration properly does

VOL. II -  315

1    depict the accused product.  Without seeing the device itself

2    or feeling or touching it or having a close examination of it,

3    the only thing I could do at the time of my report was presume

4    that that illustration was correct.  But to this day, I'm not

5    sure if it is or is not correct.

6          But even presuming that it's correct, Mr. Sharpe's

7    interpretation of second outermost surface by its plain and

8    ordinary language would require us to find that there is an

9    element that is missing from the claims in the accused

10   illustrated device.

11          MR. BURTON:  Your Honor, I would like to have Mr. Sam

12   look at Defendant's Exhibit 47.  May I approach the witness

13   with that?

14          THE COURT:  You may.

15    BY MR. BURTON:

16    Q.   I'm sure Mr. Clifford will correct me if I'm not getting

17   this right, but I believe this is a baby version of the panel

18   that Altum supplies to TTPS, the defendant in this case, for

19   its -- the panel that it's making for the door it's making

20   right now.

21          THE WITNESS:  Can I have a moment?

22          THE COURT:  Yes, you may.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Mr. Han, if it would be more convenient

25   for you to step down from the stand to examine, you may do so.

VOL. II -  316

1    Whatever is more convenient for you.

2            THE WITNESS:  Thank you, Your Honor.  And I will stand

3    up.  Thank you.

4        (Witness examines exhibit.)

5      BY MR. BURTON:

6      Q.   So you've had a chance to look -- actually had a chance

7    to touch this panel that's Defendant's Exhibit 47, right?

8      A.   Yes, I did.

9      Q.   Is there anything you observed in your manual brief

10   examination of this that sheds any light on the accuracy of

11   Mr. Sharpe's illustration?

12     A.   It appears that this panel -- it appears that this panel

13   is approximately what -- the same panel as what was described

14   by Mr. Bret Moss when he was talking about an 11-layer panel

15   where there is an inner foam and there is a weave of

16   polypropylene and then there is a polyethylene outside layer.

17   If that's true, then I believe that Mr. Sharpe's illustration

18   has one error in it.

19     Q.   What would that be?

20     A.   I believe that the way that the illustration is shown,

21   it shows an orange foam core.  It has a green layer at the

22   bottom that is a thermoplastic layer that has glass fibers in

23   it.  But it seems that this board actually also has an outer

24   layer outside of the glass fiber reinforced polypropylene

25   layer.

VOL. II - 317

1    Q.    What leads you to that comment?

2    A.    If you look really closely at the edges -- it's

3    difficult to decipher, but two things.  Number one, you can see

4    there is a very thin layer at the outside and it is starting to

5    separate at the corners so you can see it's there.  I can't

6    tell exactly what the material is it's made of, but it appears

7    there is a separate layer on the outside of the -- there are

8    two separate layers here on the outside of the foam.  And so

9    rather than this being a foam sandwiched between two

10   polypropylene layers, it seems this is a foam core that's

11   sandwiched between two layers which is, again, sandwiched

12   between two additional layers.

13        So it doesn't appear to be a three layer sandwich as

14   it's shown in the drawing.  It appears to be more than a three

15   layer sandwich.

16   Q.    Does the outermost layer on that example -- can you tell

17   where the outermost layer on that example has -- constitutes

18   the first outermost surface claimed in claim 1?

19   A.    Because there's no compression gaps or grooves that are

20   cut into this particular panel, the way that I would read the

21   claim onto this is that this would be the first outermost

22   surface.  And the way that I'm holding it would be the top of

23   the board when I'm holding it horizontally, and the second

24   outermost surface would be the bottom of the board as I hold it

25   horizontally.

VOL. II - 318

1    Q.   Let me interrupt for a second so I'm sure what we're

2   looking at.  What you said is the top first outermost surface,

3   would that be what you're looking at on the back of the truck,

4   if it were in a door mounted on a truck?

5    A.   I can't tell from this -- can we call this a blank?

6    Q.   Yes.

7    A.   I can't tell from this blank if it's mounted inside to

8   the outside this way or outside to the inside this way.  So I

9   can't tell you whether it's going to be the inside of the door

10  or the outside of the door.  The only thing that I can tell you

11  is that if we are holding onto this panel so it's horizontal to

12  the ground - the only reason I'm doing that is so I can refer

13  to it as up and down - the top would be the first outermost

14  surface and the bottom would be the second outermost surface.

15  Or alternatively, the bottom would be the first outermost

16  surface and the top would be the second outermost surface.

17       If I may add one more thing.  I don't believe that if we

18  cut grooves into this it automatically changes the entirety of

19  the first outermost surface into a different surface.  I don't

20  believe that the outermost surface can be different just by

21  cutting grooves into this thing.

22   Q.   I want to ask you about the first outermost surface.

23  Can you tell whether the -- first of all, whether -- whether

24  the first outermost surface meets the requirements that the

25  claim has for the first outermost surface?

VOL. II -  319

1      A.    I can tell that the top surface, if we're referring to

2   this, that it is a first outermost surface.  I do not know what

3   the composition of this first outermost surface is.  The one

4   thing that I do know is that it must be a thermoplastic

5   membrane.  I believe it's the language.  It has to be a

6   thermoplastic membrane, and it also has to include glass

7   fibers.

8          What I cannot tell just by touching this thing or

9   looking at it is whether or not this is a thermoplastic or a

10  thermoset.  I can tell that it's some type of a plastic, but I

11  can't tell whether it's thermoplastic or thermoset.  And the

12  second thing I cannot tell is whether or not this thing

13  actually has glass fibers in it.  Only an examination in detail

14  of the surface will be able to tell me if it has glass fibers.

15     Q.    When you said the first outermost layer has to have

16  thermoplastic with glass fibers, you're quoting or paraphrasing

17  one of the requirements of claim 1?

18     A.    Rather than paraphrasing, can I take a look at claim 1,

19  please?

20     Q.    Yes.

21     A.    Thank you.  So here, the first element to the claim

22  recites a thermoplastic membrane comprising glass fibers and

23  having a top side corresponding to the top of the door opening,

24  the bottom side corresponding to the bottom of the door

25  opening, the thermoplastic membrane forming the first outermost

VOL. II - 320

1    surface of the door.  So in order for that element of the claim

2    to read on the upper surface that I'm pointing to right now,

3    this upper surface must be, number one, a thermoplastic

4    membrane; number two, it must include glass fibers; and, number

5    three, it must be the outermost surface of the door.  And I

6    believe that it is the outermost surface of the door.  So that

7    portion of the claim is right on it.

8         I do not know if it's a thermoplastic membrane or a

9    thermoset membrane, and I do not know whether it comprises

10   glass fibers or whether it does not comprise glass fibers.

11        MR. BURTON:  Your Honor, I would move the admission of

12   Defendant's Exhibit 105 which is Mr. Han's curriculum vitae,

13   and Exhibit D107 which is the illustration used for

14   demonstrative purposes with Mr. Han's testimony.

15        THE COURT:  Any objection to 105, first of all,

16   Mr. Miller?

17        MR. MILLER:  No, Your Honor.

18        THE COURT:  105 will be received.

19        107 is not a substantive exhibit.  It's a demonstrative.

20   So it would typically not come into evidence.  It was used for

21   demonstrative purpose.  Unless there's some exception, 107 has

22   served its purpose of being a demonstrative exhibit, but it

23   will not be received because it's not substantive evidence.

24        MR. BURTON:  I have no further questions for Mr. Han.

25        THE COURT:  Cross-examination, Mr. Miller?

VOL. II - 321

1          MR. MILLER:  Yes, Your Honor.  Thank you.

2          THE COURT:  I'm assuming, Mr. Dillard or Mr. Clifford,

3     that you have no questions of this expert or do you?  He is a

4     defense expert and I wanted to make sure that before we got to

5     the cross-examination, I didn't know whether codefendant had

6     questions.

7          MR. CLIFFORD:  No questions, Your Honor.  Thank you.

8          THE COURT:  All right.  Thank you.  Mr. Miller, you

9     may proceed.

10         MR. MILLER:  Thank you, Your Honor.

11                           - - -

12                     CROSS-EXAMINATION

13     BY MR. MILLER:

14     Q.   Mr. Han, you were just going over before why you believe

15     you have ordinary skill in the art, correct?

16     A.   Yes.

17     Q.   And part of that was you saying that you had a garage

18     door, right?

19     A.   Yes.  That is correct.

20     Q.   But not everyone in the world with a garage door has

21     ordinary skill in the art of single panel roll-up doors, do

22     they?

23     A.   No, they do not.

24     Q.   And you have no experience before this case dealing with

25     single panel overhead doors, right?

VOL. II - 322

1    A.    That is correct.

2    Q.    And you've never made them, correct?

3    A.    That is correct.

4    Q.    And this is the first time you're acting as an expert in

5    a patent infringement case, correct?

6    A.    That is correct.

7    Q.    And you can't recall ever having acted as an expert

8    witness in any case before, correct?

9    A.    Not to my recollection.  Before you continue, may I put

10    this exhibit down?  My arm is getting tired.

11    Q.    Of course.

12          As your role as an expert in this case, you went through

13    the claims in the patent, correct?

14    A.    That is correct.

15    Q.    Did you go through the specifications in the patent?

16    A.    I did.

17    Q.    Did you go through the prosecution history?

18    A.    Yes, I did.

19    Q.    And all of those things that I just mentioned, those are

20    the intrinsic evidence of the patent.  Is that fair?

21    A.    That's fair.

22    Q.    And extrinsic evidence is things like additional

23    scientific evidence, right?

24    A.    That is correct.

25    Q.    And it would include dictionaries, right?

VOL. II -  323

1      A.   That is correct.

2      Q.   Correct me if I'm wrong, but when you're analyzing a

3    patent, it's most important to start with the intrinsic

4    evidence, right?

5      A.   That is correct.

6      Q.   As you're going through the claim and doing your

7    analysis, it would be proper to first look at the

8    specifications, correct?

9      A.   That is correct.

10     Q.   And you should have multiple binders near you, but I

11   would like you to look at volume one of two of plaintiff's

12   exhibits.

