UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                )
                                  )
    PLAINTIFF,                    )    CASE NO. 2:23-cv-3012
                                  )
        vs.                       )
                                  )
KIRK NATIONAL LEASE CO., *et al.*,)
                                  )
    DEFENDANTS.                   )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME III OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 5, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
    Bailey Cavalieri LLC
    By:  Christopher W. Tackett, Esq.
         John P. Miller, Esq.
         Graycen M. Wood, Esq.
    10 West Broad Street, Suite 2100
    Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
    FGKS Law
    By:  Joshua A. Koltak, Esq.
    100 South Main Avenue, Suite 300
    Sidney, Ohio  45365

    Faruki PLL
    By:  Donald E. Burton, Esq.
    110 North Main Street, Suite 1600
    Dayton, Ohio  45402

    Faruki PLL
    By:  Melissa L. Watt, Esq.
    201 East Fifth Street, Suite 1420
    Cincinnati, Ohio  45202

APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215

- - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

1        THURSDAY MORNING SESSION

2        OCTOBER 5, 2023

3                        - - -

4        THE COURT:  Good morning, everyone.  We're going to

5   continue with Mr. Grandominico.

6        MR. TACKETT:  Yes, Your Honor.

7        THE COURT:  Mr. Grandominico, please resume the stand.

8   You're still under oath.

9        MR. TACKETT:  May I proceed, Your Honor?

10       THE COURT:  Yes, you may.

11                       - - -

12                   GARY GRANDOMINICO

13   Resuming the stand for further direct examination, having

14   been previously duly sworn, continued his testimony as follows:

15                 DIRECT EXAMINATION Continued

16   BY MR. TACKETT:

17   Q.   Good morning, Mr. Grandominico.

18   A.   Good morning, Mr. Tackett.

19   Q.   Now, I understand that the night has passed since we

20   were going with the questioning.  I'm just going to pick up

21   right where we were, and I only have a few more questions for

22   you.  Okay?

23       Now, you talked about Kirk National Lease and you made

24   some statements, a couple different statements about them.  One

25   of them I want to ask about.  What did you mean when you said

1    that Jeff Phlipot knows a lot about roll-up doors?

2    A.    Every company has, you know, salespeople, and Jeff's

3    kind of very personal, personable, and he no doubt, as head of

4    the company -- he does some sales work and he understands what

5    the customers are looking for in the way of solutions is

6    basically what I meant.

7         He understands from feedback from customers what fleets

8    are looking for in the way of improving products and reducing

9    cost of operation.  Cost per mile is what our industry runs on.

10   Q.    Okay.  Now, in terms of your sales experience, sir, what

11   are the positive impacts of being able to tell a customer that

12   you have a patent on a product when you're selling?

13   A.    Having a patent is huge.  From one aspect, it means that

14   your intellectual property allows you to invest in something

15   that's ongoing.  It shows a knowledge if you can execute the

16   patent, manufacture the product.  It provides a quality to your

17   customers that they believe in.  If they know you have a

18   patent, then they will, in turn -- if you're going business to

19   business, then they will invest also.  They see the benefits.

20   They see it's protected, and they can invest their assets

21   towards using those patented materials.

22   Q.    And just, conversely, how would that be different if

23   you're trying to sell something but you don't have a patent?

24   A.    Well, then, you know, you're at a disadvantage, and you

25   don't have the ability to influence.  If I could, case in point

1    is Kirk National Lease advertising a patent, it seems, allowed

2    them to gain a lot of attention in the market and gain momemtum

3    because of the word patented and move forward with a lot of

4    interest.  And the customers were investing in that because

5    they saw an advertised patent as security and advantage.

6    Q.   Okay.  I'd like you to turn to Tab 14, Plaintiff's 14,

7    if you could, sir.  It's in one of those binders next to you

8    and it should say plaintiff's.  Let me know when you get to

9    that tab.

10            THE COURT:  Tab 14?

11            MR. TACKETT:  Yes, Your Honor.  Tab 14.

12   BY MR. TACKETT:

13   Q.   Mr. Grandominico, did you find it?

14   A.   I did find it.

15   Q.   Okay.  Now, at Tab 14 is a letter on the letterhead of

16   Barnes Law.  You see that there?  There is an email

17   andrewbarnesip@gmail.com, and it's saying the letter is to

18   Whiting Door Manufacturing Corp.  Do you see that?

19   A.   I do see it.

20   Q.   Do you recognize this letter?

21   A.   I definitely recognize the letter, yes.

22   Q.   And how did you first receive this letter?

23   A.   From Ben Whiting at Whiting Roll Up Door.

24   Q.   And who is Ben Whiting?

25   A.   Ben Whiting is president of Whiting Door.  And he has

1  been examining our composite panel for use in manufacturing a

2  roll-up door and providing it to his customers.

3  Q.    And how would you characterize this letter to Whiting

4  Door?  What does it do?

5  A.    The effect of the letter was to put the brakes full on

6  for them developing or moving forward.  They were concerned

7  that they were going to get involved in some legal activity and

8  they questioned, you know, of course, our ability to provide a

9  product at that point.

10       And so they were spending a lot of time and money

11  researching the actual use of the panel we had provided to

12  their customers.  And they stopped and hired a patent attorney

13  just to be prepared for what might come next.  But they

14  immediately stopped all testing moving forward.

15  Q.    And has Mr. Whiting said anything else to you about how

16  Whiting feels about this letter threatening royalty damages?

17            MR. KOLTAK:  Objection.

18            THE COURT:  Basis?

19            MR. KOLTAK:  Hearsay.

20            THE COURT:  Why is this not hearsay, Mr. Tackett?  I

21  don't see it coming in as any exception, and it seems to be

22  offered for the truth of the matter asserted.  Why is this not

23  hearsay?

24            MR. TACKETT:  The way I was thinking about it in terms

25  of the question is the effect to Mr. Grandominico in terms of

1    what he heard.  But I can rephrase into what is his

2    understanding of the current status based on them receiving the

3    letter.

4           THE COURT:  I'm going to sustain your objection,

5    Mr. Koltak.

6           MR. KOLTAK:  Thank you, Your Honor.

7           MR. TACKETT:  Thank you, Your Honor.

8           THE COURT:  You may rephrase.

9           MR. TACKETT:  Absolutely.

10    BY MR. TACKETT:

11    Q.   Mr. Grandominico, as a result of this letter threatening

12    royalty damages, what is your understanding of the current

13    status of Whiting's intentions with respect to you all

14    exploring business together on the roll-up door that Ridge is

15    making?

16    A.   My understanding both in conversations with Ben Whiting

17    and also with our corporate attorney David Martin who I asked

18    to contact their counsel was to -- there was a hold on things

19    and -- until they got a better feel for what was going to

20    transpire going forward.

21           MR. TACKETT:  I have no further questions at this

22    time, Your Honor.  Thank you.

23           THE COURT:  Thank you, Mr. Tackett.

24         Mr. Dillard, are you going to conduct cross?

25           MR. DILLARD:  I am, Your Honor.  Thank you.

1                           - - -

2                     CROSS-EXAMINATION

3     BY MR. DILLARD:

4     Q.   Good morning, Mr. Grandominico.

5     A.   Good morning.

6     Q.   Now, you testified yesterday or yesterday and a little

7     bit this morning about being a coinventor on the patent

8     application with Kirk National Lease.  Do you remember that?

9     A.   Yes.

10    Q.   You were -- Ridge doesn't have any co-ownership on a

11    patent with any current customers, does it?

12         MR. TACKETT:  Your Honor, we'll register an objection

13    just as to the relevance of this.

14         THE COURT:  Overruled.

15         MR. TACKETT:  Thank you.

16         THE WITNESS:  Co-ownership?  Not that I recall right

17    now.

18    BY MR. DILLARD:

19    Q.   And fair to say that Ridge has -- does Ridge have 50

20    customers, would you say currently?

21    A.   Fifty?

22    Q.   Fifty.

23    A.   No, far more than that.

24    Q.   More than a hundred?

25    A.   Absolutely.

1    Q.   More than 150?

2    A.   We have some customers that are direct customers that we

3    sell to.  Those are primarily the manufacturers of original

4    equipment, an OEM.  Those customers have many customers, and we

5    interact along that entire chain.

6    Q.   Fair to say you have hundreds of customers, then, would

7    you say?

8    A.   We have many customers.

9    Q.   And your 24 engineers on staff, they regularly work with

10   those customers, don't they?

11   A.   No.

12   Q.   They don't work on their products that you sell to them?

13   A.   Yes.  But all through Bret, Ray and I.

14   Q.   Understood.

15   A.   They don't typically work directly with all these

16   customers.

17   Q.   And I apologize.  My question may have not been clear.

18   I just meant that your 24 engineers work on products that you

19   sell to those customers and provide to those customers,

20   correct?

21   A.   They work on projects, yes.

22   Q.   You're the owner at Ridge?

23   A.   One of the owners.

24   Q.   And the other is Mr. McDonald, Ray McDonald?

25   A.   Yes.

1    Q.    You guys, fair to say, you run the company?

2    A.    This is correct.

3    Q.    Ridge currently has a total of about 298 employees?

4    A.    Yeah.  It changes day-to-day, but roughly.

5    Q.    And you're not a trained engineer.  I think you

6    testified you had an accounting degree?

7    A.    Accounting and marketing.  Yes, I am not a trained

8    engineer.

9    Q.    But you've been in this industry for decades, fair?

10   A.    Yeah.

11   Q.    You take part, you get involved, you roll up your

12   sleeves and you get in there with the engineering folks and

13   figure things out, don't you?

14   A.    Yes.

15   Q.    You don't need a piece of paper after decades of

16   experience in building things to know what you're doing, right?

17   A.    So I have a sense of how things should work, but I don't

18   do that anymore.  It's something turned over to engineers.

19   Q.    So you used to do it, or you just don't have any input,

20   then, at all?

21   A.    I grew up on a farm.  I learned to do a lot of things.

22   Q.    Yeah.  You know how to put stuff together, right?

23   A.    Yes.

24   Q.    I think you told me in your deposition that at the

25   initial meetings with KNL, you kind of had an idea pretty

1 quickly about how to solve their problem, right?

2 A.  Yes.

3 Q.  You sandwich panel and add relief cuts, correct?

4 A.  In a simplistic explanation?

5 Q.  Yeah.

6 A.  There's lot more to it than that.

7 Q.  But that was your initial kind of gut reaction, this is

8 how you're going to solve their issue?

9 A.  Yes.

10 Q.  The relief cuts were needed because the panels by

11 themselves, there's too much stiffness for them to roll up the

12 track, correct?

13 A.  That's correct.

14 Q.  I think you told me at your deposition that in 2020 or

15 thereabouts, you had a final panel that you produced and it was

16 ready for a KNL door; is that correct?

17 A.  Yeah.  Bret's engineering group came up with the final

18 panel.

19 Q.  That panel was a structural panel with relief cut

20 grooves to allow it to take -- relief cut grooves to allow the

21 panel to take a radius and arch in segments up the track like

22 you initially conceptualized in 2018, right?

23 A.  That was a question?

24 Q.  Yes.

25 A.  Yeah.  It wasn't a cut.  It was a groove.

1    Q.    I think we've been referring to them sporadically as

2   relief cuts that make grooves in the panels?

3    A.    That's a big difference.

4    Q.    Okay.  At your deposition we talked about it, and I

5   think we were referring to them as relief cuts.  I'm happy to

6   refer to them any way you want to refer to them.  How do you

7   want to refer to them?

8    A.    Grooves, please.

9    Q.    So you had to cut the grooves, then, right?

10   A.    Yes.

11   Q.    And when you cut the grooves, you have to be careful

12  because you want to leave a little bit of room so you don't

13  damage the skin on the other side, right?

14   A.    Yes.  The skin is what carries the door up and down.

15   Q.    Understood.  And as a result of the cutting process --

16  well, let me start here.  There's about 12 millimeters of foam

17  in between the two plastic layers on the Ridge panel, correct?

18   A.    Yes.  Approximately.

19   Q.    And in the grooves, what's left, I think you told me is

20  sometimes two millimeters, sometimes one millimeter and

21  sometimes a half a millimeter of foam?

22   A.    Yeah, could be.

23   Q.    And that's because, again, when you cut, you don't want

24  to cut too deep and damage that other side of the plastic,

25  right?

1    A.    Yes.

2    Q.    Ridge is making a door currently for a company called

3    Whiting Door, correct?

4    A.    Yes, and other door manufacturers.

5    Q.    And other door manufacturers, correct.

6          You went out and talked to every door manufacturer you

7    could find, right, after you broke up with KNL?

8    A.    Our company did, yes.

9    Q.    And the current Whiting doors, as they're being provided

10   today, have the grooves, correct?

11   A.    That's correct.

12   Q.    And they're generally the same -- pretty similar, very

13   similar to the panels that you provided when you were working

14   with KNL, right?

15   A.    It's the groove that we created for KNL, yes.

16   Q.    And I believe you told me that the structural panel is

17   also very similar to the one that you worked on at KNL, the one

18   that you're now providing to Whiting Door?

19   A.    Yes.

20   Q.    And I think you told me that the Ridge panel provided to

21   KNL and to Whiting Door is a structural panel, not an

22   insulating panel.  Isn't that right?

23   A.    I don't recall, but it is an insulating panel.  It's got

24   foam on it.