13     A.   Give me just one second to find it.  Do you have the

14   exhibit number?

15     Q.   I do.  It would be 19.

16     A.   Perfect.  Thank you.

17     Q.   We agree this is the expert --

18     A.   Can I move this screen away?  Will you be using this at

19   all?

20     Q.   I won't be using it right now.  I might ask defendants

21   later to put some back up.  But if you need more room --

22     A.   The binders are huge.

23     Q.   Trust me.  I understand.  I helped put them together.

24     A.   I'm sorry.  I'm back with you now.

25     Q.   We're on Exhibit 19.

VOL. II - 324

1    A.    I'm there.

2    Q.    Is this your expert report that you prepared in this

3  case?

4    A.    Give me just one moment, please.  Yes, indeed it is.

5    Q.    All right.  And your main argument, as recited in this

6  report, is that the term outermost means farther and,

7  therefore, to be within the scope of the patent, the foam

8  insulating layer must be the layer furthest from the outermost

9  surface or the thermoplastic membrane, right?

10   A.    I'm sorry.  Could you say that one more time?

11   Q.    I'm asking what your main argument is in this case.  And

12 you have an initial conclusion that the term outermost is

13 undefined, correct?

14   A.    That is correct.

15   Q.    And you assign the term farthest as the definition of

16 outermost, right?

17   A.    I assign the meaning farthest out as being the

18 definition of outermost.

19   Q.    And because you make that conclusion to be within the

20 scope of the patent, the Cold Chain patent, your argument is

21 that the foam insulating layer must be the layer furthest from

22 the first outermost layer, right?

23   A.    I initially -- if you don't mind, I initially made the

24 conclusion that the second outermost layer must be opposite the

25 first outermost layer because that's what the plain language

VOL. II - 325

1  says.  And because it says that the second outermost layer is

2  the farthest -- I'm sorry, not farthest.  But because it is the

3  outermost layer, I make the conclusion it must be the farthest

4  out layer with reference to -- I'm sorry, the second outermost

5  surface is the farthest out from the first outermost surface,

6  not layer.

7    Q.   Can I take you to plaintiff's -- actually, can we pull

8  up D107 again?  Is that all right?  If it's okay, I'm going to

9  keep 107 up so we can continually reference it while we also

10  look at the exhibits in the binder.

11   A.   Fair.

12   Q.   You were just going over what's on the screen in front

13  of you with Mr. Burton, right?

14   A.   That is correct.

15   Q.   And this is your revision of an illustration that was

16  contained in the claim chart attached to the complaint, right?

17   A.   Yes, that is correct.  And just to be clear, when you

18  say revisions, we're just talking about the words on the screen

19  and not anything else.  Is that correct?

20   Q.   I believe that was your testimony earlier, correct?

21   A.   That was my testimony and that is actually what

22  happened, was nothing else changed in this drawing except for

23  the words.

24   Q.   And you designate the green layer as the first outermost

25  layer, right?

VOL. II - 326

1    A.    That is correct.

2    Q.    And you're saying that the foam insulating layer must be

3    the furthest from that, the farthest out?

4      (Phone alarm sound.)

5         THE COURT:  You may answer.

6         THE WITNESS:  I'm sorry.  I forgot your question

7    already.  I just saw a shiny object.

8         THE COURT:  I'll have Ms. Evans read it back.

9      (Thereupon, the last question was read by the court

10   reporter.)

11        THE WITNESS:  That is correct.

12   BY MR. MILLER:

13   Q.    And your argument is because that white layer is there

14   that that white layer is the farthest out, right?

15   A.    That is correct.

16   Q.    And your argument further is that because that is not

17   the foam insulating layer, it's inconsistent with the claims of

18   the patent, right?

19   A.    That is correct.

20   Q.    So if that white layer wasn't there, there wouldn't be

21   an issue based on your analysis, correct?

22   A.    Just to clarify your question, are you asking me to

23   assume that there is no white layer for the purposes of your

24   question?

25   Q.    If we took that white layer off, the foam insulating

VOL. II - 327

1  layer would be the farthest out, correct?

2  A.   That is correct.

3  Q.   So the white layer is the problem, right?

4  A.   I don't know if I understand what problem you're

5  referring to.

6  Q.   I understand.  It wasn't a very good question.

7       But let me take you to Plaintiff's Exhibit 1.  And if

8  it's okay with everyone, I'd like to keep D107 on the screen.

9  That way we can go back and reference it later if we need to.

10  A.   Okay.

11  Q.   In your binder, I'd like to take you to P1.

12  A.   Do I need to stay on P19 also?

13  Q.   You don't.

14  A.   Thank you.  I am at P1.

15  Q.   This is the Cold Chain patent, right?

16  A.   That is correct.

17  Q.   And can we agree that all the language up until where

18  the claims are, that's the specifications of the patent?  Is

19  that fair?

20  A.   That is fair.

21  Q.   And you read all of those, correct?

22  A.   That is correct.

23  Q.   I'd like to take you to would be column 5 of Exhibit P1.

24  And that would have a Bates stamp of Ridge 6.

25  A.   I'm there.

VOL. II - 328

1    Q.    I want to take you down to line 41.  Let me know when

2    you're there.

3    A.    I am there.

4    Q.    And it says, "An optional flexible membrane 20 can also

5    be employed as illustrated in figure 1.  A flexible membrane

6    can be made of any suitable flexible material such as cloth,

7    plastic or rubber sheeting."  Did I read that right?

8    A.    You did read it correctly.

9    Q.    Doesn't that count for the white layer in the screen in

10   front of you?

11   A.    It does account for the white layer on the screen in

12   front of me.

13        MR. CLIFFORD:  Did he say does or does not?  I

14   misheard.

15        THE COURT:  According to this he says, "It does

16   account for the white layer on the screen in front of me."

17   BY MR. MILLER:

18   Q.    In that paragraph I just read, it said nothing about

19   this optional layer being a foam insulating material, right?

20   A.    That is correct.

21   Q.    And it says nothing about that optional flexible layer

22   being the second outermost layer, right?

23   A.    It does not say anything about that optional layer being

24   the second outermost layer.

25   Q.    So if the white layer is accounted for in the claim

VOL. II - 329

1 specifications and not described as the second outermost layer,

2 it is unreasonable to treat that white layer as the second

3 outermost layer, isn't it?

4 A.   Are you asking for purposes of reading the claim onto

5 the accused device, or are you asking for the purposes of

6 interpreting the claim?

7 Q.   Well, we're talking about the specifications right now,

8 and we're talking about how that would relate to the claim.  So

9 I think both.

10 A.   I don't know that I can answer the question the same way

11 for both.  So if you wouldn't mind separating out whether

12 you're asking the question about construing the claims or

13 reading the construed claims onto the accused device, then I

14 think I would be able to provide you a clearer answer.  Are you

15 asking me about construing the claims, or are we talking about

16 reading the construed claims onto the accused device?

17 Q.   Let's start with the first one.

18 A.   Construing the claims?

19 Q.   Yes.

20 A.   Sorry to interrupt.

21 Q.   I have to think back to what my original question was.

22 A.   Me too.

23      THE COURT:  I'll have Ms. Evans read it back.

24      THE COURT REPORTER:  "Question:  So if the white layer

25 is accounted for in the claim specifications and not described

VOL. II – 330

1  as the second outermost layer, it is unreasonable to treat that

2  white layer as the second outermost layer, isn't it?"

3       THE WITNESS:  I don't understand the question.

4  BY MR. MILLER:

5  Q.   We're going to move on for now.

6  A.   If I may explain why I don't understand the question.

7  The question was asked about the claim specification, and the

8  claim is separate from the specification and you've catenated

9  those two words together.  So I don't understand the question.

10 Q.   Can you look at column 7?  And that is on the next page

11 that's Ridge 7.  Can you look at claim number 9?

12 A.   I'm at claim 9.

13 Q.   That says, "The insulated overhead door of claim 1,

14 further comprising an additional membrane that is not the

15 thermoplastic membrane."  Does that account for the white layer

16 in the diagram in front of you?

17 A.   I don't know that it does or does not.  And again, the

18 question is, are you asking about claim construction or are you

19 asking about reading that claim onto an accused device?

20 Q.   Unfortunately, sir, I don't have to answer your

21 questions.  And you can have follow-up questions asked to you.

22 I've asked my question and you've given an answer that I'm

23 satisfied with for now.

24 A.   Okay.

25 Q.   Thank you.  If we go back another page to column 6, and

VOL. II - 331

1    you've already gone over claim 1, right?

2         THE COURT:  What page are we on, Mr. Miller?

3         MR. MILLER:  We're on Plaintiff's Exhibit 1 and we're

4    at Bates stamp 6, Ridge 6, Your Honor.

5         THE COURT:  I'm with you.  Thank you.

6    BY MR. MILLER:

7    Q.    That first paragraph, this requires there be a first

8    outermost surface, right?

9    A.    Yes, it does.

10   Q.    And it requires a second most outer surface, right?

11   A.    Yes, it does.

12   Q.    And they must be opposite each other, right?

13   A.    That is correct.

14   Q.    And the first and secondmost outer surfaces have to be

15   larger than all of the side surfaces, right?

16   A.    That is correct.

17   Q.    And then if we go to the next paragraph that begins with

18   thermoplastic membrane, that describes the thermoplastic

19   membrane that we have agreed is the green layer in the diagram

20   in front of you, right?

21   A.    That is correct.

22   Q.    And it says in that paragraph that the thermoplastic

23   membrane is the first outermost surface, right?

24   A.    It says that the thermoplastic membrane forms the first

25   outermost surface.  It doesn't say that it is the first

VOL. II -  332

1    outermost surface.  The surface is just one of the features of

2    that layer.  It has a thickness.  It has a density.  It has all

3    of these other things, but it also has a surface.  So the

4    surface is just one of the features, and it happens to -- at

5    least the way we've looked at it in the drawing of P10 -- D1 --

6    it doesn't have an exhibit number.  But in the drawing in front

7    of me, it's the bottom of the green surface.

8         Q.   And then the next paragraph describes a sheet of foam

9    insulating material, right?