25   Q.    Okay.  Deposition transcript, Gary Grandominico, 47, 19

1   through 22.  He's going to bring it up on the screen, what you

2   told me at your deposition.  And then we can read it and talk

3   about that answer.

4       A.    Sure.  Yeah.  I recognize this.

5       Q.    I apologize, Mr. Grandominico.  I'm having some

6   technical difficulties.

7           I think I just asked you -- the Ridge panel provided to

8   KNL and now to Whiting is a structural panel, not an insulated

9   panel.  You just told, me, no, it's an insulating panel.  Would

10  you like to change that answer based on what you're reading on

11  the screen?

12      A.    Like you said, as you pointed out, I'm not an engineer.

13  And you cannot make this panel without foam being left in the

14  groove.

15      Q.    I understand.

16      A.    And the foam -- and if you would also consider that

17  polypropylene and glass in itself is insulating.  So, yeah,

18  it's insulating.

19      Q.    So despite you what said here in your deposition when

20  you said, no, I wouldn't, I'd just consider it a Ridge

21  structural panel -- so you were wrong when you were in your

22  deposition.  Now today you're correct?

23      A.    I mean, if you want to clarify, that's what it is.  It's

24  also insulating.  Yes.

25      Q.    Also insulating.  Okay.

1     Exhibit 19, please, and go to 924.

2          THE COURT:  For the record, that's Exhibit D19.

3          MR. DILLARD:  D19.  I apologize, Your Honor.

4  Actually, 925, please.

5  BY MR. DILLARD:

6  Q.   This appears to be an email chain between you and Jeff

7  Phlipot; is that correct?

8  A.   Yes, that's what it appears to be.

9  Q.   And Jeff Phlipot sent you this email on September 12,

10  2022, telling you that KNL did not want to sell exclusive

11  patent rights to Ridge at that time, right?

12  A.   That's correct.

13  Q.   So fair to say that you had asked him to sell you the

14  exclusive patent rights at that time, correct?

15  A.   He wanted to work on this jointly together, yes.  And

16  this is –– he had gone cold here for a while.  And I was

17  pressing him, not getting answers to phone calls and emails,

18  what have you.  So he finally got back to me.

19          MR. DILLARD:  Move to strike.

20          THE COURT:  I'm going to grant your motion.  I'm going

21  to ask Ms. Evans to read back to Mr. Grandominico the question

22  and then listen to it carefully, Mr. Grandominico and tell me

23  whether you understand the question.

24     (Thereupon, the last question was read by the court

25  reporter.)

1    THE COURT:  Do you understand the question,

2    Mr. Grandominico?

3        THE WITNESS:  I'm hung up on the word to sell.

4        THE COURT:  Use sell in the common context like buy

5    and sell.  You're a businessman.  You know what it means to

6    sell product.  Use that same definition in the context of this

7    sentence, unless, Mr. Dillard, you mean sell in the different

8    context.

9    BY MR. DILLARD:

10   Q.   The email saying sell exclusive rights to the patent.

11   A.   Maybe Jeff's comment to me about at this time, we do not

12   want to sell exclusive rights, he was referring to our interest

13   in -- I don't know that I asked him to sell exclusive rights.

14   Q.   Okay.  Fair enough.

15   A.   Is that in print somewhere?

16   Q.   Fair enough.  He's responding saying he doesn't want to

17   sell them to you.

18   A.   I don't recall him asking.

19   Q.   He's just offering that.  That's fine.  If that's what

20   your story is, that's fine with me.

21       Regardless, the fact that he did not want to sell you

22   the patent rights at that time was very disappointing to you,

23   correct?

24   A.   What was disappointing is that we did not write a patent

25   together as was our plan.  That's what was disappointing.

1    MR. DILLARD:  Move to strike.

2    THE COURT:  Well, it was responsive in part because

3  you did ask, in effect -- or your question could be read to ask

4  what was disappointing to him about the transaction.  The part

5  of your answer, however -- your question that he didn't answer

6  was whether you, Mr. Grandominico, was disappointed in the fact

7  that he did not want to sell you the patent rights at that

8  time.  Were you?

9    THE WITNESS:  I was -- again, Your Honor, I didn't

10  recall asking for sell.  I was disappointed, yes.  But what I

11  was disappointed in was that he had gone to get a patent and

12  not involve Ridge, give credit to Ridge.

13    THE COURT:  Let me ask you.  Maybe I can get to it so

14  that we can move things along because I'm the fact-finder here,

15  and typically when witnesses don't answer questions directly,

16  it's either because they don't understand the question or they

17  don't want to answer the question.

18    THE WITNESS:  Okay.

19    THE COURT:  When you don't understand the question, we

20  can get clarity and you can answer it.  When you don't want to

21  answer the question, to the Court -- and in this case I'm the

22  fact-finder -- that bespeaks evasion which bespeaks insincerity

23  which redounds to your detriment.  If you don't understand the

24  question --

25    THE WITNESS:  I do not understand.

1          THE COURT:  -- I would urge you to tell me or the

2     questioner that you don't understand it.  As the fact-finder,

3     when you're being evasive, I take that as an untruth and you

4     don't want that.

5          THE WITNESS:  Okay, yeah.

6          THE COURT:  Pose your question again.

7     BY MR. DILLARD:

8     Q.    The fact that Jeff Phlipot is telling you here he

9     doesn't want to sell the exclusive rights to the patent that

10    they're going to apply for, that was very disappointing to you,

11    wasn't it?

12    A.    I was disappointed.

13    Q.    That same day, you respond to KNL and you're telling him

14    here, basically, kind of expressing your disappointment and

15    essentially telling him he may want to look to someone else to

16    supply the panels, right?

17    A.    Correct.

18    Q.    And then if we move to the top of this page, Mr. Phlipot

19    responds he is thankful for what you've done and he asks if

20    Ridge would still be willing to sell them other products.  And

21    if we move to 923, again, here, now we get into -- after the

22    sale of exclusive patent rights are gone, now we're talking

23    about you're going to do what you can to protect your rights as

24    an inventor.  Isn't that right?

25    A.    As I say here, we respect the hard work of our

1  employees.

2  Q.   So is that a yes?

3  A.   Ask me the question again.

4       MR. DILLARD:  Could you read back the question?

5  (Thereupon, the last question was read by the court

6  reporter.)

7       MR. TACKETT:  Objection.  Can we have a sidebar on

8  this issue?  I don't want to improperly give a narrative.

9                       - - -

10  (The following proceeding was held at sidebar.)

11       THE COURT:  Go ahead, Mr. Tackett.

12       MR. TACKETT:  I asked for the sidebar just out of an

13  abundance of caution because of the warning I received

14  yesterday.

15       The question has a false premise, Your Honor, that

16  the -- that the comment by Jeff Phlipot relating to --

17  requesting a sale somehow is dispositive of whether there was

18  preexisting understanding and intent that there was joint

19  development happening.  The question implies that it's one or

20  the other and that's the only way it can be.

21       He says after you couldn't get him to sell it, now you

22  first started thinking about this joint development.  It's

23  argumentative.  There is a false premise.  It's designed to

24  confuse the witness.  And especially after the intervention on

25  the disappointment question, I feel like it's creating a false

1   record of the situation.

2           THE COURT:  I will tell you this.  The question, if

3   you listen to it read back, can be confusing.  It's almost

4   compound, but the first sentence or so in the question is a

5   statement.  But it kind of sets a premise but it doesn't at the

6   same time.  It's not a question, but the second part is a

7   question.

8           When Ms. Evans read it back, I thought it was confusing.

9   Let's do this.  I'm going to hold my ruling on your objection

10  in abeyance.  I'm going to have you, Mr. Dillard, rephrase your

11  question, break it up, make it simple, a single-thought

12  question so he can answer it.  You're going to need to be

13  precise with this witness.

14          MR. DILLARD:  Actually, I'm going a little off trying

15  to be more precise.

16          THE COURT:  Fewer words, more precision.  If you still

17  believe that the rephrased question is objectionable, you may

18  interpose your objection.  I understand the basis of it now.  I

19  can answer it if Mr. Dillard asks what you believe is an

20  improper question.

21          MR. TACKETT:  Understood.  Thank you, Your Honor.

22          (The following proceeding was held in open court.)

23  BY MR. DILLARD:

24  Q.   Mr. Grandominico?

25  A.   Yes, sir.

1    Q.   After the prior email about exclusive patent rights, you

2  send this email to Mr. Phlipot telling him that Ridge is going

3  to do what it can to protect its rights as a coinventor,

4  correct?

5    A.   Correct.

6    Q.   If you move to the 922, again, here we see Mr. Phlipot

7  telling you that Ridge is not a coinventor of the patent and

8  asking you if you still want to participate in making panels;

9  is that right?

10   A.   That's correct.

11   Q.   Move to the top.  And your answer is an emphatic no,

12  correct?

13   A.   It says no.

14   Q.   Ridge never signed an agreement on IP with KNL, correct?

15   A.   This is correct.

16   Q.   So Jeff Phlipot had every right to leave R and -- to

17  leave Ridge behind, correct?

18   A.   Yes, he did.

19   Q.   And let me restate that first question because I believe

20  I said R and L instead of Ridge.

21        Just to confirm, KNL never signed an agreement on the IP

22  with Ridge, correct?

23   A.   Correct.

24   Q.   Jeff Phlipot had every right -- since you didn't have an

25  agreement, he had every right to leave you behind and not list

1  you as a coinventor on the invention, correct?

2  A.   Well, that's what he did.

3  Q.   But in your mind that didn't sit right, correct?

4  A.   Definitely did not sit well.

5  Q.   One of the main reasons we're sitting here today,

6  correct?

7  A.   Absolutely.

8  Q.   Now, the KNL breakup was not going to stop Ridge.

9       Mr. Grandominico, the KNL breakup was not going to stop

10 Ridge from entering the roll-up door market, correct?

11 A.   Well, it appears that it was until we did some research.

12 Q.   Well, it's my understanding that before you did any

13 research, you went into the market and talked to every roll-up

14 door company that you could find.  I think you said that

15 earlier, didn't you?

16 A.   No.  We didn't do any of that until we found the Cold

17 Chain IP which put a completely new twist on -- new twist on

18 everything.

19 Q.   You found the -- you acquired licensing rights to the

20 Cold Chain patent in February of 2023, correct?

21 A.   Yes.

22 Q.   You didn't talk to Whiting Door before February 2023?

23 A.   No.

24 Q.   You didn't talk to any other door manufacturers before

25 that?

1    A.    No.

2    Q.    Okay.  Now, you went into the door market because you

3    had acquired experience in the roll-up door market working with

4    KNL, correct?

5    A.    No.

6    Q.    Okay.  You were going to let that KNL work -- that door

7    go to waste, then?  Or you wanted to use that experience?

8    A.    We have a lot of experience in roll-up doors and we

9    understand them fully.

10   Q.    I understand that.  I'm saying you just spent four years

11   working with KNL on a roll-up door, right?

12   A.    Yes, we did.

13   Q.    You didn't want to let that work go to waste, correct?

14   A.    Of course not.

15   Q.    So you wanted to go -- you're going to still continue in

16   the roll-up door market, right?

17   A.    Not if someone had IP, correct, no.

18   Q.    Have you continued in the roll-up door market?

19   A.    Yes, after we found IP that would allow us to continue.

20   Q.    I understand that.  But I'm just asking what your --

21   what you're doing right now.  You're continuing.  You're

22   forging ahead in the roll-up door market?

23   A.    Yes.

24   Q.    Yes.

25   A.    We invented the product.  We worked with Jeff on

1  inventing.

2  Q.   Whiting Door is the largest roll-up door manufacturer in

3  the United States; is that right?

4  A.   Yes, sir.

5  Q.   And they have about 40 percent market share in the

6  roll-up door market?

7  A.   That is correct.

8  Q.   And I think we already talked about this, but the Ridge

9  panel provided to Whiting is the same or very similar to the

10  one that Ridge provided to KNL, correct?

11  A.   Yes.

12  Q.   Now, Ridge has also approached a company called Diamond

13  Door, correct?

14  A.   Yes.

15  Q.   And they have a 5 percent market share, right?

16  A.   I believe that's correct.

17  Q.   And if talks continue -- if talks continue with these

18  companies, your plan, Ridge's plan is to make deals with these

19  companies and move into the roll-up door market, correct?

20  A.   Yes.  We want to provide a panel to roll-up door

21  manufacturers.

22  Q.   Now, if KNL continues to make their door and sell it to

23  people, is that going to stop Ridge from going to Whiting,

24  going to Diamond Door and trying to make money in the roll-up

25  door market?

1    A.   Short answer, no.

2    Q.   And I think you told me -- you talked a little bit about

3    KNL's market share in the roll-up door market.  And you said it

4    was almost nonexistent, I think.  Is that right?

5    A.   Until, you know, what we found out lately.

6    Q.   Well, I mean, your deposition was on Sunday?

7    A.   Yeah, well.

8    Q.   And I think on Sunday you told me their market is close

9    to zero, right?

10   A.   Yeah, I didn't know that, you know, they had gone to the

11   extent they had.

12   Q.   Okay.  Now, Cold Chain is a company in Idaho that makes

13   a handful of products, right?

14   A.   Yes, sir.

15   Q.   Some doors?

16   A.   Yes.

17   Q.   And after the split with KNL, you started looking for a

18   way to stay relevant in the roll-up door market, right?