10        A.   It does indeed.

11        Q.   There is a requirement in that paragraph that that foam

12   insulating material be connected with the green thermoplastic

13   layer, right?

14        A.   Directly attached, yes.

15        Q.   And in the picture in front of you, we can agree without

16   any other labels that the foam insulating layer, as you assume

17   it to be, is attached to the green thermoplastic layer, right?

18        A.   Agreed.  It is directly attached.  The orange layer is

19   directly attached to the green layer.

20        Q.   Do you believe that the terms farthest out and outermost

21   mean exactly the same thing?

22        A.   I believe that they are synonymous.

23        Q.   What's the difference between synonymous and exactly?

24        A.   They mean the same thing.

25        Q.   Can we agree that nowhere in the patent in the

VOL. II –  333

1    specifications or the claims does it use the words farthest or

2    farthest out?

3        A.    We can agree.

4        Q.    Would you agree with me that when we're determining when

5    something is farthest from something, that we have to have a

6    point of reference to say what it's farthest from?

7        A.    I would agree.

8        Q.    And you would agree with me that there's nothing in the

9    patent that says how we decide whether something is farthest

10   from anything, right?

11       A.    I'm sorry.  Can you repeat the question one more time?

12       Q.    I'll rephrase because it was confusing.

13       A.    Yes, please.

14       Q.    Is there anything in the patent that tells us the

15   reference point that we need to determine whether something is

16   farthest out?  For example, a first outermost layer.

17       A.    For the first -- do you mean first outermost surface?

18       Q.    Yes.

19       A.    For the first outermost surface, no.  But there is a

20   point of reference for the second outermost surface, and it's

21   in the language of the claims where it says a second outermost

22   surface opposite the first outermost surface.  So at least with

23   reference to the second outermost surface, there is a point of

24   reference.  And that point of reference is the first outermost

25   surface.

VOL. II - 334

1    Q.    And that's for determining opposite, right?

2    A.    That is correct.  And just to clarify, it's for

3    determining that the second outermost surface is opposite the

4    first outermost surface.

5    Q.    Is there anything in this patent that says that the

6    second outermost surface must be the farthest from the first

7    outermost surface?

8    A.    Other than the word outermost?

9    Q.    Correct.

10    A.    No.

11    Q.    Can we agree that there's nothing in this patent that

12    requires the invention to only be two layers?

13    A.    When you say "invention," what are you referring to?

14    Q.    The invention described by the patent.

15    A.    I don't know that I understand your question.

16    Q.    Can we agree that the patent is describing an invention

17    that is a single panel roll-up door?

18    A.    May I explain my confusion with the question?

19    Q.    I suppose.

20    A.    The invention is defined by the claims, and all of the

21    claims that are in this patent - there are 19 of them - are of

22    different scope.  So when you're asking does the invention

23    cover ABC or XYZ, that particular question would have a

24    different answer depending on which claim you review.

25    Q.    Using all of the claims in the patent, is there anything

VOL. II -  335

1   in any of those claims that restrict the overhead door to only

2   having two layers?

3    A.   Yes, there is.

4    Q.   Okay.  Can you point me to it?

5    A.   Claim number 16.  It is an independent claim, and here

6   is where I agree once again with Mr. Sharpe.  Using the

7   language consisting of is closed language.  And therefore, in

8   claim 16 when it recites certain elements, we cannot add

9   anything more to claim 16.

10   Q.   So in the other claims, it was saying comprising; is

11  that right?

12   A.   That is correct.

13   Q.   But in claim 16, it particularly uses that term of art?

14   A.   That is correct.

15   Q.   So in any of the other claims besides 16, is there any

16  restriction on the door being only two layers?

17   A.   There is no restriction on the door being only two

18  layers.

19   Q.   Thank you.

20         THE COURT:  Mr. Han?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  What is your definition of comprising as

23  used in the context of patents?

24         THE WITNESS:  Comprising means that additional

25  elements can be added.  So the way I would say -- if I may use

VOL. II - 336

1   a simple enough example is if I say I have a car that comprises

2   doors and wheels, it means that I can also add a steering wheel

3   and it would still comprise the doors and the wheels.  I could

4   add chairs and seats and it would still comprise the door and

5   wheels.  I could add a seat belt and it could still comprise

6   the door and the wheels.

7       But if I use a car consisting of doors and wheels, then

8   the moment I add a steering wheel, the claim would no longer

9   read on that car.  And the reason for that is because it's

10  closed universe meaning that everything that must be in that

11  claim consisting of has to be recited as elements.

12          THE COURT:  I see.  Thank you.

13          THE WITNESS:  You're very welcome.

14          MR. MILLER:  Thank you, Your Honor.

15  BY MR. MILLER:

16  Q.  Mr. Han, would you agree that this door that's been

17  marked as Plaintiff's Exhibit 70 that I believe you were

18  looking at earlier, would you agree it has multiple surfaces?

19  A.  First of all, I don't know that I've ever looked at that

20  door.  The only exhibit I held onto and looked at is this.

21  I've seen that door from the galley back there, but the

22  distance from which I've seen that door is no closer than where

23  I'm sitting to that door right now.

24          MR. MILLER:  As long as His Honor allows it, I'm going

25  to approach and show him the exhibit.

VOL. II –  337

1          THE COURT:  You may.

2     BY MR. MILLER:

3     Q.    You've never seen this before you started attending this

4     hearing, correct?

5     A.    Yesterday and today, yes.

6     Q.    Would you agree with me looking at this that this has

7     multiple surfaces?  We have a flat surface here.  We have

8     little side surfaces, right?

9     A.    That is correct.

10     Q.    And we have this side that has the grooves, right?

11     A.    That is correct.

12     Q.    That's a surface, right?

13     A.    This is a surface inside the groove, yes.

14     Q.    And then there's these little panels in between the

15     grooves, right?

16     A.    When you are talking about the panels, are you talking

17     about the hard plastic on the outside, these panels?

18     Q.    I don't want to limit you just to the outside.  But

19     there is a surface on the thicker portions, right?

20     A.    That is correct.

21     Q.    Can we agree that all of those are surfaces facing the

22     outside?

23     A.    What do you mean by surfaces facing the outside?

24     Q.    We can touch them, right?

25     A.    We can touch all the surfaces.

VOL. II -  338

1    Q.    They're not interior to anything, right?

2    A.    By definition of surface, it cannot be interior to

3    anything.  When you say outer -- everything is a surface, but

4    to add the word outer, I don't know what that adds to surface.

5    Q.    You'd agree with me, having -- you may sit down or you

6    can stand up, whatever you want to do.

7    A.    Can I actually hold that thing?  I'm curious.

8    Q.    You'd be the only one that hasn't held it.

9          I think I have questions that will relate to me needing

10   to hold that door again.

11   A.    I'm sorry.

12   Q.    That's all right.

13   A.    I'm just trying to satisfy my curiosity.

14   Q.    Using the illustration -- please sit down -- that you

15   revised that I think is still in front of you; is that right?

16   A.    We're referring to --

17   Q.    107.

18   A.    107.

19   Q.    And 107, that is an illustration of essentially what

20   this door would look like if it was laying down, right?

21         In other words, sir, this flat surface, that would be

22   the green layer, wouldn't it?

23   A.    Hold on a second.

24     (Witness examines exhibit.)

25         I can't tell if on that door it's a single layer or

VOL. II - 339

1  multiple layers.  If we presume it's a single layer, then, yes,

2  it would represent the green.

3  Q.  You can see it now without doing any testing or anything

4  further.  It would be consistent with what your idea is from

5  the illustration, right?

6  A.  Yes.  If we treat that as a single layer, then that

7  single layer would be the green layer, correct.

8  Q.  If we're thinking of this in application as being a door

9  and the door was closed, it would be like this, right?

10  A.  That is correct.

11  Q.  And the idea is that you roll it up and it curves with

12  the tracks, right?

13  A.  Absolutely.

14  Q.  If we're looking at this door, the flat thermoplastic

15  layer, the green layer, would you agree with me that on a

16  truck, closed, it would be closest to the outside world?

17  A.  That is correct.  It would be the

18  outside-to-the-world-facing surface.

19  Q.  Or it could be the first outermost surface?

20  A.  It would be the first outermost surface.

21  Q.  And if we moved in from the first outermost surface

22  going towards the inside of the truck, the foam layer that we

23  see here -- you do see that, right?

24  A.  I do see the foam layer.

25  Q.  That could be considered the second outermost surface,

VOL. II - 340

1  right?

2  A.  It would be the second outermost layer, but it wouldn't

3  be a surface because by definition of surface is something that

4  is on the outside.

5  Q.  So it would be the second outermost surface compared to

6  the outside world, right?

7  A.  It would be the second outermost layer.  It would not be

8  the second outermost surface.

9  Q.  Just one second, Mr. Han.

10  MR. MILLER:  No more questions at this time, Your

11  Honor.

12  THE COURT:  Thank you, Mr. Miller.

13  Mr. Burton, redirect?

14  MR. BURTON:  Yes.  Thank you, Your Honor.

15  - - -

16  REDIRECT EXAMINATION

17  BY MR. BURTON:

18  Q.  Mr. Han, Mr. Miller asked you if you were someone of

19  ordinary skill in the art of single panel overhead doors.  Do

20  you remember that?

21  A.  I do remember that.

22  Q.  Do you consider that the relevant -- that to be the

23  relevant art to be looking at in this case?

24  A.  I do not believe that to be the relevant inquiry.  And

25  the reason for that is because by its plain terms, it is a

VOL. II - 341

1    person having ordinary skill in the art.  It is not a person

2    having ordinary skill in the subject matter of the patent.  It

3    is not a person having ordinary skill in the classification of

4    the patent.  It is not a person having ordinary skill in the

5    invention.  The term is ordinary skill in the art.

6         As we discussed before, the art here is from Art

7    Unit 3634 of the USPTO which is moveable closures.  A person

8    having ordinary skill in the art would be someone that has

9    experience with moveable closures.  I believe that my

10   experience for several decades with garage doors, plus my

11   engineering degree and my knowledge of physics - I teach

12   physics - qualifies me to be somebody of ordinary skill in the

13   art for moveable closures such as garage doors, or in this

14   particular case, the roll-up door that we see in the Cold Chain

15   patent.