19   A.   We started asking, you know, questions about the Arctic

20   Flex door, and that led us to the Cold Chain patent.

21   Q.   Because the Arctic Flex door was actually the Cold Chain

22   door, right?

23   A.   Correct.

24   Q.   Now, in February of 2023, Ridge acquired the licensing

25   for the Cold Chain patent, yes?

1    A.    Yes.

2    Q.    And in May it amended, right, amended the licensing

3    agreement?

4    A.    Yes.

5    Q.    And following that, Cold Chain never told Ridge how to

6    make the door, right?  You already knew.

7    A.    We had meetings with Cold Chain, and those discussions

8    went far beyond that patent and also making some of their other

9    products and supplying raw materials.

10    Q.    But my point is, like you already had a door that you

11    were making.  You didn't need them to tell you how to make the

12    door, right?

13    A.    That -- that -- the particular door that we coinvented

14    with Kirk National Lease, yeah, we knew how to make that door.

15    Q.    And that's the door you were going to make?

16    A.    One of the doors.

17    Q.    That's the door you were going to make.  That's why

18    we're here today, that door?

19    A.    That's correct, yeah.

20    Q.    And Cold Chain never gave you -- they never saw that

21    door that you were making and said, no, we need to change it?

22    A.    No.

23    Q.    Ridge didn't really make any changes to the KNL door

24    design after acquiring the Cold Chain patent, correct?

25    A.    No, that's not correct.  We made some adjustments to the

1  layers and to dimensionally what we would offer other people.

2  Q.   Dimensionally you mean sizes, correct?

3  A.   Size and also performance.

4  Q.   You're talking about structural performance?

5  A.   Yes, I am.

6  Q.   You made that structure a little bit more durable?

7  A.   We -- it's all very durable, but we made it according to

8  the load, if was going to be -- environment it was going to be

9  facing.

10  Q.   Yeah.

11  A.   Yes.

12  Q.   But it was still the sandwich panel with the grooves, I

13  think you said?

14  A.   Still a sandwich panel with grooves, that is correct.

15  Q.   Exhibit 20.  4722.

16      After acquiring the license to the Cold Chain patent and

17  amending it, you sent an email dated May 3rd to Jeff Phlipot,

18  correct?

19  A.   Is this after I said no?

20  Q.   Excuse me?

21  A.   Is this after I said no?

22  Q.   Yes, it is.

23  A.   Uh-huh.

24  Q.   Did you send this email that's on the screen, Exhibit

25  D20?

1    A.    Yes.

2    Q.    And you sent that email as reflected here on May 3rd,

3    2023, correct?

4    A.    Yes, correct.

5    Q.    And that's after you acquired the licensing to the Cold

6    Chain patent?

7    A.    Correct.  Well after.

8    Q.    Right.  And after the amendment?

9    A.    Yes.

10   Q.    And fair to say that in this letter you're still asking

11   him to add Ridge as a coinventor on the KNL door?

12   A.    Yeah.  I wanted to do business with Jeff.

13   Q.    And you wanted to be coinventor.  You wanted those

14   rights?

15   A.    Yeah, that was a way to remedy the situation and us get

16   back to work.

17   Q.    Move to 4720 still in Exhibit D20.  We're looking at a

18   separate email sent by you on May 22nd.  And you're following

19   up on the May 3rd email because apparently Mr. Phlipot never

20   wrote back, right?

21   A.    That's correct.

22   Q.    And you're following up again.  You say you want to move

23   forward.  You want those rights to that '144 application,

24   correct?

25   A.    Yeah.  You know, we developed a good product together.

1    I wanted to get it to the market.

2        Q.   Look, if KNL came back to you right now and put you on

3    that patent --

4        A.   Yeah.

5        Q.   -- that would be okay with you, correct?

6        A.   Absolutely.  We'd get to work.

7             MR. DILLARD:  I have no further questions, Your Honor.

8             THE COURT:  Mr. Koltak, any cross?

9             MR. KOLTAK:  A few questions, Your Honor, yes.

10            THE COURT:  Mr. Koltak, please proceed.

11            MR. KOLTAK:  Thank you, Your Honor.

12                                - - -

13                         CROSS-EXAMINATION

14   BY MR. KOLTAK:

15       Q.   Good morning, Mr. Grandominico.

16       A.   Good morning.

17       Q.   A few questions for you on behalf of my client Kirk

18   National Lease and TTPS.  You indicated in your testimony that

19   you met with the folks from Cold Chain when you discovered the

20   patent?

21       A.   Yes.

22       Q.   And you -- did you meet with Peter Wachtell?

23       A.   No, I met with Joe Forney.

24       Q.   And Peter Wachtell is the coinventor on the Cold Chain

25   patent, correct?

1    A.    Yes.

2    Q.    Did you have any understanding of his technical

3    background?

4    A.    As Joe explained to me that -- no, I don't really know

5    his technical background, although, you know, we met Peter and

6    he came to our plant.

7    Q.    Okay.  I'm confused.  I just asked you if you met him.

8    He met at your plant?

9    A.    Yes.

10   Q.    Okay.  You indicated that your testimony had changed

11   from your deposition with respect to the market share that Kirk

12   National Lease is taking in the roll-up door market, correct?

13   A.    Yeah.

14   Q.    And you base that on the emails you saw for the

15   advertising?

16   A.    Yes, uh-huh.  They were -- had far-reaching -- you know,

17   as I heard testified here, they were talking to many customers.

18   Q.    You've talked to those customers?

19   A.    No.

20   Q.    So you don't know what impact the word patent had in

21   those advertisements, do you?

22   A.    Only from the background that I have.

23   Q.    You were speculating?

24   A.    Pardon?

25   Q.    You were speculating, guessing?

1    A.    I would say that that's my speculation.

2    Q.    During the development of the KNL/Ridge panel that was

3    going to be used in the KNL/Ridge door, how many engineers went

4    to the KNL manufacturing plant?

5    A.    KNL -- excuse me.  Would you tell me again.

6    Q.    I misspoke.  How many Ridge engineers went to the KNL

7    manufacturing location?

8    A.    KNL doesn't have a manufacturing location I'm aware of.

9    Q.    Where do they make the doors?

10   A.    Where do they cut grooves in their doors?  I have no

11   idea.

12   Q.    You've never been yourself?

13   A.    Yes, I've been to Kirk National Lease office which is

14   not manufacturing.  And two engineers, Ray McDonald and Bret

15   Moss, were present.

16   Q.    When you went to the Kirk National Lease facility?

17   A.    Yes.

18   Q.    Did you see the panels being made?

19   A.    No.

20   Q.    So you never -- so no engineer ever participated in that

21   process at all on site with Kirk or TTPS?

22   A.    We saw the door installed, as we had made it, in a

23   trailer.

24   Q.    So the answer to my question, then, is how many times

25   did a Ridge engineer go to the Kirk National Lease facility

1  where they were building the doors prior to the doors being

2  complete is zero, right?

3     A.    The assembly of the doors?

4     Q.    Yes.  Never?

5     A.    Didn't need to.  But, yeah.  We didn't watch assembly.

6  We understand how a door is made.

7           THE COURT:  Mr. Grandominico, you're going to have an

8  opportunity to explain anything that you don't feel that you

9  were able to explain on cross.  It's really important that you

10 answer these questions so that I can understand what your

11 answer is.  Now, I'm going to read this question to you.  I

12 have it on my monitor.

13          "So the answer to my question, then, is how many times

14 did a Ridge engineer go to the Kirk National Lease facility

15 where they were building the doors prior to the doors being

16 complete is zero, right?"

17          Is it true or is it not true?  That's all I need to

18 know?

19          THE WITNESS:  We visited the offices and observed the

20 product.  We did not observe assembly or manufacturing as you

21 call it.

22          THE COURT:  So you never observed them manufacturing

23 the door?

24          THE WITNESS:  No.  Because we made the door and

25 delivered it.

1          THE COURT:  Okay.

2          MR. KOLTAK:  One follow-up question off of that.

3          THE COURT:  Please.

4     BY MR. KOLTAK:

5     Q.    Did you make the door or did you make the panel?

6     A.    We made the panel.

7          MR. KOLTAK:  No further questions, Your Honor.

8          THE COURT:  All right.

9          Mr. Tackett, redirect.

10         MR. TACKETT:  Just a few redirect questions, if I may.

11         Would it be possible to ask you to put

12    Mr. Grandominico's deposition transcript back on the screen on

13    page 46?

14                         - - -

15                    REDIRECT EXAMINATION

16    BY MR. TACKETT:

17    Q.    Mr. Grandominico, you were asked some questions on cross

18    about your deposition testimony that I think didn't tell the

19    story of your deposition transcript.  So I just wanted to ask

20    you if you could read the questions and answers from 9 to 18.

21    A.    The question on nine was:  What's the difference between

22    a structural panel and an insulating panel?

23         The answer was:  Well, there are some structural panels

24    that perhaps don't insulate.  They don't have --

25    Q.    I think that was foam.

1    A.    -- foam.  Ours does.

2          Do you want me to continue to read?

3    Q.    Yes.  Through 18, please.

4    A.    So the panel that you created for KNL and the panel you

5    created for Whiting both, you would consider those insulating

6    panels?

7          Mr. Tackett:  Objection.

8          And the answer:  All our structural panels are

9    insulated.

10   Q.    Thank you for that.

11         There were some questions about you -- I think the

12   question and answer was making doors for Whiting.  Do you have

13   any formal agreement with Whiting yet?

14   A.    No.

15   Q.    And have you sold full door orders to Whiting at all?

16   A.    No.

17   Q.    There was a question about the '144 application.  As we

18   sit here today, what's the difference between the '144

19   application and the Cold Chain patent?

20         MR. DILLARD:  Objection, Your Honor.

21         THE COURT:  Basis?  Legal basis?

22         MR. DILLARD:  Leading.  No foundation.  No expertise.

23         THE COURT:  Mr. Grandominico has testified as the CEO

24   of Ridge about his involvement in these developments of these

25   products.  You're right, he is not an engineer, but he did

1  testify that he has some involvement in development of Ridge's

2  products.  And the weight that the Court will give to his

3  answer will align with the level of his expertise in developing

4  these products as a nonengineer.

5       MR. DILLARD:  Thank you, Your Honor.

6       You may answer.

7       THE WITNESS:  Okay.  Could you give me the question

8  again, please, Mr. Tackett?

9       MR. TACKETT:  Sure.

10  BY MR. TACKETT:

11  Q.   What is the key difference between the '144 application

12  and what you have with the Cold Chain patent?

13  A.   I kind of leave those details to Mr. McDonald and

14  Mr. Moss.

15  Q.   And perhaps your answer is such because my question is

16  not a good one.  From your sales and marketing perspective,

17  what's the difference between having an application for a

18  patent and having a patent?

19  A.   Huge, huge impact on the market.

20  Q.   Which one is better?

21  A.   Having a patent is much better.

22  Q.   Why?

23  A.   Well, for a lot of reasons.  You know, when you have a

24  patent, you have intellectual property.  Property means

25  something.  The patent means something.  And that gives

1   confidence to your customers to invest and move forward.  It

2   gives an image of expertise.  And a patent is much better to

3   have than a -- no patent.

4       Q.   Okay.  Just one more question.  From your sales and

5   marketing perspective, what negative impacts would it have on

6   Ridge if KNL is allowed to resume marketing and selling the

7   accused door?

8               MR. DILLARD:  Objection, Your Honor.  Speculation.

9               THE COURT:  I'm sorry?

10              MR. DILLARD:  Speculation.

11              THE COURT:  Overruled.

12              THE WITNESS:  If KNL can continue to market the door,

13  it, you know, gives credence.  And it causes a lot of confusion

14  in the market, huge confusion.  So that damages our ability to

15  actually market a door that has a patent.

16              MR. TACKETT:  Thank you.  I don't have anything

17  further.

18              THE COURT:  Any recross, Mr. Dillard?

19              MR. DILLARD:  No, Your Honor.  Thank you.

20              THE COURT:  Mr. Koltak, any recross?

21              MR. KOLTAK:  No.

22              THE COURT:  Mr. Grandominico, thank you very much,

23  sir.  You may step down.

24              THE WITNESS:  Thank you.

25              THE COURT:  Mr. Tackett, does the plaintiff have any

1   additional witnesses?

2       MR. TACKETT:  Your Honor, the plaintiff has no further

3   witnesses on its motion at this time.  And I'll report to the

4   Court that we prepared a listing of all exhibits that have been

5   presented during plaintiff's case.  And we have conferred with

6   opposing counsel regarding those exhibits and have reached

7   agreement on all of the exhibits that have been referenced

8   except for a few.  We have it.  It may be easier to just give

9   you the written materials we have at some point.

10      THE COURT:  The ones on which you disagree, what's the

11  basis of the disagreement?  First of all, how many exhibits are

12  there on which you did not reach an agreement?

13      MR. TACKETT:  On which we did not reach an agreement,

14  I believe there are four, Your Honor.  Plaintiff's 70, the

15  panel, defendants did not agree to the admission of.

16  Seventy-one, the Facebook post showing that KNL still has false

17  marketing statements in the market.  We did not reach agreement

18  on that.

19      The other two that we did not reach agreement upon were

20  47 which is the flat panel -- the less wide panel that

21  defendant's counsel had shown to some witnesses.  I assume that

22  they may in their case build foundation for that exhibit.

23  Forty-eight was the panel created by defendants for the purpose

24  of argument with the thick foam, that there was no testimony to

25  at all.  So we object to that, of course, Your Honor.