16   Q.   Ridge's counsel asked you some questions about the

17   specification of the patent, and you used the phrase -- I'm not

18   sure I got it down -- of conflating or something like that.

19   Can you explain what you mean by that?

20   A.   One of the questions that was asked of me -- may I refer

21   to the patent?

22   Q.   Yes.  Do you still have that binder in front of you?

23   A.   I do.  I have it opened to the patent.  One of the

24   questions that he asked was about the claims specification, it

25   doesn't have the word farthest out or something similar to

VOL. II - 342

1   that.  It doesn't have the definition.  I forget exactly what

2   the question was.  But when he uses the phrase claims

3   specification, to me as a patent attorney, it's a little

4   jarring because the claims mean one thing; the specifications

5   mean another thing.  And claim specification in my field

6   doesn't really have a fixed understanding.  It's either the

7   claims or it's the specification.  It's not a claim

8   specification.

9   Q.   You were asked about whether the term farthest out

10  appears in the specification, right?

11  A.   That is correct.

12  Q.   Do the terms -- either of the terms first outermost

13  surface or second outermost surface appear in the

14  specification?

15  A.   The phrase outermost surface does not appear at all in

16  the specification.

17       MR. BURTON:  Thank you.  That's all I had.

18       THE COURT:  Any recross, Mr. Miller?

19       MR. MILLER:  Just one question.

20                    - - -

21              RECROSS-EXAMINATION

22  BY MR. MILLER:

23  Q.   Mr. Han, you were talking with your counsel and you were

24  making some differentiation between specification and claims,

25  right?

VOL. II -  343

1    A.    That is correct.

2    Q.    What's all included in the specifications?

3    A.    The drawings and everything that leads up to where it

4    says what is claimed is.

5    Q.    Is it fair to say that the specifications are providing

6    some background and some description of what the claims

7    represent?

8    A.    I believe -- I believe that in order to properly

9    construe the claims, we have to do them in light of the

10   specification.

11   Q.    Thank you.

12        MR. MILLER:  No further questions, Your Honor.

13        THE COURT:  All right.  Anything further, Mr. Burton?

14        MR. BURTON:  No, Your Honor.

15        THE COURT:  Mr. Han, thank you very much, sir.  You

16   may be excused but you may remain in court if you wish.

17        THE WITNESS:  Thank you, Your Honor.  I appreciate it.

18        MR. CLIFFORD:  Your Honor, you had asked a question of

19   whether defense counsel intended to call Mr. McDonald, recall

20   him again.  And based on the evidence we heard, we are not

21   going to call him.  We would let the Court know that we would

22   allow him to come into the courtroom.  We've made the

23   determination.

24        THE COURT:  Mr. Burton?

25        MR. BURTON:  We are not planning on calling

VOL. II -  344

1    Mr. McDonald either.

2         THE COURT:  If you wish him to come back into the

3    courtroom, Mr. Tackett or Ms. Wood, you may do so.

4         Mr. Tackett, do you have additional witnesses?

5         MR. TACKETT:  We have one further witness, Your Honor.

6    And I wanted to ask if it would be possible to take a very

7    brief recess.

8         THE COURT:  That's why I was going to ask the

9    question.  It's about 3:15.  We'll take our afternoon recess

10   now until 3:30 with the intention to work until approximately

11   five o'clock.

12      (Recess taken from 3:10 p.m. to 3:31 p.m.)

13        THE COURT:  Mr. Tackett, your next witness.

14        MR. TACKETT:  Plaintiff Ridge Corporation calls Gary

15   Grandominico.

16      (Witness sworn.)

17        THE COURT:  Mr. Grandominico, please bend the

18   microphone toward you and speaking clearly into it.  Thank you.

19        THE WITNESS:  Your Honor, I just want to say that I

20   have a little bit of a congestion in my ears, so I might have

21   to have things repeated.

22        THE COURT:  That's fine.  Please let us know when you

23   need anything.

24        Please proceed, Mr. Tackett.

25        MR. TACKETT:  Yes, sir.  Thank you, Your Honor.

VOL. II – 345

1                           – – –

2                     GARY GRANDOMINICO

3    Called as a witness on behalf of the Plaintiff, being first

4    duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. TACKETT:

7    Q.   Sir, can you please state your full name for the record?

8    A.   Gary Allen Grandominico.

9    Q.   What's your title with Ridge, sir?

10   A.   CEO.

11   Q.   What is your educational background?

12   A.   I have a degree in marketing and a degree in accounting

13   from the University of Findlay.

14        THE COURT:  From the university of what?

15        THE WITNESS:  Findlay, Ohio.

16   BY MR. TACKETT:

17   Q.   What is your work experience before founding Ridge, sir?

18   A.   Initially, I worked for a manufacturer of structural

19   steel components such as drivelines and universal joints out of

20   Defiance, Ohio, and traveled the United States.  Then I worked

21   for a company by the name of Truck-Lite Corporation in

22   Jamestown, New York, that made lighting.

23   Q.   When was that?

24   A.   Out of college in 1976, I took a job for Zeller

25   Corporation.  And then in 1979, I took a job -- I had to think

VOL. II - 346

1  about when the hurricane or the storm was in northern Ohio.  I

2  took a job with Truck-Lite out of Jamestown, New York.  After

3  that, I was employed by the Burris Corporation in about 1982 as

4  sales manager, and again traveled the United States working

5  with trailer manufacturers.

6  Q.   Okay.  What industry did the Burris Corporation sell to?

7  A.   They sold structural oak floor into the truck/trailer

8  manufacturing association or industry.

9  Q.   How long did you work with that company, sir?

10  A.   Until 1984 when I started my own business Grandominico

11  and Associates.

12  Q.   And what did Grandominico and Associates do, sir?

13  A.   Grandominico and Associates sold to truck/trailer OEMs

14  structural flooring, some of it composite, a FRP wall which was

15  fiberglass clad plywood structural panel, structural steel

16  components to build a trailer out of, side posts and roof bows,

17  that sort of thing.

18      Also I worked for a company that made trailer doors.

19  These were metal clad swing doors over plywood.

20  Q.   And what was the name of that company and when did you

21  work for it?

22  A.   That made metal clad doors?

23  Q.   Yes, sir.

24  A.   That company's name was New Court out of Texas.  They

25  were the largest door manufacturer at that time.

VOL. II -  347

1    Q.    When did you work for them?

2    A.    All of that happened after 1984, yes.  And then

3    continuing from then until I started Ridge Corporation.

4    Q.    What year did you form Ridge Corporation, sir?

5    A.    In December, late December of 2004.

6    Q.    How would you describe the products that Ridge

7    Corporation provides?

8    A.    Ridge Corporation manufacturers a polymer reinforced

9    single sheet composite.  It can be made up of many layers, and

10   also a structural -- or a lot of ways to describe it,

11   stressed-skin panel, structural panel, a load-bearing panel.

12   Q.    What industries does Ridge focus its products towards?

13   A.    Initially, our products were focused towards the

14   truck/trailer industry.  From there we have branched out into

15   industry such as aircraft container industry, RVs, boats, and

16   homeless housing, a variety of industries, truck/trailer, truck

17   body, so on.

18   Q.    And how long total have you, sir, worked in the area of

19   selling products in the truck and trailer industry?

20   A.    Since 1979 with Truck-Lite Corporation.

21   Q.    So the entirety of time from 1979 to 2023 you've worked

22   selling products to the truck and trailer industry?

23   A.    That's correct.

24   Q.    Okay.  Sir, you testified that you are CEO of Ridge.

25   What are your duties in that role?

VOL. II - 348

1    A.    In that role, the CEO is kind of like the buck stops

2   here when it comes to financial.  That's one of the major

3   things.  You have to run a going concern profitable business.

4   And the rest of it I do a lot of organization planning,

5   personnel placement and chief cook and bottle washer.  You

6   catch it all.

7    Q.    In terms of the business's operations, do you have any

8   particular area of the operations that you focus your attention

9   in?

10    A.    Yes.  You know, back to my education, I focus in the

11   area of sales and marketing, and also I have a special love for

12   new product development.

13    Q.    Can you tell me about Ridge's history and experience in

14   the roll-up door space involving commercial vehicles?

15    A.    Yeah.  I can talk a lot to that because over the years

16   it's been a special interest of mine.  When I worked for

17   Truck-Lite Corporation, the largest fleet in the United States,

18   Roadway Express up in Akron, Ohio, was my biggest customer and

19   my biggest responsibility.  I had to interface between them and

20   trailer manufacturers to make sure they got the product they

21   wanted and that it performed correctly.  The gentleman that was

22   the head of the fleet equipment specified the equipment and

23   bought the equipment.  I guess he took pity on me because I was

24   young and kind of put me under his wing.  We worked together on

25   a lot of things.

VOL. II - 349

1    And one day he took me out of his office and out to his

2 yard and said, You see this roll-up door in the back of the

3 trailer?

4    And I said yes.

5    And he said, You see the plastic hanging out of that

6 trailer?  We have to put plastic on every load because roll-up

7 doors are terrible and they leak.  They don't last.  Can you

8 come up with a replacement for these?

9    So that conversation kind of wore on me over the years.

10 When I had an opportunity to find an avenue to get down that

11 road, I took it.  I have, as you know - I gave you the file -

12 plenty of paperwork from my basement of drawings I had made and

13 products I had gathered to make a single panel door but in this

14 case it would be a cloth door.  I couldn't get around the

15 security nature of a cloth door.  And I kept, you know,

16 looking, looking for a better mousetrap in that area.

17 Q. Stop there if you could, sir.  Around what years were

18 you doing that research?

19 A. Around 1989, 1990.

20 Q. Okay.  You can continue in terms of any further

21 investigation and research you did into commercial roll-up

22 doors moving forward from there, sir.

23 A. I've had -- when we got to the point at Ridge

24 Corporation that we started to manufacture first a honeycomb

25 panel, it was a very, very exciting time because we had two

1   skins separated by a core which brought us into the structural

2   panel world.