1           The other one that we objected to was --

2           THE COURT:  Forty-eight I don't believe was offered.

3    We aren't in the defense case yet.

4           But I'm interested in 70.  Mr. Dillard, you had an

5    objection to 70?

6           MR. DILLARD:  Seventy is the Facebook post?

7           THE COURT:  No.  70 is the exemplar that everyone has

8    been using throughout this hearing.

9           MR. DILLARD:  No one has properly identified this as

10   where it came from.  It's our feeling that no one has testified

11   that they know where that came from.  The person they say it

12   came from has not been called by them to testify as to how he

13   came into possession of that material.

14          MR. TACKETT:  Your Honor, I believe we've established

15   a chain of custody regarding this tangible testimony of

16   evidence through the testimony of multiple witnesses.

17          THE COURT:  Maybe -- it could be that there was

18   some -- that I missed the original witness who was first -- the

19   first person in the chain.  And so maybe you should refresh my

20   recollection because I don't recall it either.  I was -- I was

21   wondering when I was going to see a -- maybe an exemplar of the

22   Cold Chain door -- or let me put it like this, an exemplar of a

23   panel made pursuant to the Cold Chain patent by Ridge.

24          MR. TACKETT:  Your Honor, so just to be clear, this

25   door came from --

1          THE COURT:  Seventy.

2          MR. TACKETT:  -- came from Kirk National Lease.  The

3    testimony in the record is that an employee of Kirk National

4    Lease had this door as a sales sample, and that he is the one

5    who gave it to Ridge.

6          THE COURT:  Mr. Burton, do you dispute that this door

7    came from Kirk National Lease?

8          I ask you this both as counsel for KNL and as an officer

9    of this court.

10         MR. BURTON:  We do not dispute that.

11         THE COURT:  So it's not disputed.  So tell me, then,

12    Mr. Dillard, what's the basis.

13         MR. DILLARD:  The employee that took this door, his

14    name is Chris Fannin.  We've talked about him some.  He left

15    the employment of KNL under circumstances --

16         THE COURT:  No.  No.  I asked you where you were

17    going.  You told me where you had been.

18         MR. DILLARD:  Okay.

19         THE COURT:  Let me pose the question again.  What is

20    the basis of your objecting to this when Kirk National Lease's

21    counsel has just stated as an officer of this court in open

22    court that here is a Kirk National Lease sample door or sample

23    exhibit that was -- it is a sample door, isn't it?  Isn't it

24    considered --

25         MR. KOLTAK:  It's a sales sample that was --

1          THE COURT:  It's a sales sample.  Thank you,

2     Mr. Koltak.  That's a sales sample.  They made it.  They admit

3     it's a sales sample.  There is a business relationship between

4     your client and KNL.  What is the basis of your objection to

5     that panel?

6          MR. DILLARD:  So --

7          THE COURT:  Or that sample.

8          MR. DILLARD:  I will agree.  If KNL is satisfied that

9     is a KNL panel, that's fine.

10          THE COURT:  Okay.  Good enough.

11          MR. DILLARD:  Could we have a sidebar on this issue?

12          THE COURT:  Certainly.

13                         - - -

14     (The following proceeding was held at sidebar.)

15          THE COURT:  I want Mr. Burton in here too since

16     Mr. Burton has already answered my question.  But I'm going to

17     let you make your record.  Go ahead.

18          MR. DILLARD:  Thank you.  Our problem is that this

19     door has been characterized in multiple different ways,

20     including a Cold Chain door.  And our position is that ain't a

21     Cold Chain door.  That's a KNL door, and it's the same door

22     that Ridge is making.  So I just wanted the record to reflect

23     that we are not agreeing that that door is being admitted for

24     the purposes of demonstrating what a Cold Chain door is.

25     That's it.

1          MR. TACKETT:  And we haven't argued that, Your Honor.

2     We have specifically identified it as being a sales sample that

3     came from KNL.  And then our expert witness testified that it

4     meets all the elements of the Cold Chain patent.

5          THE COURT:  All right.  So I'm clear what you're

6     saying.  I'm clear what you're saying.  I'm going to admit

7     Exhibit 70.  And then at the break -- so at the break what I

8     want you to do is just a representative from each client meet

9     with Ms. Stash and go over the exhibits that you all agree to.

10     And then at another break, I can have -- hold a hearing on ones

11     other than 70 which I'm going to admit and we can work out this

12     agreement.  But since time is of the essence, we'll hold that

13     in abeyance until we have our next break.

14          MR. TACKETT:  Abeyance as to the others?

15          THE COURT:  Yeah.  There are three more now.

16          MR. TACKETT:  I think that's right, Your Honor.

17          THE COURT:  And then the other ones will come in.  And

18     I'll go through -- before we close the record, I'll go through

19     all of them to make sure everyone agrees to all of these.

20          MR. TACKETT:  Understood.

21          THE COURT:  So you're done with your presentation of

22     witnesses; is that right?

23          MR. TACKETT:  Yes, Your Honor, with reservation of

24     rebuttal.

25          THE COURT:  Of course.  So we're going to follow the

1    same order.

2        MR. BURTON:  It's going to be the KNL defendant's

3    witnesses and then the Altum witnesses.

4        THE COURT:  That's fine.  Are you ready for your first

5    witness, you or Mr. Koltak?

6        MR. BURTON:  Yes.

7        THE COURT:  Good enough.

8      (The following proceeding was held in open court.)

9        THE COURT:  Mr. Koltak or Mr. Burton, your first

10   witness.

11       MR. KOLTAK:  Kirk National Lease and TTPS call Larry

12   Phlipot.

13       THE COURT:  Mr. Phlipot, please come forward and --

14   well, you don't have to be sworn.  You're still under oath.

15   Please come forward.

16       Thank you, Mr. Phlipot, for bending it toward you.

17   Speak clearly into it.  You may proceed, Mr. Koltak.

18       MR. KOLTAK:  Thank you, Your Honor.

19                            - - -

20                       LARRY PHLIPOT

21   Called as a witness on behalf of the Defendants, being

22   previously first duly sworn, testified as follows:

23                     DIRECT EXAMINATION

24   BY MR. KOLTAK:

25   Q.   Good morning, Mr. Phlipot.

1    A.    Good morning.

2    Q.    Please state your full name for the record.

3    A.    Larry J. Phlipot.

4    Q.    Mr. Phlipot, where are you currently employed?

5    A.    TTPS.

6    Q.    And how long have you been at TTPS?

7    A.    Two to three years, in that time frame.

8    Q.    What's TTPS stand for?

9    A.    Truck and Trailer Part Solutions.

10   Q.    And I may have asked you this, but I forgot.  Where were

11   you employed prior to TTPS?

12   A.    Kirk National Lease.

13   Q.    And for how many years were you employed there?

14   A.    Around 18 years.  I started in 2004.

15   Q.    What did you do at Kirk National Lease?

16   A.    I started out as a mechanic, and then I went to the role

17   of shop manager to run the shop for them.  After that, that

18   shop basically closed, I went to another shop.  But then after

19   I -- some medical reasons I went into -- I couldn't do

20   mechanical field so I basically went into maintenance of the

21   shops, facility maintenance.

22   Q.    And is that similar or different than what you do for

23   TTPS?

24   A.    It's similar, same thing.

25   Q.    What are your duties at TTPS?

1    A.    TTPS, I ran the shop there.  And we were building

2    Conestoga kits.  That's the curtain on the side of a flatbed

3    trailer for a company.

4         I also worked on the door that we are currently making.

5    And I also did maintenance on the building there that needed to

6    be done.

7         THE COURT:  Mr. Phlipot, are you an engineer by

8    training?

9         THE WITNESS:  No, sir.

10   BY MR. KOLTAK:

11   Q.    Is that capital D door, the one we're here for today?

12   A.    Yes, sir.

13   Q.    Tell the Court a little bit more about the type of

14   mechanical repair work you've done for Kirk National Lease and

15   TTPS over the last 20 years, 25 years?

16   A.    Oh, God, lots of things.  I've done brake jobs, brake

17   chambers.  I've been in the engine, pulled out camshafts.

18   We've done it in ways that -- you're supposed to pull the whole

19   motor out.  We never did that.  We engineered a different way

20   of how we could do it without pulling the whole motor.  Just

21   done so many variety of different things.  I've repaired the

22   garage doors in shops.  I ran the shop.  I took care of all the

23   guys in the shop.  I gave them their assignments.  I went over

24   all the invoicing that we had in the shop before it went to

25   corporate to the ladies that did all the billing.

1    Q.    Did you ever do any work on trailers?

2    A.    Yes, I have.

3    Q.    Would you approximate how many trailer you've repaired?

4    A.    The company we was doing the work for, they had over a

5    hundred trailers we had to take care of.

6    Q.    One of the duties that you mentioned for TTPS is that

7    you work on the door?

8    A.    Yes.

9    Q.    The door that we're here for today, how many of those

10   doors have you made?

11   A.    I made every door that has been made.  I physically made

12   every door that has went out of TTPS.

13   Q.    Can you approximate how many that is?

14   A.    It's over a 170.  But some were demo doors and some I

15   used as test doors, so...

16   Q.    Okay.  Since you're the guy that makes all of them, can

17   you tell the Court how you make a door?

18   A.    Well, we started out with Jeff came to me.  We sat down

19   and talked.  And he said we had a customer that wanted -- they

20   wanted a door that would clear 108 inches.

21   Q.    We'll get into that.  Tell the Court how you actually

22   make a door.

23   A.    I get the blank in.

24   Q.    What's a blank?

25   A.    The blank is the panel that I use to make the door with.

1    Q.   Okay.

2    A.   So when I started out doing it, I get the blank in.  I

3    had to lay out the blank on how I wanted all the grooves put in

4    the blank.  I measured everything out and did all the

5    calculations and all of that on there.  Then I hand routed

6    every blank I did because I didn't have a CNC router.  That's

7    where I got started at.

8        I would take the door and I'd find whatever hinge I

9    could find.  I even made my own hinges up and put on the door.

10   I shouldn't call them hinges because they're not a hinge.  It's

11   actually a bracket.  I put all the brackets on the door.  And

12   basically, I duplicated a door that was in a dry van, trailer,

13   as it was.

14   Q.   You indicate you cut the grooves.  Who decides where you

15   cut the grooves on the panel when you're making a door?

16   A.   Me.

17   Q.   How do you determine that?

18   A.   Well, there's different things.  You got to understand

19   how a door works in a trailer.  Every trailer has a different

20   door in it.  It depends on what the header is.  The header

21   determines what the radius is inside of a trailer.

22   Q.   What's a header?

23   A.   The header is the top part of the trailer.

24   Q.   And how does that determine the radius?

25   A.   Because if you get -- if you put the wrong radius in a

1    trailer, then when the trailer door goes to close, it won't hit

2    the header.  So if you try -- for example, if you try to put a

3    10-inch radius in a 5-inch header, the top part won't close.  I

4    could get it to close.  It won't open.

5    Q.    Okay.  You indicate the grooves.  What's the function of

6    the groove?

7    A.    The groove is just to relieve -- I don't need a foam in

8    there.  I groove it down as close as I can get it to the

9    outside skin without going through it because it's a very fine

10   line that I got to run against.  That groove will -- when I put

11   my bracket on next to the groove, my bracket don't go in the

12   groove, my roller don't go in the groove.  That groove is just

13   to relieve the panel so it can make the radius.

14   Q.    How much foam do you like to have left after you're done

15   cutting your grooves?

16   A.    I try to get down as close as I can to the outside skin.

17   Most of the time there might be a 16th to 3/16th of foam left

18   in the door.

19   Q.    What you have talked us through so far is you got a

20   panel and you've cut some grooves in it.  What's next?

21   A.    After I get that done, the grooves cut, then I cut the

22   dimension the door is.  So, you know, for example, if they say

23   the door is 96-inches wide and 93-inches tall, I have to make

24   that door blank fit that opening.  So then I measure out before

25   it -- I know that dimension before I rout the grooves.  So I

1   already laid out the panel with the grooves.  So when I trim it

2   down to size, I got my bottom panel the size I want and I got

3   my top panel the size I want.  If you don't have the top and

4   bottom panel the right size, it's not going to work right

5   either.

6          So I get my blank.  I already got my grooves all

7   determined.  Now I cut it down to size.  And then, after I do

8   that, I will make my groove on the bottom of the door blank and

9   put my bottom seal on because the bottom seal determines

10  where -- because I have the seal already punched for the

11  lock -- determines where the lock goes.  That has to be in the

12  middle of the door blank.

13         And then after I get that part all done, then I put all

14  of my brackets on.  When I put my brackets on, I put -- my

15  brackets are designed to catch the edge of the groove and go

16  onto the outermost part of the door, which is the inside of the

17  door.  I drill a hole through my brackets, and that's where I

18  run my bolts up through the door and I attach my brackets

19  there.  So I do that on both sides.

20         Then I go to the top of the door which takes a different

21  bracket.  And that bracket is designed on what radius and what

22  track you have in that door or in that trailer because when you

23  go to close it, you can adjust that bracket to close the

24  header.

25    Q.   At this point have you made a door?  Do we have a door

1  yet?

2  A.   I've made several doors already.

3  Q.   No.  The process you just described.

4  A.   After I get that part on, I flip the blank over and

5  attach my anchor brackets which the cable is hooked to, and I

6  put my lock and keeper and handle and pull strap on the door.