3   Q.   What year was that, sir?

4   A.   Sometime -- I'm not certain.  I would say around early

5   2000s.

6   Q.   Okay.

7   A.   We became very practiced at laminating honeycomb because

8   the reason people want honeycomb is because they want

9   lightweight.  So a lightweight honeycomb core and lightweight

10  skins was a very delicate material to make.  And the customer

11  we were building this for made structural aircraft containers

12  to put baggage in and what have you, different type of aircraft

13  container applications for different models of planes.

14       And Bret Moss and I -- we burnt a lot of time and money

15  learning to make a good composite wall for an aircraft

16  container.

17  Q.   Okay, sir.  And what did you do next in terms of any

18  investigation or research you did on a commercial roll-up door?

19  A.   Well, getting into a structural panel was key.  A

20  roll-up door is a sandwich panel, if you will.  It's made of

21  plywood.  And as the industry continued to move forward, a

22  different composite which I helped to work on at a company

23  called Wabash, which was a steel and solid plastic core

24  composite, came on the market and they were looking for more

25  ways to spread that type of product around.  One of the things

VOL. II - 351

1    they did was take that to the roll-up door industry.

2           For Ridge, we continued to progress through cores and

3    looking for the best application to make a structural panel,

4    and that took us through to PET cores and all types of cores

5    and laminating different skins onto those cores.  And finally

6    we settled on polypropylene and polypropylene glass core which

7    allowed us to fuse a panel together without any glue.  This was

8    a huge advancement for the industry.

9    Q.   What year was -- what year was it that you achieved that

10   advancement?

11   A.   Around 2016.  It made a big difference because now we

12   could give a warranty on our material that was lifetime.  It

13   was not ever going to delaminate which for a structural panel

14   is an engineer's dream.

15          So we started looking at different applications.  And we

16   had some customers around that time that were interested in

17   using our panel which we designed to replace plywood as a

18   replacement for plywood on a roll-up door.  So those types of

19   conversations were going on.

20          When KNL came to our office and announced that they were

21   interested in making a roll-up door, I was very excited.

22   Q.   What can you tell me about that?  When was that?

23   A.   KNL was -- let's see -- doing business with us around

24   2017.

25   Q.   What was the nature of that business at that time?

VOL. II - 352

1    A.   Well, that was -- we had a very high-impact ballistic

2    panel.  And they wanted to protect the interior of trailers

3    from forklift trucks, and our material would do that.  So they

4    were using that in conjunction with another company.  And our

5    salesman was involved in both: Chris Fannin.

6         And Chris Fannin told me that he was very excited about

7    Kirk National Lease because they were very knowledgeable people

8    and they did a good job by their customers.  He informed me

9    that they wanted to come in and talk about potentially a door

10   application.

11   Q.   Okay.  So what happened -- what happened next in terms

12   of the meeting that you had with Kirk National Lease?

13   A.   Well, Jeff came in and Jeff and I got a chance to talk

14   for a while.  We hit it off, I would say.  And by that, I mean,

15   we had a common thing we wanted to develop.  And I had a chance

16   to spend time with Jeff when he visited, and we had quite a

17   discussion about what Ridge could do for him.  And I had an

18   understanding, of course, from being in the truck/trailer

19   industry, that from Jeff's landscape of leasing and repairing

20   vehicles, he had a great understanding of what the need was for

21   a better roll-up door.

22        I knew what I was capable of material-wise because we

23   had worked in so many applications.  We are quickly developing

24   more and more skills and taking this new raw material that we

25   manufacture, which is glass and polypropylene, into more and

VOL. II - 353

1    more applications.

2         When Jeff came in and visited, one of the things that he

3    made clear was that he was looking to do a roll-up door

4    application.  So immediately I knew that he was going to need

5    to take a radius.  And, you know, this is not something that's

6    difficult for Ridge as we've done a lot of work in putting a

7    radius via cuts on our material for side skirts on trailers to

8    come up with the very best aerodynamic design.  We had put cuts

9    into our structural panels to show that we could come to

10   different shapes.  We -- you know, the material is best when

11   it's not cut, but that is the quickest solution to get to a

12   radius.

13     Q.    Okay.  And in terms of the meeting, what was the work

14   that KNL was asking for Ridge to do?

15     A.    KNL -- you know, I believe when Jeff walked through the

16   plant, he began to understand that we had, first, a very

17   sophisticated manufacturing technique.  We could make a single

18   sheet composite which he would need on a structural panel, and

19   we could make that out of different types of glass with

20   different orientation to give him the characteristics of bend

21   that he was going to need to make a radius on a roll-up door.

22         We could also adjust the density of the foam so that it

23   would simulate the door he's trying to replace, which is a

24   plywood door, because we already made plywood floors

25   replacement for Airstream and others.  So we had that

VOL. II -  354

1   technology.  And Bret's team and project engineering knew how

2   to lay up the glass fibers and the foam core to get to the

3   product characteristics that Jeff was going to need.

4        Jeff came simply with a request of, Can you help us come

5   to a product that would work as a roll-up door?  And our answer

6   to him was, Yes, we have that capability.

7   Q.   When Jeff Phlipot, who you're referencing, came to Ridge

8   Corporation, did he have an operative roll-up door?

9   A.   No, he did not.  He had a concept, and he needed help to

10  put that concept on the market.  So one of his concerns was how

11  to get the product to bend.  And the quick answer which I

12  mentioned to Jeff was, well, we can simply cut it, but let's

13  look at an overall approach because I don't like to cut our

14  material.  It does weaken it.

15       So one of the things I quickly instigated with Bret

16  was --

17            THE WITNESS:  Could I possibly get some water, Your

18  Honor?

19            THE COURT:  Yes, you may.

20            THE WITNESS:  Thank you.

21       One of the things I mentioned to Bret was I want to

22  start immediately working on a two-skin approach because if we

23  can keep the inner skin of our door material, our structural

24  panel -- the inner skin intact without cutting it, I felt this

25  would be a definite advantage.

VOL. II - 355

1    Now, this took designing.  And having made -- what I

2  wanted to do was a copper dye because it would, in our

3  laminating capability, pass the heat through to the layers we

4  wanted to form.  And we're quite busy at the company, and that

5  took some time to get the product ordered and get it made.  And

6  the company that does our metal work in Columbus was so busy

7  they really couldn't get to it.  So this was delaying our

8  activity.  And I suggested to Bret that we just go with simply

9  cutting the material to get started, and we would learn

10  something from that while we developed a different method of

11  making a door.

12    You see, when you corrugate the material with both

13  skins, it will take a bend, it will take a radius.  So that is

14  another method.

15  Q.    What engineering work did Ridge have to do to figure out

16  the optimal placement of grooves in the panel for the roll-up

17  door design work with KNL?

18  A.    That's work that Bret and his team, you know, had done

19  before with our side skirt.  We wanted to take a radius on the

20  skirt, but you don't want the radius to look bad.  You want it

21  to look like a nice continuous radius.  So Bret and his team

22  were able to determine what those dimensions were.

23    I asked him to do things, but they are actually trained

24  to figure these more difficult issues out.  So it would be Bret

25  and his team collaborating with Ray.

VOL. II - 356

1    Q.    Okay.  And did KNL have an engineering -- did KNL have

2    the engineering capabilities to do that work?

3    A.    No.  I mean --

4              MR. DILLARD:  Objection, Your Honor.  Speculation.

5              THE COURT:  Sustained without more of a foundation,

6    Mr. Tackett.

7              MR. TACKETT:  Thank you, Your Honor.  Understood.

8    BY MR. TACKETT:

9    Q.    Mr. Grandominico, you testified that you worked with

10   Kirk National Lease dating back to 2017, right?

11   A.    Yes, correct.

12   Q.    And how long did you work with Kirk National Lease for?

13   A.    After 2017?

14   Q.    From 2017 until the end or current status of your

15   working relationship with them.

16   A.    All the way into late spring, early summer of 2023.

17   Q.    And during those six years, did you have occasion to

18   observe the capabilities of Kirk National Lease?

19   A.    We did -- we visited Jeff at his place.  And I have a

20   good understanding of what a leasing company is, and repair

21   company and parts company.  So I knew what capabilities there

22   were.  And I want to say that Ridge is extremely unusual in the

23   market.  Most suppliers to the truck/trailer industry have a

24   few engineers on staff.  We have 24 engineers on staff, many of

25   them mechanical engineers to solve these types of issues.  And

VOL. II -  357

1    that's completely unheard of in our industry in truck/trailer.

2    So we have become the preferred stop, I think, if there is a

3    composite structure that needs to be developed.  And we have

4    many examples of solving problems for our customers with our

5    composites.

6      Q.   Sir, did -- from your observations over those six years,

7    did you observe Kirk National Lease to have the engineering

8    capability necessary to do the design work that Ridge did to

9    engineer the single panel roll-up door for KNL to be operative?

10     A.   This was a good marriage because Jeff had a clear idea

11   of what the problems were with the roll-up door.  And we had a

12   panel, a structural panel, to solve the problem.  So this open

13   relationship began where we would exchange ideas freely and to

14   work for a common solution.  And Jeff and I had, I thought, a

15   very clear agreement that this would be a development together

16   with each other, each company, I should say.

17     Q.   And what -- in your mind, what was Ridge bringing to the

18   table in that joint development process?

19     A.   It was clearly the manufacturing and engineering

20   expertise.  Jeff did not have, that I knew of, engineers on

21   staff.  He had an idea.  He wanted to see it become successful.

22   He knew that we not only engineered products for truck/trailer,

23   we commercialized them, we did the testing, we did the

24   marketing, and we brought those customers together with these

25   products for the betterment of, you know, truck/trailer

VOL. II - 358

1    manufacturing.

2      Q.   And at the conclusion of Ridge's design and engineering

3    work in collaboration with KNL, did KNL now have a roll-up door

4    that worked?

5      A.   That's what Jeff told me.  He told me it worked and it

6    worked well.  And he was very excited about getting to the next

7    step.  And he asked me to build a business plan so we could get

8    down the road to commercializing this product to the industry.