7  After that I put my top seal on, and after that the door is

8  done.

9  Q.   Are you familiar with the '144 patent application that's

10  at issue in this case?

11  A.   That's the door that we currently make.

12  Q.   Okay.  Who came up with the idea for the door in the

13  '144 patent application?

14  A.   Jeff did.

15  Q.   When did Jeff come up with that idea?

16  A.   It was probably in the late 2017, early '18, in that

17  time frame.

18  Q.   What was your involvement?

19  A.   Well, I went to his office one day to find out what --

20  if there's anything needed done and he told me he had an idea.

21  I said, What's that?

22       And he says, Well, I was down at Miller Brewery and they

23  want a trailer.  They don't want swing doors because when they

24  open the doors up, the beer cans are exposed to the elements

25  when they're back in the dock.

1          Since we built self-unloading trailers and roller

2    trailers for them, they thought, well, see what you guys can do

3    with this.  I took on the challenge.  I said, That's sounds

4    pretty interesting.  I said, I'll work on that.

5          So that's how it all come about.  And the reason it come

6    about, he seen ceiling liners we was using on the jobs we was

7    doing for Honda.  And it's flexible.  So that's how it came

8    about the idea of making a door.

9    Q.    What kind of materials were you working with?

10   A.    That was a polypropylene material, I believe.

11   Q.    What was a polypropylene material?

12   A.    It was a thermoplastic, basically, had polypropylene and

13   glass webbing fibers put in the glass -- in the panel.

14   Q.    Are you talking about the ceiling liner panel?

15   A.    Yes.

16   Q.    What other materials did you end up trying?

17   A.    That was the material we was working with most of the

18   time.  We didn't really try to make other ones because, you

19   know, I can't take wood and bend wood like that.

20   Q.    Did there come a point where you worked on a different

21   material than the ceiling liner?

22         Where did you get the ceiling liner from?

23   A.    It came from Lakeshore Trailer.

24   Q.    Who was the original manufacturer of that?

25   A.    Ridge.

1  Q.   Did you get any other products from Ridge that you tried

2  to make the door with?

3  A.   No.

4  Q.   Did there come a point where you had a piece of material

5  that you tried to make a mockup with?

6  A.   Well, whenever Jeff went to Ridge to see how they did

7  the lining at, he seen a sandwich panel there.  So he asked if

8  he could have a piece of that to try to make the door he was

9  trying to make.

10  Q.   Is the sandwich panel different than the material you

11  were just describing?

12  A.   Yes.

13  Q.   And so did they give Jeff a piece of material to try to

14  make the door with?

15  A.   Yes.  Chris Fannin gave Jeff a piece of material that he

16  brought back to me.

17  Q.   What did you do with it?

18  A.   The first thing I did with it, I looked at it.  I

19  thought this is pretty interesting.  So I took it and I started

20  putting grooves in it.  I thought I'd try a V groove.  All fine

21  and dandy.  It kind of works a little bit, but it put too much

22  stress on where it bent.

23       So then I took part of the panel and I made grooves in

24  it.  I took a power saw and cut so far to make three grooves in

25  it to be about an inch wide.  You can't let the other material

1  in there because when it goes around the radius, it won't

2  squeeze together.  So then I took a chisel and chiseled that

3  all out and then it started flexing better.

4      I told Jeff, hey, check this out.  It does flex.  I had

5  a sample track I laid on the thing and I sat the rollers and

6  ran it through, you know.  And so I said, I wonder if we can

7  get a piece of this.  So Jeff asked if we could get a piece.

8  Q.  How big was what you were describing that you were

9  rolling through the tracks?

10  A.  That piece was only like maybe a foot wide by three foot

11  long, something like that.

12  Q.  Where is that model now that you built?

13  A.  I built the smaller model with the track and all, and he

14  took it back with him because he had a meeting with them.  And

15  he took the model back with him up to Ridge to show them what

16  we wanted to do.  So they still have the model of the door.

17  Q.  And who built that model?

18  A.  I did.

19  Q.  Did you have any input from Ridge before you built that

20  model?

21  A.  No.

22  Q.  Did you have any input from Ridge before you started

23  putting grooves in the board?

24  A.  No.

25  Q.  I believe plaintiff's exhibit book is up there.  Would

1   you look at Exhibit No. 7.

2           THE COURT:  One other question before you move to this

3   next exhibit, Mr. Phlipot.  Who from either KNL or TTPS

4   assisted you in building this model?

5           THE WITNESS:  I built it myself.

6           THE COURT:  No one assisted you?

7           THE WITNESS:  No.

8           THE COURT:  Okay.

9           THE WITNESS:  Section 7, Josh?

10  BY MR. KOLTAK:

11  Q.   Yes.

12  A.   I don't see a diagram.

13  Q.   I'll get you there.  It might be on the screen in front

14  of you, actually, if you look.

15  A.   Okay.  I see it now.

16  Q.   Turn to page Ridge 0059 in that exhibit.

17  A.   Yes.  I got it.

18  Q.   You got it?  Take a look at that page and the two pages

19  that follow.  Prior to the filing of this lawsuit, had you ever

20  seen those documents?

21  A.   No.

22  Q.   Prior to your construction of the model you were just

23  discussing, had you ever seen these documents?

24  A.   No.

25  Q.   Prior to coming up with a door that worked using the

1  Ridge panel, had you ever seen these documents?

2  A.    No.

3  Q.    Prior to filing for your patent application, have you

4  ever seen these documents?

5  A.    No.

6  Q.    If you look at the first chart I was showing you,

7  there's some math on there.  Do you know what that math is

8  trying to establish?

9  A.    Well, the first part is just -- the square is just a

10  dimension of the door blank.  On the right side of that is

11  basically where I was grooving the panels at.  And then the

12  bottom one shows a radius, but the radius is not for a

13  semitrailer.  That is a radius for an overhead door in a house,

14  a residential building.

15  Q.    How do you know that?

16  A.    Because a semi only uses a 6-, 8- and a 10-inch radius.

17  Q.    What radius is being used on that chart?

18  A.    That's a 12.

19  Q.    Anything else on these documents that caught your

20  attention?

21  A.    Well, there is on document -- the third page, document

22  61.  If you look at the roller where the bracket is at, that is

23  one of the brackets I use.  I also made my own brackets, but

24  that is the bracket I used from the getgo because I wanted a

25  bracket where the roller -- I could take apart and pull the

1  roller back out.  So that bracket that they have drawed up

2  there is a bracket I used on my mock panel.

3   Q.   But you had never seen these documents before you did

4  that?

5   A.   No.  That's what caught my eye by looking at this thing

6  is that's the bracket I used.

7   Q.   And that's the type of bracket you put in the mock

8  panel, you said?

9   A.   Yes, because I had to use what we had at the shop to

10  make it work.

11   Q.   Did there come a time when Kirk National Lease, TTPS,

12  had a functioning door?

13   A.   Yes.

14   Q.   Do you know when that was?

15   A.   I know it was before the pandemic because I got thinking

16  this is going to kill us.  Now I finally get a door working and

17  everything is shutting down.  So it would be in the 2019 to

18  maybe early 2020.  I can't recall the exact date.  But I had

19  the door in there.

20   Q.   And whose panel were you using for that door?

21   A.   The Ridge's panel.

22   Q.   Did you have any problem with the Ridge panel?

23   A.   No, not that panel after we got it figured out, no.

24   Q.   Were you content to continue building the door with that

25  panel?

1    A.    Yes.

2    Q.    Do you have an understanding of why the relationship

3    broke down between Kirk National Lease and Ridge?

4    A.    Yes.

5    Q.    What is that understanding?

6    A.    Well, we met with them to come up with a plan to start

7    manufacturing the door, let them find us the blanks and us

8    building it.  In that meeting, it didn't really get that far.

9    They wanted to basically take over and market the whole door.

10   So we said, okay.  So they said they would come up with a plan,

11   a proposal for us.  And before that all was all done, they said

12   that they went out and looked at the door and checked it out

13   and make sure it actually worked which the door did work.  Bret

14   Moss, he got up inside there.  He took pictures of it and all

15   that and checked out the inside.

16        And so then after we went back inside, then they wanted

17   to market the door and do all of that.  Well, they kind of

18   caught me off surprise when they said this has to go through

19   all kinds of testing, blah, blah, blah.  And I'm like thinking

20   to myself, oh, my God, this is going to be a stopper and

21   they're talking it's going to cost a lot of money.  So that

22   bothered me.

23        So that was like in September, October, something like

24   that because in the wintertime I took a section of blank home.

25   And on a Saturday, I set up the blank, put the hinges on it,

1    and it was only like a two-foot by eight-foot section.  So I

2    built the thing at home in my barn.  And I put the blank inside

3    the track and I want to see how much weight this can hold

4    before it breaks.

5         So I had lime which is material that's made to spread on

6    fields.  It's in 50-pound bags.  So I started at one end and I

7    start putting them all the way across.  So I had like

8    150 pounds in there.  It sagged a little bit.  I said that

9    worked pretty good.  I did another layer.  That was 300 pounds.

10   I kept doing it until I had 900 pounds on that door.  The door

11   bowed down and touched my floor in my barn.  I said that's

12   pretty impressive that it can hold that much weight and not

13   break.

14        So I took it all back off.  What really impressed me was

15   it went back straight again.

16   Q.   You mention Bret Moss came out and looked at the door?

17   A.   Yes.

18   Q.   This is after you have a functioning door in the truck?

19   A.   Yes.  He came out with Ray and Gary.

20   Q.   Okay.  Had Bret Moss ever been to your facility before?

21   A.   He might have been there once.

22   Q.   Had he ever been in watching you manufacture a door?

23   A.   Not that I know of.

24   Q.   Did he provide any input to you when he was there?

25   A.   No.

1    Q.    Have you ever heard of the Cold Chain patent?

2    A.    Not until we got a letter from Ridge's attorneys.

3    Q.    Had you heard of the Cold Chain patent before you made

4    your mockup?

5    A.    No.

6    Q.    Had you heard of the Cold Chain patent before you

7    started meeting with Ridge?

8    A.    No.

9    Q.    Had you heard of the Cold Chain patent before you

10   started building the door with the Ridge panel?

11   A.    No.

12   Q.    Had you heard of the Cold Chain patent before you come

13   up with a successful door?

14   A.    No.

15   Q.    Who did you hear about the Cold Chain patent from?

16   A.    The letter we got from Ridge's attorneys.

17   Q.    Was this before or after the relationship breaking down

18   that we were talking about earlier?

19   A.    It was after.

20   Q.    What do you know about the Cold Chain patent?

21   A.    Well, after we got it, I looked it up and to see what it

22   said.  And the first thing it said it was an insulated door.  I

23   said, that's good.  I would like to know how the insulated door

24   is going to work.  I thought about it and there's no way I can

25   get an insulated door to work.  I went through the thing and

1    looked at it.  And they got an outer skin and they use

2    polypropylene.  I got to looking at how they mount their hinges

3    on there which they really don't give a clear detail how they

4    do it.

5         But I know they put relief cuts in the foam but not very

6    deep.  But they also, after they do the first layer, they put

7    another layer on there to cover up the grooves they put in

8    because, on a reefer door, it's meant to hold the heat out.

9    Q.   What door?

10   A.   A reefer door.

11   Q.   What is a reefer door?

12   A.   A reefer door is a door they put inside refrigerated

13   trailers or refrigerated boxes.  All of those doors are two

14   inches thick or thicker.  It depends on what kind of produce or

15   if they're going to haul ice cream or what they're going to

16   haul.

17        So I thought about it -- and this is way before I heard

18   about the Cold Chain.  And I would not attempt to make it

19   because it won't hold up.

20   Q.   Does the door you make follow the Cold Chain patent?

21        MR. TACKETT:  Objection.

22        THE COURT:  Basis?

23        MR. TACKETT:  The witness lacks expertise to opine on

24   the Cold Chain patent, Your Honor.

25        THE COURT:  Sidebar.

1                          – – –

2        (The following proceeding was held at sidebar.)

3        THE COURT:  Mr. Koltak, what is the basis for this

4   witness's knowledge of the Cold Chain patent?

5        MR. KOLTAK:  Twenty years of constructing doors,

6   constructing the door at issue in this case, and also being a

7   patent applicant, I think it goes to the weight the same way it

8   did with Mr. Grandominico.

9        THE COURT:  Mr. Grandominico did business with Cold

10  Chain and he –– there was testimony that he was familiar with

11  the patent.  I don't recall there being testimony of his

12  familiarity with the Cold Chain patent unless your admission is

13  that by him building this door, that was just like the Cold

14  Chain patent so that was –– that was kind of ipso facto his

15  familiarity with the Cold Chain patent.  I don't think that's

16  what your argument.

17       MR. KOLTAK:  That is certainly not the argument.  He

18  has just testified that he reviewed it.

19       MR. TACKETT:  He's getting into interpretation of a

20  patent application.

21       MR. KOLTAK:  I can ask a different question.

22       THE COURT:  I'll tell you what.  I understand where

23  you're going with this, but I want to be satisfied that he has

24  ample familiarity with it to know that he wasn't following, you

25  know, this patent.  So far this –– this witness knows how to

1  fix things, and there are a lot of people who know how to fix

2  things and they gained it through experience.  Some people gain

3  it through formal education.  I'm not saying that he can never

4  testify that he followed or declined to follow the Cold Chain

5  patent, but at least I want to have some assurances that he

6  understands what he's looking at.  Do you understand what I'm

7  saying, Mr. Koltak?