9    And we've had a lot of experience at Ridge of doing that.  And

10   that means a lot of steps.  You don't just have a quick idea

11   and, you know, put one piece out to make sure that it does

12   roughly what you want and you go to market.  That is not the

13   way you sell products.  We've seen a lot of products in the

14   industry fail over the years with that kind of approach.

15        I can cite a lot of examples, but composite-wise, you

16   know, what we have seen, for instance, is a thermoset glass

17   reinforced composite used for roof material that a company by

18   the name of Kemlite rushed to market.  They put that on

19   truck/trailers.  And thermosets age because of a cross leaking

20   of chemicals.  That makes the product brittle.  And the UV

21   exposure continues to brittle-ize it.  Upon impact, it breaks.

22   I'm sure Jeff has reroofed many a Kemlite trailer because it

23   was quite common for a while.

24        That industry grew quickly, and there were a lot of

25   trailers, maybe as much as 30 percent of the market being built

VOL. II -  359

1   with Kemlite roofs.  And then suddenly those trailers fell

2   apart on the interstate because once they were damaged they

3   continued to rip apart.  You can't allow a new product to be

4   put in that position because it will kill it.

5           Today we make a structural single sheet made out of many

6   layers like we made for Jeff, and that roof sheet is stronger

7   and lighter than aluminum.  We have OEMs such as General Motors

8   using our sheets because of their strength and lightweight and

9   ability to take impact and converting from metals like aluminum

10  and aluminum roof.

11          We have to be very careful when we launch a new product

12  into the market and go to every extent to make sure it

13  performs.

14          We were getting to the point, as Jeff understood, that

15  he wanted a business plan.  So I got with my business

16  development manager, John Maynie.  John helped to develop a

17  business plan that would reflect Jeff's company's ability to

18  take our raw material and make a door, and also that Ridge

19  could put a door on the market and then, in return, pay him a

20  royalty as we found success.

21          In this way we could work together marketing and proving

22  out the door and taking it to market.  We provided the

23  engineering expertise to develop that door, and he could help

24  with the initial testing of the door to make sure that it

25  worked.

VOL. II - 360

1    Q.   I'm going to stop you there.

2         Was Ridge Corporation ever paid for the design work that

3    it did for KNL on the single panel roll-up door?

4    A.   No.  We were working as a partner.

5    Q.   What was your understanding of that partnership?

6    A.   That we were going to continue to commercialize, first

7    of all, good product that would work.  Then would develop a

8    sales relationship.  And we -- Jeff knew that we had the

9    ability to go to a trailer OEM, a trailer manufacturer such as

10   Great Dane, such as Wabash, such as Stoughton, such as -- you

11   know, you name it, every one of them, and present a product to

12   their engineering staff which we regularly communicate with,

13   these engineers, through engineering releases, prints,

14   drawings, et cetera.  And we also -- on our side skirt, we're

15   the only company that engineers the side skirt to bolt up under

16   the trailer to fit the substructure of the trailer.  That's how

17   much we're trusted.  We're given the prints of those

18   manufacturers.

19   Q.   Can I stop you?  I don't want to interrupt you but I

20   want to focus on a few issues.

21        So can you turn to Tab 7 in the plaintiff's binder?

22   Tab 7.  There is an email on the very last page of Plaintiff's

23   7 that I would like you to look at.

24   A.   Where is the email?

25   Q.   The email is the very last page of Tab 7.  If you

VOL. II -  361

1   actually go to Tab 8 and go backward one page.  It's probably

2   the easiest way to find it.

3     A.   Okay.

4     Q.   This is a compilation exhibit.  These are attachments to

5   an email that your patent counsel sent to KNL's patent counsel.

6   The bottom left-hand corner of this page containing two emails,

7   it says Ridge 63.  Are you there?

8     A.   I recognize them, yes.

9     Q.   Okay.  At the top of the page, there is an email from

10  Jeff Phlipot of KNL dated July 23rd, 2021, to you, Gary

11  Grandominico, subject line, roll-up door.  Do you recognize

12  that email?

13    A.   I do.

14    Q.   And this is an email that you received from Jeff

15  Phlipot?

16    A.   Yes, it is.

17    Q.   Okay.  The email says:  After many attempts, we have the

18  roll-up door working.  Actually, it works great.  Would like to

19  sit down with you to start the paperwork to lock this down.

20  Patent, comma, IP, dot dot.  Let me know a day and time that

21  works for you.

22         What was your understanding of this email from Jeff

23  Phlipot?

24    A.   This was consistent with Jeff and I's conversations over

25  the months.  We spoke a lot over the phone.  And Jeff would

VOL. II -  362

1   check in on materials we were making and what we were doing,

2   and I would check in with Jeff on his progress with the roll-up

3   door.  It was a clear direction for me that Jeff wanted to get

4   to a commercialized door.  And we had talked about the steps to

5   get there, including developing intellectual property and

6   whatever arrangements would be necessary.

7        And he had crossed the first goal, and that was

8   confirming that jointly we came up with a door that worked.

9   And that was exciting, especially coming from Jeff because he

10  knows roll-up doors and he knows what's going to work and not

11  going to work.

12  Q.   And when the email says would like to sit down with you

13  to start the paperwork to lock this down, what was your

14  understanding of what paperwork Mr. Phlipot was referring to?

15  A.   Well, in conversations with Jeff, it was clear that we

16  had to go through certain phases.  And the first phase was

17  coming up with the raw materials he needed in getting to a

18  working door.  The next phase that Ridge always does was to go

19  do our homework.  We would look at what is -- what's in the

20  door that we could protect.

21       We do our homework there and decide if there is

22  intellectual property.  Of course, we don't want our efforts to

23  go to waste because some of this product development that we've

24  done on new products such as our trailer helmet takes five to

25  seven years.  And when you get to that phase -- we also have

VOL. II -  363

1   different scuff liners that we have patented.  You want to be

2   able to enjoy all the investment in engineering and

3   manufacturing to make a good product and enjoy that for years

4   to come.  So this was the next step in working together and

5   coming up with a marketable door.

6   Q.   And did you and Jeff Phlipot ever have a meeting to work

7   on the paperwork to lock down patent IP, et cetera, that he's

8   referring to?

9          THE COURT:  I want to state right now, I was

10  struggling somewhat with Mr. Grandominico's answer to your

11  previous question about the paperwork because his response

12  didn't actually address any paperwork.

13         MR. TACKETT:  I agree.

14         THE COURT:  Then when your follow-up question is did

15  you have a meeting to work on the paperwork, I'm still asking

16  in my mind what paperwork.

17         MR. TACKETT:  Me and you are together on this.

18         THE COURT:  Someone has to make the operative

19  decision.  Mr. Grandominico, did you understand your lawyer's

20  previous question about explaining what paperwork you were --

21  was being referred to in the email of July 23rd from

22  Mr. Phlipot?

23         THE WITNESS:  Yeah.  This was Jeff to me.  And I'm

24  sorry, Your Honor.  Sometimes I wander.

25         THE COURT:  You won't be the first one ever to have

VOL. II - 364

1   sat in that seat who wandered on a question.  So I won't hold

2   that against you.  But I do want you to tell us what it meant

3   to you when he referred to start -- would like to sit down to

4   start the paperwork to lock this down.  What did that mean to

5   you?

6           THE WITNESS:  That meant to me that Jeff wanted to

7   tighten our relationship to include how we would go to market,

8   what role Ridge would play and what role Jeff's companies would

9   play and put it down on paper so we understood the next step

10  going forward.  And when he said patent IP, that meant that --

11  how do we protect this for each of us.  He didn't say his IP or

12  his patent.  That wasn't the approach.  The approach was

13  getting to a research of what was available to us IP-wise.

14          THE COURT:  I understand.

15          THE WITNESS:  Okay.  That was the paperwork.

16          THE COURT:  All right.  Please continue, Mr. Tackett.

17          MR. TACKETT:  Thank you, Your Honor.  You did a better

18  job than me.

19          THE COURT:  I'm not certain of that, but at least we

20  have a clear record.

21          MR. TACKETT:  Thank you, Your Honor.

22   BY MR. TACKETT:

23   Q.   Mr. Grandominico, did that meeting ever occur where you

24  and Jeff Phlipot did the paperwork to lock down patent IP, et

25  cetera?

VOL. II - 365

1    A.    No, it did not.

2    Q.    And why not, from your perspective?

3    A.    That's, you know, a good question.  It seemed that after

4    that Jeff became harder and harder to get in touch with.

5    Instead of picking up the phone when I'd call, it was voice

6    mail after voice mail.  There was delays in his responses.  And

7    then I got concerned.  And we have the next email here where he

8    says we value Ridge.  I thought that was already a given, and

9    the quality of your products.  And when he said my concept,

10   this was an extreme departure from previous conversations.

11   And, quite frankly, I got alarmed because I've had a lot of

12   work in sales and marketing working with vendors and customers,

13   and you can read things between the lines.

14   Q.    What you're referring to, this is an October 8, 2021,

15   email from Jeff Phlipot to you as well as Ray McDonald and a

16   number of other people on the Ridge team with copy to

17   Mr. Phlipot's corporate attorney.  Is that fair?

18   A.    Yeah.  That's correct.  That also struck me as, you

19   know, interesting, that he was copying his attorneys because we

20   had met with his attorneys prior to this and was always

21   cooperative about getting down the road to developing future IP

22   and a business agreement.  So we have things in paper and

23   everybody understood their place.

24   Q.    And so from the time of this email October 2021, what

25   happened next in the relationship between Ridge and KNL?

VOL. II —  366

1    A.   Things became, you know, quieter.  There was less

2    interaction, less conversation, and it was not a good sign for

3    the future.

4    Q.   And did you have discussions after that point in time

5    about -- did you have further discussions about the IP

6    associated with the work on the roll-up door for KNL?

7    A.   This was '21, and there were few conversations with Jeff

8    along those lines and very little progress on putting the

9    business relationship together, although we were supplying him

10   materials to continue testing and development of the

11   commercialized door.

12   Q.   And at some point in time did communication stop

13   altogether?