8        MR. KOLTAK:  Yes.  You want to go beyond what he

9  already --

10        THE COURT:  Yeah.  I mean, I can look at the Cold

11  Chain patent.  But I may not be able to follow it or

12  consciously not follow it.  You see what I'm saying?  I don't

13  know what I'm looking at other than what an average person of

14  average intelligence might understand when they look at

15  something like that.  I want you to lay a foundation that will

16  at least tell the finder of fact that he understands the patent

17  to the extent that he knows when he's not following it or

18  conversely when he's following it.

19        MR. KOLTAK:  Okay.

20        THE COURT:  Thank you.

21      (The following proceeding was held in open court.)

22        THE COURT:  Please continue, Mr. Koltak.

23  BY MR. KOLTAK:

24  Q.   Mr. Phlipot, going back to the Cold Chain patent, did

25  you look at the descriptions of the Cold Chain patent, of the

1  door, how the door was described in the patent?

2  A.   Yes.

3  Q.   I'm not asking you about claims.  What did you

4  understand the door was describing or the patent was

5  describing?

6  A.   An insulated door is what I understood.

7  Q.   Anything else about it?

8  A.   It's just a one panel insulated garage door.

9  THE COURT:  Let me ask you this, Mr. Phlipot.  When

10  you looked at the patent, what did the patent mean to you?

11  THE WITNESS:  On how it's made?

12  THE COURT:  Yes.  And what about how it's made?  What

13  did you understand with respect to the terms set forth in the

14  patent, the dimensions set forth in the patent and so forth?

15  That's what I'm getting it.

16  THE WITNESS:  That I seen there was no dimensions in

17  the patent as far as the thickness and all of that stuff that's

18  in a patent.  With working on semitrailers and that, when it

19  comes to an insulated door for a semitrailer, all the doors I

20  ever messed with are every bit of 2 inches thick because you

21  have to hold the heat out.  If you don't hold the heat out of a

22  semitrailer, that refrigerator unit in front is not going to do

23  its job.

24  THE COURT:  And when you say you looked at the patent,

25  you're talking about Plaintiff's Exhibit 1.  Is that what you

1  were asking him about, Mr. Koltak?

2         MR. KOLTAK:  Yes.

3         THE COURT:  All right.  You may continue, Mr. Koltak.

4  BY MR. KOLTAK:

5  Q.    Let me ask it to you this way, Mr. Phlipot.  Is there

6  anything you read in the Cold Chain patent that was instructive

7  in the production of the door that you make?

8  A.    No.

9  Q.    Did you derive any benefits from reading the Cold Chain

10  patent for the door that you make?

11  A.    No.

12  Q.    Do you have a notion of the type of door described in

13  the Cold Chain patent?

14  A.    It's an insulated door.  Is that what you're asking?

15  Q.    Do you know what it looks like?  Can you picture it in

16  your head based on the description?

17  A.    Not really.  I tried to figure out how to make it and I

18  can't figure it out.

19         THE COURT:  When you said you tried to figure out how

20  to make it but couldn't figure it out, what do you mean by

21  that?

22         THE WITNESS:  In my head I'm sitting there going how

23  do they make -- do they put all of that foam in there with the

24  rollers and get it to flex.  Because I've done multiple

25  different grooves on my door, and I have to remove all of that

1 to get my door to flex around the radius. That's the part I

2 can't figure out. How can you make an insulated door that's

3 going to be insulated enough in a reefer trailer to make it

4 flex on the radius? That's a one piece. That's the part I

5 can't figure out.

6 BY MR. KOLTAK:

7 Q. Is the door that you're making now with Altum panels, do

8 you consider that an insulated door?

9 A. No.

10 MR. KOLTAK: No further questions.

11 THE COURT: Thank you.

12 Mr. Dillard or Mr. Clifford, do you have any questions

13 of this witness?

14 MR. DILLARD: No, we don't, Your Honor. Thank you.

15 THE COURT: Cross, Mr. Tackett?

16 MR. TACKETT: Yes, Your Honor, if I may.

17 THE COURT: Could I see you counsel?

18 (Thereupon, Court and Counsel conferred out of the hearing

19 of open court and off the record.)

20 (Recess taken from 10:11 a.m. to 11:02 a.m.)

21 THE COURT: Mr. Tackett, we'll begin with your

22 cross-examination.

23 MR. TACKETT: Thank you, Your Honor.

24

25

1                              - - -

2                      CROSS-EXAMINATION

3     BY MR. TACKETT:

4     Q.   Mr. Phlipot, good morning, sir.

5     A.   Good morning.

6     Q.   Now, do you remember the testimony that you gave when I

7     was questioning you yesterday?

8     A.   Yes.

9     Q.   Do you remember the engineering work that you testified

10    about yesterday that Ridge had done to assist you with the KNL

11    door?

12    A.   The diagram I looked at earlier?

13    Q.   No.   The entirety of your testimony.   I'm saying do you

14    remember your testimony regarding the engineering work that

15    Ridge had done to assist you with the KNL door?

16    A.   They had made drawings up and changed layers in the

17    panels for us.   But as far as drawings, no.

18    Q.   Now, you testified that the sandwich panel used for

19    starting work on the KNL door came from Ridge, correct?

20    A.   Yes.

21    Q.   And Ridge Corporation is an expert in the composites

22    used in the KNL door, isn't it?

23    A.   They are one of the companies that are experts in making

24    composite blanks and using that material, yes.

25    Q.   You would agree that Ridge has many years of experience

1    engineering products using those unique composites, doesn't it?

2    A.    Yes.  That's their business.

3    Q.    Okay.  And you, sir, you don't have any personal

4    experience creating products using those composites, do you?

5    A.    No.

6    Q.    Okay.  And does KNL have any prior experience creating

7    products using those composites?

8    A.    No.

9    Q.    You testified that Ridge Corporation wanted to do

10   testing, right?

11   A.    They said they would have to do testing on the door.

12   Q.    And you said that you didn't want to do that testing.

13   Is that fair?

14   A.    I didn't say I didn't want to do the testing.  It

15   just -- I did my own testing because it kind of shocked me.  So

16   I did my own testing in my barn.  And then it still bothered me

17   so I called the National Association of Trailer Builders and

18   asked the guy there if there is anything a rear door has to

19   hold back or anything like that.  The guy says, good question,

20   I'll call you back.

21         The next day the guy called me and said, Larry, I looked

22   it up for you.  There's no such thing as any testing on a rear

23   door.

24         I said, Why is that?

25         He says, The only testing on a semitrailer is the side

1  door or the side panels and the front.

2       I said, Nothing on the door?

3       He says, No, because you can't attach anything to a rear

4  door of a trailer.  He said, If you do, how you going to get it

5  open?  He says, There's no testing on a rear door.  All it does

6  is close up the back of the trailer, that's it.

7            MR. TACKETT:  I would move to strike that response.

8            THE COURT:  Overruled.  I think that Mr. Phlipot

9  answered your question but with a bit of editorializing, but

10  your -- the last clause of your question was "is that fair."

11  So that was open ended enough to solicit the kind of response

12  that you got.  So I'm going to let it stand.  But you certainly

13  may disaggregate elements of his answer and cross-examine him

14  on those disaggregated elements.

15            MR. TACKETT:  Understood and appreciate that.  Thank

16  you.

17  BY MR. TACKETT:

18  Q.   Mr. Phlipot, you would agree that Ridge Corporation

19  wanted to do more testing on the KNL door than you did, right?

20  A.   Yes, but they said we had -- an agreement that they had

21  said they had to do more testing.  They were going to send us a

22  proposal.  We rejected the proposal.  So nothing happened after

23  that.  They said they would have to do testing.

24  Q.   My question is different.  Would you agree that Ridge

25  Corporation wanted to do more testing than you wanted to do?

1    A.   At the time when they said that, I didn't do no testing.

2   I mean, I didn't -- when we talked to him, I did not do the

3   testing besides put it in the trailer and going up and down.

4           THE COURT:  To your knowledge, Mr. Phlipot, did Ridge

5   want to do more testing than either KNL or TTPS, to your

6   knowledge?

7           THE WITNESS:  They said they wanted to do more testing

8   on it, yes.

9           THE COURT:  Was that more testing that you as a

10   representative of KNL wanted to do?

11           THE WITNESS:  I would have done any testing there was.

12           THE COURT:  I understand that.  Mine is a slightly

13   different question.  So you have Ridge saying we want to do

14   more testing.  My question to you is that:  Is that more

15   testing than you wanted to do?

16           THE WITNESS:  I wanted to do at much testing as could

17   be done.

18           THE COURT:  Right.  And I understand that.  You told

19   me that.  But my question is, if we put -- if we stack the two

20   against each other, did you want to do more testing than Ridge?

21   Or did Ridge want to do more testing than you?

22           THE WITNESS:  That's hard to explain because --

23           THE COURT:  I'm going to give you an opportunity to

24   explain it but you got to answer it first.  You got to answer

25   the question as asked, Mr. Phlipot.

1      THE WITNESS:  Okay.  So they wanted to do more testing

2  than me at the time, yes.  They wanted to do more testing.

3      THE COURT:  Than you wanted?

4      THE WITNESS:  Than I did or wanted, yes.

5      THE COURT:  All right.

6      MR. TACKETT:  Thank you, Your Honor.

7  BY MR. TACKETT:

8  Q.   You testified yesterday, sir, that you have never

9  created or developed a product that you commercialized with an

10 original equipment manufacturer.  Do you remember that?

11 A.   Yes.

12 Q.   Sir, are you aware and do you understand that to scale

13 and commercialize a product for large scale distribution with

14 an OEM, you have to have quality control and you have to have

15 process control?

16 A.   I never knew that.

17 Q.   And part of that process, sir, do you understand is

18 repeated controlled testing?  Do you understand that?

19 A.   Yes.

20 Q.   You have testified, sir, that you are one of three

21 inventors of the KNL door that you're using, correct?

22 A.   Yes.

23 Q.   What was your specification for the skin of that door?

24 A.   Repeat that.

25 Q.   Yes, sir.  You've testified that you're one of three and

1  only three inventors on the KNL door.  What was your

2  specification for the skin of the door?

3  A.    That it be a polypropylene fiberglass skin is what I

4  wanted on the door.  Flexible.  Is that what you're asking?

5  Q.    I think you've answered the question.  Did you dictate

6  to Ridge exactly how that skin needed to be made up?

7  A.    We talked with Ridge on the skin and how it's laid out,

8  yes.

9  Q.    How many different versions of the door skin did KNL and

10 Ridge go through together?

11 A.    It took us eight door blanks to get the door blank that

12 I needed.

13 Q.    And through that process of doing and redoing the skin,

14 it was Ridge doing that work, wasn't it?

15 A.    Yes.  We've asked them if they could remove layers out

16 and reorganize where the glass is laid in the door, yes.

17 Q.    Would you agree that you did not design the

18 thermoplastic skin?

19 A.    No, I did not design that skin.

20 Q.    Now, you had -- you gave some testimony about a first

21 meeting between your brother Jeff Phlipot and Ridge

22 Corporation.  Do you recall that?

23 A.    Yes.

24 Q.    You were not in the room at that meeting, were you?

25 A.    No.

1    Q.   So you were not in the room to know whether or not Ridge

2    told your brother Jeff Phlipot that he needed to make cuts in

3    the door panel, were you?

4    A.   The meeting that -- I don't know the first meeting when

5    he went up to see a process and talk about the material.  I

6    don't know what was said in that meeting.

7    Q.   Okay.  Thank you.  Would you agree that you have no

8    expertise or experience interpreting patents?

9    A.   I agree.

10   Q.   Okay.  Sir, do you have any formal education beyond high

11   school?

12   A.   Just high school and then I did take some evening

13   classes in machine trade and auto body.

14   Q.   Mechanical trade courses?

15   A.   Just machine trades is the only trade I took besides

16   auto body, yes.

17   Q.   Now, isn't it true that you were not in the meeting

18   between KNL and Ridge when Ridge advised KNL to make grooves,

19   slash, relief cuts wider?

20            MR. KOLTAK:  Objection.

21            THE COURT:  Basis?

22            MR. KOLTAK:  Assumes a false narrative.

23            THE COURT:  I disagree.  If that is not his

24   recollection, he can simply answer.  The objection is noted but

25   overruled.

1          You may answer, Mr. Phlipot.

2          THE WITNESS:  That he asked to have the grooves made

3    wider?  Like I said, I was not in that meeting to tell you if

4    he asked to make it wider or not.

5    BY MR. TACKETT:

6    Q.   Okay.  As an alleged inventor, what would you say would

7    be the impact of having a wider groove versus a more narrow

8    groove?

9    A.   I know at one time I routed an inch-and-an-eighth

10   groove.  And I thought that gave too much flexibility.  So I

11   kept narrowing my grooves down, and I also went down to

12   three-quarter inch groove.  Well, that was too tight.  So now

13   I'm operating at the groove I use now which is 15/16th, in that

14   neighborhood.  Between 15/16th and an inch is what I run in the

15   door right now.

16   Q.   Sir, you did not answer my question, respectfully.  What

17   was the effect of a wider groove?

18   A.   It makes it too flimsy.

19   Q.   I'm sorry.  A wider groove makes it too flimsy?

20   A.   Yes, because the weight on the door makes it buckle out

21   more.

22   Q.   Isn't it true that making a groove wider can relieve

23   stress on the door panel?