14   A.   Pretty much, yes.

15   Q.   Around when did that occur?

16   A.   Things got a little more tenuous when he hired Chris

17   Fannin.  That wasn't really appreciated, you know.  But I

18   didn't really blame Jeff.  Maybe it was Chris Fannin's desire

19   to do something else and start a new employment, a new future.

20   And I thought perhaps this would be helpful, you know, that one

21   of our own people were working with Jeff and communications

22   might pick up.  However, that didn't happen.

23   Q.   When did that occur?

24   A.   I got a million dates in my head.  I want to say maybe

25   fall of '22 or summer of '22, somewhere in there.

VOL. II - 367

1    Q.    Okay.  Now, what did you do after things became tenuous

2    with KNL in terms of your continued pursuit of a roll-up door?

3    A.    I don't remember exactly all the sequential dates of

4    what happened, but at some point, you know, it was very obvious

5    by lack of communication that things have gone off track.

6    Sometime after that we found out about a patent application.

7    Talks on paperwork kind of stalled on our business plan and

8    what have you.

9         So when we found out about the patent, that was very

10   upsetting because it's not something I would have expected out

11   of Jeff.

12   Q.    And, sir, when you say "patent application," are you

13   referring to Plaintiff's Exhibit 4?  Turn to your binder and

14   take a look.

15   A.    What?

16   Q.    Plaintiff's Exhibit 4.

17   A.    Yes.  Yes.  That's correct.

18   Q.    And can you describe what this is?

19   A.    This is a patent application that Jeff and his brother

20   and Mr. Schneider, in cooperation with a patent attorney,

21   submitted to the U.S. Patent Office.  And we were put back,

22   quite surprised that it didn't include Ridge employees.

23   Q.    When you say "include," is there a particular section

24   that you're thinking of?

25   A.    Yeah.  On the inventor -- on the inventor's part.

VOL. II -  368

1    Q.    Can you tell me what the title is for this patent

2    application?

3    A.    Single panel roll-up door.

4    Q.    And have you reviewed this patent application?

5    A.    Yes, we have.

6    Q.    And do you have a -- do you have a belief about whether

7    it attempts to cover the work that you guys did?

8    A.    Yeah.  It covers the operation, the successful operation

9    of the door upward and downward and around a radius by use of

10   the grooves that we put into the panel.  And those grooves were

11   designed to give the maximum life expectancy to that point

12   where the panel takes a bend.

13   Q.    And has this patent application been granted?

14   A.    No, it has not, to my knowledge.

15   Q.    And once you found out about this, what did you do next

16   in terms of your exploration of a roll-up door?

17   A.    Well, first, I threw up.  It was disturbing.  And what

18   we did was tried to talk to Jeff, get things back on track.

19   And Jeff eventually informed me that that wasn't going to

20   happen.

21        The other thing we did was -- my mind went to, you know,

22   the patent that they applied for seemed, as Ray and I and Bret

23   and our patent attorney reviewed, it was very a complicated

24   patent.  And we realized - I did - that, you know, we had never

25   done a search on a roll-up door.  And our salesman Zach Rittler

VOL. II - 369

1   who used to work at TODCO reminded me that TODCO attempted to

2   put a single panel roll-up door in the market.

3       So I asked him to contact his uncle who I knew that

4   worked for TODCO, and he said that, you know, that Dan wasn't

5   there during that time but he was.  And I said, you know, what

6   was the name of the door and what -- what can you find out

7   about it?

8       And Zach remembered that it was Arctic Flex, and he

9   thought it was a licensed door.  And we began research and did

10   discover that a company by the name of Cold Chain had issued a

11   license to TODCO to develop that door.

12   Q.  And what did you do after you learned about this Cold

13   Chain patent involving the roll-up door?

14   A.  I talked with Bret and Ray about moving forward.  We

15   looked at the Cold Chain patent and it was clear to us that it

16   had many of the elements that comprised the door that we were

17   making for Cold Chain.  And so I looked up Cold Chain on the

18   Internet --

19       MR. DILLARD:  Objection, Your Honor.

20       THE COURT:  Basis?

21       MR. DILLARD:  Confused record.

22       THE COURT:  I'm sorry?

23       MR. DILLARD:  Nonresponsive, confused record.

24   Sidebar, Your Honor.

25       THE COURT:  Yes.

1                           - - -

2      (The following proceeding was held at sidebar.)

3           MR. DILLARD:  I think some of the answers, at least

4   this one in particular -- I raised the objection to he's

5   indicated they're making a door for Cold Chain.  What he meant

6   to say, I believe -- I guess I could have corrected it in

7   recross or cross -- is they're making a door at that time with

8   TODCO.  And I think he's talking about making the door now with

9   Whiting.

10          THE COURT:  Read the question and answer.

11      (Thereupon, the last question and answer was read by the

12  court reporter.)

13          MR. TACKETT:  I think he meant KNL.

14          THE COURT:  Would you clear it up?

15          MR. TACKETT:  I will.

16          THE COURT:  Your objection is sustained.

17      (The following proceeding was held in open court.)

18   BY MR. TACKETT:

19   Q.   Mr. Grandominico, when you were just testifying, it

20  sounded as if you misspoke and we want to make sure we have a

21  clear record.

22   A.   Okay.

23   Q.   You testified that you learned of the Cold Chain patent

24  and that you had examined the Cold Chain patent, and then, upon

25  examination, you realized that it had many of the elements of

VOL. II -  371

1   the door that you were making and then you said, quote, for

2   Cold Chain.  And I believe you were trying to say for KNL?

3    A.   I'm sorry.  Yes, that's what I meant.  I'm sorry.

4    Q.   You meant KNL?

5    A.   I did mean KNL.  That is correct.

6    Q.   Okay.

7    A.   So then I looked on the Internet, found Cold Chain's

8   website.  I put a call in.  The president of the company was

9   listed as Joe Forney.  And I finally got ahold of Joe after

10  many attempts, but I told Joe that we were a manufacturer of

11  composite materials in central Ohio and knew that he had done

12  some work with TODCO and didn't know if that was still ongoing.

13  And he stated that that was not ongoing.  And I -- I told him

14  that I would like to come out -- did you want me to stop?

15   Q.   I think you've more than answered the question.  If you

16  will allow me to just ask you another question, sir.

17       After you had worked and talked with Cold Chain, what

18  happened next in terms of your business dealings with Cold

19  Chain?

20   A.   After I spoke with Cold Chain?

21   Q.   Yes, sir.

22   A.   I went out and visited them to see their facility and

23  see what they were doing, get to know the owners of the company

24  and described for them that we had interest in manufacturing

25  and marketing a roll-up door.

VOL. II -  372

1    Q.   And what did you ultimately request of Cold Chain?

2    A.   First, I requested that they come see us so they could

3    understand what Ridge was made of.  Then, after they saw what

4    we did, the extent of our engineering expertise, our reach into

5    the market, I asked them if it would be something they would

6    consider, to extend us a license to try to make their door.

7    Q.   Okay.  And --

8    A.   And I got an answer back of definitely yes.

9    Q.   Okay.  I want to turn your attention to Plaintiff's 3.

10   Sir, do you recognize this document?

11   A.   Yes.  This is the license agreement between ourselves

12   and Cold Chain signed by Joe Forney and myself.

13   Q.   Now, if you can turn to the last page of this document,

14   would you agree that this is your signature?

15   A.   It is my signature.

16   Q.   And this is titled Amended and Restated License

17   Agreement.  It's dated May 1st, 2023.  Is that right?

18   A.   This is correct.

19   Q.   And there was a -- was there another license agreement

20   before that?

21   A.   Yeah.  Initially --

22   Q.   Can you look at Tab 2, please?

23   A.   Uh-huh.  This was the initial agreement.

24   Q.   Okay.  What date does this have at the top?

25   A.   This --

VOL. II - 373

1    Q.   First line.

2    A.   Yes.  Fifteenth of February.

3    Q.   What year?

4    A.   2023.

5    Q.   Okay.  Can you turn to the last page?

6    A.   Yes.

7    Q.   Do you recognize the signature on the last page for

8    Ridge Corporation?

9    A.   That is Jeff Forney has signed for Cold Chain and I have

10   signed for Ridge Corporation.

11   Q.   What's your understanding of the rights that Ridge

12   Corporation obtained under these two agreements?

13   A.   We obtained an exclusive license on the Cold Chain

14   patent.

15   Q.   Why did you do -- I'll strike that.

16        Can you look at Plaintiff's 23 for me, please?

17   A.   Give me that again.

18   Q.   Yes, sir.  I'm sorry.  I'm asking if you can turn to

19   Plaintiff's 23.

20   A.   Twenty-three.  Yes.

21   Q.   What communications did you have with Kirk National

22   Lease after you had obtained this license agreement in

23   February?

24   A.   We informed Kirk National Lease that we felt they were

25   infringing upon this patent.

VOL. II -  374

1   Q.   Now, if you turn to the third page of Plaintiff's 23,

2   it's Bates labeled Ridge 4722 in the bottom right corner.

3   A.   Have I got the wrong book?  It says Exhibit P22.

4   Q.   P23 should be where you're at, sir.

5   A.   Okay.  This email?

6   Q.   Yes.  Can you turn to the third page?

7   A.   The third page of the email.  May 3rd, 2023, yes.

8   Q.   So there is an email here from you, Gary Grandominico,

9   to Jeff Phlipot at KNL dated May 3rd, 2023.  Do you recognize

10  this?

11  A.   I do.

12  Q.   And in the second paragraph here, what are you

13  communicating to Jeff Phlipot?

14  A.   I'm explaining to Jeff that we, in fact, obtained a

15  license on a single panel roll-up door and our intention was to

16  market it, a door panel, to the door manufacturers in the

17  market.  And I was hoping that Jeff would correct the

18  inventorship issue on the patent that he had applied for

19  because of the hard work that Ridge employees did to get him to

20  a successful door.

21  Q.   And how did Mr. Phlipot respond to those two separate

22  propositions?

23  A.   Is that in here?

24  Q.   I believe it's in the first email, if you look at it.

25  But I'm just asking you about your recollection, frankly.

VOL. II - 375

1    A.   My recollection was that Jeff felt that we didn't

2    contribute in the inventorship issue.  It was basically what he

3    was telling me.