24   A.   Yes, it would relieve stress.

25   Q.   Okay.  On direct, you admitted that the Cold Chain

1    patent does not include any specifications of how wide the

2    thermoplastic skin needed to be and how wide the foam layer

3    needed to be, correct?

4       A.    Correct.

5       Q.    On direct you testified that Ridge Corporation's

6    director of engineering, Bret Moss, came out to KNL relating to

7    the work Ridge and KNL were doing on the door, correct?

8       A.    He was out there.

9       Q.    And you were not in the meeting that day when Bret Moss

10   was helping Jeff Phlipot with continued revisions to the unique

11   composite skin on the KNL door, were you?

12      A.    No.

13      Q.    And are you aware -- strike that.  Would you agree that

14   in the continued development process of the KNL door that we're

15   talking about, that there were calculations to determine the

16   amount of stress on the door panel at different widths of

17   groove cuts?

18      A.    No.

19      Q.    You're not aware?

20      A.    No.

21      Q.    Would you agree that there would need to be calculations

22   of the degree of stress on the door panel relative to the

23   groove cuts?

24      A.    No.

25      Q.    Why not?

1    A.   Because I done everything I done.  I did trial and

2    error.

3    Q.   And would you be familiar with the unit of measurement

4    that would reflect a calculation of stress on the door panel

5    while traversing the track in the door frame?

6    A.   No.

7    Q.   Are you familiar with what the terminology would be for

8    that type of stress on the door panel?

9    A.   No.

10   Q.   Are you familiar with the term flexural stress?

11   A.   No.

12   Q.   Okay.  And as we sit here today with what you think is a

13   complete design of the KNL door, do you know what the

14   acceptable flexural stress range on the panel would be?

15   A.   I was told by somebody as long as I didn't go over

16   27 percent of the curve that the panel will never break.

17   Q.   I'm not asking --

18   A.   Otherwise, I don't know.  That's the only thing I've

19   been told.

20   Q.   And you were told that by someone else, correct?

21   A.   Yes, by someone else.

22   Q.   But you don't know what the acceptable stress level

23   number would be as expressed in pounds per square inch, do you?

24   A.   No.

25        MR. TACKETT:  No further questions.  Thank you.

1          THE COURT:  Mr. Koltak, any redirect?

2          MR. KOLTAK:  No, Your Honor.

3          THE COURT:  Mr. Phlipot, thank you very much, sir.

4    You may be excused.

5          MR. KOLTAK:  Your Honor, if I may, Mr. Phlipot spent

6    the majority of the last few days sitting out in the hall.  I

7    didn't know if he was potentially going to be called again.

8          THE COURT:  Do you anticipate calling him again?

9          MR. TACKETT:  No, Your Honor, we certainly do not.

10          THE COURT:  Mr. Phlipot, you're free to remain in the

11    courtroom if you'd like.

12          Your next witness.

13          MR. BURTON:  Yes, we'd like to call Jeff Phlipot.

14          THE COURT:  Mr. Jeff Phlipot, you're still under oath.

15    Please resume the stand.

16                          - - -

17                      JEFFREY PHLIPOT

18     Called as a witness on behalf of the Defendants, being

19    previously first duly sworn, testified as follows:

20                      DIRECT EXAMINATION

21     BY MR. BURTON:

22     Q.   Mr. Phlipot, what is your position with KNL?

23     A.   CEO.

24     Q.   What's your position with TTPS?

25     A.   President.

1    Q.    How long have you been with KNL?

2    A.    The last stint or the one right now?

3    Q.    Let me go back to the beginning.  When did you first

4    start working for KNL?

5    A.    1979.

6    Q.    How long did you work for them after 1979?

7    A.    I worked for them for 14 years.

8    Q.    Did you go to some other position?

9    A.    I left and went and worked on heavy equipment.

10    Q.    When did you come back to KNL?

11    A.    I should say after I left the heavy equipment, I bought

12    a marine dealership.  But went back to KNL in 2002.

13    Q.    In what capacity did you join KNL?

14    A.    Director of maintenance.

15    Q.    What has been the positions you've held in your career

16    with KNL since then?

17    A.    Director of maintenance.  Then I went to president, and

18    then I went to COO, and then I bought the company in '08.

19    Q.    Since you bought the company, what's been your position?

20    A.    CEO.

21    Q.    And you had some testimony about the relationship or

22    interrelationship between TTPS and KNL.  Which of the companies

23    sells the -- or sell the single panel roll-up door?

24    A.    Well, we both do.  But I guess when you look at it, TTPS

25    actually sells it to Kirk, and then Kirk resells it, or TTPS

1    will sell it directly to a customer.

2    Q.   Do both at times sell the single panel roll-up door?

3    A.   Yes.

4    Q.   Backing up for a minute.  Can you explain what KNL's

5    business is?

6    A.   KNL's actually short for Kirk National Lease.  So the

7    national lease -- we're part of the national lease system and

8    we lease semi-trucks, trailers, straight trucks, and we also

9    maintain -- we have maintenance contracts on larger fleets.

10   Q.   Do you know which of the companies sold the first single

11   panel roll-up door that you made between TTPS and Kirk National

12   Lease?

13   A.   It would have been Kirk National Lease.

14   Q.   When was that?

15   A.   Somewhere around April of '22, maybe May.

16   Q.   Who was that sale to?

17   A.   I think the first one went to Coke.

18   Q.   Was that sale on a trial basis?

19   A.   Yeah, we put the door in.  They were going to run it,

20   test it for us, let us know what they thought of it.  And we

21   had the agreement with them if it didn't work or they didn't

22   like it, we'd take it back out because it's pretty hard to

23   convince them to try it.

24   Q.   What happened with that sale?

25   A.   They ran it for about four days, and they called up and

1   said just go ahead and bill us for the panel.

2      Q.   How many single panel roll-up doors have been sold to

3   date by either company?

4      A.   About 170-some I think was on the sheet.

5      Q.   If you could turn or look on the screen at Defendant's

6   Exhibit 111.  We'll try and make that a little bigger.

7           When you said the sheet, what were you referring to?

8      A.   Please?

9      Q.   You said it's on the sheet.  I was asking what you were

10  referring to.

11     A.   Excel spreadsheet that we sent in.

12     Q.   Does Exhibit 111 reflect the number of total sales?

13     A.   I think if you scroll down to the bottom a little bit

14  further.  Because it doesn't actually total up at the bottom on

15  this one.  There it is.  177.

16     Q.   If you keep it on that page.  And you agree that that's

17  accurate, 177 sales?

18     A.   Yes.

19     Q.   If you keep it on that page and look at the column

20  June -- or the row June '23, how many sales were made in that

21  month?

22     A.   Forty-one.

23     Q.   Was that your biggest month for sales to date?

24     A.   It looks like August is -- total-wise, you're right.

25  Yes, that's the biggest.

1    Q.    And the total is what for June?

2    A.    For June?  Forty-one.

3    Q.    And what do the other two columns that add up to 41

4    after that signify?

5    A.    Well, the 32 is -- at the top sheet it will show Coke,

6    and then the nine is other customers.  Coke is -- used in the

7    door in quite a few of the different locations across the

8    country to see how it's going to hold up.

9    Q.    How did the concept of the single panel roll-up door

10   come about?

11   A.    It came about like you heard in earlier testimony.  We

12   were -- we designed and built a roller for a trailer,

13   self-unloading trailer, for Miller Brewery.  They -- it's kind

14   of when they approached us on the Miller Brewery side of it to

15   build the trailer.  First of all, we built the roller floor

16   trailer because the ones they were using, they didn't like the

17   way they were built.  So they asked us if we could design a

18   trailer that -- for the roller floor.  And about six months

19   after we did that, then he wanted us to make it automated.  And

20   at that point, I thought yeah, right.  But that's what they

21   wanted and that's what we did.  And we have a patent on that.

22         But about two years after that they -- when those were

23   in, they come to us and asked if we could create a door that

24   they wouldn't have to open the swing doors and back in the dock

25   and leave the trailer open till they -- till it was unloaded or

1    whatever.  The challenge that it come up with was to clear 108

2    and a half inches.  That's how tall the cans were.  When you're

3    looking at a trailer, the inside is roughly 111.  The frame of

4    the trailer for the door frame is about 109 and three quarters.

5          So you don't have much room to hide a track or operator

6    or anything else up in there.  But we just took it on.  And I

7    guess it set in the back burner for three months and -- we was

8    working on a Honda project and we got it from Lakeshore but it

9    was a ceiling liner from Ridge.

10         When we were installing that, I just noticed when we

11   would attach it to the roof, the way that it sagged down and

12   the --

13   Q.   The way that what sagged down?

14   A.   The ceiling liner.  It flowed down, nice curve.  You

15   shove it up and straighten up, and it had some really, really

16   strong features about it.  So at the end of the roll that we

17   received, we cut it off and we tried to actually make a -- I

18   should say Larry tried to make a door out of it.

19   Q.   Would that have been a single panel door?

20   A.   Yes.

21   Q.   Was that successful?

22   A.   No.  We -- if you look at your window channel in the

23   car, we were actually going to use some type of felt in the

24   C-channel.  When we did that and made the frame for the track

25   going up -- because the nice thing about that panel, it was

1    thin.  So it was really easy to get the height we needed.  The

2    problem was it was a little flimsy.  And the second thing we

3    ran into, during the winter if you would get water inside that

4    felt, it would freeze and nobody is going to open the door.  So

5    we kind of abandoned that.

6    Q.    How did you come up with a material that -- different

7    from that to use in your single panel door concept?

8    A.    Chris Fannin was a salesman for Ridge, and they come out

9    with what they call ogre which is a scuff liner.  It's -- from

10   my understanding, it's made from recycled material that's cut

11   off their panels.  But anyhow, he wanted me to see it because

12   it was extremely durable.  And so we started installing -- we

13   worked out and started installing the scuff liner into the

14   trailers, but he wanted me to come to Ridge and look at that

15   and see how it was produced.  He took me around and showed me.

16         During that first meeting there, we passed a sandwich

17   panel, and I asked Chris about it.  And he was telling me a

18   little bit about it.  And he gave me a scrap piece -- went to

19   somebody out in the plant and they went somewhere and picked up

20   a scrap piece and I brought it back.

21   Q.    What did he tell you about it?

22   A.    Just it was a sandwich panel.

23   Q.    Why were you interested in it?

24   A.    One thing, it was stiff.  And it basically -- might as

25   well just say it was a board.  Just the idea of what we were

1  trying to do with the ceiling liner would basically use the

2  outside skin or one of the skins of that panel as the ceiling

3  liner and rout the door -- the panel out to put grooves in it

4  to flex, bend, or whatever you want to call it.

5  Q.   Whose idea was it to use the grooves in the panel?

6  A.   Well, Larry messed around with it and started cutting on

7  that panel until he got something that would bend where we need

8  it to.

9  Q.   To back up a step, the scrap piece that you got from

10  Ridge, did it have grooves?

11  A.   No, just sandwich panel.

12  Q.   So a solid rectangle, is that --

13  A.   Yes.

14  Q.   What was the result of cutting the grooves in?

15  A.   Well, it gave enough relief in the panel to bend.

16  Q.   Did you develop a -- what you thought was a successful

17  model or --

18  A.   Yeah.  Larry built that.

19  Q.   -- whatever you call it?

20  A.   We put it into a track with brackets on it and just --

21  we wanted to make sure it would have enough -- would bend

22  enough to make the radius.

23  Q.   What did you -- from doing that process, what did you

24  find out?

25  A.   It worked very well.

1    Q.    Then what did you do?

2    A.    I took -- got ahold of Chris Fannin and he set a meeting

3    up at Ridge.

4    Q.    Did you bring the model?

5    A.    Yes.

6    Q.    What should we call that?

7    A.    I just call -- I just call it a mockup of a door.

8    Q.    For that -- did that meeting happen?

9    A.    Yes.

10   Q.    About what time did this happen, your approximation on

11   that?

12   A.    To be honest I really don't know if it was towards the

13   fall.  I would have to look at -- all the dates we've been

14   looking at the last couple -- this week, I really can't

15   remember if it was -- I'm not even going to guess.  I don't

16   know.

17   Q.    Can you guess a year?

18   A.    It would have been 2018.

19   Q.    All right.  Did you bring the mockup with you to that

20   meeting?

21             MR. TACKETT:  Objection.

22             THE COURT:  Basis?

23             MR. TACKETT:  Leading.

24             THE COURT:  I'm going to allow it.  Technically,

25   you're right.  I think it's probably more foundational than

1  anything.  So I'm going to allow the question to stand.

2      You may answer, Mr. Phlipot.

3      THE WITNESS:  Yes, I brought the mockup with me.

4    BY MR. BURTON:

5    Q.  What did you explain about it, if anything?

6      THE COURT:  Before you go on to that, what else did

7  you bring with you to the meeting, Mr. Phlipot?

8      THE WITNESS:  That was it.

9      THE COURT:  Just the mockup?

10      THE WITNESS:  Yes.

11      THE COURT:  Did anyone ask you to bring the mockup to

12  the meeting?

13      THE WITNESS:  No.

14      THE COURT:  It was your decision to do so?

15      THE WITNESS:  Yes.

16    BY MR. BURTON:

17    Q.  Can you tell me what you talked about at that meeting?

18    A.  I think I testified earlier that when we went into the

19  meeting, Chris Fannin, and I know Zach was in there, and Bret I

20  believe was in there.  And it was just to show them the panel,

21  whether they could engineer a panel to work for the concept

22  that I wanted, to make a door out of it.