4    Q.   And how did he respond to the notice regarding the Cold

5    Chain patent covering the KNL door?

6    A.   I told him that in effect, you know, we take

7    inventorship and we take our IP very seriously and we were

8    going to defend this IP.

9    Q.   How did Jeff Phlipot respond to that?

10   A.   I'm not real certain, but I believe Jeff eventually got

11   back to me and told me that he did not feel that we had IP that

12   would cover a roll-up door and that he was going to continue

13   with his own IP and go to the market.  I'm not certain the

14   exact words of the -- I'd have to read the email.

15   Q.   Okay.  And after this occurred, did Ridge -- did KNL

16   stop buying panels from Ridge?

17   A.   KNL pretty much stopped buying panels from Ridge months

18   before this.  We didn't know exactly where they were getting

19   their panels, but we assumed that it was Altum based on

20   comments at that point from Chris Fannin who had come back to

21   work for us.

22   Q.   And do you know the three partners of Altum?

23   A.   Yes, I do.  They -- I know them very well, yes.

24   Q.   How so?

25   A.   One is my son, and Kyle was his best friend in high

VOL. II - 376

1    school and he was the first employee I hired at Ridge.  And

2    then I also hired Greg because he had a good background in

3    composites and chemical engineering.  And they all worked at

4    Ridge Corporation, were very knowledgeable.

5    Q.    How long did Dominic and Kyle Gaines work at Ridge

6    Corporation?

7    A.    I would say from two thousand -- wait a minute, Ridge

8    Corporation was formed in 2004.  I believe my son joined in

9    2007.  I'm not real clear on all of this, but Kyle -- Kyle

10   helped me make the very first panels that Ray and I made in our

11   basement commercially to supply to the market.

12        So I would say it would be after 2005 that Kyle came to

13   work, early 2005.  And my son was completing school so I think

14   he was around 2006 or seven.

15   Q.    When did they leave?

16   A.    Around 2018 or -- yeah, somewhere in there.

17   Q.    And during their time working at Ridge, what knowledge

18   would they have gained that may be relevant to KNL?

19        MR. DILLARD:  Objection.  Speculation.

20        THE COURT:  Basis?  Speculation?  I'm going to sustain

21   the objection as stated.  There's no basis for this witness to

22   tell us what knowledge they would have gained that could be

23   relevant to KNL.  So your objection is sustained, Mr. Dillard.

24        MR. DILLARD:  Thank you, Your Honor.

25

VOL. II -  377

1    BY MR. TACKETT:

2    Q.    While working at Ridge for over a decade, did Kyle

3    Gaines or Dominic Grandominico gather knowledge of any of the

4    materials that were inside of the single panel roll-up door

5    that you all worked on with KNL?

6           MR. DILLARD:  Objection, Your Honor.

7           THE COURT:  Sustained.  You may get at that particular

8    information, Mr. Tackett, but the question as phrased does

9    require him to speculate.  So if you'll lay the foundation for

10   how he would know what Kyle or Dominic, the knowledge to which

11   they were exposed, then that might be an approach that would be

12   availing to you.

13          MR. TACKETT:  Thank you, Your Honor.

14   BY MR. TACKETT:

15   Q.    Did Dominic or Kyle Gaines do work or have exposure to

16   the structural panels that you used for the KNL door when they

17   were employed at Ridge?

18   A.    Absolutely.  Kyle was director of materials, and Kyle

19   and I worked together on material suppliers such as honeycombs

20   and foams.  Kyle was involved with, very early on, on our

21   development of foams and he was very knowledgeable about the

22   foams.  Of course, Dominic was operations manager.  He was an

23   engineer.  He knew everything that was going on at the company,

24   and he knew our ability to laminate and understood full well

25   how to make those products.

VOL. II - 378

1    Q.    And when Dominic left the company at that point in time,

2    did he have any roles as an officer or director of the company?

3    A.    Yes.  He was a director of the company at that time.

4    Q.    Did you have -- strike that.  What concerns did you have

5    when you learned that Altum was the supplier that KNL had gone

6    to after your dispute arose with them?

7    A.    What concerns did I have?  Well, the biggest concern was

8    that there was disruption in the cooperation between Kirk

9    National Lease and Ridge Corporation to develop and market a

10   roll-up door.

11   Q.    And as you continued analyzing the situation with KNL,

12   what further contacts did you make to KNL about the concerns

13   that you had with respect to the Cold Chain patent?

14   A.    We sat with our patent attorneys and discussed the

15   situation of infringement and decided to issue letters to let

16   KNL know that we felt they were infringing on our patent, our

17   licensed patent.

18   Q.    Can I turn your attention to Plaintiff's Exhibit 9, sir?

19   Plaintiff's Exhibit 9 is a June 6th, 2023, letter, from Pearne

20   Gordon to Jeff Phlipot of Kirk National Lease and also to Truck

21   and Trailer Parts Solutions Inc., as well as their counsel.  Is

22   this a letter that you were referring to?

23   A.    Yes, that's correct.

24   Q.    And after this letter went out to Kirk National Lease

25   notifying them of the patent and your belief of infringement,

VOL. II - 379

1   how did Kirk National Lease respond to this?

2     A.   They did not really, I believe, respond quickly to the

3   letter.  It took them quite some time to respond.  And when

4   they did, they merely said that this patent did not read upon

5   what they were putting in the market.

6     Q.   Okay.  And in the course of investigating this, did you

7   learn anything about how KNL was marketing the roll-up door

8   after you -- you all had parted ways?

9     A.   Yeah.  So what KNL was doing was working with the

10  customers they had at hand.  And this is a different level than

11  what Ridge goes to market in.  We sell materials to the trailer

12  OEMs.  And they began selling it to some of their customers

13  that they felt could -- had interest and could use a single

14  panel roll-up door because it's lighter, therefore it's easier

15  for the user.  It's much easier to put graphics on.  If you

16  notice in there, they've got some nice graphics on some of the

17  roll-up doors they put in the market.  These are all good

18  advantages for that roll-up door.

19        Am I rambling again?

20    Q.   That's okay.

21        How do you believe that Kirk National Lease being

22  permitted to sell the door you believe is infringing harms

23  Ridge Corporation?

24           MR. DILLARD:  Objection.

25           THE COURT:  Basis?

VOL. II - 380

1          MR. DILLARD:  It's a legal conclusion.  Speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  So, you know, I think I've explained I

4    have years of interest in getting into a high quality roll-up

5    door, and that's what Ridge is all about, is making quality.

6    We're rated quality ISO, and soon next year we'll be AITF 16949

7    which is a very high automotive standard.

8          And I thought, you know, Jeff made a very bad move here

9    because when you take a door and you put it out into the market

10   at that level where the user is, that's good, that's fine, but

11   without the engineering background that he had in his company,

12   without the manufacturing expertise, and even if you consider

13   Altum, it's limited compared to Ridge.  A mistake in the market

14   on the door, the performance of the door, this could be huge in

15   tarnishing a structural composite, lightweight door.  And we

16   didn't want to see that happen because that kind of mistake

17   lives for years in the market.

18         THE COURT:  All right.  Let's stop there unless you

19   have another short question that follows up that answer.

20         MR. TACKETT:  Your Honor, I would want to ask him what

21   he means by lives for years in the market, but how long he

22   might respond for --

23         THE COURT:  I will allow that last question.

24         MR. TACKETT:  Thank you, Your Honor.

25

VOL. II - 381

1    BY MR. TACKETT:

2    Q.    What do you mean by that, sir, that a mistake like that

3    lives for years -- can live for years in the market?

4    A.    I think I talked about -- probably too long about

5    Kemlite earlier and their mistake on their translucent panel.

6    Today we try to sell a translucent panel which we know can

7    handle the rigors of trailer construction and endure all the

8    impacts and provide a good surface.  But yet the customer has

9    the attitude, the memory of what happened years ago that cost

10   them a fortune because of mistakes, unknown mistakes to

11   Kemlite.  This is a big, big corporation.  Kemlite was owned by

12   Crane which is a large manufacturer of plastics.  Yet, they

13   didn't fully develop the product before they launched it.  This

14   came back to haunt them and it haunts us today trying to get

15   customers to try our product.  Once they do, they like it.  But

16   it's slow to get back into the market.

17              MR. TACKETT:  Thank you.

18              THE COURT:  We'll pick up there in the morning

19   at 8:30.

20         Mr. Grandominico, may be excused.

21              THE WITNESS:  Thank you, sir.

22              THE COURT:  I'm going to ask counsel to slide your --

23   you can leave your materials, but defense counsel will slide

24   their materials at least to where Mr. Burton is standing, and

25   plaintiff's counsel will slide their materials over so that my

VOL. II – 382

1    students will have at least one seat at plaintiff's table and

2    one seat at defense counsel table.

3                 MR. TACKETT:  Absolutely, Your Honor.

4                 THE COURT:  We'll reconvene in the morning at 8:30.

5            (Proceedings concluded at 4:55 p.m.)

6                                  – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOL. II –  383

1                              – – –

2                        WITNESS INDEX

3                              – – –

4     WITNESSES           DIRECT   CROSS   REDIRECT   RECROSS

5     PLAINTIFF'S:

6     Richard Sharpe                           174       177
      (By Mr. Burton)              166                   179
7     (Further)                               181
      Jeffery Phlipot              182
8     Larry Phlipot                236
      Bret Moss           249      267       288
9     (By Mr. Koltak)              285
      Gary Grandominico   345
10
                               – – –
11

12    DEFENDANT'S:

13    Sam Han             292      321       340       342

14

15

16

17

18

19

20

21

22

23

24

25

VOL. II - 384

C E R T I F I C A T E

        I, Shawna J. Evans, do hereby certify that the
foregoing is a true and correct transcript of the proceedings
before the Honorable Algenon L. Marbley, Judge, in the United
States District Court, Southern District of Ohio, Eastern
Division, on the date indicated, reported by me in shorthand
and transcribed by me or under my supervision.




                            s/Shawna J. Evans_____
                            Shawna J. Evans, RMR, CRR
                            Official Federal Court Reporter


                            October 12, 2023