23    Q.  What did you expect Ridge to do for you?

24    A.  To make me a panel.

25    Q.  Had you made any decisions about how many grooves should

1  be on it or where the grooves should be at that point?

2  A.   No.

3  Q.   Did Ridge help you in arriving at that -- at that -- at

4  a final decision of where the grooves should be in the panel?

5  A.   The first panel I think we got from them was exactly the

6  same type of panel that I made the mockup out of.  The mockup

7  was only about a foot wide.  I should say Larry made the

8  mockup.  The mockup was about a foot wide and probably three

9  feet long or somewhere in there.  I think we had four or five

10  rollers and we run it through the track.  When we made the

11  panel the size of a regular door and we installed it into the

12  trailer, the first time they went to close the door, the door

13  got about halfway down the track and then the panel had so much

14  memory, it come back up and it actually literally shot out the

15  back of the track.  So at that point, we went back to Ridge

16  on -- to change the panel.

17  Q.   Change the panel in what way?

18  A.   Whether they were going to -- recommendations to sit

19  there and try to make the panel so it would be easier to bend.

20  Q.   Did "it make it easier to bend" involve any work by

21  Ridge on optimizing where the grooves should be on the panel?

22  A.   No.  Because the next several panels we got from them

23  while we were working on them came with no grooves.

24  Q.   How would you describe generally Ridge's role in the

25  development process for the single panel roll-up door after

1   that first meeting that you mentioned?

2   A.   I would say that they -- their part of it was to make

3   their product work for the idea that I had.  And I said they

4   got a very good product and it did work very well.

5   Q.   When you say "their product," what do you mean?

6   A.   The door, sandwich panel.

7   Q.   Now, did Ridge send invoices to TTPS or KNL during the

8   development process for their work on the door?

9   A.   The only panel I didn't pay for is the one they gave me

10  at the very beginning, the scrap piece.

11  Q.   If you could look at Plaintiff's Exhibit 7.  Can we

12  bring that up on the screen?

13       I'd like to look at the last page of that exhibit.  Do

14  you see at the top there, Mr. Phlipot, a July 23, 2021, email

15  from you to Mr. Grandominico?

16  A.   Yes.

17  Q.   It says:  Gary, good afternoon.  After many attempts, we

18  have the roll-up door working.  Actually, it works great.

19  Would you like to -- would like to sit down with you to start

20  the paperwork to lock this down, the patent, IP, dot dot.

21       So let me ask you, when you say we have the roll-up door

22  working, what were you referring to there as far as working?

23  A.   We had the first door actually inside a trailer, that it

24  operated functionally.  We ran it through a winter, no

25  cracking.  We had a customer take it and use it for a little

1    bit to make sure we were going to have no issues with it.

2    Everything worked.  And so that's why it worked very well.

3    Q.   Why were you willing to sit down and start the

4    paperwork?

5    A.   As I mentioned earlier, we designed a self-unloading

6    trailer.  We used many vendors to make parts for us.  And we

7    sat down with each one of those vendors because we had to make

8    trays for the roller and it had to be a certain design to work

9    to keep our clearance.  The rollers had to carry a certain

10   amount of weight.  They had to be a certain diameter.  We sat

11   down with Rolcon in Cincinnati.  They drew up all the plans for

12   us.  Selmco in Sidney drew all that.  Allied drew up everything

13   for us on the drive system that we built and designed.  And

14   when we went to the patent for that, it was the same thing, to

15   get all the paperwork that we would need for Andrew to file a

16   patent on it.

17   Q.   Are you talking about something other than the work on

18   the roll-up door?

19   A.   Yes.  That was a self-unloading trailer that we did that

20   for.

21   Q.   Was that before this July 23rd, 2021, time frame?

22   A.   Yes.

23   Q.   So what kind of information were you looking for from

24   Mr. Grandominico or Ridge?

25   A.   They took their panel and they made their panel work for

1  the application.  If there was something special about the

2  panel, the design, how it had to work for what we were using it

3  for, my look was to lock it down so nobody could come in behind

4  us and say, well, I changed this on it or I changed this on it

5  and it made it a different product.

6     Q.   Did Ridge sell panels to KNL or TTPS for use in

7  commercially sold single panel roll doors?

8     A.   You're asking if they sold us panels?

9     Q.   Yes.

10    A.   Yes.

11    Q.   Do you know how many?  Let me amend the question.  How

12  many commercially sold single panel roll doors went out the

13  door from TTPS or KNL with a Ridge panel in it?

14    A.   Somewhere around 32.

15    Q.   We're talking about the first commercially sold panel to

16  Coke, was the panel on that door supplied by Ridge?

17    A.   Yes.

18    Q.   Did there come a time when KNL and TTPS stopped using

19  Ridge as the supplier of panels for the single panel roll-up

20  door?

21    A.   Yes.

22    Q.   Let's look at Defendant's Exhibit 114.  This looks like

23  an email with a document behind it, Mr. Phlipot.  But can you

24  tell us specifically what this is?  It's in our book, too, if

25  you want to look at all three pages.

1    A.    I'm really not for sure what it's referencing.

2    Q.    You want to look at the second page, then?  Have you

3  seen this document before?

4    A.    Corporate agreement.  No.

5    Q.    You don't remember seeing it?  Can we go back to the

6  previous page?  This is an email from Gary Grandominico to you.

7  Do you recognize it as that?

8    A.    Yes.

9    Q.    It's dated June 8th, 2022?

10    A.    Yes.

11    Q.    And you say you don't recall seeing this cooperative

12  agreement that's the second page?

13    A.    I don't remember it.

14    Q.    If we look at exhibit -- look at Defendant's

15  Exhibit 118.  Can you tell me what we're looking at in

16  Defendant's Exhibit 118?

17    A.    At the time we already filed for the patent, and Gary

18  wanted the rights to the patent.  And I talked with Larry and

19  Mark, and at the time we're not ready to give exclusive -- or

20  sell the exclusive rights to the patent.

21    Q.    This is -- is this an email from you to

22  Mr. Grandominico?

23    A.    Yes.

24    Q.    And the date is what?

25    A.    September 12th.

1    Q.    What year?

2    A.    2022.

3    Q.    And can you look at the first couple of sentences and

4    the reference to exclusive rights?

5    A.    Yes.

6    Q.    Why were you talking to Mr. Grandominico about exclusive

7    rights?

8    A.    Because earlier when we met with them, Gary put a

9    presentation together for -- for them to either acquire the

10   rights or to -- to the patent.

11   Q.    Is this email in response to Mr. Grandominico about

12   exclusive rights to the patent?

13   A.    Yes.

14   Q.    And what was your position on that?

15   A.    At the time we weren't ready to do that.

16   Q.    Does that mean you would have considered doing it later?

17   A.    Yes.

18   Q.    At the time when you wrote this letter, what were --

19   your thinking might be that would change the equation where you

20   would be interested?

21   A.    Gary put a proposal together and gave to us.  The first

22   proposal that he sent was offering us a million dollars over

23   eight years off of royalties.  Not knowing whether that is a

24   fair price or not, thinking that we would hold onto it, work

25   with them.  If it became a better value, if everything worked,

1 the door worked out great, then at that time it might be a

2 greater value.

3    Q.    If you could look at Defendant's Exhibit 121.  Do you

4 recognize this document, Mr. Phlipot?

5    A.    Yes.

6    Q.    This is an email.  It says it's an email from

7 Mr. Grandominico to you dated September 29, 2022; is that

8 correct?

9    A.    Correct.

10    Q.    Do you recall receiving this email?

11    A.    Yes.

12    Q.    Do you know what -- tell me what the subject matter of

13 this email is talking about.

14    A.    They were going to pursue whatever it took to challenge

15 the patent, I guess, is what they were looking for.

16    Q.    Challenge the patent in what way?

17    A.    To get their name on it.

18    Q.    Is this the first time Mr. Grandominico raised this

19 issue with you?

20    A.    No.

21    Q.    When did he first raise it?

22    A.    I don't know if it was in an email, but it was after we

23 already filed for the patent.

24    Q.    What was your response to this letter, this email?

25    A.    Well, I just passed it on to our attorneys.  But I just

1  rejected it.

2   Q.   Why is that, aside from any legal advice?  Was there a

3  reason that you rejected it?

4   A.   We just weren't ready to do anything with the rights to

5  the patent yet.

6   Q.   Did you understand Mr. Grandominico to be saying that

7  Ridge had some inventorship interest in the application you

8  filed?

9   A.   Yes.

10   Q.   What was your reaction to that?

11   A.   On the inventorship side of it, I looked at -- we went

12  to Ridge with the idea, with the concept, how we wanted it, to

13  bring in a mockup.  I thought that was the whole idea of the

14  patent, who thought of it, who brought it fruition, basically,

15  no matter if -- whatever vendor you used to make the pieces you

16  need.  Like I said on the rollers on the self-loading trailer,

17  not one of those companies come to me and said, Jeff, our name

18  has got to be on that patent.

19       They made a panel.  They made a very good panel.  It

20  worked very good.  It could have been a long, long

21  relationship.  I had no thoughts or ambitions of going anywhere

22  else with it.

23   Q.   Was Ridge the only supplier of panels to TTPS and KNL at

24  that time?

25   A.   Yes.

1    Q.    Were you willing to continue with them as the supplier?

2    A.    Yes.

3    Q.    Did you make that position -- did you convey that

4    position to Mr. Grandominico?

5    A.    Yes.

6    Q.    What was his reaction?

7    A.    No.

8    Q.    Did you switch suppliers at that time?

9    A.    We did switch after that time, yes.  It took a while.

10   Q.    Who did you switch to?

11   A.    Altum.

12   Q.    Why Altum?

13   A.    They were one of the first ones that come to us with a

14   panel that worked.

15   Q.    When you say one of the first ones, did you look at more

16   than one company to be a replacement supplier for Ridge?

17   A.    Yes.  Impact Guard made panels, US Liner, Tuck Modal,

18   Altum.  And Avient never made a panel.  They backed out at the

19   beginning.

20   Q.    Did you contact all the companies you went to?

21   A.    Yes.

22   Q.    Did some of them make a panel or supply you with some

23   kind of demonstration panel?

24   A.    Yes.  I got a building full of panels to test.

25   Q.    So why did you go with Altum?

1    A.    Theirs was the only one that worked.  Some of the other

2    companies are still sending us panels or trying to get to it.

3    Q.    Before September 2022 time frame, had you heard of Altum

4    before?

5    A.    No.

6    Q.    Is Altum the supplier that TTPS uses today?

7    A.    Yes.

8    Q.    That's a supplier of panels?

9    A.    Yes.

10   Q.    Does it come in with grooves cut in it?

11   A.    No.

12        THE COURT:  Mr. Burton, the last four or five

13   questions have been leading, and I want you to discontinue that

14   line of questioning.  Let him tell us.  Rephrase your question.

15   BY MR. BURTON:

16   Q.    Tell me what Altum sends you as a supplier.

17   A.    At the very beginning, they sent us a sandwich panel

18   which was -- it was a seam panel.  At that point, I think they

19   only had the capability of doing 30 inches of width of a panel

20   at a time.  So they would seam the panels together to give us

21   our height we needed.

22   Q.    Currently, what does Altum send you?

23   A.    Right now, they're making us a continuous panel.

24   Dominic redesigned their machine that they make the panels

25   with.  And now they can make a continuous panel without seams.

1    The seams caused issues because we couldn't rout in the seams.

2    Every time we would try to rout and test a door a different

3    size, we had to shift the panel up and down.

4         So to not create waste -- because Dominic can take a

5    30-inch panel, and to save waste, he can cut that 30-inch panel

6    into like 15 inches, seam that to it, use that next 15 inch

7    onto the next panel.  When he first gave us the first couple of

8    panels, we wasted so much out of those panels, it was costly.

9    Q.   When TTPS receives a panel from Altum, what is the next

10   step?  What do you do with it?

11   A.   We bring it in and we rout it, set the router up for

12   whatever size door.  Larry does most of that.

13   Q.   And what is the router used for in relation to the Altum

14   panel?

15   A.   To cut the grooves out to give it -- so we can bend it.

16   Q.   I'd like you to look at Defendant's Exhibit 124.

17        THE COURT:  Can I see you at sidebar and -- you,

18   Mr. Tackett.  Mr. Burton and Mr. Tackett.

19     (Thereupon, Court and Counsel conferred out of the hearing

20   of open court and off the record.)

21        THE COURT:  We're going to stop here for the day.

22   We're going to resume at two o'clock and work tomorrow until

23   we're done.  Thank you very much, everyone.

24        Mr. Phlipot, you may be excused.

25     (Proceedings concluded at 11:59 p.m.)

1                              – – –

2                        WITNESS INDEX

3                              – – –

4        WITNESSES          DIRECT   CROSS   REDIRECT   RECROSS

5        PLAINTIFF'S:

6        Gary Grandominico    387     392       417
         (By Mr. Koltak)              413

7

8                              – – –

9        DEFENDANT'S:

10       Larry Phlipot        426     449
         Jeffrey Phlipot      459

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                            s/Shawna J. Evans_____
                              Shawna J. Evans, RMR, CRR
12                            Official Federal Court Reporter

13

14                            October 12, 2023

15

16

17

18

19

20

21

22

23

24

25